Agreed-Upon Redacted Copy - May be Made Public

**REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

RECEIVED
OVER THE COUNTER
JUL 25 2007
THE OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

OSG PRODUCT TANKERS LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Case No. 07-561 C

**FILED UNDER SEAL: REQUEST FOR PROTECTIVE ORDER PENDING**

## COMPLAINT

This case involves a competitive procurement conducted by the Military Sealift Command ("MSC") of the United States Department of the Navy for the replacement and long term time-charter of two U.S. flag, clean product T-5 tankers ("T-5 Tanker Replacement Procurement"). The lowest priced, technically acceptable offeror is OSG Product Tankers LLC ("Product Tankers"). However, MSC notified Product Tankers on July 6, 2007 that it found Product Tankers non-responsible for this contract award for various reasons related to one of its ultimate parent companies, Overseas Shipholding Group, Inc. ("OSG"), and awarded the contract to the second lowest bidder, USS Product Carriers LLC, a subsidiary of U.S. Shipping Partners L.P. (collectively referred to herein as "USS").

Product Tankers alleges the following in support of its Complaint for declaratory and injunctive relief and damages against the United States of America:

## THE PARTIES

1. Plaintiff, Product Tankers, is an indirect subsidiary of OSG, established in Delaware and headquartered in Tampa, Florida.

2. Defendant is the United States of America.

REDACTED VERSION

The cognizant Contracting Officer for the contract at issue is:

Diana Fischer
Contracting Officer
Department of the Navy
Military Sealift Command
Washington Navy Yard
914 Charles Morris Court, S.E.
Washington, D.C. 20398-5540
Telephone: (202) 685-5833
Facsimile: (202) 685-5887
Electronic Mail: Diana.fischer@navy.mil

## JURISDICTION

3. The United States Court of Federal Claims has jurisdiction over this action pursuant to The Tucker Act, codified at 28 U.S.C. § 1491(b) (2000).

## STATEMENT OF FACTS

### I. BACKGROUND ON OSG AND PRODUCT TANKERS.

4. OSG is a global energy transportation company that was incorporated in 1969 and currently trades on the New York Stock Exchange. In addition to its corporate headquarters in New York, OSG has additional offices around the globe – Fort Lauderdale, Houston, Philadelphia and Tampa domestically, and in Athens, Greece; London and Newcastle, England; Manila, The Philippines; Montreal, Canada; and Singapore internationally. Its commercial customers are primarily oil companies, including the oil majors. Due to the international nature of its business, OSG operates vessels worldwide, with crews consisting of both U.S. and international citizens, depending on the flag of the vessel. OSG vessels are documented in both the United States ("U.S. flag vessels") and in foreign countries ("international flag vessels"). Currently, OSG operates over 100 vessels and employs over 3,900 people worldwide.

5. OSG's U.S. flag vessels, built in compliance with the Jones Act, operate under different legal entities than its international flag vessels. The Jones Act restricts the carriage of goods



FILED UNDER SEAL: REQUEST FOR PROTECTIVE ORDER PENDING

**REDACTED VERSION**

between points in the United States to vessels that are owned by citizens of the United States and that have a certificate of documentation issued by the United States Coast Guard ("USCG") with a coastwise endorsement. 46 U.S.C. § 55102(b). To be a U.S. flag vessel eligible to provide services in the Jones Act trade, the vessel must be built in the U.S. (id. at § 67.19(c)) and the company must meet certain U.S. citizenship requirements (referred to as "Section 2 citizenship"), including that the company is domiciled in the U.S., managed by U.S. citizens, and has 75% or more U.S. ownership. Id. at § 67.39. The officers and crewmembers of U.S. flag vessels must also be U.S. citizens. As a result, OSG keeps its international and U.S. flag vessel operations separate from one another.

6. Product Tankers is one of OSG's U.S. flag vessel operating entities. Product Tankers is an indirect subsidiary of OSG, with 75% of the company owned by OSG Product Tankers I LLC and 25% of the company owned by Aker American Shipping, Inc. ("Aker"), a leading builder of U.S. flag vessels. Product Tankers is a subsidiary of OSG Product Tankers I LLC, which is a subsidiary of OSG Product Tankers II LLC, which is in turn a subsidiary of OSG Product Tankers Corporation, which is a subsidiary of OSG Bulk Ships, Inc., a subsidiary of OSG. Product Tankers operates out of OSG's Tampa, Florida offices, where only U.S. flag vessels are managed.

## II. OSG'S RECENT CONVICTIONS AND RESOLUTION OF CONCERNS RELATING TO ITS PRESENT RESPONSIBILITY.

7. In July 2006, OSG was indicted in the Eastern District of Texas for violations related to one of its international flag vessels ("Indictment"). In December 2006, OSG entered into a plea agreement with the United States Department of Justice ("DOJ") and six U.S. Attorney's Offices – the Central District of California, the Northern District of California, the District of Maine, the District of Massachusetts, the Eastern District of North Carolina and the Eastern District of

REDACTED VERSION

Texas – to plead guilty to violations related to the handling of bilge water and oily mixtures from the engineer rooms on twelve of its international flag vessels ("Plea Agreement").

8. The criminal violations to which OSG pleaded guilty involved the operation of twelve international flag vessels operated by OSG Ship Management (UK) Ltd. and OSG Ship Management (GR) Ltd., both of which are ultimately owned and controlled by OSG. These entities operate international flag vessels in international trade.

9. None of OSG's fleet of U.S. flag vessels or U.S. crews were involved in the environmental infractions, nor did the infractions involve Product Tankers.

10. The Plea Agreement required OSG to enter pleas in two different jurisdictions, one in the U.S. District Court for the Eastern District of Texas, and a second, consolidating the charges in the remaining five jurisdictions, in the U.S. District Court for the District of Massachusetts. The plea to some of the charges in the Indictment and to others in a criminal information was entered in the U.S. District Court for the Eastern District of Texas on January 23, 2007, and OSG was sentenced on June 20, 2007. Informations, related to the charges in the five other jurisdictions, were filed in the U.S. District Court for the District of Massachusetts, and OSG's plea was entered on March 21, 2007. The sentence and judgment related to this plea was issued on May 25, 2007. As one of the counts included a Clean Water Act ("CWA") violation aboard the *Motor Tanker* ("*M/T*") *Overseas Neptune*, an international tanker flagged in the Marshall Island and crewed by an international crew, that vessel was statutorily debarred upon judgment on May 25, 2007 and posted on the Excluded Parties List.

11. The Plea Agreement required payment of a significant fine, funding of various community service projects, and a three-year probationary period, which included as conditions of probation, compliance with the terms of a comprehensive Environmental Compliance Plan



FILED UNDER SEAL: REQUEST FOR PROTECTIVE ORDER PENDING

**REDACTED VERSION**

("ECP") to be carried out fleet-wide, and oversight by a Court Appointed Monitor, who will report to the U.S. District Court for the District of Massachusetts. This ECP was approved by DOJ and USCG, and OSG volunteered to have the ECP cover the entire OSG fleet of both U.S. flag and international flag vessels; not just those ships calling at U.S. ports as is customary. As reflected in the Appendix to the ECP, a large portion of the plan had already been satisfactorily implemented at the time the ECP was approved. See generally, Appendix to the Environmental Compliance Plan (Exhibit A). In recognition of the work that had already been completed, the Government agreed that the length of the probation was appropriately three years instead of the potential maximum of five years.

12. OSG's probation began on May 25, 2007, simultaneously with the entry of judgment in the U.S. District Court for the District of Massachusetts. Under the Plea Agreement, probation will terminate on May 24, 2010, over four months prior to the beginning of vessel operations under the T-5 Tanker Replacement Procurement.

13. The federal agencies, including the Department of the Navy, determined and agreed that the United States Maritime Administration ("MarAd") would serve as the lead agency in any administrative action regarding discretionary suspension or debarment from federal contracts under the Federal Acquisition Regulation ("FAR") and grants, loans and other federal assistance under the non-procurement regulations, also known as the Common Rule. See FAR Subpart 9.4; 2 C.F.R. Part 180. Both of these regulations provide that where more than one agency has an interest in suspension or debarment of a company, a lead agency can be designated to make the decision to suspend or debar or take some other action for all agencies. See e.g., FAR 9.402(c). Under reciprocity rules, a debarment or suspension is effective under both the procurement and non-procurement regulations. See e.g., id. at 9.401. The United States Environmental Protection



**FILED UNDER SEAL: REQUEST FOR PROTECTIVE ORDER PENDING**

Agency ("EPA"), however, retained jurisdiction over the statutorily mandated exclusionary action under the CWA against the one international flag vessel, the *M/T Overseas Neptune*, that was involved in the single CWA violation.

