# EXHIBIT D

BEFORE
THE UNITED STATES MARITIME ADMINISTRATION

In the matter of: )
)
Overseas Shipholding Group, Inc. ) Case No. ____________

## COMPLIANCE AGREEMENT

This Agreement is made between the United States Maritime Administration (MarAd) and Overseas Shipholding Group, Inc. (OSG), on behalf of itself and all of its organizational units, including all subsidiaries and affiliates. MarAd and OSG are sometimes referred to individually as a "Party" and are sometimes referred to collectively as the "Parties."

## PREAMBLE

WHEREAS, OSG having been indicted in six Federal district courts – the Central District of California, the Northern District of California, the District of Maine, the District of Massachusetts, the Eastern District of North Carolina and the Eastern District of Texas – for multiple environmental infractions, including one violation under the Clean Water Act involving one vessel, the *M/T Neptune*, triggering award ineligibility under that statute, entered into a consolidated plea agreement (Plea Agreement) with the U.S. Department of Justice and the six U.S. Attorney's Offices; and,

WHEREAS, OSG's Plea Agreement called for pleas in two different jurisdictions, one in the U.S. District Court for the Eastern District of Texas, and a second, consolidating the infractions in the remaining five jurisdictions, in the U.S. District Court for the District of Massachusetts; and,

WHEREAS, the plea in the U.S. District Court for the Eastern District of Texas was entered on January 23, 2007 and OSG was sentenced on June 20, 2007, and the plea in the U.S. District Court for the District of Massachusetts was entered on March 21, 2007 and the judgment was issued and probation for OSG commenced on May 25, 2007.

WHEREAS, OSG's Plea Agreement required payment of a significant fine, funding of various community service projects, and a three-year probationary period, which included as conditions of probation compliance with the terms of a comprehensive Environmental Compliance Plan (ECP) and oversight by a Court Appointed Monitor who will report to the U.S. District Court for the District of Massachusetts (the Court); and,

WHEREAS, in anticipation of possible suspension and debarment proceedings, OSG met with MarAd to address OSG's present responsibility, as a potential contractor and/or participant in Federally-funded activities, arising from OSG's environmental violations; and,

WHEREAS, in addition to meeting with MarAd, OSG provided a written submission that constitutes part of the administrative record detailing OSG's substantial remedial and compliance efforts, the details of the criminal proceedings and underlying issues, and OSG's specific responses to each issue; and,

WHEREAS, OSG acknowledges that its past environmental problems resulted, in part, from serious misconduct by several of its senior sea staff officers and crewmembers, and those who were responsible, or admitted wrongdoing, or were convicted for wrongdoing were terminated by OSG, or in some cases, did not have their employment contracts renewed by OSG; and,

WHEREAS, OSG has made significant efforts in cooperation and support of the government's investigation, including voluntarily disclosing violations concerning six vessels; voluntarily producing thousands of pages of documents; waiving the attorney-client and work product privileges; making more than 70 crewmembers and shore staff available to the U.S. Government to be interviewed and/or testify, many of whom were outside the subpoena authority of the U.S. Government; and paying wages, travel, lodging and subsistence expenses for such crewmembers and shore staff when providing them to government investigators or while they were detained at the Government's request; and,

WHEREAS, OSG's current senior management has implemented a "Do It Right" Program to stress OSG's commitment and attitude toward environmental compliance, which included a fleet-wide stand down during which senior corporate managers visited each vessel to stress the importance of environmental compliance; telephone contacts by senior technical managers to every ship on multiple occasions to emphasize the importance of environmental compliance; the creation and mandatory viewing by all sea staff of a video presentation featuring OSG's Chief Executive Officer and Head of Shipping Operations stressing the importance of environmental compliance; and, an increase in technical shore side staffing to allow for greater attention to environmental matters; and,

WHEREAS, OSG's current senior management has taken considerable additional steps in response to the past misconduct in an effort to address OSG's environmental violations and compliance attitude, including but not limited to:

1. Removing the environmental compliance budget from the operating expenditures budget;
2. Implementing a new computer operating system to be utilized by Chief Engineers, Masters, shore side personnel and others that will allow for greater oversight of vessel operations, maintenance and repair;
3. Designing, creating and/or implementing new environmental compliance and monitoring equipment, such as Environmental Tags (Enviro-Tags), the Environmental Logger (Enviro-Logger), polishing filters and other technical improvements; as well as new engineering and maintenance requirements, such as periodic calibration of oil content meters and other pollution prevention equipment;
4. Creating an anonymous sea staff-specific reporting system;

