to) Hess. If the rate for an ITB exceeds the support rate set forth in the Support Agreement, we must pay the excess to Hess to reimburse Hess for any payments made to us by Hess under the Support Agreement. Once Hess has been fully reimbursed for all payments made under the Support Agreement, we must pay Hess 50% of any remaining excess. Payments to Hess, net of payments received from Hess, under the Support Agreement were $0.5 million for the three months ended March 31, 2007. Advances from Hess, net of payments to Hess, under the Support Agreement were $0.9 million for the three months ended March 31, 2006. For the three months ended March 31, 2007 and 2006, five ITBs were covered by the Support Agreement. One ITB is under contract with Hess at a charter rate less than the support rate. This vessel will be covered by the Support Agreement upon any termination of that contract.

*Financing Cash Flows*

Net cash provided by financing activities was $13.3 million for the three months ended March 31, 2007, an increase of $10.1 million, compared to net cash provided by financing activities of $3.2 million for the three months ended March 31, 2006. In the three months ended March 31, 2007, we borrowed $18.0 million under our delayed draw term loan and made scheduled repayments of $0.7 million. The Joint Venture received $2.3 million from the Joint Venture Investors and borrowed $2.0 million under its revolving credit facility. Additionally, in the three months ended March 31, 2007, we paid distributions of $8.4 million. In the three months ended March 31, 2006, we had net revolving borrowings of $10.0 million which were offset by scheduled debt repayments of $0.5 million and distributions of $6.4 million.

*Payments of Distributions*

On May 3, 2007, the Board of Directors of the general partner declared our regular cash distribution for the first quarter of 2007 of $0.45 per unit. The distribution will be paid on all common, subordinated and general partner units on May 15, 2007 to all unitholders of record on May 11, 2007. The aggregate amount of the distribution will be $8.4 million.

The Board of Directors also declared a quarterly distribution to unitholders of $0.45 per unit in respect to the quarter ended December 31, 2006 to unitholders of record on February 12, 2006. The distribution was paid to all common, subordinated and general partner unitholders on February 15, 2007. The aggregate amount of the distribution was $8.4 million.

*Ongoing Capital Expenditures*

Marine transportation of refined petroleum, petrochemical and commodity chemical products is a capital intensive business, requiring significant investment to maintain an efficient fleet and to stay in regulatory compliance. Both domestic (U.S. Coast Guard) and international (International Maritime Organization) regulatory bodies require that our vessels be drydocked for major repair and maintenance at least twice every five years. To date our ITBs have been able to participate in the United States Coast Guard Underwater Inspection In Lieu of Drydock ("UWILD") Program, which allows our ITBs to be drydocked once every five years, with a mid-period underwater survey in lieu of a drydock. We were recently advised by the U.S. Coast Guard that U.S. flagged non-double hulled tank vessels that are over 15 years in age and trade internationally will not, consistent with International Maritime Organization regulations, be eligible to participate in the UWILD Program. However, the U.S. Coast Guard has advised us that it will consider for participation in the UWILD Program non-double hulled tank vessels that are over 15 years of age but only trade domestically. If we are required to conduct a second drydock in each five year period rather than rely on an underwater survey, our ITBs will be out of service longer and our drydock expenses will be higher than the time required for and the cost of conducting an underwater survey, which could adversely affect our business, financial condition and results of operations. This could also adversely impact our cash available to pay cash distributions and to pay interest on, and principal of, our indebtedness. In addition, vessels may have to be drydocked in the event of accidents or other unforeseen damage. Periodically, we also make expenditures to acquire or construct additional tank vessel capacity and/or to upgrade our overall fleet efficiency, and, in the future may make capital expenditures to retrofit vessels to meet the requirements of OPA 90.

During 2006, the parcel tankers, *Charleston, Chemical Pioneer* and *Sea Venture*, and the ITBs *Groton* and *Mobile* were placed in drydock. The *Charleston* drydock was completed in July at a cost of $5.2 million, the *Chemical Pioneer* drydock was completed in December at a cost of $5.5 million and the initial *Sea Venture* drydock was completed in June at a cost of $9.9 million. The *Sea Venture* drydock was an extensive drydocking that brought the vessel to our operational standards followings its acquisition. The ITB *Groton* was completed in August at a cost of $5.2 million and the ITB *Mobile* was completed in December at a cost of $5.1 million. The *Baltimore* and the *Philadelphia* are scheduled for drydock in 2007 at a total estimated cost of $12.0 million. For future drydockings, we estimate that d rydocking the ITBs will cost approximately $6.0 million per vessel, the parcel tanker and *Houston* drydocks will cost approximately $3.5 million to $6.0 million per vessel, the ATB drydockings will cost between $1.0 million and $2.0 million per vessel and the new tanker drydocks will cost between $3.5 million and $4.0 million per vessel. While drydocked, each of our ITBs will be out of service for approximately 50 to 70 days, each parcel tanker and the *Houston* will be out of service for approximately 35 to 60 days, each ATB unit will be out of service for approximately 25 days and each new tanker will be out of service for approximately 35 to 40 days. At the time we drydock these vessels,

the actual cost of drydocking may be higher due to inflation and other factors. In addition, vessels in drydock will not generate any income, which will reduce our revenue and cash available for distribution and to pay interest on, and principal of, debt.