14. As part of MarAd's extensive investigation into whether it was necessary to debar OSG or any of its operating entities, or whether OSG could demonstrate its present responsibility as provided for in the regulations, the agency reviewed the Plea Agreement, including the ECP, the accompanying Joint Factual Statement ("JFS") that both OSG and the Government agreed set out the facts associated with the violations, and the various criminal informations and the one Indictment issued against OSG. OSG also met with MarAd and EPA at a joint meeting on April 18, 2007, and provided both agencies with information addressing the violations, and describing OSG's cooperation with the Government's investigations and detailing the significant remedial actions that it had taken to prevent future violations. In addition to this oral presentation, OSG provided extensive written materials and documents addressing these matters.

15. Some of the mitigating factors and remedial measures that OSG undertook, which were discussed with MarAd and EPA, included:

a. Significant cooperation with the Government's investigations, including voluntarily disclosing violations concerning six vessels, half of the vessels for which pleas were entered;

b. Voluntarily producing for the Government thousands of pages of documents;

c. Waiving the attorney-client and work product privileges;

d. Making more than 70 crewmembers and shore staff available to the Government to be interviewed and/or testify, many of whom were outside the subpoena authority of the Government;

**REDACTED VERSION**

e. Paying wages, travel, lodging, and subsistence expenses for such crewmembers and shore staff when providing them to Government investigators or while they were detained at the Government's request;

f. Creating and implementing an internal and external audit program, whereby all of OSG's vessels received an initial environmental audit by December 15, 2006, the date the Plea Agreement was signed; and

g. Implementing numerous organizational, procedural and technical measures to ensure environmental compliance, several of which have been identified by DOJ and USCG as best-practices and which comprise the most comprehensive environmental compliance program in the industry.

16. On May 17, 2007, MarAd's Chief Counsel submitted to the MarAd Administrator the MarAd Report on Investigation and Recommendation regarding Debarment of Overseas Shipholding Group ("MarAd Report"), detailing her findings and recommending to the Administrator, acting as the Government's Debarring Official, that OSG not be debarred. See MarAd Report at 4 (Exhibit B). Rather, the Chief Counsel recommended that MarAd enter into an administrative compliance settlement agreement with OSG. See id. at 4.

17. During the investigation, in order to prepare the MarAd Report, MarAd's Office of Chief Counsel consulted with DOJ and USCG, the two agencies most actively involved in the criminal investigation and the negotiation of the subsequent Plea Agreement and ECP with OSG. See id. at 2. DOJ and USCG confirmed that:

> OSG cooperated to a great extent with the investigation and half the violations to which OSG pled were self-reported violations that occurred after the commencement of the investigation. OSG conducted its own internal investigation once it became aware of the misconduct and provided many of the results to the government, waiving privilege in some instances. OSG terminated the employment of the Chief Engineers involved, declined to reemploy some

> engine room personnel involved in the misconduct and took other appropriate personnel action against subordinates. Even so, OSG worked with DOJ to ensure that any employees it needed for the criminal investigation, including those OSG would otherwise have terminated, remained available for DOJ's use in the appropriate jurisdiction.

Id. at 3. Further, DOJ and USCG verified that OSG's environmental compliance initiatives, which formed the ECP, "were more extensive and comprehensive than any previous agreement [and would be] considered the benchmark by which future compliance plans will be measured." Id. (emphasis added). DOJ and USCG also opined that:

> OSG's significant cooperation in the investigation and self-reporting of half the violations to which they pled guilty should mitigate against debarment. They [DOJ and USCG] felt debarment of OSG could even be counter-productive to their enforcement efforts since it would set a bad example to further penalize a company that has cooperated extensively, pled guilty and been sentenced to three-year probation, agreed to pay huge fines and community service, and agreed to implement an undeniably comprehensive and expensive Environmental Compliance Plan to ensure future compliance by its company and employees.

Id. [1]

18. As a result of MarAd's investigation, the agency recognized that "OSG ha[d] accepted responsibility for the wrongdoing of its employees and recognize[d] the seriousness of the misconduct." Id. Moreover, based upon information from DOJ, MarAd found that "the investigation did not show that any corporate officials were involved in, planned, directed or condoned the misconduct." Id.

[1] MarAd issued two reports relating to its present responsibility review of OSG. The original report, dated May 17, 2007, is the version relied upon by the Contracting Officer and made a part of the administrative record. However, MarAd issued a second, "corrected" version on June 12, 2007. That version was the same as the original except that it removed the reference to DOJ and USCG recommending against debarment of OSG. This portion was apparently removed based upon a policy issue that DOJ does not normally take a position on whether an agency should debar a company. We attach both reports hereto and make reference only to the original report (referenced herein as "MarAd Report"), since it constitutes part of the official administrative record. See MarAd Report dated May 17, 2007 at Exhibit B; see also MarAd Report dated June 12, 2007 at Exhibit C. It is unclear whether the second, corrected version of the MarAd Report was received by the Contracting Officer as it was not identified as a part of her Responsibility Determination.

**REDACTED VERSION**

19. MarAd also determined that "[s]ince OSG's three-year probation is dependent upon full compliance with the ECP, it is highly probable that the corrective action required will be fully implemented by OSG." Id.

20. The MarAd Administrator, acting as the Government's Debarring Official, approved the recommendation not to debar OSG. See id. at 4. OSG transmitted the MarAd Report to MSC on May 18, 2007.

21. On June 25, 2007, OSG and MarAd entered into a compliance settlement agreement ("Compliance Agreement"), whereby MarAd agreed that it would not suspend or debar OSG so long as it, *inter alia*, maintained its environmental compliance program, made any changes it deemed necessary to meet environmental laws and regulations, and complied with the terms of its probation. See Compliance Agreement between OSG and MarAd at 3 (Exhibit D).

22. OSG transmitted the fully executed Compliance Agreement to MSC on June 25, 2007.

23. Resolution of the statutory exclusion of the *M/T Overseas Neptune*, relating to the single CWA violation aboard that international flag vessel, remains pending with the EPA.

## III. MSC's T-5 Tanker Replacement Procurement.

24. On August 31, 2006, MSC issued a Request for Proposal ("RFP") for the replacement and charter of two Jones Act compliant (eligible for U.S. coastwise trade) T-5 tankers (Solicitation Number N00033-06-R-5416) ("Solicitation"). The RFP required that the vessels delivered to MSC be no more than 10 years old upon delivery. Because there were no current vessels that fit this requirement, the RFP required bidders to contract with various shipyards to construct new vessels in the United States. The RFP's delivery schedule required the first vessel to be delivered between October 1 and December 31, 2010, and the second vessel to be delivered between January 1 and March 31, 2011. Thereafter, the ships would be chartered to MSC at a

**REDACTED VERSION**

fixed per diem rate. The initial period of the contract would last until the end of the fiscal year in which the ships were delivered. There were four additional one-year options for charter service.

25. The RFP also required the offeror to have a facility security clearance at the "secret" level by the time of initial vessel operation in October 2010.

26. Offers were originally due to MSC by 4:00 P.M. EDT on October 31, 2006. On October 23, 2006, Amendment 0002 extended the deadline for offers until 4:00 P.M. EDT on November 30, 2006. Product Tankers timely submitted a fully compliant bid on November 30, 2006.

27. On January 19, 2007, MSC sought clarification from Product Tankers as to who would be signing the Contract and if OSG was not going to be the signatory, would it guarantee performance. Product Tankers responded on February 7, 2007, that it: "will be signing the contract and the performance will be guaranteed by the parent company [OSG]." Product Tankers' Revised Technical Proposal at 9 (Feb. 7, 2007).

28. On January 23, 2007, Product Tankers met with MSC to discuss technical aspects of its proposal. <u>See</u> Declaration of W. Hayden at ¶ 4 (Exhibit E). During this meeting, MSC briefly inquired into OSG's Plea Agreement with the Government. <u>See id.</u> Product Tankers briefly described the violations and advised MSC that all the violations involved intentional flag vessels and that none of these vessels would be used for the work under the T-5 Tanker Replacement Procurement. <u>See id.</u> Moreover, Product Tankers informed MSC that the officers and crewmembers of international flag vessels were not eligible to man the vessels to be used in performance of the T-5 Tanker Replacement Procurement. <u>See id.</u> Product Tankers provided that it could make anyone at OSG available to MSC to address their specific concerns, and offered to provide MSC a copy of the JFS. <u>See id.</u> MSC indicated that they had a copy of the JFS and would be reviewing it shortly. <u>See id.</u>

**REDACTED VERSION**

29. On February 7, 2007, Product Tankers submitted a Revised Technical Proposal ("RTP") to MSC. In the RTP, Product Tankers responded to a question from MSC regarding "a settlement agreement between OSG and the Department of Justice." Product Tankers' Revised Technical Proposal at 9 (Feb. 7, 2007). Product Tankers provided MSC with facts regarding the Plea Agreement entered into by one of its ultimate parent companies, OSG. See id. at 10-11. Product Tankers informed MSC that OSG pled guilty to one count of violating the CWA and other counts related to environmental recordkeeping; that DOJ recognized OSG's cooperation and self-disclosures relating to six vessels; that OSG agreed to a settlement even though the judge in the U.S. District Court for the Eastern District of Texas had dismissed 8 of 10 charges for which OSG had been indicted in that case; that OSG had terminated crewmembers who had violated the law and OSG policies; that OSG had implemented the ECP, which contained numerous organizational, procedural and technical compliance measures; and significantly, that "[n]o Government vessels were involved in the settlement agreement." Id.