5. Creating an internal compliance oversight staff, including an Operational Compliance Officer who reports directly to the Chief Executive Officer and Board of Directors, and increasing the number of management staff to oversee vessel operations;
6. Implementing an internal and external environmental audit program; and
7. Enhancing its general environmental training, including adding specialized training courses directly related to waste stream handling and disposal; and,

WHEREAS, OSG's response to the investigation and implementation of the remedial measures detailed above, which the government has identified as industry best practices, evidence an excellent corporate attitude toward compliance with applicable laws and regulations; and

WHEREAS, OSG has presented evidence to MarAd about its efforts to correct the conditions that gave rise to the Clean Water Act violation aboard the *M/T Neptune*, specifically through implementation of best practice procedures and installation of equipment aimed at preventing the illegal discharge of bilge water, including many of the efforts detailed above; and,

WHEREAS, MarAd finds that OSG's response to its past misconduct appears to be a meaningful and serious effort to address such conduct, MarAd desires to allow OSG's corrective measures to continue and thereby achieve its goal of environmental compliance,

NOW THEREFORE, MarAd and OSG agree to the following terms and conditions.

## TERMS AND CONDITIONS

1. OSG shall maintain its environmental compliance program and make any and all changes as it deems necessary to ensure that OSG and any and all of its organizational units operate in accordance with environmental laws and regulations. Any material departures from its program shall be noted with the reason for such change, and retained in the event that a compliance review of this Agreement is conducted during the time of, and under the terms of, this Agreement.

2. OSG shall comply with the conditions of the three-year probation. If, at any time prior to the completion of probation, the Court finds that OSG has materially violated the terms of its parole, such a finding by the Court shall be deemed a violation of this Agreement and shall constitute grounds for the issuance of a Notice of Proposed Debarment and related proceedings pursuant to the provisions of 49 C.F.R. Part 29 to OSG, or, where appropriate, any of OSG's subsidiaries or affiliates.

3. OSG shall provide MarAd with copies of all reports submitted to the Court pursuant to the terms of the ECP.

4. OSG shall provide MarAd information and updates when they become available on the following activities undertaken pursuant to the ECP:

   a. Enviro-Logger technology upgrades being developed in conjunction with the U.S. Coast Guard; and

b. Prototyping of emerging oily water separator technologies that OSG has indicated it is evaluating.

5. OSG shall take reasonable steps to promote the commercialization of environmental compliance technology that it has developed to address issues relating to waste stream disposal, such as the Enviro-Tag and Enviro-Logger Systems.

6. OSG shall provide copies to MarAd of a study to be funded by OSG, pursuant to the terms of the Plea Agreement, whereby the National Fish and Wildlife Foundation will analyze waste stream management and the effectiveness of existing oily water separators.

7. In recognition of the cooperation of OSG, the remedial efforts it has taken, the ECP and OSG's promises contained in this Agreement, MarAd agrees as the lead federal agency not to suspend or debar OSG or any of its subsidiaries or affiliates by reason of the convictions identified in the Plea Agreement, or for the facts and events giving rise to these convictions.

8. If during the Agreement period, OSG, or any director, officer, employee, or consultant of OSG, is criminally charged by any governmental entity, enters a guilty plea or plea of *nolo contendre*, or is criminally convicted, either by entrance of an order or by a deferred prosecution agreement, for a violation of any environmental law or regulation, as the result of conduct occurring after the execution of this Agreement, OSG agrees to notify MarAd at the address specified herein within thirty (30) calendar days of OSG's receipt of notice of such event.

9. This Agreement shall become effective at the time it is fully executed by all the Parties and will continue until May 24, 2010, terminating simultaneously with OSG's three-year probation period. At the end of this period, this Agreement will end without further action by the Parties.

10. Nothing in this Agreement precludes OSG from petitioning MarAd to modify this Agreement.

## GENERAL TERMS

11. **Limitations on Settlement.** This Agreement relates solely to resolution of suspension and debarment issues under 48 C.F.R. Subpart 9.4 and 49 C.F.R. Part 29, in conjunction with the circumstances recited herein, and in no way waives any criminal, civil, contractual, or administrative remedy or right that the Government may have for the circumstances so described, nor does this Agreement restrict the authority, responsibility or legal duty of MarAd to consider and institute suspension and/or debarment proceedings against OSG if information is received that provides a cause for suspension and/or debarment independent of the circumstances recited or referenced herein.