Our partnership agreement requires our general partner to deduct from basic surplus each quarter estimated maintenance capital expenditures as opposed to actual maintenance capital expenditures in order to reduce disparities in basic surplus caused by fluctuating maintenance capital expenditures, such as retrofitting or drydocking. Our annual estimated maintenance capital expenditures for purposes of calculating basic surplus were increased from $19.6 million in 2006 to $20.9 million in 2007. This amount is based on our current estimates of the amounts of expenditures we will be required to make in the future, which we believe to be reasonable. The amount of estimated maintenance capital expenditures deducted from basic surplus is subject to review and change by the board of directors of our general partner at least once a year, with any change approved by the conflicts committee.

The following table summarizes total maintenance capital expenditures, consisting of drydocking expenditures, and expansion capital expenditures for the periods presented (in thousands):

| | Three Months Ended March 31, | |
|---|---|---|
| | 2007 | 2006 |
| Maintenance capital expenditures | $ 106 | $ 3,497 |
| Expansion capital expenditures - ATBs | 22,183 | 17,137 |
| Expansion capital expenditures - Tankers | 4,553 | — |
| Total capital expenditures | $ 26,842 | $ 20,634 |

We are currently conducting a study to assess strategic alternatives so that our ITBs may continue trading past their current OPA 90 lives, including retrofitting the ITBs with an internal double hull, repurposing the ITBs to carry products other than petroleum products, or a combination of the two. We believe that there are significant opportunities to repurpose or retrofit these vessels so that they may continue trading past their OPA 90 lives, which range from 2012 to 2014. We may choose to make these adjustments to the ITBs before their current OPA 90 expiration date – likely concurrent with a regularly scheduled drydock – if we believe market conditions to be favorable. We have received preliminary advice from the United States Coast Guard that our current plans to retrofit the ITB *Philadelphia* to add a double hull in order to bring the vessel into compliance with OPA 90 can be substantially performed in a foreign shipyard without losing its Jones Act classification. We currently estimate that performing this work in a foreign shipyard, if done in conjunction with the required drydock of the vessel, will cost approximately $12.0 million - $15.0 million in current dollars, which is substantially less than the cost of such work in a U.S. shipyard. If we retrofit this vessel in a foreign shipyard, we estimate that the vessel will be out of service approximately 4-6 months for the combined retrofit and drydock. We estimate this retrofit will decrease vessel capacity by approximately 18%; however, we believe we could reduce this reduction by performing additional work in U.S. shipyards, although the cost would be higher. The reduction in capacity will negatively impact the charter rates we would receive in respect of these retrofitted vessels. The cost of retrofitting our ITB units compared to the cost of newbuildings, market conditions, charter rates, customer acceptance and the availability and cost of financing will be major factors in determining the OPA 90 compliance plan that we ultimately implement and the timing thereof.

***Liquidity Needs***

Our primary short-term liquidity needs are to make scheduled debt and interest payments, pay our quarterly distributions, make progress payments related to our new build ATB units under construction, to fund construction costs of tankers, and to fund general working capital requirements and drydocking expenditures. Our long-term liquidity needs are primarily associated with expansion and other maintenance capital expenditures. Expansion capital expenditures are primarily for the purchase or construction of vessels, including the ATB units currently under construction. Maintenance capital expenditures include drydocking expenditures and the cost of bringing our vessels into compliance with OPA 90. Our primary sources of funds for our short-term liquidity needs will be cash flows from operations and borrowings under our amended and restated credit facility. Our long-term sources of funds will be from cash from operations, long-term bank borrowings and other debt or equity financings.