30. On March 5, 2007, Product Tankers timely submitted a Revised Pricing Proposal. See Declaration of W. Hayden at ¶ 5 (Exhibit E). MSC had requested the revised proposals due to changes in the parameters of the T-5 Tanker Replacement Procurement. See id. Offerors were notified, however, that this was not a "Final Proposal Revision" and there was no technical submission required. See id.

31. On March 21, 2007, MSC issued Amendment 0012, closing discussions on the T-5 Tanker Replacement Procurement and requesting Final Proposed Revisions ("FPR"). FPRs were due to MSC by 2:00 P.M. EDT on March 28, 2007. Product Tankers timely delivered its sealed FPR prior to the 2:00 P.M. deadline on March 28th. See id. at ¶ 6.

**REDACTED VERSION**

32. Approximately thirty minutes after the 2:00 P.M. deadline on March 28th, Product Tankers received Amendment 0013, which "extend[ed] the due date and time of Final Proposal Revisions for [the Contract] to 3:00 pm EDT Friday March 30, 2007." Solicitation, Amendment 0013; see also Declaration of W. Hayden ¶ 6 (Exhibit E). Shortly thereafter, Product Tankers received a call requesting confirmation of Product Tankers' receipt of Amendment 0013. See Declaration of W. Hayden at ¶ 6 (Exhibit E).

33. Through conversations with MSC shortly after receiving Amendment 0013, Product Tankers requested and received permission to retrieve its FPR that it had timely submitted. See id. at ¶¶ 7-8. Significantly, Product Tankers inquired whether its FPR was still sealed. See id. MSC explained that the FPR had been opened, but that MSC had procedures in place to restrict who could review offers and that the FPR would be secured any time it was not in the possession of authorized personnel. See id. MSC indicated that Product Tankers could retrieve the FPR at 12:00 P.M. EDT the next day (March 29, 2007). See id. On March 29, 2007, Product Tankers retrieved its opened FPR. See id. at ¶ 9.

34. MSC gave no explanation for the extraordinary, *post hoc* extension of time to submit the FPR, nor why it opened Product Tankers' bid if it knew it was going to extend the due date of the submission. See id. MSC has never identified which offeror requested the extension of time to submit a complete FPR, but presumably it was an offeror whose continued presence in the competition was critical to the ultimate selection.

35. On March 29, 2007, MSC issued Amendment 0014, which allowed "revisions to an FPR submitted previously [to be] submitted via facsimile . . . as long as the total number of pages, including the cover sheet, is five pages or less on standard 8.5 inch by 11 inch paper."

Solicitation, Amendment 0014. Product Tankers timely hand delivered an unchanged FPR on March 30, 2007. See Declaration of W. Hayden at ¶ 9 (Exhibit E).

36. On April 27, 2007, MSC requested in writing a meeting with Product Tankers to discuss its responsibility as a potential awardee for the T-5 Tanker Replacement Procurement. As part of its request, MSC prepared and provided to Product Tankers a list of more than twenty questions relating to the facts surrounding the violations that were the basis for OSG's Plea Agreement and OSG's remedial actions, including the ECP. MSC also expressed a need to proceed with a meeting as soon as possible. Despite the short time provided to respond to the more than twenty questions posed by MSC, Product Tankers accommodated MSC's expedited timetable by scheduling a meeting on May 4, 2007.

37. On May 1, 2007, in anticipation of its meeting with MSC, Product Tankers provided MSC a copy of the materials previously submitted just weeks before to MarAd to assist that agency with its consideration of OSG's present responsibility.

38. Representatives from OSG and Product Tankers, including OSG's Head of Worldwide Shipping Operations, met with MSC on May 4, 2007 ("May 4th Meeting") to discuss Product Tankers' responsibility. The meeting lasted well over three hours, for which there was neither a recording nor a verbatim transcript. The questions focused almost exclusively on OSG actions and programs.

39. On May 8, 2007, OSG and Product Tankers supplemented its oral responses provided at the meeting and responded to various other questions posed by MSC before, and subsequent to, the May 4th Meeting with a detailed, 49-page written response, which answered each of the questions posed in writing by MSC.

## IV. THE AWARD OF THE MSC CONTRACT TO USS.

40. On July 6, 2007, MSC issued a notice of the intent to award the T-5 Tanker Replacement Procurement, contract number N00033-07-C-5416 ("Contract"), to USS. In a letter dated that day, the contracting officer for the procurement, Ms. Diana Fischer ("Contracting Officer"), advised Product Tankers that, while it was the lowest-priced, technically-acceptable offeror, that she could not find it presently responsible under FAR 9.104 and thus awarded the Contract to the next lowest offeror, USS. This determination was made despite the MarAd Compliance Agreement, OSG's remedial measures, including its ECP, and its cooperation with the Government investigation. MSC's action against Product Tankers is also inconsistent with the fact that MSC had found offerors, such as Maersk Line Ltd., responsible in past procurements even though their parent companies had been convicted of serious environmental violations.

41. The T-5 Tanker Replacement Procurement required firm fixed per diem prices (charter hire) for the firm contract period (first year) and each of the four option periods. The RFP also provided that materially unbalanced pricing would be unacceptable. See Solicitation at § M-1. However, according to information released by MSC to the public, USS' pricing is materially unbalanced. MSC provided the following breakout of charter hire rates for the USS vessels:

| | | | | |
|---|---|---|---|---|
| First Year (firm) | 1st Vessel | $74,000 per day | 2nd Vessel | $79,422 per day |
| 1st Option Year | 1st Vessel | $57,900 per day | 2nd Vessel | $57,900 per day |
| 2nd Option Year | 1st Vessel | $54,910 per day | 2nd Vessel | $54,910 per day |
| 3rd Option Year | 1st Vessel | $56,491 per day | 2nd Vessel | $56,491 per day |
| 4th Option Year | 1st Vessel | $57,922 per day | 2nd Vessel | $57,922 per day |

See Section B of Contract with USS.

42. In addition to the daily charter hire, MSC agreed to pay USS a "delivery bonus" of $1,308,822 for each vessel upon commencement of the charter period. Payment of this delivery bonus appears to be inconsistent under the RFP with the building of a new vessel.

**REDACTED VERSION**

43. In contrast, Product Tankers provided balanced prices that reflected modest inflation cost increases each year. Product Tankers' prices were:

| | | | | | | |
|---|---|---|---|---|---|---|
| First Year (firm) | 1st Vessel | $[redacted] | per day | 2nd Vessel | $[redacted] | per day |
| 1st Option Year | 1st Vessel | $[redacted] | per day | 2nd Vessel | $[redacted] | per day |
| 2nd Option Year | 1st Vessel | $[redacted] | per day | 2nd Vessel | $[redacted] | per day |
| 3rd Option Year | 1st Vessel | $[redacted] | per day | 2nd Vessel | $[redacted] | per day |
| 4th Option Year | 1st Vessel | $[redacted] | per day | 2nd Vessel | $[redacted] | per day |

44. As a result, under the Contract as awarded, the Contracting Officer agreed to pay USS $[redacted] per day more for the first vessel than Product Tankers' price and $[redacted] per day more for the second vessel than Product Tankers' price during the firm contract period.[2] Thus, the Government will pay USS over $16.4 million more than OSG's price for the two vessels during the firm contract period. Significantly, Product Tankers did not include a "delivery bonus" in its offer.

45. The awardee, USS, was not without its own responsibility issues. In fact, publicly available information reveals the poor financial condition of USS and the precarious financial arrangements related to the construction of its Jones Act tankers, including the two T-5 tankers offered by USS for this particular Contract with MSC. See Citigroup Analysis of USS at 4-5 (Oct. 16, 2006) (Exhibit F); see also *Citigroup analyst pours cold water on US Shipping ambitions*, TRADEWINDS.NO WEEKLY, Oct. 20, 2006, *available at* http://www.tradewinds.no/weekly/w2006-10-20/article-474618.ece (need subscription to view) (Exhibit G). Additionally, current information filed with the Securities and Exchange Commission ("SEC"), including Form 10-Q of May 10, 2007 ("SEC 1st Quarter Report") indicates a potentially serious financial risk for USS in constructing the T-5 replacement tankers. See SEC Form 10-Q for U.S. Shipping Partners (May 10, 2007) (Exhibit H).