12. **Breach of Agreement/Survival of Cause for Debarment.** The Parties agree that the causes for debarment survive the execution of this Agreement and MarAd may initiate suspension and/or debarment proceedings against OSG on these grounds if there is a material breach of this Agreement. Any material breach of this Agreement may also be regarded as an

independent cause for suspension or debarment. The Parties also agree that repeated violations of non-material provisions of this Agreement may cumulatively become a material breach of this Agreement. Furthermore, any violation of this Agreement that is not corrected within thirty (30) days from the date of receipt of notice from MarAd may constitute an independent cause for debarment. If correction is not possible within thirty (30) days, OSG shall present an acceptable plan for correction within that thirty (30) day period. MarAd may, upon evidence that OSG has committed a material breach or not sufficiently cured a violation of this Agreement, initiate discretionary suspension and/or debarment proceedings under 49 C.F.R. Part 29 or 48 C.F.R. Subpart 9.4 against OSG, or, where appropriate, any of its subsidiaries and affiliates. MarAd will promptly notify OSG in writing of the suspension or proposed debarment. OSG will have the right to contest the suspension or proposed debarment according to the procedures set forth in 49 C.F.R. Part 29 or 48 C.F.R. Subpart 9.4. Alternatively, in the event of any non-compliance, MarAd may in its sole discretion extend this Agreement for a period equal to the period of non-compliance. OSG does not, by this Agreement or otherwise, waive its right to oppose such action under 49 C.F.R. Part 29, or any other substantive, procedural, or due process rights it may have under the Constitution or other applicable laws or regulations of the United States.

13. **Unallowable Costs.** When the application of FAR cost principles is required under FAR Part 31, OSG will assure that all costs, defined in FAR subsection 31.205-47, incurred for or on behalf of OSG in response to or in preparation of government criminal, civil, or administrative actions arising out of the convictions identified in the Plea Agreement or for the facts and events giving rise to these convictions, and all costs incurred by OSG in negotiating, implementing and abiding by the terms of this Agreement, are accounted for and segregated in such a manner, consistent with OSG's current accounting system, that no such costs are included in any bills or charges to the Government, with the exception of those instances described in Paragraph 14 of this Agreement. These amounts shall be separately accounted for by OSG by identification of costs incurred:

a. Through account records to the extent possible;

b. Through memorandum records, including diaries and formal logs, regardless of whether such records are part of official corporate documentation, where accounting records are not available; and

c. Through good faith itemized estimates where no other accounting basis is available.

14. **Allowable Costs.** The costs of all self-governance, compliance, or ethics programs, activities and offices, and the general cost of operations, maintenance and compliance with existing law and regulations in existence prior to when the matters described in the Preamble of this Agreement arose and which are continued by the terms of this Agreement shall be allowable costs to the extent otherwise permitted by law and regulation.

15. **Release of Liability.** By execution of this Agreement, OSG releases and shall hold harmless the United States, its instrumentalities, agents, and employees, in their official and

personal capacities, of any and all liability or claims arising out of or otherwise related to the negotiations and actions leading up to the execution of this Agreement.

16. **Freedom of Information Act.** OSG acknowledges that this Agreement is subject to release by MarAd in accordance with the provisions of the Freedom of Information Act, 5 U.S.C. §§552 et seq.

17. **Restructuring or Acquisition of New Businesses.** OSG shall not, through a change of name, business reorganization, sale or purchase of assets, or similar action, seek to avoid the obligations and conditions set forth in the Agreement. If, during the period covered by this Agreement, OSG acquires or gains control of any business concern, which performs or may perform work on projects funded by Federal assistance or procurement programs, MarAd shall be notified within ten (10) calendar days. Such notice shall state the nature of the business concern, the address of the business concern and the names and addresses of the business concern's officers or directors. MarAd may at their sole election determine that such concern shall be subject to the terms and conditions of this Agreement. In the event that MarAd determines that a newly-acquired business concern shall be subject to the provisions of this Agreement, MarAd shall notify OSG in writing of its determination.

18. **Successor and Sale of Assets.** The terms, conditions and obligations of this Agreement shall survive the reorganization of OSG's corporate structure and shall be fully binding upon any organization which is a successor in interest to substantially all of the assets or shares of OSG or which is associated or affiliated with OSG. The Successor or Purchaser may request MarAd review the need for continuation of the terms and obligations of this Agreement under the provisions and criteria at 49 C.F.R. §§ 29.875 and 29.880.

19. **Documentation.** OSG shall maintain documentation sufficient to demonstrate compliance with the requirements of this Agreement.