***Contractual Commitments and Contingencies***

In 2006, we entered into a contract with Manitowoc Marine Group ("MMG") for the construction of four barges, each of which is specified to have a carrying capacity of approximately 156,000 barrels at 98% of capacity. However, we have paid $0.5 million for the option to cancel one barge prior to June 18, 2007. If the cancellation option is exercised, we will forfeit all amounts previously paid for this barge (which will aggregate $3.8 million). We have also paid $1.2 million of deposits for owner-furnished equipment for the fourth of these ATB units that may not be recoverable if we decide not to proceed with that vessel. In 2006, we also entered into a contract for the construction of three tugs with Eastern Shipbuilding Group, Inc. ("Eastern"), which will be joined with the barges to complete three new ATB units. The contract with Eastern also includes an option to construct and deliver an additional tug, which must be exercised by August 1, 2007. The total

construction cost anticipated for these new ATB units is approximately $65.0 million to $66.0 million per unit (subject to change orders and modifications), in each case inclusive of owner furnished equipment, but exclusive of capitalized interest. The capitalized interest as of March 31, 2007 relating to this series of ATBs is $2.7 million. We expect that the first two of these ATB units will be completed in August 2008 and November 2008, respectively, and the second two of these ATB units to be completed in August 2009 and, if not cancelled, November 2009. As of March 31, 2007, we have made payments totaling approximately $41.0 million related to these new builds. As of March 31, 2007, we had in escrow approximately $156.2 million, which is the amount we estimate it will cost to complete construction of the first three of these ATBs.

The construction of our first 19,999 dwt ATB, the parcel barge *Chemical Transporter* and the pusher tug *Freeport*, is nearing completion. Engine commissioning on the *Freeport* began in early May and sea trials are scheduled to commence in mid May. Final systems testing and regulatory certification are expected to be completed immediately following the tug's arrival in Baltimore, where it will be joined together with the barge. Launch of the *Chemical Transporter* is scheduled to occur in late May. Following final commissioning and testing of cargo systems and regulatory certification and sea trials, the completed ATB is expected to enter our chemical service in mid June. This ATB unit is already covered with contracts of affreightment with major customers of ours. The estimated final delivered cost of the ATB unit is currently expected to approximate $86.0 million to $88.0 million, excluding capitalized interest and net of a $21.0 million settlement with the original builder. Delays and cost overruns associated with this ATB unit are primarily attributable to the original builder's failure to perform under the shipbuilding contract. We believe that we have valid claims which, if recovered, will reduce this gross amount. We are currently pursuing a sale and leaseback of this ATB, which if completed will allow us to finance the construction of the fifth ATB of the series, if we proceed with the construction of that unit. The decision whether to proceed with the construction of the fifth ATB unit needs to be made by June 18, 2007. Our ability to complete the first ATB on the above estimates of both timing and cost are dependent on a number of factors, some of which are beyond our control, including the availability and cost of needed equipment and labor as well as weather conditions.

As a result of the delay in the delivery of, and the increased cost of constructing, the first ATB, we probably will not be able to meet certain of our current financial covenant requirements under our senior credit facility in the second half of the year. We believe that the lenders under the senior credit facility will modify the financial covenants so that we will remain in compliance with such covenants, although there can be no assurance of this. If we default under our covenants, and such defaults are not cured via waiver or amendment, then a majority of the lenders under the senior credit facility may elect to declare all or a portion of the outstanding amounts due under the senior credit facility immediately due and payable and/or terminate the loan commitments under such credit facility. We are in compliance with all our financial covenants at the end of the first quarter of 2007. Any delay in delivery of the ATB and/or increase in the cost of completion could adversely affect our business, results of operations and ability to pay distributions and to pay interest on, and principal of, debt.

***New Accounting Pronouncements***

As of January 1, 2007, we adopted the provisions of Financial Accounting Standards Board ("FASB") Interpretation Number ("FIN") 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109." See Note 2, *Adoption of New Accounting Policy-Income Taxes*, in the attached Unaudited Condensed Consolidated Financial Statements for a full description of our accounting policy related to the accounting for income tax contingencies. As a result of the implementation of FIN 48, we recognized no material adjustment in the liability for unrecognized income tax benefits and all such liabilities are now classified as long-term, including the associated accrued interest and penalties.

In September 2006, the FASB issued Statement of Financial Accounting Standards, or FAS, No. 157, "Fair Value Measurement," effective for fiscal years beginning after November 15, 2007. FAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. This statement does not require any new fair value measurements, but simplifies and codifies related guidance within generally accepted accounting principles. FAS No. 157 applies under other accounting pronouncements that require or permit fair value measurements. We are currently reviewing the impact of this pronouncement upon its adoption.

In February 2007, the FASB issued FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities, including an amendment of FASB Statement No. 115," ("FAS 159") effective as of the beginning of fiscal years beginning after November 15, 2007. FAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value at specified election dates. A business entity shall report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. Under FAS 159 the fair value option:

1. May be applied instrument by instrument, with a few exceptions, such as investments otherwise accounted for by the equity method
2. Is irrevocable (unless a new election date occurs)
3. Is applied only to entire instruments and not to portions of instruments.