[2] This price difference includes the per diem charter hire plus the "delivery bonus" spread over the initial firm contract period.

46. Moreover, the SEC 1st Quarter Report also contains information of serious financial risk relating to USS' performance under this Contract. See id. That report states that the USS joint venture contracting for the construction of the tankers:

> expects to sell the vessel together with any chartering contract that may be in place on such vessel. Since the long-term chartering contracts entered into by the Joint Venture will result in a fixed stream of cash flows over a multi-year period, the value that the Joint Venture may be able to obtain upon the sale of the combined vessel and chartering contract is subject to volatility based upon how interest rates fluctuate.

Id. at ¶ 11.

47. The SEC 1st Quarter Report also indicated that USS had suffered serious financial difficulties in connection with a tug and barge construction program. The Report states:

> As a result of the delay in the delivery of, and the increased cost of constructing, the first [articulated tug barge], the Partnership probably will not be able to meet certain of its current financial covenant requirements under its senior credit facility in the second half of the year. The Partnership believes that the lenders under the senior credit facility will modify the financial covenants so that the Partnership will remain in compliance with such covenants, although there can be no assurance of this. If the Partnership defaults under the covenants, and such defaults are not cured via waiver or amendment, then a majority of the lenders under the senior credit facility may elect to declare all or a portion of the outstanding amounts due under the senior credit facility immediately due and payable and/or terminate the loan commitments under such credit facility.

Id. at ¶ 15.

## V. THE CONTRACTING OFFICER'S RESPONSIBILITY DETERMINATION OF PRODUCT TANKERS.

48. By letter dated July 6, 2007, Product Tankers requested a post-award debriefing from MSC.

49. In response, on July 10, 2007, the Contracting Officer issued a written debriefing ("Post-Award Debriefing") stating that Product Tankers was the lowest bidder by over $[redacted] million on

**REDACTED VERSION**

the base term of the contract (one year)[3] and by over $[redacted] million on the base term plus its option periods (the base year plus four one-year option periods). See MSC Post-Award Debriefing Letter at 1 (Jul. 10, 2007). However, the Contracting Officer found Product Tankers non-responsible under FAR 9.104 and therefore could not award the Contract to Product Tankers. Id. The Contracting Officer enclosed her written responsibility determination, dated June 19, 2007 ("Responsibility Determination"), with the Post-Award debriefing to Product Tankers.

50. Among the sources the Contracting Officer referenced as supporting her Responsibility Determination were two letters, dated April 13, 2007 and May 7, 2007, from USS' counsel, Winston & Strawn LLP. See MSC Responsibility Determination at 2 (Jun. 19, 2007) (Exhibit I). Each of these are dated after March 21, 2007, the date MSC closed discussions on the T-5 Tanker Replacement Procurement. See id.

51. The Contracting Officer's Responsibility Determination purported to examine Product Tankers pursuant to the criteria of FAR 9.104. However, the analysis focused almost exclusively on OSG, one of Product Tankers' ultimate parent companies, its Plea Agreement, and the charges to which it pleaded guilty, rather than the actual offeror, Product Tankers. Indeed, even the subject line on the Post-Award Debriefing stated "Overseas Shipholding Group, Inc. (OSG) Debriefing for Solicitation N00033-06-R-5416." See MSC Post-Award Debriefing at 1 (Jul. 20, 2007). Throughout the Responsibility Determination, the Contracting officer appears to treat Product Tankers and one of its ultimate parent corporations, OSG, interchangeably.

52. The areas the Contracting Officer maintained she assessed with regard to Product Tankers was whether it possessed: 1) adequate financial resources; 2) the ability to comply with the performance schedule; 3) a satisfactory performance record; 4) a satisfactory record of

---

[3] The excessive payment to USS during the firm contract period is understated by MSC and apparently does not include the $2.6 million in delivery bonuses to be paid to USS.

integrity and business ethics; 5) the necessary organization, experience, accounting and operational controls, and technical skills to perform; 6) the necessary facilities and equipment to perform; and 7) whether Product Tankers was otherwise qualified and eligible (i.e., that Product Tankers was not listed on the Excluded Parties List). See MSC Responsibility Determination at 2-16 (Exhibit I).

53. The Contracting Officer acknowledged the MarAd decision not to debar OSG, and its role as the lead federal agency. However, it appeared to challenge that designation and determination by stating that MSC had a greater interest in reviewing the responsibility of OSG, because "OSG has no active contracts with MARAD, rather it is a recipient of the Maritime Security Program. Unlike MSC, MARAD has no operational risk in its decision to enter into a Settlement Agreement with OSG rather than take debarment action." Id. at 17. In ignoring MarAd, the Contracting Officer appears to misunderstand the role of the lead agency and the application of the procurement and non-procurement regulations.

54. Significantly, in justifying why it could ignore MarAd's designation as the lead federal agency and act independently, the Contracting Officer cited the authority of the Common Rule, Governmentwide Debarment and Suspension (Non-Procurement) for the proposition that a decision not to debar a company by one agency did not preclude another agency from debarring that company. Id. (citing the Text of the Common Rule, Governmentwide Debarment and Suspension (Non-Procurement) § 215 and 53 Federal Register 19204, 19208 (May 26, 1988) (Common Rule adopted by the Department of Transportation)).

55. However, this particular version of the regulation and the Common Rule cited by the Contracting Officer has been superseded. More importantly, the provision allowing each agency the ability to independently determine whether to debar a company has been removed from the

current, effective regulation. See 2 C.F.R. Part 180 (OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)); see also 68 Fed. Reg. 66534 (Nov. 26, 2003).

56. Although the Contracting Officer found Product Tankers' financial resources adequate and performance record satisfactory, the Contracting Officer speculated that Product Tankers [redacted] Specifically, the Contracting Officer believed that [redacted] See MSC Responsibility Determination at 2-16 (Exhibit I). In conducting this analysis, the Contracting Officer actually focused on OSG rather than Product Tankers, and as a result of these findings found Product Tankers [redacted] for the T-5 Tanker Replacement Procurement, although it never really addressed, or even acknowledged, that Product Tankers, not OSG, was the offeror and prospective contractor. See id. at 16-18.

57. With regard to Product Tankers' ability to meet the performance schedule, the Contracting Officer focused on [redacted] Specifically, the Contracting Officer determined that "[redacted]" Id. at 4. The Contracting Officer alluded to [redacted]

REDACTED VERSION

[redacted] See id. at 3. In the Responsibility Determination, the Contracting Officer stated that [redacted]. However, OSG is headquartered in New York, whereas Product Tankers is headquartered in Tampa, Florida. As reported by the Contracting Officer, [redacted] See id. at 3 (Exhibit I).

58. Based on these general responses regarding a hypothetical company, the Contracting Officer concluded [redacted]. See id. at 3-4.

59. MSC did not raise the issue of [redacted] during discussions or afford Product Tankers an opportunity to respond to MSC's now apparent concerns. See Declaration of W. Hayden at ¶ 13 (Exhibit E).

60. Not discussed was the fact that a U.S. flag affiliate of Product Tankers, OSG Car Carrier Inc., currently holds [redacted].

61. Further, the Contracting Officer asserted that [redacted]" MSC Responsibility Determination at 4 (Exhibit I). The Contracting Officer did not explain why [redacted] the admittedly best-in-class compliance plan that had been implemented, nor

**REDACTED VERSION**

address why MarAd reached the exact opposite conclusion. As a result of her analysis of OSG, the Contracting Officer concluded [redacted]. See id.

62. To address Product Tankers' [redacted], the Contracting Officer [redacted] See id. at 5-6. On April 26, 2007, the Board met with representatives from DOJ and USCG that were involved in the investigation of OSG and negotiation of the subsequent ECP. See id. at 6. Presumably these were the same individuals who had been contacted by MarAd counsel and who had praised OSG's cooperation, its extraordinary ECP, and recommended against suspension or debarment.

63. The Contracting Officer acknowledged some pro-active actions on the part of OSG, including some of the cooperative efforts with the Government in its investigation, staffing increases in shore-side management, the establishment of several internal oversight functions, termination of offenders, some of the technology developments and upgrades, the separation of environmental expenses from operational budgets, increased training, and the "benchmark" ECP applicable to all vessels, including those that would be provide and operated under the T-5 Tanker Replacement Procurement. See id. at 6-8.