20. **Notification Addresses.** All notifications or submissions from OSG required under this Agreement will be mailed to the following addresses:

Joseph Byrne
Acting Associate Administrator for
Environment and Compliance
U.S. Maritime Administration
1200 New Jersey Ave, S.E.
Washington, D.C. 20590

The OSG contact for matters involving this Compliance Agreement shall be:

Robert E. Johnston
Senior Vice President and Head of Shipping Operations
Overseas Shipholding Group, Inc.
666 Third Avenue
5th Floor

New York, NY 10017

and cc'd to:

James I. Edelson
General Counsel and Secretary
Overseas Shipholding Group, Inc.
666 Third Avenue
5th Floor
New York, NY 10017

21. **Certification as to Facts Recited**. By signature hereto, the individual executing this Agreement on behalf of OSG certifies, personally as well as on behalf of OSG, subject to criminal penalties of 18 U.S.C. §1001, that the facts recited herein and in the submission by counsel for OSG in the proceedings leading to this Agreement, are to the best of his knowledge, information and belief, true, complete and accurate.

6/22/07

BY: Robert E. Johnston DATE
Senior Vice President and Head of Shipping Operations
Overseas Shipholding Group, Inc., and on behalf of all organizational units.

6/25/07

By: Sean T. Connaughton DATE
Debarring Official and Maritime Administrator
U.S. Maritime Administration

# EXHIBIT E

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | | |
|---|---|---|
| OSG PRODUCT TANKERS LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. __________ |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF WARREN A. HAYDEN**

I, Warren A. Hayden, declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am the President of Washington Maritime Shipping Corporation (hereinafter "WMSC") and have served in that role since 2000. WMSC is a privately held ship brokerage company specializing in military contracts, specifically contracts awarded by Military Sealift Command (hereinafter "MSC") and Surface Deployment and Distribution Command. WMSC was appointed by OSG Product Tankers LLC (hereinafter "Product Tankers") to serve as their broker on the MSC Solicitation N00033-06-R-5416 ("MSC Solicitation"). In addition to my position at WMSC, I also serve as Secretary of the National Defense Transportation Association Washington, DC chapter and am a member of the American Bureau of Shipping, the Association of Ship Brokers and Agents (USA), the National Contract Management Association and the Propeller Club, Washington DC chapter.

2. The MSC Solicitation was published to solicit bids for the replacement of two T-5 Tankers.

3. As Product Tankers' broker on the MSC Solicitation, I assisted Product Tankers in preparing and submitting its offer and supporting documentation to MSC, including the Final Proposal Revisions. I also act as a liaison and point of contact between Product Tankers and MSC for purposes of the MSC Solicitation.

4. On January 23, 2007, on behalf of Product Tankers, I attended a meeting with MSC to discuss technical aspects of its proposal under the MSC Solicitation. During this meeting, MSC briefly inquired into a Plea Agreement between the U.S. Government and OSG regarding certain environmental violations that occurred on OSG vessels. We, myself and Eric Smith of Product Tankers, briefly described the violations, which included just one Clean Water Act violation, and explained that all of the violations related to foreign flag vessels. We further emphasized that neither these vessels, nor their crew would be used for the work contemplated under the MSC Solicitation. We concluded the subject by offering to make anyone at OSG available to MSC to discuss these matters in greater depth with them. We also offered MSC a copy of the Joint Factual Statement supporting the Plea Agreement. MSC indicated that they had a copy of the Joint Factual Statement, albeit they had not had a chance to review it.

5. On March 5, 2007, I hand delivered a Revised Pricing Proposal. MSC had requested the revised proposals due to changes in the parameters of the work under the MSC Solicitation. MSC notified Product Tankers, however, that this was not "Final Proposal Revision" and there was no technical submission required.

6. On March 28, 2007, I hand delivered Product Tankers' sealed Final Proposal Revisions ("FPR") to MSC at approximately 1:30 P.M. EDT. The deadline to submit the FPR was 2:00 P.M. EDT. Approximately thirty minutes after the deadline, at 2:28 P.M. EDT, I received Amendment 0013 to the Solicitation from MSC, which extended the deadline for FPRs until 3:00

P.M. EDT on March 30, 2007. Shortly thereafter, I received a call from Ms. Silvia Molinillo-Corral of MSC confirming my receipt of Amendment 0013.

7. At approximately 4:00 P.M. EDT on March 28, 2007, I called Ms. Molinillo-Corral. After failing to reach Ms. Molinillo-Corral, I contacted Ms. Carole Wieszek, also of MSC. I informed Ms. Wieszek that I wished to retrieve the sealed FPR that I had submitted earlier that day on behalf of Product Tankers. Ms. Wieszek indicated that I could retrieve the FPR, however, it was no longer sealed. In a subsequent call a few minutes later, Ms. Wieszek explained that MSC has procedures for who would be allowed to view offers and that the FPR would be secured any time it was not in the possession of authorized personnel.