We are currently reviewing the impact of this pronouncement upon its adoption.

***Related Party Transactions***

*Hess Support*

Hess is one of our significant customers. Voyage revenues earned from charters with Hess (which do not include amounts received under the Support Agreement) for the three months ended March 31, 2007 and 2006 were $5.4 million and $3.2 million, respectively. We had a payable to Hess under the Support Agreement of $1.3 million at March 31, 2007, and a receivable from Hess under the Support Agreement of $0.1 million at December 31, 2006.

*General Partner*

General and administrative expenses, including shore side employee expenses, and wages and benefits for crew members are incurred directly by our general partner. These amounts are reimbursable by us pursuant to the partnership agreement. Reimbursable amounts expensed by us were $12.7 million and $10.7 million, respectively, for the three months ended March 31, 2007 and 2006.

*New York Office*

On September 23, 2005, we entered into a ten-year lease for office space for our New York City office. We sublease 75% of the leased space to certain companies affiliated with our Chairman and Chief Executive Officer. The affiliated companies pay their portion of the rent in advance of our making the rental payment. We have provided a letter of credit totaling $0.2 million to secure final payments of the lease commitment. We have been reimbursed 75% of the cost of providing the letter of credit and have received a guaranty from our Chairman in the event of any default of the lease, including that which would require drawdown of the letter of credit. For the three months ended March 31, 2007, we paid $102 thousand in connection with the lease and received $77 thousand from our related parties. There were no payments made relating to the lease in the first quarter of 2006.

*USS Product Manager LLC*

USS Product Manager LLC ("Product Manager"), our wholly-owned subsidiary, manages the construction and operation of the tankers for the Joint Venture, for which it will receive the following, subject to certain specified limitations:

- an oversight fee of $1.0 million per tanker, payable ratably over the course of construction of such tanker;
- a management fee of $1.0 million per year for each completed tanker that is operated by the Joint Venture;
- a delivery fee of up to $0.75 million per tanker, depending on the delivery date and cost of construction; and
- a sale fee of up to $1.5 million per tanker upon its sale to the Partnership or a third party, depending on the price obtained and whether a charter meeting specified terms is in place.

The management agreement between Product Manager and the Joint Venture has an initial term of 10 years, subject to early termination under certain circumstances. The obligations under the management agreement will be performed by employees of US Shipping General Partner LLC, our general partner. Certain members of our management are expected to devote significant time to the management and operation of the Joint Venture. For the three months ended March 31, 2007, we recorded $17 thousand in income related to this management agreement; however this amount was eliminated in consolidation.

*The Blackstone Group and Other Joint Venture Investors*

As a result of the formation of the Joint Venture, we consider The Blackstone Group and Other Joint Venture Investors to be related parties. For the three months ended March 31, 2007, the Joint Venture has paid interest on the Revolver totaling $1.2 million to The Blackstone Group and Other Joint Venture Investors.

## ITEM 3. *Quantitative and Qualitative Disclosures about Market Risk*

Our market risk is affected primarily by changes in interest rates. We are exposed to the impact of interest rate changes primarily through our variable-rate borrowings under our credit facility. Significant increases in interest rates could adversely affect our profit margins, results of operations and our ability to service our indebtedness. Based on our average variable interest rate debt outstanding during the three months ended March 31, 2007, a 1% change in our variable interest rates would have increased our interest expense by $0.4 million for the three months ended March 31, 2007, after taking into effect the interest rate swap agreements we had in effect as described below.

We utilize interest rate swaps to reduce our exposure to market risk from changes in interest rates. The principal objective of such contracts is to minimize the risks and/or costs associated with our variable rate debt. All derivative instruments held by us are designated as hedges and, accordingly, the gains and losses from changes in derivative fair values are recognized as comprehensive income as required by FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities, ("SFAS No. 133"), as amended. Gains and losses upon settlement are recognized in the statement of operations or recorded as part of the underlying asset or liability as appropriate. We are exposed to credit-related losses in the event of nonperformance by counterparties to these financial instruments; however, counterparties to these agreements are major financial institutions, and the risk of loss due to nonperformance is considered by management to be minimal. We do not hold or issue interest rate swaps for trading purposes.

We had two interest rate swap agreements as of March 31, 2007. The intent of these agreements is to reduce interest rate risk by swapping an unknown variable interest rate, three month LIBOR, reset quarterly, for a fixed rate. As of March 31, 2007 the fair market values of our two interest rate swaps were a loss of $2.6 million and a loss of $1 thousand, respectively.