64. Despite the litany of extensive remedial measures, and the determination by MarAd as the lead agency that the "corrective measures set forth in the Plea and ECP and in the supplementary materials submitted . . . by OSG constitute[d] a significant corporate commitment to combat and eliminate the criminal conduct." (MarAd Report at 3-4 (Exhibit B)), the Contracting Officer stated she had [redacted]

**REDACTED VERSION**

[redacted] See MSC Responsibility Determination at 8 (Exhibit I). The Contracting Officer concluded that [redacted]. See id. Further, the Contracting Officer concluded that [redacted]. See id. at 8-10. The Contracting Officer mistakenly believed that [redacted]" (Id. at 10-11), when OSG had, in fact, explained at length to the Contracting Officer and MSC orally and in writing that it had determined [redacted]

65. The Contracting Officer also alleged concerns about [redacted], albeit touting this same measure as positive action elsewhere in the Responsibility Determination. See id. at 11-14.

66. The Contracting Officer incorrectly considered that [redacted]. See id. at 14. This was cited by the Contracting Officer as support for her ultimate conclusion that [redacted]. See id. In fact, the ECP, as confirmed by DOJ and USCG, specifically stated that the initial audits required by the ECP had already been completed on all (100%) of the vessels in the fleet (over 100 vessels and subsequent audits) and provided to the Government. As a result of these various considerations of OSG, most of which were factually erroneous, the Contracting Officer determined that [redacted]. See id.

67. While finding that Product Tankers possesses the necessary organization, experience, accounting, operational controls and technical skills, the Contracting Officer applied the same

rationale from its [redacted]." Id. at 15. As previously indicated, she ignored the fact that many of the remedial measures were implemented prior to the execution of the ECP and which now set the industry standard. The Contracting Officer also ignored the crucial fact that neither Product Tankers, nor any OSG U.S. flag vessels, nor any of Product Tankers shore-side management or U.S. flag sea-going personnel, were involved in the problems which gave rise to the violations included in the Plea Agreement and the convictions. The concerns raised by the Contracting Officer related only to the violations aboard OSG's international flag vessels, none of whose crews or OSG managers would perform work under the T-5 Tanker Replacement Procurement.

68. Concerning Product Tankers' [redacted] which the Contracting Officer equated to [redacted], she cited the same unfounded concerns that Product Tankers [redacted]. See id. This determination was again made without addressing the ability of the actual offeror, Product Tankers, to [redacted].

69. The Contracting Officer's Responsibility Determination is beset with significant factual inaccuracies, misinterpretations, misunderstandings, and in some cases, a complete disregard of factual information provided by Product Tankers and OSG, as well as cognizant Government agencies. The Contracting Officer, on several occasions, stated her belief that [redacted] Product Tankers and OSG encouraged an open dialogue at the meeting, answering all of MSC's pre-prepared questions, as well as tangential and follow-on questions, and then followed up its oral responses

**REDACTED VERSION**

with detailed written responses to each question on May 8, 2007. See OSG/Product Tankers Written Responses to MSC (May 8, 2007). Apparently the Contracting Officer relied on faulty memory or an erroneous perception of what was orally discussed at the May 4th Meeting, rather than refer to the detailed and accurate written submission from Product Tankers and OSG.

70. Additional mistakes made by the Contracting Officer include her general failure to address the present responsibility of the actual offeror, Product Tankers, while focusing on one of its ultimate parent corporations, OSG; and her mistaken treatment of the Government's Sentencing Memorandum in support of the Plea Agreement ("GSM"), an advocacy document laying out the Government's allegations and argument, as a finding by the U.S. District Court for the District of Massachusetts. Likewise, she erroneously believed that the problems OSG was experiencing were unique to it and were not "[redacted]." MSC Responsibility Determination at 13. To the contrary, in February 2006, a DOJ Environment Crimes Section representative stated that "[t]he 'going rate' for oily water separator offences [sic] in the US is 'going up'" and described them "as an epidemic of crimes." *U.S. Signals Zero Tolerance for Polluters*, LLOYD'S LIST, Feb. 8, 2006 *at* http://www.lloydslist.com/NASApp/cs/ContentServer (no longer active) (Exhibit J). Further, between 1995 and 2005, DOJ had "prosecuted 30 criminal cases . . . involving [the] intentional discharge of oil, 21 of which have come since 2002." Id.

71. In addition to publicly announcing the award of the Contract to USS, MSC has taken the extraordinary step of providing information to the press and the public from the Responsibility Determination, which is a source-selection document.

**REDACTED VERSION**

## COUNT I

**(MarAd's Decision not to Debar OSG Pre-empts the Contracting Officer From Making Her Non-Responsibility Determination)**

72. Plaintiff incorporates and realleges each of the allegations in paragraphs 1 through 71 as if fully set forth herein.

73. In accordance with procurement and non-procurement regulations, various federal agencies, including the Department of the Navy, agreed that MarAd would serve as the lead agency in the discretionary suspension or debarment proceedings against OSG.

74. In this role, MarAd reviewed various court documents, met with and reviewed materials provided by OSG, and consulted with other interested agencies, including the lead investigative agencies in the OSG criminal case – DOJ and USCG. See MarAd Report at 2-4 (Exhibit B). DOJ and USCG confirmed the cooperation of OSG during the investigation and OSG's extraordinary remedial measures, including the ECP approved by the Government, which is now considered the best in the industry. See id. at 3. They also confirmed that, despite certain management failures, "the investigation did not show that any [OSG] corporate officials were involved in, planned, directed or condoned the misconduct." Id.

75. Considering all of the available evidence, MarAd found that debarment of OSG was not necessary to protect the Government's interest. Rather, MarAd elected to enter into a Compliance Agreement with OSG, which gave the agency the ability to monitor the company's progress. In making this determination, MarAd acted for all federal agencies. Just as a debarment by the lead agency would have bound all federal agencies and contracting officers, the decision not to suspend or debar OSG or any of its subsidiaries prevents contracting officers from denying a contract award to OSG or any of its subsidiaries on the same basis.

**REDACTED VERSION**

76. The Contracting Officer was fully apprised of MarAd's activities, its designation as the lead federal agency, and its ultimate decision not to debar OSG or any of its operating entities. In fact, MSC received the MarAd Report weeks before the Contracting Officer executed her Responsibility Determination. This event made the Contracting Officer aware that MarAd would forego suspension and debarment, and would enter into a settlement compliance agreement with the company. MSC also received the fully executed Compliance Agreement well before the Contracting Officer announced her decision to award the Contract to USS.

77. The Contracting Officer also ignored the observations and recommendations of DOJ and USCG. See MarAd Report at 3 (Exhibit B).

78. The Contracting Officer reviewed the same facts, circumstances and information as MarAd, focusing on the general effect of OSG's violations and convictions rather than any risks posed by the actual offeror, Product Tankers, which is only an indirect U.S. flag vessel operating subsidiary of OSG. This exceeded the limits of her authority under the FAR. By issuing a Responsibility Determination adverse to Product Tankers and by focusing almost exclusively on OSG, the Contracting Officer functionally supplanted, and overturned the decision by MarAd, as the lead agency, not to debar OSG. In the Responsibility Determination, the Contracting Officer ostensibly acknowledged MarAd's involvement and role in the debarment process. However, the Contracting Officer effectively usurped MarAd by focusing her determination on OSG. She justified assuming this role by stating that MSC's interest in OSG was greater than that of MarAd and that "MARAD has no operational risk in its decision." MSC Responsibility Determination at 17 (Exhibit I). Significantly, had MSC, or rather its parent agency, the Department of the Navy, believed it had sufficient interest in reviewing OSG's present responsibility, it could have sought designation as the lead agency. However, the Department of



**FILED UNDER SEAL: REQUEST FOR PROTECTIVE ORDER PENDING**

the Navy ceded the lead agency role to MarAd, which should have precluded MSC from taking a contrary responsibility determination based on the same information.

79. The Contracting Officer was without authority to deny this Contract to Product Tankers based upon the convictions and Plea Agreement by one of its ultimate parent corporations, OSG, whose present responsibility had already been resolved by the lead federal agency, MarAd. To do otherwise undermines the overall goal of the lead agency concept in the regulations to have the federal government speak with one voice. As a result, the Contracting Officer's decision was arbitrary, capricious and unsupported by the administrative record. It effectively amounted to a "de facto debarment."

80. A declaratory judgment by this Court providing that the lead agency's determination pre-empts a contradictory determination by a contracting officer and order directing that such determination be withdrawn will be in the best interests of Product Tankers and the Government alike.

## COUNT II

### (The Contracting Officer Lacked a Rational Basis for Her Non-Responsibility Determination)

81. Plaintiff incorporates and realleges each of the allegations in paragraphs 1 through 80 as if fully set forth herein.

82. The Contracting Officer's non-responsibility determination is arbitrary, capricious, lacks a rational basis, and is unsupported by the administrative record in several respects, examples of which are set forth below.

**A. It was improper for the Contracting Officer to focus her Responsibility Determination on one of Product Tankers' ultimate parent companies, OSG, rather than on the actual offeror, Product Tankers.**

83. FAR Subpart 9.1 requires contracting officers to make responsibility determinations of "prospective contractors." FAR 9.104-1.