8. At approximately 4:45 P.M. EDT, Ms. Molinillo-Corral returned my call and confirmed that Product Tankers' FPR had been opened and that it was currently in a locked location. She advised me that I could retrieve the documents at approximately 12:00 P.M. the following day (March 29, 2007).

9. On March 29, 2007, at the direction of Product Tankers, I retrieved the now opened FPR from MSC out of concern that Product Tanker's pricing would leak out prior to the submission of an FPR from another offeror. On March 30, 2007, I redelivered the unchanged FPR to MSC before the new deadline. No explanation was ever given by MSC as to why it was necessary to issue Amendment 0013 after the due date for submission of FPRs and allow another two days for such submittals.

10. As a representative of Product Tankers, I attended a pre-award meeting with representatives of the MSC on May 4, 2007. Also in attendance were representatives of Overseas Shipholding Group, Inc. (hereinafter "OSG"), one of the parent companies of Product Tankers.

11. I have reviewed the Overseas Shipholding Group, Inc. Post Award Debriefing for Solicitation N00033-06-R-5416 dated July 10, 2007 from the MSC, and the MSC Contracting Officer's Responsibility Determination, OSG Product Tankers LLC, dated 19 June 2007 (hereinafter "MSC Responsibility Determination"). In the MSC Responsibility Determination, the Contracting Officer bases numerous conclusions on statements allegedly made at the May 4, 2007 meeting.

12. Based on my participation in the meeting at which the oral presentation was made by Product Tankers and OSG, and my recollection and review of documents summarizing the matters discussed at the meeting, I am aware of several significant errors in the MSC Responsibility Determination regarding statements attributed to representatives of Product Tankers and OSG during the oral presentation. These errors include, but are not limited to:

a. The MSC Responsibility Determination states that [redacted] ¶I.D.2.B.2.(c), MSC Responsibility Determination at p. 9. This statement is wrong. At the meeting on May 4, 2007, [redacted]

[redacted] OSG stated that, as a consequence of the implementation of this policy, the majority of Masters and senior engineers serving on the vessels at the time the violations occurred had not been rehired.

b. The MSC Responsibility Determination states that "[redacted]" ¶I.D.2.B.2.(d), MSC Responsibility Determination at p. 9. This statement is not accurate, [redacted]. In its oral presentation, and in its subsequent written submission, [redacted]

c. The MSC Responsibility Determination states that "[redacted]" ¶I.D.2.B.2.Subconclusion, MSC Responsibility Determination at pp. 9-10. This misstates what was said by OSG during the oral presentation.

[redacted] Second, [redacted]

d. The MSC Responsibility Determination states "[redacted]" ¶I.D.2.B.3, MSC Responsibility Determination at p. 10. During the oral presentation, OSG stated that [redacted] Further, OSG stated that [redacted]. OSG also stated that [redacted]. As a consequence of these statements by OSG, [redacted]

e. The MSC Responsibility Determination states "[redacted]'" ¶I.D.2.B.5.(a), MSC Responsibility Determination at p. 12. OSG, in its oral presentation, indicated that [redacted] Initially, OSG stated that [redacted]. The following are examples of some of the programs put in place by OSG [redacted]

- OSG stated [redacted].
- OSG stated that [redacted]
- [redacted]
- [redacted]

[redacted]

- [redacted]

f. The MSC Responsibility Determination states "[redacted]"" ¶I.D.2.B.8, MSC Responsibility Determination at p. 14. OSG at the oral presentation stated that the Environmental Compliance Program ("ECP") established as a condition of probation under the Plea Agreement between OSG and the Government had been largely implemented by OSG prior to the signing of the Plea Agreement. At the oral presentation, OSG continually referred to the Appendix to the ECP that had been entered into between OSG and the Government, stating during the oral presentation, that there were three types of audits that were required under the ECP – Initial, On-going and Final. OSG personnel stated that, as established in the Appendix to the ECP, OSG had already complied with the Initial audit requirement, which required that 100% of the fleet then existing be audited. In fact, Robert Johnston, Head of Shipping Operations for OSG, specifically stated during the presentation that OSG had completed and provided to the

Coast Guard over 170 audits. Finally, OSG stated that, because OSG had already complied with the initial audit requirement, the Government agreed that the probation period would be three years instead of five years. [redacted] OSG did state during the presentation that the on-going audit phase had begun in June of 2006, before the ECP had been mandated, and that this fact too had been recognized by the Government in the ECP Appendix.

13. Throughout my involvement on the MSC Solicitation on behalf of Product Tankers, MSC never inquired into Product Tankers' ability to [redacted]

Executed on this 25th day of July, 2007.

Warren A. Hayden