The following is a summary of the economic terms of these agreements at March 31, 2007:

| | | |
|---|---|---|
| Notional amount | $ | 124,063 |
| Fixed rate paid | | 5.355% |
| Variable rate received | | 5.350% |
| Effective date | | 8/15/2006 |
| Expiration date | | 8/6/2012 |
| Fair Value | $ | (2,589) |
| Notional amount | $ | 99,250 |
| Fixed rate paid | | 4.899% |
| Variable rate received | | 5.350% |
| Effective date | | 12/12/2006 |
| Expiration date | | 8/6/2012 |
| Fair Value | $ | (1) |

We have entered into contracts for the purchase of owner-furnished items relative to our newbuild ATB series, denominated in Euros, costing approximately $14.4 million. To hedge the exposure to foreign currency, we have entered into a series of foreign currency forward contracts with an average exchange rate of $1.25/Euro. As of March 31, 2007 the fair value of the foreign currency hedge was approximately $0.9 million.

The contracts to construct our ATBs with MMG and Eastern are primarily fixed; however there is an escalator clause related to the price of steel. The contract is priced utilizing a steel cost of $900/ton for steel plate and $1,100/ton for steel shape. The impact of an increase in steel prices of $100/ton would increase the cost of construction by $0.4 million per vessel.

*Joint Venture Hedging*

On February 27, 2007, the Joint Venture purchased a $100.0 million nine year interest rate cap effective April 1, 2007 for $1.9 million, including transaction fees. This interest rate cap of the three month U.S. Dollar LIBOR of 6% is part of a hedging strategy in place at the Joint Venture to protect the value of its vessels and the chartering contracts thereon. Upon the completion of the construction of each vessel, the Joint Venture expects to sell the vessel together with any chartering contract that may be in place on such vessel. Since the long-term chartering contracts entered into by the Joint Venture will result in a fixed stream of cash flows over a multi-year period, the value that the Joint Venture may be able to obtain upon the sale of the combined vessel and chartering contract is subject to volatility based upon how interest rates fluctuate. The Joint Venture plans to utilize derivative financial instruments to reduce the potential negative impacts to the Joint Venture's cash flows that could result in movements in interest rates between the date a chartering contract is entered into and the anticipated sale date of such combined vessel and chartering contract. The Joint Venture does not plan to hold or issue derivative financial instruments for trading purposes, but has not performed the activities necessary to qualify the contract for hedge accounting treatment under SFAS No. 133, as amended. The fair market value of the interest rate cap at March 31, 2007 was $1.9 million and is recorded in "Other Assets" on the Unaudited Condensed Consolidated Balance Sheets. Changes in the fair value of those instruments are reported in earnings.

## ITEM 4. *Controls and Procedures*

In accordance with Exchange Act Rules 13a-15 and 15d-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2007 to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the

Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to management as appropriate to make timely decisions regarding required disclosures.

There has been no change in our internal control over financial reporting that occurred during the three months ended March 31, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II—OTHER INFORMATION

**ITEM 1.** ***Legal Proceedings***

We are subject to various claims and lawsuits in the ordinary course of business for monetary relief principally from personal injuries, collision or other casualty and to claims arising under vessel charters. Although the outcome of any individual claim or action cannot be predicted with certainty, we believe that any adverse outcome, individually or in the aggregate, would be substantially mitigated by applicable insurance or indemnification from previous owners of our assets, and would not have a material adverse effect on our financial position, results of operations or cash flows. We are subject to deductibles with respect to our insurance coverage which range up to $0.15 million per incident, and we provide on a current basis for estimated payments thereunder.

***ITEM 1A.*** ***Risk Factors***

The following information updates the risk factors set forth in Item 1A. of our Form 10-K for the year ended December 31, 2006:

In August 2004, we entered into a contract with Southern New England Shipyard Company ("SENESCO") to build a 19,999 dwt ATB at a price of $45.4 million to be delivered in early 2006. In November 2005, SENESCO indicated that they were not able to complete the first ATB on the contract terms due to infrastructure problems and production line issues, and that the completion of the barge would be delayed. In November 2005, we entered into a revised agreement with SENESCO providing for completion of the ATB at another facility that SENESCO would operate. In order to address completion issues experienced by SENESCO, on June 1, 2006, pursuant to a settlement with SENESCO, we cancelled our agreement with SENESCO to construct the ATB and took possession of the tug and barge under construction. SENESCO paid us $21.0 million to cover a portion of the cost overruns. We have hired a naval architecture and marine engineering firm to manage and supervise the completion of the ATB. The construction of the ATB, the parcel barge *Chemical Transporter* and the pusher tug *Freeport*, is nearing completion. Engine commissioning on the *Freeport* began in early May and sea trials are scheduled to commence in mid May. Final systems testing and regulatory certification are expected to be completed immediately following the tug's arrival in Baltimore, where it will be joined together with the barge. Launch of the *Chemical Transporter* is scheduled to occur in late May. Following final commissioning and testing of cargo systems and regulatory certification and sea trials, the completed ATB is expected to enter our chemical service in mid June. This ATB unit is already covered with contracts of affreightment with major customers of ours. The estimated final delivered cost of the ATB unit is currently expected to approximate $86.0 million to $88.0 million, excluding capitalized interest and net of a $21.0 million settlement with the original builder. Delays and cost overruns associated with this ATB unit are primarily attributable to the original builder's failure to perform under the shipbuilding contract. We believe that we have valid claims which, if recovered, will reduce this gross amount. We are currently pursuing a sale and leaseback of this ATB, which if completed will allow us to finance the construction of the fifth ATB of the series, if we proceed with the construction of that unit. The decision whether to proceed with the construction of the fifth ATB unit needs to be made by June 18, 2007. Our ability to complete the first ATB on the above estimates of both timing and cost are dependent on a number of factors, some of which are beyond our control, including the availability and cost of needed equipment and labor as well as weather conditions.

As a result of the delay in the delivery of, and the increased cost of constructing, the first ATB, we probably will not be able to meet certain of our current financial covenant requirements under our senior credit facility in the second half of the year. We believe that the lenders under the senior credit facility will modify the financial covenants so that we will remain in compliance with such covenants, although there can be no assurance of this. If the Partnership defaults under the covenants, and such defaults are not cured via waiver or amendment, then a majority of the lenders under the senior credit facility may elect to declare all or a portion of the outstanding amounts due under the senior credit facility immediately due and payable and/or terminate the loan commitments under such credit facility. We are in compliance with all our financial covenants at the end of the first quarter of 2007. Any delay in delivery of the ATB and/or increase in the cost of completion could adversely affect our business, results of operations and ability to pay distributions and to pay interest on, and principal of, debt.

Both domestic and international regulatory bodies require that our vessels be drydocked for major repair

and maintenance at least twice every five years. To date our ITBs have been able to participate in the United States Coast Guard Underwater Inspection In Lieu of Drydock ("UWILD") Program, which allows our ITBs to be drydocked once every five years, with a mid-period underwater survey in lieu of a drydock. We were recently advised by the U.S. Coast Guard that U.S. flagged non-double hulled tank vessels that are over 15 years in age and trade internationally will not, consistent with International Maritime Organization regulations, be eligible to participate in the UWILD Program. However, the U.S. Coast Guard has advised us that it will consider for participation in the UWILD Program non-double hulled tank vessels that are over 15 years of age but only trade domestically. If we are required to conduct a second drydock in each five year period rather than rely on an underwater survey, our ITBs will be out of service longer and our drydock expenses will be higher than the time required for and the cost of conducting an underwater survey, which could adversely affect our business, financial condition and results of operations. This could also adversely impact our cash available to pay cash distributions and to pay interest on, and principal of, our indebtedness.

*ITEM 2. Unregistered Sales of Equity Securities and Use of Proceeds*

None.

*ITEM 3. Defaults Upon Senior Securities.*

Not applicable.

*ITEM 4. Submission of Matters to a Vote of Security Holders.*

On February 2, 2007, U.S. Shipping Partners L.P. held a special meeting of unitholders. The matters on which the unitholders voted, in person or by proxy, were:

i. A change in the terms of U.S. Shipping Partners L.P.'s class B units to provide that each class B unit will automatically convert into a common unit (the "Class B Conversion Proposal"); and

ii. The issuance of 3,123,205 additional common units upon the Class B Conversion Proposal approval (the "Issuance Proposal").

Both the Class B Conversion Proposal and the Issuance Proposal were approved. The results of the voting were as follows:

**Common Units:**

Class B Conversion Proposal:

| Votes For | Votes Against | Abstain |
|---|---|---|
| 4,584,113 | 46,574 | 53,293 |

Issuance Proposal:

| Votes For | Votes Against | Abstain |
|---|---|---|
| 4,576,032 | 55,154 | 52,793 |

**Subordinated Units:**

Class B Conversion Proposal:

| Votes For | Votes Against | Abstain |
|---|---|---|
| 6,899,968 | 0 | 0 |

Issuance Proposal:

| Votes For | Votes Against | Abstain |
|---|---|---|
| 6,899,968 | 0 | 0 |

*ITEM 5. Other Information.*

On April 25, 2007, we hired Jan T. Ziobro, a 28-year veteran of the shipping industry, as Vice President, New Construction. In this role, Mr. Ziobro will have oversight of the Partnership's new construction program, which presently stands at nine 49,000 dwt product tankers and four 19,999 dwt ATB units. Mr. Ziobro will report to Joseph P. Gehegan, President and COO.