84. Product Tankers was the prospective contractor in this case. However, the Contracting Officer focused her responsibility analysis entirely on OSG, rather than on Product Tankers as required by the FAR.

85. Product Tankers time charters and operates only U.S. flagged vessels and is a distinct legal entity from OSG Ship Management (UK) Ltd. and OSG Ship Management (GR) Ltd., the companies actually involved in operating the international flag vessels where the violations occurred. Further, Product Tankers operates its vessels and provides shore-side management and support out of its office in Tampa. Neither this office, its vessels, crews or shore-side personnel were charged with any wrongdoing.

86. The operations and shore-side support for OSG Ship Management (UK) Ltd. and OSG Ship Management (GR) Ltd. are the responsibility of OSG's Newcastle and Athens offices, respectively.

87. There is no evidence that ties any violations by the international flag vessels and related operations that were the subject of OSG's Plea Agreement to any of Product Tankers' vessels, its crews or its shore-side management, nor is there any evidence that any environmental violations ever took place on any of OSG's U.S. flag vessels, including those operated by Product Tankers out of its Tampa office.

88. Product Tankers is only 75% owned by OSG Product Tankers I LLC, as the other 25% is owned by Aker, which owns the shipyard in Philadelphia that will build the tankers Product

Tankers proposed to MSC. Thus, Product Tankers is not a wholly owned subsidiary of OSG or a direct affiliate of any OSG subsidiaries that operated the vessels that were the subject of the Plea Agreement.

89. Pursuant to the FAR, the Contracting Officer only had authority to consider the responsibility of Product Tankers, the specific offeror, to perform this particular procurement. FAR 9.104-1. There is no evidence in the record that any environmental violations have ever been committed by Product Tankers, or for that matter, any OSG U.S. flag vessel operations. That is the relevant information that should have been considered by the Contracting Officer. The Contracting Officer, however, reviewed the entire operation of one of Product Tankers' ultimate parent companies, OSG, focusing her inquiry on foreign operating entities, vessels, crews and shore-side personnel that would never, and due to Jones Act restrictions, could never perform work under the T-5 Tanker Replacement Procurement.

90. Thus, the Contracting Officer's review was outside the scope of her authority and in violation of FAR 9.104. Therefore, she lacked authority and a rational basis to make an adverse present responsibility determination against Product Tankers. In addition, her analysis of OSG was itself flawed as indicated elsewhere in this Complaint.

**B. The Contracting Officer's Responsibility Determination is premised entirely on unreasonable and unsupported assumptions about [redacted].**

91. The Contracting Officer acknowledged that OSG has all the necessary technical and financial capabilities and operational expertise to perform the terms of the Contract. See MSC Post-Award Debriefing Letter at 1 (July 10, 2007); see also MSC Responsibility Determination at 2-3 (Exhibit I). However, the Contracting Officer found there was performance risk based entirely on unreasonable assumptions about [redacted]. See MSC Responsibility Determination at 3-4 (Exhibit I).

**REDACTED VERSION**

92. The Contracting Officer assumed [redacted], despite having the industry's best ECP, [redacted]. See id. at 4. No rational basis is provided for this unsupported assumption and indeed, it is contrary to MarAd's findings. MarAd found that [redacted] it is highly probable that the corrective action required will be fully implemented by OSG." MarAd Report at 3 (Exhibit B).

93. The Determination also does not discuss how a [redacted] would affect an indirect subsidiary like Product Tankers, which is not named in the Plea Agreement and which would have to be separately proposed for debarment under FAR 9.406-1(b). Even then, it would have to be shown to have some involvement in the wrongdoing that was the basis for the breach to have debarment action taken against it. Thus, there is no rational basis for the assumption that [redacted] Product Tankers has no record of environmental violations or any other misconduct, [redacted].

94. The Contracting Officer further assumed that [redacted]. See MSC Responsibility Determination at 4 (Exhibit I). [redacted]



**FILED UNDER SEAL: REQUEST FOR PROTECTIVE ORDER PENDING**

[redacted] FAR 9.405-1 (providing that "agencies may continue contracts or subcontracts in existence at the time the contractor was debarred").

95. The Contracting Officer also assumed that [redacted] See id. This is an unreasonable assumption. Product Tankers was not guilty of, or involved in, any felony convictions; it is not even a wholly-owned subsidiary of OSG; its office is located a considerable distance away from other OSG organizations; its office is staffed by personnel with no involvement in the past environmental violations; and its ships are manned by U.S. mariners that were never involved in any of the environmental convictions. There is no rational basis for the Contracting Officer to assume that [redacted]

96. Finally, the Contracting Officer's conclusion that [redacted] MSC Responsibility Determination at 3 (Exhibit I). None of these statements support her conclusion that [redacted].

### C. The Contracting Officer based her Responsibility Determination on material errors of law and fact.

97. The Contracting Officer based her adverse Responsibility Determination on numerous material errors of law and fact. These errors include, but are not limited to the following in paragraphs 98 through 103.

98. In her Responsibility Determination, the Contracting Officer cited an outdated regulation for the proposition that "a decision not to impose debarment shall be without prejudice to a subsequent imposition of debarment by any other agency." Id. at 17 (citing 53 Fed. Reg. 19204, 19208 (May 26, 1988)). However, this regulation has been superseded and this language and underlying principle, relied upon by the Contracting Officer, and were specifically removed from the non-procurement debarment regulations when they were revised in 2003. See 68 Fed. Reg. 66534 (Nov. 26, 2003). Further, even had this provision remained valid, it would not apply to MSC in this case, since the determination was made by a contracting officer and not a debarring official as contemplated by the rule. See 53 Fed. Reg. at 19207-08.

99. The Contracting Officer incorrectly asserted that [redacted] Id. at 14. Again, the Contracting Officer is mistaken about a material fact. [redacted]

100. The Contracting Officer incorrectly based her determination on an erroneous understanding that [redacted] Id. This conclusion was one of the key factors in her determination that [redacted] This is simply incorrect, as demonstrated in the record available to her and emphasized during the oral presentation. As acknowledged by the Government in the ECP, all of the initial audits on the entire OSG fleet required under the ECP were completed by December 15, 2006,

when the Plea Agreement between OSG and the Government was signed. Environmental Compliance Plan, Appendix at ¶ 15 (Exhibit A). OSG's Head of Worldwide Shipping Operations reminded MSC of this fact at the May 4th Meeting when he stated that OSG had completed and provided to the Government over 170 audits. See Declaration of W. Hayden at ¶ 12.f (Exhibit E).

101. The Contracting Officer erroneously states that [redacted] MSC Responsibility Determination at 4 (Exhibit I). The Contracting Officer [redacted] However, there are numerous examples of the effectiveness and "success" of the OSG compliance measures. For instance, OSG's Open Reporting System, that was put in place in 2004, [redacted] which the Government acknowledged were unknown to the United States at the time of their disclosure. Further, OSG's ECP, which both DOJ and USCG approved and confirmed was the "benchmark by which future compliance plans will be measured" (MarAd Report at 3 (Exhibit B)), includes a twenty-four paragraph Appendix that "annotate[s] and list[s] those areas of the ECP that OSG has already satisfied in whole or in part." Environmental Compliance Plan, Appendix at 46 (Exhibit A).

102. The Contracting Officer stated that it does not appear that environmental noncompliance is widespread throughout the entire industry, implying that [redacted] The Contracting Officer could not be more wrong in this assertion. In February of 2006, an attorney from DOJ Environmental Crimes Section described the increase in oily water separator offenses "as an epidemic of crimes." See LLOYD'S LIST supra, at ¶ 70 (Exhibit J). In fact, between 1995 and 2005, DOJ had "prosecuted 30 criminal cases . . . involving [the] intentional discharge of oil, 21 of which have come since 2002." Id. Further, since that time

REDACTED VERSION

(February 2006), there have been approximately 30 to 35 additional criminal cases for which information is publicly available involving violations by individuals or corporations similar to those to which OSG pleaded guilty.

103. Finally, on several occasions, the Contracting Officer quoted to language she asserts is from "the Court" as support for her determination. See e.g., MSC Responsibility Determination at 13 (Exhibit I). However, the language cited is not from a court decision or document, but rather from a Government brief advocating a certain position be adopted by the trial judge at sentencing. Thus, any portion of the determination based upon this incorrect and misleading reference should be considered unsupported.