*Jan T. Ziobro* was appointed as vice president, new construction of our general partner and of United States Shipping Master LLC on April 25, 2007. Prior to that, he was employed for over 17 years in various capacities with Overseas Shipholding Group, Inc. ("OSG"), including 11 years in OSG's New Construction Group as Senior Naval Architect. During this time he was involved in construction projects of over 20 vessels for the account of OSG in both Japan and South Korea. Mr. Ziobro holds a Bachelor of Science degree in Naval Architecture and Marine Engineering from the University of Michigan. He is a member of the Society of Naval Architects and Marine Engineers and an associate member of the Association of Ship Brokers and Agents.

***ITEM 6. Exhibits***

| Exhibit Number | Description |
|---|---|
| 10.1 | Second Amendment dated as of April 25, 2007, to Third Amended and Restated Credit Agreement, dated as of August 7, 2006, among U.S. Shipping Partners L.P., U.S. Shipping Operating LLC, ITB Baltimore LLC, ITB Groton LLC, ITB Jacksonville LLC, ITB Mobile LLC, ITB New York LLC, ITB Philadelphia LLC, USS Chartering LLC, USCS Chemical Chartering LLC, USCS Chemical Pioneer Inc., USCS Charleston Chartering LLC, USCS Charleston LLC, USCS ATB LLC, USS ATB 1 LLC, USS ATB 2 LLC, USCS Sea Venture LLC, USS M/V Houston LLC, USS JV Manager Inc., USS PC Holding Corp., U.S. Shipping Finance Corp. and USS Product Manager LLC as the Borrowers, and certain commercial lending institutions, as the Lenders, Canadian Imperial Bank of Commerce as Letter of Credit Issuer, Canadian Imperial Bank of Commerce, as the Administrative Agent for the Lenders, Lehman Commercial Paper Inc., as the Syndication Agent, KeyBank National Association, as the Collateral Agent. |
| 10.2* | Employment Agreement for Jan T. Ziobro. |
| 31.1 | Certification of the Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of the Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

* Management contract, compensatory plan or arrangement.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: May 10, 2007

U.S. SHIPPING PARTNERS L.P.

By: US Shipping General Partner LLC, its general partner

by: /s/ Paul B. Gridley

Paul B. Gridley
Chairman, Chief Executive Officer
(principal executive officer)

by: /s/ Albert E. Bergeron

Albert E. Bergeron
Vice President—Chief Financial Officer
(principal financial and accounting officer)

32

---

**Exhibit 10.1**

**SECOND AMENDMENT TO
THIRD AMENDED AND RESTATED CREDIT AGREEMENT**

**THIS SECOND AMENDMENT TO THIRD AMENDED AND RESTATED CREDIT AGREEMENT** (this "Amendment"), dated as of April 25, 2007 (the "Effective Date"), is entered into by and among **U.S. SHIPPING PARTNERS L.P.**, a Delaware limited partnership (the "MLP"), **U.S. SHIPPING OPERATING LLC**, a Delaware limited liability company ("Operating LLC"), **ITB BALTIMORE LLC**, a Delaware limited liability company, **ITB GROTON LLC**, a Delaware limited liability company, **ITB JACKSONVILLE LLC**, a Delaware limited liability company, **ITB MOBILE LLC**, a Delaware limited liability company, **ITB NEW YORK LLC**, a Delaware limited liability company, **ITB PHILADELPHIA LLC**, a Delaware limited liability company, **USS CHARTERING LLC**, a Delaware limited liability company ("Charter LLC"), **USCS CHEMICAL CHARTERING LLC**, a Delaware limited liability company ("Chemical Chartering"), **USCS CHEMICAL PIONEER INC.**, a Delaware corporation ("Chemical Pioneer"), **USCS CHARLESTON LLC**, a Delaware limited liability company ("Charleston"), **USCS CHARLESTON CHARTERING LLC**, a Delaware limited liability company ("USCS Chartering"), **USCS ATB LLC**, a Delaware limited liability company ("ATB LLC"), **USS ATB 1 LLC**, a Delaware limited liability company ("ATB1 LLC"), **USS ATB 2 LLC**, a Delaware limited liability company ("ATB2 LLC"), **USCS SEA VENTURE LLC**, a Delaware limited liability company ("Sea Venture LLC"), **USS M/V HOUSTON LLC**, a Delaware limited liability company ("Houston LLC"), **U.S. SHIPPING FINANCE CORP.**, a Delaware corporation ("Finance Corp."), **USS JV MANAGER INC.**, a Delaware corporation ("JV Manager"), **USS PC HOLDING CORP.**, a Delaware corporation ("PC Holding") and **USS PRODUCT MANAGER LLC**, a Delaware limited liability company ("Product Manager") (each of the foregoing being individually called a "Borrower" and collectively, the "Borrowers"), the various financial institutions as are or may become parties to the Credit Agreement as hereinafter defined (collectively, the "Lenders"), **CANADIAN IMPERIAL BANK OF COMMERCE**, as Letter of Credit Issuer, **CANADIAN IMPERIAL BANK OF**