**D. The Contracting Officer misconstrued and misstated various oral responses given by Product Tankers and OSG at the May 4th Meeting and ignored written responses to the same questions.**

104. On several occasions, the Contracting Officer in her Responsibility Determination referred to statements allegedly made at the May 4th Meeting. See e.g., id. at 9. However, the Contracting Officer simply misstated the responses or in some cases misconstrued these statements by taking them out of context. Furthermore, Product Tankers and OSG submitted written responses to all of the questions asked by the Contracting Officer after the face-to-face meeting. Therefore, since the May 4th Meeting was neither recorded nor transcribed verbatim, if the Contracting Officer could not recall a response to a certain question, she could have simply reviewed the written responses provided by OSG and Product Tankers subsequent to the May 4th Meeting. In many cases these written responses place the responses in the appropriate context than is represented by the Contracting Officer's characterization of the oral statements, are completely ignored by the Contracting Officer in justifying her conclusions.

105. The Contracting Officer asserted in several instances that [redacted] See MSC Responsibility Determination at 8-14 (Exhibit I). To the contrary, at the May 4th Meeting, OSG and Product Tankers were led to believe by MSC that they had answered all the questions asked of them. Furthermore, on several occasions, OSG and Product Tankers asked if MSC understood its answers to the questions and whether there were any follow-up questions. Regardless, OSG and Product Tankers followed up the meeting with a 49-page written submission responding to each question in detail.

106. The Contracting Officer implied that [redacted]. See MSC Responsibility Determination at 8 (Exhibit I). However, this is contradicted by the JFS, which states that OSG "conducted internal investigations concerning these allegations through outside counsel [redacted] U.S. District Courts (Central CA, Northern CA, MA, ME, Eastern NC, Eastern TX) Joint Factual Statement at 4 (Dec. 15, 2006).

107. The Contracting Officer incorrectly asserted that [redacted] MSC Responsibility Determination at 8 (Exhibit I). This statement implies that [redacted] OSG reported potential illegal conduct when it became aware of it and after it had obtained sufficient information to determine a violation may have occurred. This, again, was discussed at length at the oral presentation on May 4th.

REDACTED VERSION

108. The Contracting Officer erroneously asserted that [redacted] Id. at 9. [redacted] See e.g., Declaration of W. Hayden at ¶ 12.a (Exhibit E).

109. It is quite relevant that none of the environmental violations cited by the Contracting Officer occurred on OSG's U.S. flag vessels, such as those operated by Product Tankers. The unblemished record of the U.S. flag vessels may be attributed in part to the fact that the officers and crews manning the U.S. flag vessels are U.S. citizens or legal residents. The U.S. flag vessel crews, by virtue of living in the U.S., have been exposed to governmental and media anti-pollution campaigns for decades. In the U.S., there is a strong moral stigma against polluters that is simply not present in many other countries. It was unreasonable for the Contracting Officer to attribute the problems experienced on some international flag vessels involving foreign citizen crewmembers to Product Tankers and the U.S. officers and crews who would man the T-5 Tanker Replacement Procurement vessels.

110. The Contracting Officer asserted that [redacted] MSC Responsibility Determination at 9 (Exhibit I). This is contrary to MarAd's finding that "OSG has accepted responsibility for the wrongdoing of its employees and recognizes the seriousness of the misconduct." MarAd Report at 3 (Exhibit B). It is also contrary to the Plea Agreement and to the JFS entered into by OSG and the Government, in

**REDACTED VERSION**

which OSG acknowledged its responsibility for the violations. See Plea Agreement at 2; see also Joint Factual Statement, supra 106, at 2-3. This assertion is also completely divergent from OSG's oral statements at the May 4th Meeting and its written responses to those questions. See OSG/Product Tankers Written Responses to MSC at 45. The Contracting Officer's characterization is unreasonable and unsupported by the administrative record.

111. The Contracting Officer misconstrued various statements in the JFS and the MarAd Report [redacted] See MSC Responsibility Determination at 8-10 (Exhibit I). This is, once again, a misstatement of the JFS and the MarAd Report. The Contracting Officer misconstrued a statement made in the JFS relating to [redacted] See id. at 9 citing Joint Factual Statement, supra 106, at 10-13. [redacted] Similarly, the Contracting Officer misconstrued a statement in the MarAd Report discussing [redacted]. See id. at 10 citing MarAd Report at 2 (Exhibit B). In fact, MarAd found, after consultation with DOJ and USCG, that "the investigation did not show any corporate officials were involved in, planned, directed, or condoned the misconduct." MarAd Report at 3 (Exhibit B).

112. The Contracting Officer's complaints about [redacted] are based on misunderstandings of the facts. MSC Responsibility Determination at 10 (Exhibit I). Furthermore, the Contracting

REDACTED VERSION

Officer's statement implied that [redacted] See id. This is in direct contradiction to MarAd's finding, based on conversation with DOJ and USCG, that "the investigation did not show any corporate officials were involved in, planned, directed, or condoned the misconduct." MarAd Report at 3 (Exhibit B).

113. The Contracting Officer's assertion also implies that [redacted]. See MSC Responsibility Determination at 10 (Exhibit I). This again ignores OSG's written materials, whereby OSG provided:

> As to management, there has been a significant turnover in management, including senior management, since the inception of the Government's investigation. Further, . . . OSG conducted an office-by-office review of shore staffing and organization. This resulted in the reclassification of some jobs and the hiring of an additional 21 personnel in the operations group.

OSG/Product Tankers Written Responses to MSC at 29-30. It also ignores the changes made to top management since the violations, information on and documentation (before and after organization charts) of which were also provided to the Contracting Officer. See Declaration of W. Hayden at ¶ 12.d (Exhibit E); see also OSG/Product Tankers Written Responses to MSC at 48 & Attachment 3.

**E. The Contracting Officer failed to consider all relevant and available information in making her Responsibility Determination.**

114. Product Tankers and OSG provided the Contracting Officer with substantial materials prior to and following the May 4th Meeting. These included a three-inch binder with a 41-page narrative and thirty attachments of supporting documents, which OSG had originally prepared for and provided to MarAd for its present responsibility review, and a 49-page written response prepared specifically for the Contracting Officer by Product Tankers and OSG that addressed in detail the specific questions posed by the Contracting Officer.

**REDACTED VERSION**

115. The Contracting Officer [redacted] However, the Contracting Officer's Responsibility Determination primarily focuses on her characterization, and in many cases mischaracterization, of oral statements allegedly made by Product Tankers and OSG at the May 4th Meeting for which there is no recording or verbatim transcript.

116. Among other things, in making her determination, the Contracting Officer ignored the written record provided by OSG regarding:

a. Its proactive compliance efforts;

b. Its ship and shore-side staffing changes;

c. The current implementation status of many of its environmental compliance programs, such as the completion of the initial audits and a number of ongoing audits; and

d. The documented effectiveness of its environmental compliance efforts.

117. The Contracting Officer stated that [redacted]. See MSC Responsibility Determination at 17-18 (Exhibit I). However, as stated above, this premise is faulty because [redacted]. Further, the Contracting Officer failed to consider that Product Tankers and OSG implemented a new industry leading process whereby a waste stream analysis is performed on all new-builds prior to construction. Through this process, an industry best practice recognized by

**REDACTED VERSION**

both DOJ and USCG, Product Tankers works with the designer to reduce the volume of wastes produced and/or increases the on-board waste handling capabilities to deal with the expected waste streams. Thus, Product Tankers' proposal includes cutting edge vessels that are better equipped to comply with various environmental regulations relating to waste handling, even though its price is $[redacted] million less than what USS offered.

118. For the above reasons, the Contracting Officer did not have a rational basis for determining Product Tankers non-responsible and therefore ineligible for award of the T-5 Tanker Replacement Procurement.

**<u>COUNT III</u>**

**(The Contracting Officer has Treated Product Tankers Unequally and Unfairly)**

119. Plaintiff incorporates and realleges each of the allegations in paragraphs 1 through 119 as if fully set forth herein.

**A. The Contracting Officer ignored publicly available information calling into question the responsibility of USS.**

120. While the Contracting Officer went to extraordinary lengths to find Product Tankers non-responsible, she apparently chose to treat USS quite differently by ignoring publicly available information of the poor financial condition of USS and the precarious financial arrangements related to the construction of its Jones Act tankers, including the two T-5 tankers offered by USS for this particular Contract with MSC. These issues directly implicate the responsibility criteria of FAR 9.104. The poor financial condition of USS is reflected in the poor credit rating of B- given by S&P and a lower rating of Caa1 from Moody's.[4] Furthermore, Citigroup has downgraded USS's stock to "sell" and labeled the company as a "high risk." <u>See</u>

[4] In contrast, OSG is rated B+ by S&P, even after the fines paid and the Plea Agreement with the Government.

Citigroup Analysis (Oct. 16, 2006); (Exhibit F); see also TRADEWINDS.NO WEEKLY, supra at ¶ 45 (Exhibit G).