151

**COMMERCE** ("CIBC"), as administrative agent (in such capacity together with its successors in such capacity, the "Administrative Agent") for the Lenders, **LEHMAN COMMERCIAL PAPER INC.**, as the syndication agent (in such capacity together with its successors in such capacity, the "Syndication Agent") for the Lenders, and **KEYBANK NATIONAL ASSOCIATION**, as collateral agent (in such capacity, together with its successors in such capacity, the "Collateral Agent") for the Secured Parties (as defined in the Credit Agreement hereinafter defined).

**W I T N E S S E T H:**

**WHEREAS**, the Borrowers, the Lenders, the Letter of Credit Issuer, the Administrative Agent, the Syndication Agent and the Collateral Agent have entered into that certain Third Amended and Restated Credit Agreement dated as of August 7, 2006 as amended by the First Amendment to Third Amended and Restated Credit Agreement dated as of August 28, 2006 (as so amended and further amended or otherwise modified, the "Credit Agreement");

**WHEREAS**, the Borrowers, the Lenders, the Letter of Credit Issuer, the Administrative Agent, the Syndication Agent and the Collateral Agent intend to amend certain provisions of the Credit Agreement as set forth herein.

**NOW THEREFORE**, in consideration of the foregoing and the mutual agreements set forth herein, the parties hereto agree as follows:

**SECTION 1.** Definitions. Unless otherwise defined in this Amendment, each capitalized term used in this Amendment has the meaning assigned to such term in the Credit Agreement.

**SECTION 2.** Amendment of Section 1.1. Section 1.1 of the Credit Agreement is hereby amended

(a) by inserting the text ", as such letter agreement may be amended, supplemented or otherwise modified from time to time by the parties thereto and in compliance with Section 7.2.12" immediately before the period in the text for each of the definitions "Option Cancellation Option Letter" and "Option Letter"; and

(b) by inserting the following new definition immediately after the definition "Option Cancellation Option Letter":

"Option Expiry Date" means May 1, 2007 or such later date as is the date that is the earlier of (a) that certain date specified in the Option Cancellation Option Letter as the last day upon which USS ATB 1 LLC can cancel its already-exercised option with respect to the construction by Bay Shipbuilding Co. of a fourth barge and (b) that certain date specified in the Option Letter as the last day upon which the MLP can exercise its right to contract for Eastern Shipbuilding Group, Inc. to construct a fourth pusher tug identified as "Hull No. 934" in the Option Letter."

**SECTION 3.** Amendment of Section 3.1 of the Credit Agreement. Section 3.1 of the Credit Agreement is hereby amended by deleting the text of clause (k) thereof and replacing it in its entirety with the following:

"(k) shall, on the first Quarterly Payment Date occurring after the early termination or cancellation of any New ATB Construction Contract for any reason (other than with respect to the cancellation of the already-exercised option for the construction of one barge as required by Section 7.1.14) or performance default by the relevant ATB Contractor make a mandatory prepayment of the Term Loans in an amount equal to 100% of the Individual New ATB Escrow Amount applicable for such New ATB Construction Contract or the Option Letter; and".

**SECTION 4.** Amendment of Section 7.1.14 of the Credit Agreement. Section 7.1.14 of the Credit Agreement is hereby amended by deleting the text thereof and replacing it in its entirety with the following:

"**SECTION 7.1.14** Limitations on a Fourth New ATB. The Borrowers will, and will cause each Restricted Subsidiary to, (a) exercise their rights, on or before the Option Expiry Date, under the Option Cancellation Option Letter to cancel the already-exercised option for the construction of "Vessel No. 4" identified therein and (b) refrain from exercising any option granted under the Option Letter to construct the pusher tug identified therein as "Hull No. 934"; provided however, that if (i) on or before the date