121. Moreover, current information filed with the SEC indicates a potentially serious financial risk for USS in constructing the T-5 replacement tankers. See SEC Form 10-Q for U.S. Shipping Partners (May 10, 2007) at ¶ 1 (Exhibit H). USS has a commitment with a shipyard to build nine Jones Act tankers, of which two would service this Contract. However, the price for all nine tankers is one billion dollars, exclusive of tens of millions of capitalized interest for such a multi-year project. See id.; see also Citigroup Analysis at 4-5 (Oct. 16, 2006) (Exhibit F); USS Press Release (Jul. 9, 2007) (Exhibit K). A major risk is that USS has only been able to arrange financing for the first five tankers. See SEC Form 10-Q for U.S. Shipping Partners at ¶ 1 (May 10, 2007) (Exhibit H). If financing cannot be arranged for the remaining four tankers, then the price for the first five tankers will increase. Thus, the cost to be incurred by USS to build the two T-5 replacement tankers is subject to risks of substantial increases that could jeopardize the ability of USS to complete the tankers or charter them to MSC for the agreed fixed per diem prices.

122. The SEC 1st Quarter Report, also contains information of serious financial risk relating to USS' performance under this Contract that was apparently ignored or overlooked by the Contracting Officer. See id. The SEC 1st Quarter Report also indicated that USS had suffered serious financial difficulties in connection with a tug and barge construction program. See id. at ¶ 15.

123. The Contracting Officer's determination that USS was financially responsible and her decision to award the contract to USS rather than to Product Tankers is unreasonable and evidence of unfair and unequal treatment.

**B. The Contracting Officer selected an awardee, USS, with an unacceptable pricing arrangement in order to address a problem with its present responsibility.**

124. According to information released by MSC to the public, USS' pricing is materially unbalanced.

| | | | | |
|---|---|---|---|---|
| First Year (firm) | 1st Vessel | $74,000 per day | 2nd Vessel | $79,422 per day |
| 1st Option Year | 1st Vessel | $57,900 per day | 2nd Vessel | $57,900 per day |
| 2nd Option Year | 1st Vessel | $54,910 per day | 2nd Vessel | $54,910 per day |
| 3rd Option Year | 1st Vessel | $56,491 per day | 2nd Vessel | $56,491 per day |
| 4th Option Year | 1st Vessel | $57,922 per day | 2nd Vessel | $57,922 per day |

See Section B of Contract with USS.

125. In addition to the daily charter hire, MSC agreed to pay USS a "delivery bonus" of $1,308,822 for each vessel upon commencement of the charter period. MSC's agreement to pay a "delivery bonus" to build a "newbuild" vessel is contrary to the terms of the Solicitation.

126. It is apparent that USS has substantially front-loaded the per diem charter hire for the initial firm contract period. Charging the Government $74,000 and $79,422 per day for the first and second vessel, respectively, in the first year plus a "delivery bonus" of $1,308,822 for each vessel, and then only an average of $56,808 per day for the four option years is materially unbalanced pricing. Such unbalanced pricing greatly increases the true cost to the Government since it is essentially paying in advance for services to be rendered during the option years. If any of the option years are not exercised by the Government then it will have grossly overpaid for the services provided by USS.

127. Thus, under the current award, the Contracting Officer has agreed to pay USS [redacted] per day more for the first vessel than Product Tankers' price and almost [redacted] per day more for the second vessel than Product Tankers' price during the firm contract period.[5] This waiver of the prohibition against unbalanced pricing and agreement to payment of a delivery bonus for a

[5] This price difference includes the per diem charter hire plus the "delivery bonus" spread over the initial firm contract period.

newbuild vessel by the Contracting Officer in favor of USS are two substantial examples of unequal treatment of offerors. The payment of such exorbitant charter hire to USS plus $2.6 million in "delivery bonuses" during the firm contract period also raises questions as to the reasonableness of any decision by the Contracting Officer to award to USS.

128. The acceptance of a prohibited unbalanced bid and a delivery bonus help alleviate the precarious financial situation of USS that would otherwise constitute a possible basis for the Contracting Officer to find USS not presently responsible. Unlike her treatment of Product Tankers that relied upon adverse information of a different legal entity and highlighted every possible adverse implication, she considered information from USS' legal counsel, Winston & Strawn LLP, and not only ignored USS' adverse and precarious financial position, but essentially modified the Contract to benefit only USS and allow award.

**C. The Contracting Officer treated Product Tankers and USS unequally in this particular procurement.**

129. Product Tankers timely submitted a sealed FPR on March 28, 2007 as per Amendment 0012, and only after the deadline passed was Product Tankers informed of Amendment 0013, which extended the FPR deadline by two days and one hour. See Declaration of W. Hayden at ¶ 6 (Exhibit E). The Contracting Officer never explained her rationale for extending the FRP deadline. See id. at ¶ 9. Furthermore, during the relatively short period of time between the submission of Product Tankers' FPR and the conversations Product Tankers had with MSC following the receipt of Amendment 0013, Product Tankers' FPR had been opened. See id. at ¶¶ 7-8. Product Tankers believes the Contracting Officer inappropriately extended the deadline to accommodate a late or insufficient FPR issued by USS. Moreover, Product Tankers is concerned that the opening of its sealed FPR may have been reviewed by persons who communicated its

confidential and business proprietary information to other offerors. These actions demonstrate the preferential treatment afforded to USS, to Product Tankers' detriment.

130. The Contracting Officer's decision to award the Contract to USS was unfair and unequal treatment in favor of USS. Evidence of this unfair and unequal treatment appears to have commenced with the extraordinary extension of the due date for the FPRs (see paragraph 129), includes the decision to accept the grossly unbalanced pricing proposed by USS and payment of the delivery bonus (see paragraphs 124 through 128), and continued with ignoring public evidence that USS lacks financial capability to perform without substantial risk (see paragraphs 120 through 123).

**D. The Contracting Officer treated Product Tankers unequally compared to the way MSC treated offerors in past procurements.**

131. MSC has on numerous occasions awarded contracts to offerors with criminal records that risk debarment during the term of the contract.

132. For example, in 2005, MSC awarded a contract, Contract No. N00033-05-C-5340, to Maersk Line Ltd., an affiliate of Moller-Maersk, A/S ("Maersk"), for the operation and maintenance of eight fast sealift ships ("Maersk Procurement"). The contract was valued at $26 million for its initial year and $135 million for the base year plus its four one-year options.

133. Just months following the award of the Maersk Procurement, Maersk pled guilty to various environmental violations related to an investigation that began in 2004 involving waste oil and false Oil Record Book entries; environmental violations strikingly similar to OSG's. As part of the plea agreement, Maersk was ordered to develop and implement a fleet-wide environmental compliance program.

134. In this example, Maersk faced possible suspension and debarment action, yet MSC did not impute the crimes of the foreign entity, Maersk, to the domestic offeror, Maersk Line Ltd., as

it has done in this case. Furthermore, even if MSC had not learned of Maersk's convictions in time to affect the award of the base contract, it should have precluded the exercise of the option years.

135. In light of MSC's conduct in the Maersk Procurement, it is clear that the Contracting Officer has treated Product Tankers unfairly and unequally to other prospective contractors.

## PRAYER FOR RELIEF

**WHEREFORE,** Product Tankers hereby requests this Court to find that the Contracting Officer's June 19, 2007 Responsibility Determination that Product Tankers is not responsible was pre-empted by MarAd's decision not to debar OSG, or in the alternative was outside of her scope of authority and therefore invalid; that such a non-responsible determination is contrary to facts in the record and lacked a reasonable or rational basis; and that the conduct of this procurement by MSC exhibited unequal treatment of offerors to Product Tankers' detriment. As a result of MSC's improper conduct, Product Tankers is rightly entitled to:

A) Declaratory judgment that the Contracting Officer's non-responsibility determination is in error and is void;

B) Declaratory judgment that Product Tankers is responsible and eligible for the award of Contract No. N00033-07-C-5416;

C) A permanent injunction ordering MSC to terminate the award of Contract No. N00033-07-C-5416 to USS and ordering the Award of Contract No. N00033-07-C-5416 to Product Tankers;

D) Alternatively, a preliminary injunction ordering MSC to terminate the award of Contract No. N00033-07-C-5416 to USS; have a different Contracting Officer perform a responsibility determination of Product Tankers consistent with the

Court's findings and, if Product Tankers is determined to be responsible, award Contract No. N00033-07-C-5416 to Product Tankers;

E) All costs of attorneys fees incurred in pursuing this action; and

F) Such other relief as the Court may deem just and proper.

Dated: July 25, 2007

Respectfully submitted,

John J. Pavlick, Jr.
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

Of Counsel:
Lars E. Anderson
Dismas N. Locaria
Peter A. Riesen
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

Susan B. Geiger
William A. Shook
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006-1600
Telephone: (202) 778-9000
Facsimile: (202) 778-9100

DC1/248765