**Agreed Upon Redacted Copy – May be Made Public**

**REDACTED VERSION**

**BID PROTEST**

**No. 07-516C**
**(Judge Hodges)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**OSG PRODUCT TANKERS, LLC,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant,**

**and**

**USS PRODUCT CARRIERS, LLC,**

**Defendant-Intervenor.**

---

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

---

**JOHN J. PAVLICK, JR.**
**Venable LLP**
**575 7th Street, N.W.**
**Washington, DC 20004-1601**
**Telephone: (202) 344-4000**
**Facsimile: (202) 344-8300**

**OF COUNSEL:**

**LARS E. ANDERSON**
**DISMAS N. LOCARIA**
**PETER A. RIESEN**
**Venable LLP**
**575 7th Street, N.W.**

**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

**Washington, DC 20004-1601**
**Telephone: (202) 344-4000**
**Facsimile: (202) 344-8300**

**WILLIAM A. SHOOK**
**Kirkpatrick & Lockhart Preston Gates Ellis LLP**
**1601 K Street, N.W.**
**Washington, DC 20006-1600**
**Telephone: (202) 778-9000**
**Facsimile: (202) 778-9100**

**August 20, 2007**

**REDACTED VERSION**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ..... iv

PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD ..... vi

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD ..... 1

STATEMENT OF THE ISSUE ..... 2

BACKGROUND ..... 2

I. MSC's Responsibility Determination of Product Tankers

Is Unreasonable ..... 2

II. MSC Utilized a Different and Unreasonable Responsibility

Standard for the Awardee ..... 10

III. MSC Utilized a Different and Unreasonable Standard In Finding USS Product Carriers Responsible by Allowing it to Use Prohibited Materially Unbalanced Pricing and Receive an Exorbitant Profit to Help Alleviate Its Financial Situation. ..... 14

IV. MSC Waived USS Product Carriers' Unacceptable Delivery and Redelivery Bonus Terms in the FPR ..... 16

V. MSC's *Post Hoc* Extension of Time to Submit Final Proposed Revisions ..... 18

ARGUMENT ..... 20

I. Standard of Review ..... 20

II. Specific Discovery Requested to Supplement the Administrative Record ..... 22

A. The Need for Supplementation of the Administrative Record Relating to the CO's Responsibility Determination of Product Tankers ..... 24

1. There is Insufficient Information in the Current Administrative Record Explaining Why the CO Failed to Consider that Product Tankers is a Separate Legal Entity from OSG ..... 24

2. The Administrative Record Fails to Provide the Rationale for the Conclusion That There Would be a Substantial Risk that Product Tankers Could Not

**REDACTED VERSION**


Obtain a Facility Security Clearance by the Start of Contract Performance ........ 25

3. The Administrative Record Fails to Provide Any Rationale or Support for the CO's Conclusion that OSG Would Likely Violate the Terms of its Plea Agreement, Resulting in Both OSG and Product Tankers, Being Debarred ........ 26

4. The Administrative Record Fails to Provide the Reasoning Behind the Determination that the Environmental Issues Facing OSG were Unique to it, When in fact She was Presented with Evidence from MSC and DOJ Officials that These were Industry-Wide Problems ........ 27

5. The Current Administrative Record Fails to Provide an Explanation for Ignoring the Fact that these Violations Only Involved International Flag Vessels, and that Neither Current OSG nor Any Product Tankers Management were Involved ........ 28

B. The Need for Supplementation of the Administrative Record Explaining Why MSC Treated Product Tankers and USS Product Carriers Unequally ........ 30

1. There is Insufficient Information in the Administrative Record Explaining Why MSC Ignored USS Product Carriers' Serious Financial Deficiencies and the Tenuous Structure of its Proposal ........ 31

2. There is Insufficient Information in the Administrative Record Explaining Why MSC Accepted USS Product Carriers' Materially Unbalanced Pricing in Contravention of the Solicitation Requirements ........ 33

3. There is Insufficient Information in the Administrative Record Explaining Why MSC Indefinite Delivery Bonuses in USS Product Carriers' Proposal in Contravention of the Solicitation Requirements ........ 35

4. There is Insufficient Information in the Administrative Record Explaining the Extension on March 28, 2007 for Final Proposal Revisions ........ 36

C. The Need for Supplementation of the Administrative Record Regarding Relevant Communications ........ 37

**REDACTED VERSION**


1. There is Insufficient Information in the Administrative Record Regarding Communications between MSC and Other Federal Agencies Regarding the Present Responsibility of OSG and Product Tankers ........ 37

2. Additional Briefing Materials Regarding the Award of the T-5 Replacement Tanker Procurement to USS Product Carriers and the Disqualification of Product Tankers ........ 38

III. Requested Supplementation Through Discovery ........ 39

CONCLUSION ........ 40

**REDACTED VERSION**

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502 (2003) .......... 20, 21

*Beta Analytics International, Inc. v. United States*, 61 Fed. Cl. 223 (2004) .......... 22

*Comprehensive Health Services, Inc. v. United States*, 70 Fed. Cl. 700 (2006) .......... 21

*Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345 (1997) .......... 21

*Cybertech Group, Inc. v. United States*, 48 Fed. Cl. 638 (2001) .......... 30

*Emerald Coast Finest Produce Co. v. United States*, 76 Fed. Cl. 445 (May 22, 2007) .......... 20

*GraphicData L.L.C. v. United States*, 37 Fed. Cl. 771 (1997) .......... 21

*Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d 1324, 1340 (Fed. Cir. 2001) .......... 21-22, 30

*International Resource Recovery, Inc. v. United States*, 61 Fed. Cl. 38 (2004) .......... 22

*J.C.N. Constr. Co., Inc. v. United States*, 60 Fed. Cl. 400 (2004) .......... 30

*Orion Int'l Techs v. United States*, 60 Fed. Cl. 338 (2004) .......... 20, 21

*Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738 (2006) .......... 21, 26

*Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413 (2006) .......... 21, 23

*Tech Sys., Inc. v. United States*, 50 Fed. Cl. 216 (2001) .......... 20

### STATUTES

31 U.S.C. § 3324 .......... 15

### RULES

2 C.F.R. Part 180 .......... 3

FAR Subpart 9.4 .......... 3

FAR 9.103(a) .......... 4

FAR 9.104 .......... 2, 10, 13

**REDACTED VERSION**

FAR 9.405 ........................................................................................................ 27
FAR 9.406-1(b) ........................................................................................................ 8, 27
FAR 15.402(a) ........................................................................................................ 16
FAR 52.215-1 ........................................................................................................ 14

**REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| OSG PRODUCT TANKERS LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>USS PRODUCT CARRIERS LLC,<br><br>Defendant, Intervenor. | Case No. 07-561C<br>Judge Hodges |

**PLAINTIFF'S MOTION TO**
**SUPPLEMENT THE ADMINISTRATIVE RECORD**

Pursuant to RCFC 7(b)(1), Plaintiff, OSG Product Tankers LLC ("Product Tankers"), hereby moves to: i) include in the Administrative Record information regarding MSC's procurement process and award of Contract Number N00033-06-R-5416 ("Contract") that is not adequately explained in the documents currently comprising the Administrative Record; and ii) supplement the Administrative Record with evidence of the Military Sealift Command's ("MSC") bias in the procurement process and award of the Contract. Specifically, Product Tankers seeks the following discovery:

a. The deposition of the MSC Contracting Officer, Ms. Diana Fischer;

b. The deposition of Carole Wieszek, Director Chartering & Ship Operations for MSC;



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

c. All communications or evidence of communications between MSC officials that relate to Product Tankers' or OSG's participation in this procurement, specifically those that relate to the Determination of Responsibility;

d. The deposition of Agent Janet Benzer of Defense Security Service ("DSS"), or another appropriate DSS official;

e. All records of the exact time MSC received each FPR on March 28, 2007 and when they were opened, information on who decided to extend the FPR deadline, and all communications with Seabulk relating to the submission of FPRs;

f. All communications or evidence of communications between MSC officials and any Navy or other Department of Defense or civilian agency officials that related to Product Tankers' and/or OSG's participation in the T-5 Tanker Replacement Procurement; and,

g. All briefing charts or presentation materials, or other presentation summaries, regarding the T-5 Tanker Replacement Procurement, the decision to award to USS Product Carriers LLC, or the decision to find Product Tankers non-responsible.

A memorandum in support of this motion accompanies this motion.

Dated: August 20, 2007

Respectfully submitted,

s/ John J. Pavlick, Jr.________________

John J. Pavlick, Jr.
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

Of Counsel:
Lars E. Anderson
Dismas N. Locaria
Peter A. Riesen
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

William A. Shook
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006-1600
Telephone: (202) 778-9000
Facsimile: (202) 778-9100



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| OSG PRODUCT TANKERS LLC, Plaintiff, v. THE UNITED STATES, Defendant, and USS PRODUCT CARRIERS LLC, Defendant, Intervenor. | ) | Case No. 07-561C<br>Judge Hodges |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

Plaintiff, OSG Product Tankers LLC ("Product Tankers"), hereby submits this memorandum in support of its Motion to Supplement the Administrative Record. In order to resolve this protest, this Court needs a complete administrative record to determine whether the Department of Navy's Military Sealift Command ("MSC") acted reasonably and in accordance with law and regulations in conducting this procurement and that the Contracting Officer ("CO") utilized proper and equal standards in determining Product Tankers non-responsible. Unfortunately, the current Administrative Record is incomplete. There are large gaps in the Administrative Record provided by the government, and the current Administrative Record does not support many of the CO's conclusions and assumptions in her Responsibility Determination of Product Tankers ("Responsibility Determination") and her evaluation of the awardee, USS Product Carriers LLC ("USS Product Carriers"). These deficiencies cannot be addressed merely



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

by legal argument, but require that the record be supplemented to enable the Court to make a reasoned decision. Accordingly, for the reasons discussed below, Product Tankers moves this Court to allow supplementation of the Administrative Record through discovery.

## STATEMENT OF THE ISSUE

Whether the existing Administrative Record needs to be supplemented through discovery to establish a complete and accurate record upon which this Court can render a reasoned decision regarding the Contract Officer's actions which are the subject of this protest.

## BACKGROUND

On July 6, 2007, Ms. Diana Fischer, the CO responsible for the T-5 Tanker Replacement Procurement for MSC, advised Product Tankers that, while it was the lowest-priced, technically-acceptable offeror, she could not find it presently responsible under Federal Acquisition Regulation ("FAR") 9.104. Administrative Record ("AR") 3409. As a result, she awarded the contract (Contract No. N00033-06-R-5416 ("Contract")) to the only remaining offeror, USS Product Carriers. *Id.* Product Tankers protested the CO's Responsibility Determination and award to USS Product Carriers.

### I. MSC's Responsibility Determination of Product Tankers Is Unreasonable.

Initial Offers were submitted on November 30, 2006 and Product Tankers was the lowest priced initial offeror. AR 3175. In December 2006, one of Product Tankers' ultimate parent corporations, Overseas Shipholding Group ("OSG"), entered into a plea agreement with the Department of Justice ("DOJ") arising out of violations of pollution laws and falsification of records to cover up those violations that occurred on twelve of OSG's international flag vessels managed by two of its foreign subsidiaries. As part of the Plea Agreement, the DOJ, United States Coast Guard ("USCG"), and OSG agreed upon an extensive and comprehensive

**REDACTED VERSION**

Environmental Compliance Program ("ECP"), much of which had already been implemented, that covers all of OSG's operations, not just the international or foreign flag vessels on which the violations occurred. *See* AR 2010-12; *see also* 2024-28.

In January 2007, MSC prepared and sent to Product Tankers "Issues for Discussion" concerning its initial offer. AR 3491-97. MSC asked specifically whether OSG or Product Tankers would be signing the Contract and requested that, if Product Tankers intended to sign the Contract, it must provide a parent company guarantee of performance. AR 3494. Product Tankers responded that it was the offeror and would be signing the contract. AR 1619.

MSC also required that Product Tankers:

[redacted]

AR 3495. MSC also asked Product Tankers to "identify any Government vessels that were involved in the settlement agreement." *Id.*

In January 2007, federal agencies, including the Department of the Navy (of which MSC is a part), determined and agreed that the United States Maritime Administration ("MarAd") would serve as the lead agency for the federal government in any administrative action regarding discretionary suspension or debarment of OSG from federal contracts under the FAR and from grants, loans and other federal assistance under the non-procurement debarment regulations. *See* FAR Subpart 9.4; *see also* 2 C.F.R. Part 180.

After holding discussions with Product Tankers on January 23, 2007, during which Product Tankers provided information on OSG's violations and remedial actions, the CO sent an email to Carole Wieszek, Director of Chartering and Ship Operations for MSC, providing a summary of those discussions. AR 3554. Ms. Fischer reported that:



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

[redacted]

*Id.* The CO then made the incredible admission five months before she made her non-responsibility determination that "The bottom line is **if MARAD doesn't debar OSG, we may have a problem.**" *Id.* (emphasis added).

On March 5, 2007, Product Tankers furnished the additional information requested by MSC, and OSG agreed to guarantee the performance of Product Tankers. AR 1605-41.

At the end March 2007, the four offerors remaining in the competitive range submitted Final Proposed Revisions ("FPRs"). AR 3157. Product Tankers again submitted the lowest priced offer, while two of the four offerors were deemed unacceptable by MSC due to defects in their offers. AR 3575-77; *see also* AR 3644. The offer submitted by Product Tankers "was evaluated to be Technically Acceptable, with a Satisfactory record of past performance, and represents the lowest evaluated price (both with and without termination liability)…" AR 3575.

The MSC CO purported to review the responsibility of Product Tankers pursuant to FAR 9.103(a) prior to award of the Contract. AR 3429. On April 26, 2007, the CO, and other MSC officials, met with the attorney from the DOJ and a USCG officer who were most familiar with the environmental violations that had occurred on OSG's international flag vessels, and the indictments, plea arrangement and corrective action taken by OSG. AR 3895-97. The DOJ attorney informed MSC that his office has worked on approximately 50 to 60 similar cases related to falsification of records to conceal pollutant activities, but noted that "very few of these



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

cases involved US flag vessels." AR 3896. The DOJ attorney and the USCG official also informed MSC that, with regard to:

> Foreign Subsidiaries of OSG – **All the violations occurred on vessels owned by OSG's foreign subsidiaries and operated by foreign mariners.** The DOJ did not investigate any of OSG's US flag vessels.
>
> Cooperation/Compliance – While under investigation, OSG cooperated with the DOJ by providing necessary records and witnesses. **The company developed a compliance program for all ships in its fleet that is considered the gold standard among environmental standard programs.**

*Id.* (emphasis added).

On April 27, 2007, MSC requested in writing a meeting with Product Tankers to discuss its responsibility as a potential awardee for the Contract. AR 3781-82. As part of its request, MSC provided to Product Tankers a list of more than twenty questions relating to the facts surrounding the violations that were the basis for OSG's Plea Agreement and OSG's remedial actions, including its ECP. AR 3783-85. Product Tankers accommodated MSC's request for an expedited timetable by agreeing to meet on May 4, 2007. AR 2521-22.

On May 1, 2007, in anticipation of its meeting with MSC, Product Tankers provided MSC information regarding OSG's remedial measures and its comprehensive ECP, which had been submitted to MarAd to assist that agency with its consideration of OSG's present responsibility. AR 2521-2874.

Representatives from OSG and Product Tankers met with MSC on May 4, 2007 ("May 4th Meeting") to discuss Product Tankers' responsibility. *See* AR 2072-73. The meeting lasted well over three hours, for which neither a recording nor a verbatim transcript was taken. The questions focused on the underlying problems and violations on the international vessels, OSG's responses to these, and its remedial programs and its ECP. *See* AR 3783-85.

On May 8, 2007, OSG and Product Tankers supplemented their oral responses given at

**REDACTED VERSION**

the May 4th Meeting with a detailed, 49-page written response answering each of MSC's questions. AR 1807-64.

In response to MSC's question of "How does OSG propose to prevent these same practices from occurring on vessels they might manage or operate for the Government," Product Tankers responded that "[n]o U.S. flag vessels or U.S. licensed or documented crew members were involved in any of the incidents that resulted in the violations to which OSG has pleaded guilty." AR 3806. Further, all OSG vessels, U.S. and international flag alike, were now equipped with state of the art compliance equipment and subject to the most comprehensive ECP in the industry. AR 3806-07. MSC was also informed that Product Tankers was only an indirect subsidiary of OSG, being partially owned by Aker American Shipping, Inc., the shipyard building the tankers for this procurement. AR 3818.

On May 18, 2007, MSC received a copy of the May 17, 2007, "Report of Investigation and Recommendation regarding Debarment of Overseas Shipholding Group, Inc.," prepared by MarAd's Chief Counsel. AR 1961-64. The report found:

> The corrective action OSG has agreed to undertake is significant . . . Since OSG's three-year probation is dependent upon full compliance with the ECP, it is highly probable that the corrective action required will be fully implemented by OSG. DOJ and Coast Guard personnel involved in investigating the misconduct and negotiating the ECP confirmed OSG's assertion that its ECP and the other corrective actions being implemented by OSG were more extensive and comprehensive than any previous agreement; the ECP is considered the benchmark by which future compliance plans will be measured. DOJ and Coast Guard also indicated that OSG's significant cooperation in the investigation and self-reporting of half the violations to which they pled guilty should mitigate against debarment. They felt debarment of OSG could even be counter-productive to their enforcement efforts since it would set a bad example to further penalize a company that has cooperated extensively, pled guilty and been sentenced to three-years probation, agreed to pay huge fines and community service, and agreed to implement an undeniably comprehensive and expensive Environmental Compliance Plan to ensure future compliance by its company and employees.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

AR 1963. The MarAd Chief Counsel concluded by recommending that the Government enter into negotiations with OSG to resolve this matter via a settlement agreement in lieu of debarment. AR 1964. The lead agency Debarring Official, the Administrator of MarAd, approved the recommendation. *Id.* On June 25, 2007, MarAd and OSG entered a compliance settlement agreement resolving any potential debarment arising out of the Plea Agreement. AR 4157-63. This was transmitted to MSC counsel and forwarded to the CO. AR 4155-56.

Notwithstanding the information provided by Product Tankers and OSG, the information provided by DOJ and USCG, and the determination of MarAd – the lead federal agency for this matter – the CO signed a Responsibility Determination dated June 19, 2007 finding Product Tankers not responsible. AR 1766-83.

On July 6, 2007 MSC awarded the Contract to USS Product Carriers. AR 4064. In a Post-Award Debriefing, Product Tankers was informed that it was the lowest bidder by over [redacted] million on the base term of the contract (one year) and by over [redacted] million on the base term plus its option periods (the base year plus four one-year option periods). AR 3429. The pricing for the Contract as awarded to USS Product Carriers was materially unbalanced as determined by MSC itself. *See e.g.*, AR 3269. As reflected in MSC's Price Evaluation Report, USS Product Carriers' average profit for the entire charter period is [redacted] and the profit rate for the first year was a staggering [redacted]. AR 3637. In contrast, Product Tanker's profit factor for the entire contract was only [redacted]. *Id.*

The Responsibility Determination contains numerous factual errors, often contradicted by the Administrative Record. There are also a number of unexplained actions and unsupported assumptions upon which the determination is premised. A primary flaw in the CO's evaluation attributes the criminal violations which occurred aboard international flag vessels, manned by



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

foreign crews and primarily managed by foreign subsidiaries of OSG, to one of OSG's U.S. flag-subsidiaries, Product Tankers, the actual offeror. Confusion between OSG and Product Tankers is found throughout the Responsibility Determination, and the Administrative Record. The CO ignores, without explanation, the crucial fact that none of the violations or improper conduct involved Product Tankers or any of OSG's U.S. flag vessels, manned by U.S. citizens, the type of vessel and crew required for the Contract. The CO fails to explain why Product Tankers, as only an indirect subsidiary of OSG, geographically isolated from the personnel responsible for the violations, and staffed by U.S. citizens with extensive and spotless records of operating and managing U.S. flag vessels should now be punished for the problems associated solely with the OSG's international flag vessels. While the CO purports to assess the present responsibility of the offeror, she never addresses or acknowledges that Product Tankers, not OSG, was the legally recognized offeror and prospective contractor. *See* AR 3446-48.

Furthermore, the CO also makes the incredible and unsupported assumption that [redacted]. AR 3434. She draws this conclusion despite the advice of the DOJ and USCG officials most familiar with OSG and the determination by MarAd that OSG's "gold standard," "World Class environmental compliance program," makes future violations "highly unlikely." Not only is this mere speculation contrary to the evidence in the record, the CO makes a further unsupported assumption that [redacted]. This assumption is inconsistent with suspension and debarment regulations. *See* FAR 9.406-1(b).



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

The CO also attempted to justify her determination of non-responsibility by stating that [redacted] AR 3434. The CO based this determination solely on [redacted] AR 4134. As one would expect, [redacted]. *Id.* The CO's questions, however, omitted important facts. For instance, Product Tankers, [redacted]. Moreover, the CO, reflecting her confusion between OSG and Product Tankers, indicates that [redacted].

Moreover, MSC did not raise the [redacted]. *See e.g.*, 3738-85. Finally, the CO did not explain how [redacted].

The CO's Responsibility Determination also is beset with other significant factual inaccuracies, misinterpretations, misunderstandings, and in some cases, with a complete disregard for factual information provided by Product Tankers, OSG, and cognizant Government agencies. For example, the CO, on several occasions, stated her belief that Product Tankers and OSG failed to answer questions posed at the May 4th Meeting. *See e.g.*, AR 3443. However,



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

Product Tankers and OSG encouraged an open dialogue at the meeting, answered all of MSC's pre-prepared questions, as well as tangential and follow-on questions, and on May 8, 2007, followed up its oral responses with detailed written responses to each question. AR 1808-64. Even though MSC was asked if they had any further questions, the CO did not raise any with OSG or Product Tankers. The CO unreasonably relied upon an inaccurate memory and erroneous perceptions of what was orally discussed at the May 4th Meeting, rather than on the detailed and accurate written submission from Product Tankers and OSG.

## II. MSC Utilized a Different and Unreasonable Responsibility Standard For The Awardee.

In stark contrast to MSC's strict scrutiny of and reliance on inaccurate factual assumptions in the Responsibility Determination, MSC applied a highly deferential standard to USS Product Carriers and ignored major deficiencies which should have rendered that company not financially responsible. Consistent with one of the factors in FAR 9.104-1 required for present responsibility, Section L-7(d) of the Solicitation required that an "Offeror must furnish evidence of adequate financial resources to perform the contract or the ability to obtain such resources." AR 364.

USS Product Carriers, however, only provided the 2005 annual report of its parent company, U.S. Shipping Partners LP ("USSP"). AR 3256. Additionally, early in the procurement process, MSC evaluators became aware of issues regarding financial capability when they learned that [redacted] AR 3257. [redacted] *Id.*



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

MSC requested DCAA to perform a risk analysis of offerors in the competitive range. AR 3256. DCAA responded, with regard to USS Product Carriers, that:

> It should be noted that this assessment pertains only to the parent company, U.S. Shipping Partners, LP. Financial data was not provided for its subsidiary, USS Product Carriers nor USS Product Investors. Therefore, should a contract be awarded to either of these subsidiaries, we recommend MSC obtain a Corporate Guarantee (Form DCMA 1620) from the U.S. Shipping Partners, LP.

AR 3964. As a result, MSC requested that if USS Product Carriers was signing the Contract, "will the parent company [USSP] guarantee the performance of the subsidiary?" AR 3394.

This was critical because in order to perform the Contract, USS Product Carriers would need to arrange for the construction and financing of two tankers costing approximately [redacted] million. [redacted] *See* AR 2903. Operating and maintaining the two tankers for the MSC five-year charter period would also cost approximately [redacted] million. AR 3168. Consequently, the MSC contractor would need significant financial resources for both the [redacted] million construction phase and the [redacted] million chartering phase.

USS Product Carriers' plan for meeting these requirements centered around a contract it entered into in 2006 with the National Steel and Shipbuilding Company ("NASSCO"), to build nine tankers costing approximately [redacted] million each or [redacted] billion for all nine. AR 8, 53. However, USS Product Carriers essentially has no assets.

In August 2006, [redacted] *Id.* Construction financing was arranged for the first five tankers with investors contributing [redacted] million and USSP contributing [redacted] million to capitalize USS Products Investor LLC, <u>not</u> USS Product Carriers. AR 8-9. This provided just [redacted] million to construct [redacted] million worth of vessels.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

Thus, [redacted] *See generally* AR 3996-4042.

Another subsidiary of USSP, USS Product Manager LLC, will supervise construction of the vessels and then operate the vessels for USS Product Carriers. AR 9. USSP has only guaranteed to USS Products Investor LLC (the joint venture financing construction of the first five tankers) the performance of USS Product Manager LLC as supervisor of construction and operator of the tankers (AR 28-33), and has not guaranteed USS Product Carriers in its performance of the Contract for MSC. *See* AR 8-9.

Significantly, [redacted] AR 4039-40. However, [redacted] AR 4040. [redacted]. *See id.* Furthermore, [redacted]. *Id.*

Thus, the Contract awardee, USS Product Carriers, is obligated to: [redacted] no financial information was provided to MSC for USS Product Carriers as part of the proposal and there is no indication in the current Administrative Record that the awardee has any net worth or financial assets with adequate financial resources to perform the awarded Contract. *See* AR 3256; *see also* 3964.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

USSP refused to guarantee the Contract performance of USS Product Carriers. Rather, the Responsibility Determination of USS Product Carriers merely notes that:

> USS has entered into a joint venture with USS Products Investor LLC to finance construction of the first five NASSCO tankers. The joint venture [but not Product Carriers] is capitalized with [redacted], of which [redacted] came from the Partnership. US [sic] Product Manager LLC is another wholly owned subsidiary of the Partnership that manages the construction and operation of the NASSCO tankers for the joint venture. In various Security and Exchange Commission (SEC) public filings the Partnership has guaranteed the obligation of USS Product Manager LLC.

AR 3774-75. Although this is correct, it does not address the glaring issue that no one has guaranteed performance of the actual offeror, USS Product Carriers, to MSC. There is no guarantee to MSC of USS Product Carriers' performance by the intended tanker operator USS Product Manager LLC. USS Product Carriers has not been capitalized, only the joint venture, USS Products Investor LLC, has been capitalized for [redacted] million and that is to cover part of the construction cost of all five tankers at [redacted] million each, not just the two tankers to be delivered to MSC.

With regard to DCAA's recommendation that MSC receive a guarantee from USS Product Carriers' parent company, the CO provided that:

> To further assist the Contracting Officer in determining that USS has adequate financial resources, USS was requested to submit documentation to support its financial resources as a subsidiary to U.S. Shipping Partners [LP]. USS submitted a copy of its Funding Agreement with NASSCO shipyard dated August 7, 2006 (referenced in paragraph 1 above) which includes [redacted] USS has also submitted a copy of [redacted] The documented balance in this account is [redacted]. Based on this information, the Form 1620 recommended by DCAA is no longer needed.
>
> Conclusion: Based upon the information provided above, I have determined that USS has "adequate financial resources to perform the contract or the ability to obtain them." FAR 9.104-1(a).



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

AR 3775.

There is no indication in the Administrative Record that the CO ever considered USS Product Carriers' liability to provide permanent financing upon delivery of the tankers or the fact that USS Product Carriers remains liable to NASSCO to fund construction of four additional tankers costing in excess of [redacted] million during the time when MSC's [redacted] million charters were scheduled to perform. Apparently, the CO was confused, or ignored the financial structure of USS Product Carriers' proposal and did not realize that the MSC awardee had no capitalization and no performance guarantee from the parent or any other entity. As a result, when a comparison is made between the responsibility determinations of the awardee and that of Product Tankers, it appears that the CO unreasonably applied two different standards.

## III. MSC Utilized a Different and Unreasonable Standard In Finding USS Product Carriers Responsible by Allowing it to Use Prohibited Materially Unbalanced Pricing and Receive an Exorbitant Profit to Help Alleviate Its Financial Situation.

USS Product Carriers offered, and the CO allowed, materially unbalanced pricing in direct contravention of the Solicitation. This pricing structure appears to attempt to alternate the financial pressure on USS Product Carriers. The Solicitation contained FAR 52.215-1 and MSC stated that "[t]he Government may reject an offer as non-responsive if it is materially unbalanced. An offer is unbalanced when it is based on prices significantly less than cost for some work and prices which are significantly overstated for other work." AR 3264-65. The Solicitation also provided that "the proposed price will be evaluated for price reasonableness. The Government may determine that an offer is unacceptable if the option prices are significantly unbalanced." AR 368.

USS Product Carriers' pricing from its initial offer through its FPR was [redacted]. *See e.g.*, AR 3269. This



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

front loading is, in effect, an improper advance payment (*see* 31 U.S.C. § 3324) and apparently deemed necessary by USS Product Carriers in order to reduce risk and provide some relief to its precarious financial condition.

The MSC Price Evaluation Committee Report of the initial proposals found that USS Product Carriers has front loaded the firm contract period with heavy capitalized costs at [redacted] profit that drops to negative (ending at [redacted] in the final option period). AR 3271. [redacted] *Id.* MSC evaluators observed that [redacted] AR 3275.

In its "Issues for Discussion" with USS Product Carriers, MSC notes that USS Product Carriers [redacted] AR 3395. MSC explained to USS Product Carriers that there is a limit on termination liability and stated that:

[redacted]

*Id.*

According to MSC's notes after discussions, USS Product Carriers' response to the unbalanced pricing issue was that it [redacted] AR 3510. MSC responded to USS Product Carriers that the government requires the offeror to submit balanced pricing. *Id.*



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

However, USS Product Carriers' FPR dated March 27, 2007 was still front loaded, substantially unbalanced, and had an even higher profit. *See* AR 196. For the first (firm) contract year, the price for the first vessel was [redacted] per diem and the second vessel was [redacted] per diem, although the daily cost of operating each vessel, including G&A, was only [redacted]. *Id.*; *see also* AR 208-217.

USS Product Carriers' unbalance pricing was noted in MSC's April 2007 Price Evaluation Committee Report. AR 3634. Specifically, [redacted] AR 3641. Significantly, the Report also stated that USS Product Carriers' profit average for the entire charter period was [redacted] and that in the first year the profit was [redacted] per day or a staggering [redacted]. AR 3637. In contrast, Product Tankers profit factor for the entire contract was only [redacted]. AR 3637.

The fact that USS Product Carriers' price for the firm period of the MSC Contract includes a [redacted] profit factor and the profit for the entire five-year contract period is [redacted], appears to indicate that USS Product Carriers did not, at the time of contract award, have adequate financial resources. However, this fact was ignored by the CO in making the determination that USS Product Carriers was financially responsible and offered a "fair and reasonable" price (AR 3580), a requirement for award. *See* FAR 15.402(a).

## IV. MSC Waived USS Product Carriers' Unacceptable Delivery and Redelivery Bonus Terms in the FPR.

The Administrative Record reflects a confusing sequence of events regarding what appears to be unacceptable delivery and redelivery bonus terms in USS Product Carriers' FPR. These unacceptable terms also appear to reflect USS Product Carriers precarious financial condition. Moreover, MSC's treatment of USS Product Carriers in this regard appears to be



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

another attempt to keep USS Product Carriers in the competition at all costs and to avoid addressing issues with their financial capability thereby creating a different responsibility determination standard than the one used for Product Tankers.

A charter party normally commences when the vessel arrives or is "delivered" at the first designated port to load cargo and terminates with the vessel being "redelivered" when it has discharged the cargo at the last port designated by the charterer, in this case MSC. The vessel owner must incur the cost of sailing the vessel from where ever it is located at the time the charter is awarded to the load out port and then incur the cost of sailing from the redelivery port to its next destination. It is customary for the charterer to pay the vessel owner a "delivery" and "redelivery" bonus to compensate for the cost of sailing while not carrying cargo under charter. The Solicitation provided that delivery could be anywhere in the continental United States and redelivery anywhere worldwide.

USS Product Carriers' initial offer required an unspecified delivery and redelivery bonus. However, MSC responded in January 2007 that it could not accept an "unpriced delivery/redelivery bonus." AR 3507. On March 3, 2007, USS Product Carriers sent a letter to MSC indicating that it required a delivery bonus of [redacted] if a vessel is delivered in the [redacted] and a redelivery bonus of [redacted] if a vessel is redelivered in [redacted] and elsewhere, the bonus was "to be adjusted proportionally based upon time, distance and applicable canal tolls." AR 52, 58. This approach was also rejected on March 14, 2007 by MSC, and USS Product Carriers was required to address this issue and offer a fixed value in its FPR.

In a letter dated March 27, 2007, USS Product Carriers provided firm fixed delivery and redelivery bonuses of [redacted] and [redacted], respectively, regardless of where the delivery and redelivery occurred. AR 193. However, in a revised FPR dated March 30, 2007, USS



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

Product Carriers reverted to the indefinite language in its March 3, 2007 letter that had been rejected by MSC. AR 184.

The Contract awarded to USS Product Carriers on July 6, 2007 contains the firm bonus pricing regardless of geographic location from USS Product Carriers' letter of March 27, 2007, ignoring the updated FPR dated March 30, 2007, which apparently was never withdrawn. *See* AR 4065. On the same day MSC awarded the Contract it issued Modification P00001 to the Contract requiring MSC to accept delivery of each vessel at the NASSCO shipyard rather than a load out port and redeliver each vessel in the [redacted] regardless of its last discharge port. AR 4128. Essentially MSC would now be paying USS Product Carriers [redacted] and [redacted] per diem while the vessels sailed from NASSCO in San Diego to where ever the first load out port may be and similarly pay the option year charter hire rate while the vessel sails with no cargo from anywhere in the world to the [redacted]. In exchange for this commitment from MSC, the delivery and redelivery bonuses were deleted from the contract. This action also removed substantial financial risk from USS Product Carriers.

The Administrative Record is completely devoid of any indication as to why MSC ignored or waived USS Product Carriers' unacceptable updated FPR of March 30, 2007. Nor is there any record of the negotiations that must have occurred between MSC and USS Product Carriers prior to the execution of both the Contract and of Modification P00001 on the same day – July 6, 2007.

## V. MSC'S *POST HOC* EXTENSION OF TIME TO SUBMIT FINAL PROPOSED REVISIONS.

Prior to Contract award, on March 21, 2007, MSC issued Amendment 0012, closing discussions on the T-5 Tanker Replacement Procurement and requesting FPRs. AR 3150-51.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

FPRs were due to MSC by 2:00 PM EDT on March 28, 2007. *Id.* Product Tankers timely delivered its sealed FPR prior to the 2:00 PM deadline on March 28th. AR 3157.

Approximately thirty minutes after the 2:00 P.M. deadline on March 28th, Product Tankers received Amendment 0013, which "extend[ed] the due date and time of Final Proposal Revisions for [the Contract] to 3:00 pm EDT Friday March 30, 2007." AR 3152-53; *see also* AR 3157. Shortly thereafter, Product Tankers received a call requesting confirmation of Product Tankers' receipt of Amendment 0013. AR 3481-82.

Shortly after receiving Amendment 0013, Product Tankers requested and received permission to retrieve its FPR that it had timely submitted. AR 3482. MSC advised Product Tankers that the FPR had been opened, but that MSC had procedures in place to restrict who could review offers and that the FPR would be secured any time it was not in the possession of authorized personnel. *Id.* On March 29, 2007, Product Tankers retrieved its opened FPR.

At the time, MSC gave no explanation for the extraordinary, *post hoc* extension of time to submit the FPR, nor why it opened Product Tankers' bid if it knew it was going to extend the due date of the submission. *See* AR 3483-86. The administrative record asserts that the extension was necessary because Seabulk Tankers, Inc.'s ("Seabulk") FPR contained contingent language that required removal for the offer to be eligible for award. AR 3157. MSC further claimed that the decision to extend the due date was made prior to 2:00 PM on April 28, 2007, but administrative errors delayed issuance of Amendment 00013 until 2:30 PM. *Id.*

Although MSC asserts that no FPRs were delivered late, it has produced no records to establish when the FPRs were received on April 28, 2007. Moreover, MSC has a history of improper *post hoc* extensions of proposal and FPR due dates to accommodate favored offerors. *See Geo-Seis Helicopters, Inc.*, No. 07-155C __ Fed. Cl. __ (Jul. 30, 2007). MSC's stated



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

justification for the *post hoc* extension of FPRs raises other issues. For example, why did MSC open Seabulk's FPR prior to 2:00 PM and apparently engage in discussions with Seabulk at that time. Also, if MSC determined prior to 2:00 PM to extend the due date for FPRs why did it open Product Tankers' FPR when it was delivered at approximately 1:30 PM?

## ARGUMENT

### I. STANDARD OF REVIEW

"[E]vidence in cases challenging *formal* agency rulemaking brought under the Administrative Procedure Act ("APA") is limited to materials contained in the administrative record." *Orion Int'l Techs v. United States*, 60 Fed. Cl. 338, 342 (2004) (emphasis in original). In the bid protest context, it is generally the case that the "the court focuses its review on 'the administrative record already in existence.'" *Emerald Coast Finest Produce Co. v. United States*, 76 Fed. Cl. 445, 448 (May 22, 2007) (*quoting Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 508 (2003)). However, the "record produced during a formal adjudication or rulemaking . . . is different from a record of an informal agency decision," such as a bid protest. *Orion Int'l Techs*, 60 Fed. Cl. at 342. "In the case of an informal administrative decision, such as the award of a contract, the administrative record is merely a 'convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court.'" *Id.* (*quoting Tech Sys., Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001)). In fact, this Court has provided that:

> As a practical matter, . . . in most bid protests, the "administrative record" is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review. This is true in the contract award context if for no other reason than that, due to the absence of a formal record, the agency has to exercise some judgment in furnishing the court with the relevant documents. In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and possibly limited discovery.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

*Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 350 (1997). "Accordingly, the Court of Federal Claims does not 'apply an iron-clad rule automatically limiting its review to the administrative record.'" *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 508 (2003) (citation omitted); *GraphicData L.L.C. v. United States*, 37 Fed. Cl. 771, 780 (1997) (stating that "a judge confronted with a bid protest case should not view the administrative record as a[n] immutable boundary that defines the scope of the case.").

The United States Court of Federal Claims has "identified the threshold inquiry [regarding supplementation of the administrative record] as whether an agency's action before the court is susceptible to a 'record review.'" *Comprehensive Health Services, Inc. v. United States*, 70 Fed. Cl. 700, 720 (2006) (citations omitted). Thus, "a party may supplement the administrative record when necessary to prove that evidence not in the record is evidence without which the court cannot fully understand the issues." *Al Ghanim*, 56 Fed. Cl. at 508.

This Court has further refined its willingness to supplement the administrative record for two principal purposes:

> [T]o assist the court in understanding an agency decision when the record has not adequately explained it, and to place in the record material that, by its very nature, would not be contained in it, such as evidence of bias or bad faith."

*Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006). The latter principle has also included "information relied upon but omitted from the paper record, or the content of conversations," *Orion Int'l Techs*, 60 Fed. Cl. at 343-44 (footnotes and citations omitted), as well information to "fill gaps concerning the factors the contracting officer considered in reaching his decision." *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 745 (2006). This is consistent with the approach adopted by the Federal Circuit. *See Impresa Construzioni Geom.*



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

*Domenico Garufi v. United States,* 238 F.3d 1324, 1340 (Fed. Cir. 2001) (ordering supplementation of the administrative record with the CO's deposition because he had not adequately explained his reasoning). Product Tankers seeks to supplement the administrative record on grounds related to both of these principles.

Furthermore, with regard to bias, this Court has "recognized [that] '[such] issues [in bid protests] are not amenable to record review.'" *International Resource Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 41 (2004). "Allegations of bias, prejudice and bad faith, . . . which depend upon a Government official's past conduct toward a bidder necessarily cannot be subsumed within the record of a challenged award decision." *Id.* Indeed, it would be a rare occasion when evidence of bias or an improper predisposition "will be placed in an administrative record, and to insist on this – and thus restrict discovery . . . to cases involving officials who are both sinister *and* stupid – makes little sense." *Beta Analytics International, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004) (citation omitted) (emphasis in original).

## II. SPECIFIC DISCOVERY REQUESTED TO SUPPLEMENT THE ADMINISTRATIVE RECORD.

The deficiencies in the record fall into three broad categories: 1) gaps in information and erroneous conclusions of fact or law in the CO's Responsibility Determination; 2) gaps in information, lack of explanation of actions, and apparent evidence of bias and unequal treatment in favor of USS Product Carriers in the evaluation of the last two remaining offerors, including the determinative conclusion that while USS Product Carriers is responsible, Product Tankers is not; and 3) relevant records that apparently exist, but were not included.

Supplementation of the record is required in the first category so that the Court is apprised of the true facts and operation of regulations and laws that are pertinent to the unreasonable Responsibility Determination regarding Product Tankers, as well as the position of



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

cognizant government agencies that the CO either ignored or misstated. *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006) (supplementation required where the record has not adequately explained the agency decision).

The need for the second category is perhaps most troubling. Not only is supplementation required to fill in gaps in the record as in the first category, but also to address evidence in the existing record which demonstrates an apparent bias or predisposition toward USS Product Carriers and against Product Tankers for award of the Contract. In this regard, the existing record contains a "smoking gun" that reflects this predisposition to exclude Product Tankers from the award. In a January 24, 2007 email from the CO to the Director of the Chartering & Ship Operations for MSC, the CO, after noting that none of OSG's violations involved U.S. flag vessels and that its has in place an industry-leading compliance program laments that "[t]he bottom line is if MARAD doesn't debar OSG, we may have a problem." AR 3554. It appears that the referenced "problem" was how to eliminate Product Tankers from the competition.

When MarAd, the lead federal agency for consideration of suspension and debarment, evidenced an intention to enter into a compliance settlement agreement rather than debar OSG, thereby accepting OSG's proof of present responsibility, the CO proceeded to rely on unsupported assumptions, incorrect factual and legal conclusions and a unique set of considerations to find Product Tankers non-responsible. As a result, MSC was able to award the Contract to the only remaining offeror, USS Products Carriers, notwithstanding the application of far more lenient standards of responsibility and by accepting otherwise unacceptable contract terms that assisted USS Product Carriers' weak financial position. This included ignoring the specific advice of the DCAA to require performance guarantees, ignoring USS Product Carriers'

financial situation, and allowing USS Product Carriers to use unbalanced pricing and charge the government an outrageous [redacted] percent profit rate in the first and only firm year of the Contract.

The third category encompasses documents or records of communications within MSC and with other agencies regarding OSG and this procurement, which are relevant to this protest, but have not yet been produced.

The supplementation of the record through discovery should be granted and included in the administrative record for the following reasons:

**A. The Need for Supplementation of the Administrative Record Relating to the CO's Responsibility Determination of Product Tankers.**

**1. There is Insufficient Information in the Current Administrative Record Explaining Why the CO Failed to Consider that Product Tankers is a Separate Legal Entity from OSG.**

The Responsibility Determination indicates that she uses the term "OSG" to mean "OSG Product Tankers LLC." AR 3431. However, what follows is an analysis that appears to focus entirely on OSG, rather than the actual offeror, Product Tankers, and to treat OSG as the offeror. For example, the CO refers to OSG as being on parole. AR 3434. However, Product Tankers is not on parole, OSG is on parole. Additionally, the report of the panel commissioned to review the offeror's present responsibility is titled: "Comments Regarding Present Responsibility Determination of Overseas Shipping Group, Inc. (OSG)." AR 3936. These misstatements are replete throughout the Responsibility Determination and the Administrative Record. These numerous inconsistencies call into question exactly which entity the CO was considering with regard to present responsibility, a fundamental issue before this Court. As a result, the CO's failure to distinguish between the actual offeror and one of its ultimate parent companies requires supplementation of the record through a deposition of the CO.

**REDACTED VERSION**

**2. The Administrative Record Fails to Provide the Rationale for the Conclusion That There Would be a Substantial Risk that Product Tankers Could Not Obtain a Facility Security Clearance by the Start of Contract Performance.**

Section C-8 of the Solicitation required the owner of the vessel(s) "to have a facility clearance up to Secret level." AR 2934. On December 22, 2006, MSC evaluators rated Product Tankers as "Acceptable" in this regard. AR 3228. Not a single question posed to either Product Tankers or OSG throughout the entire procurement process raised any question or concern regarding Product Tankers' ability to obtain a Secret facilities security clearance. Indeed, even though MSC raised the OSG Plea Agreement during discussions, it did not raise any questions regarding Product Tankers' ability to obtain a facility security clearance. [redacted] AR 4134. In an email to herself, the CO indicated that:

[redacted]

*Id.* Even after that discussion she did not raise this issue with Product Tankers.

In contrast, MSC evaluators found [redacted] AR 3393. Yet, USS Product Carriers responded that it "was well aware of the backlog in obtaining clearances and intends to start the process long before performance is due and immediately following award." AR 4. A statement that the CO simply accepted.

Thus, USS Product Carriers was able to cure a "deficiency" by merely pointing out that it was American-owned and promising that it would promptly apply for the clearance after award. This stands in stark contrast to the treatment of Product Tankers, where every inference was



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

drawn against it and it was not given the opportunity to address the CO's concerns about this issue.

Based upon the scant record of information regarding her investigation into the ability of Product Tankers to obtain a facility security clearance, it is necessary to depose the CO as to what she asked DSS about the process of obtaining a facility security clearance, what facts she provided to DSS for her hypothetical question, what DSS said to her, and why she failed to distinguish between the two separate legal entities, OSG and Product Tankers. The deposition of Agent Janet Benzer or a responsible DSS official is also requested in order to determine what advice would be given if posed an accurate question regarding Product Tankers. This Court has afforded discovery in the past when information is only available outside the existing record, without which the court cannot have a full understanding. *See Precision Standard, Inc.*, 69 Fed. Cl. 738, 746-47 (2006) (allowing the record to be supplemented in order to inform the court about a technical process).

**3. The Administrative Record Fails to Provide Any Rationale or Support for the CO's Conclusion that OSG Would Likely Violate the Terms of its Plea Agreement, Resulting in Both OSG and Product Tankers Being Debarred.**

The CO asserts as part of her reasoning for not finding Product Tankers responsible that:

[redacted]

AR 3434. This assertion, however, is unsupported in the Responsibility Determination and unsupported in the current Administrative Record. It appears to be mere speculation because the CO does not provide any further rationale. In fact, the current Administrative Record contains facts that directly contradict the CO's conclusion with documents authored by MarAd and DOJ officials. *See* e.g. AR 1963. There is no record of any violations on any OSG U.S. flag vessels

and those vessels are covered by an ECP that is considered to be the gold standard for the industry.

The absence of the CO's rationale for this conclusion, in direct contrast to existing records, as well as her apparent lack of recognition that debarment does not require termination of existing contracts, *see* FAR 9.405, and that debarment does not automatically extend to subsidiaries such as Product Tankers, *see* FAR 9.406-1, requires supplementation of the record through a deposition of the CO.

**4. The Administrative Record Fails to Provide the Reasoning Behind the Determination that the Environmental Issues Facing OSG were Unique to it, When in fact She was Presented with Evidence from MSC and DOJ Officials that These were Industry-Wide Problems.**

The CO erroneously concluded that [redacted] AR 3443. This conclusion was an essential basis of the CO's finding Product Tankers not responsible. This conclusion, however, has been completely discredited by the current Administrative Record and there is nothing in the Administrative Record that supports her conclusion.

On April 26, 2007, the CO met with the USCG and DOJ officials most familiar with OSG's violations. AR 3896-97. During this meeting, the DOJ official informed MSC that his office has worked on approximately 50 to 60 cases relating to falsification of records to conceal pollutant activities and that "very few of these cases involve US flag vessels." AR 3896. Furthermore, on May 3, 2007, Captain Cynthia Varner of MSC, provided Ms. Fischer and other MSC officials with an email attaching an article on a recent conviction for similar environmental violations as OSG. AR 4180-81. Significantly, Captain Varner commented that these types of incidents were "an epidemic" *Id.*

**REDACTED VERSION**

The CO's statement in her Responsibility Determination is unsupported by the current Administrative Record and a deposition of the CO is necessary to document her reasoning behind this conclusion.

**5. The Current Administrative Record Fails to Provide an Explanation for Ignoring the Fact that these Violations Only Involved International Flag Vessels, and that Neither Current OSG nor Any Product Tankers Management were Involved.**

As the Contract will be performed by U.S. flag vessels, manned by U.S. citizens and managed by an indirect subsidiary of OSG that only operates U.S. flag vessels, the fact that no U.S. flag vessels were involved in the violations was extremely relevant. The CO was told repeatedly that no violations occurred on OSG U.S. flag vessels. *See e.g.*, AR 1821. In a letter on January 19, 2007, entitled "Issues for Discussion," MSC properly asked Product Tankers to "[p]lease identify any Government vessels that were involved in the Settlement Agreement." AR 3495. During discussions on these issues on January 23, 2007, Product Tankers stressed that "the vessels involved in this violation were not U.S. Flag Ships." AR 3497. The record also disclosed that no top level OSG managers were responsible for the violations (AR 1963), and the lower level OSG managers, none of which were associated with or employed by Product Tankers, that may have been derelict on the international flag vessels have been terminated or were not rehired. AR 1835-36.

The CO fully recognized the importance this fact could have on her ability to find Product Tankers not presently responsible. Indeed, in an email to Carole Wieszek, the Director of the Chartering & Ship Operations for MSC, on January 24, 2007, the CO summarized the discussions with Product Tankers and noted that "the violations were not on U.S. flag ships and . . . they now have an environmental compliance plan in place that is fully accepted by the



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

Government." AR 3554. Then the CO stated: "The bottom line is if MARAD doesn't debar OSG, we may have a problem." *Id.*

During the April 26th meeting between the CO and the USCG and DOJ officials most familiar with OSG's violations, they informed MSC that "[a]ll the violations occurred on vessels owned by OSG's foreign subsidiaries and operated by foreign mariners. The DOJ did not investigate any of OSG's U.S. flag vessels." AR 3896. Moreover, "[w]hile under investigation, OSG cooperated with the DOJ by providing necessary records and witnesses. The company developed a compliance program for all ships in its fleet that is considered the gold standard among environmental standard programs." *Id.* Thus, even though no violations occurred on its U.S. flag vessels, OSG implemented all the technical changes to the vessels and other corrective action developed to cure the problem in the international flag vessels.

Then, on May 16, 2007, MSC Engineer, John Henry, provided in an email to Ms. Wieszek that "OSG has a World Class environmental compliance program. This program far exceeds anything in the industry today either US or international." AR 3931. Also on May 16th, James Fernan of MSC sent an email to various individuals reviewing the responsibility of Product Tankers, including the CO, pointing out that this was not another Enron or Tyco where the crimes were committed by Senior Management. AR 3932. Rather, he stated that "[t]here is evidence that when OSG became aware their efforts were not successful, they took further action to correct it. . . . The corrective actions OSG took, support a determination of integrity and business ethics." *Id.*

With all the evidence that environmental violations occurred on international flag and not U.S. flag vessels, there is no reasonable or rational justification for the CO to assume that there was a risk of an environmental violation on the two U.S. flag tankers to be chartered by Product



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

Tankers. The Federal Circuit has afforded discovery in the form of depositions of the CO when he/she has failed to articulate his/her rationale. *See Impresa Construzioni Geom. Domenico Garufi v. Untied States*, 238 F.3d 1324, 1340 (Fed. Cir. 2001) (ordering supplementation of the administrative record with the CO's deposition because he had not adequately explained his reasoning). As a result, the CO should be deposed to document the basis for her conclusions.

**B. The Need for Supplementation of the Administrative Record Explaining Why MSC Treated Product Tankers and USS Product Carriers Unequally.**

There are numerous gaps in the record and unexplained actions with regard to the disparate treatment of Product Tankers as opposed to USS Product Carriers. Additionally, there appears to be a predisposition in favor of USS Product Carriers that permeates the procurement process and in particular the responsibility determinations. The email between Ms. Fischer and Ms. Wieszek, cited above appears to be evidence of a bias against awarding a contract to Product Tankers. Therefore, as an overreaching matter, the CO's and Ms. Wieszek's depositions should be taken to explain why they ignored the determinative fact that no violations had occurred on U.S. flag vessels and why they felt there would be a "problem" if MarAd did not debar OSG.

This predisposition is also reflected in the areas described below that require supplementation of the record to not only explain what appears to be unsupported actions or conclusions by the CO, but also to determine whether there was bias and unequal treatment of the offerors to the prejudice of Product Tankers. This Court has allowed discovery in the form of depositions to root out bias. *See J.C.N. Constr. Co., Inc. v. United States*, 60 Fed. Cl. 400, 405 n. 8 (2004) (allowing depositions regarding asserted bias); *see also Cybertech Group, Inc. v. United States*, 48 Fed. Cl. 638, 650-1 (2001) (authorizing depositions where plaintiff alleged that Government officials failed to act impartially and provided preferential treatment by steering the contract award to a particular vendor).

**REDACTED VERSION**

Moreover, since there appears to be a determined effort by some MSC officials to find Product Tankers non-responsible, whereby it could be eliminated from competition for this Contract, MSC should be ordered to produce all communications or evidence of communications between MSC officials that relate to OSG's participation in this procurement.

**1. There is Insufficient Information in the Administrative Record Explaining Why MSC Ignored USS Product Carriers' Serious Financial Deficiencies and the Tenuous Structure of its Proposal.**

The Solicitation, in Section L-7, required that all offerors furnish evidence of adequate financial resources to perform the Contract or the ability to obtain such resources. AR 364. USS Product Carriers, which essentially had no assets, provided only the 2005 annual report of its parent company, USSP. AR 3256. As a result, when DCAA analyzed USS Product Carriers at MSC's request, it responded that:

> It should be noted that this assessment pertains only to the parent company, U.S. Shipping Partners, L.P. Financial data was not provided for its subsidiary, USS Product Carriers nor USS Product Investors. Therefore, should a contract be awarded to either of these subsidiaries, we recommend MSC obtain a Corporate Guarantee (Form DCMA 1620) from the U.S. Shipping Partners, L.P.

AR 3964. In addition, MSC's internal analysis, based upon risk identified from Dun & Bradstreet reports, recommended that [redacted] AR 3257.

MSC did explicitly request that if USS Product Carriers was signing the Contract, that its parent, USSP, guarantee the performance of USS Product Carriers under the Contract. AR 3394. This was critical because USS Product Carriers, as the MSC contractor, would be liable to NASSCO for the [redacted] million to build the two vessels, liable to MSC for performance of the [redacted] million charter, and liable to NASSCO for the cost of the last four tankers [redacted] of the contract to purchase nine tankers. However, USS Product Carriers has essentially



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

no assets at this time to fund performance.

The CO's determination totally ignores the fact that the awardee, USS Product Carriers, has no capital and that no one has guaranteed performance of USS Product Carriers to MSC. The [redacted] million funding of the Joint Venture LLC may be adequate to cover the construction of the first five tankers costing [redacted] million, but only if two of the tankers are sold upon delivery in order to fund the construction of the last two of five tankers. The CO ignores the fact that the awardee is obligated to pay NASSCO over [redacted] million for tankers 6 through 9, which will occur during the charter period and for which no financing has been secured.

USSP refused to guarantee performance of USS Product Carriers under the Contract. Rather than insist upon their guarantee, MSC merely noted in the Responsibility Determination for USS Product Carriers that:

> USS has entered into a joint venture with USS Products Investor LLC to finance construction of the first five NASSCO tankers. The joint venture [but not Product Carriers] is capitalized with [redacted], of which [redacted] came from the Partnership. US [sic] Product Manager LLC is another wholly owned subsidiary of the Partnership that manages the construction and operation of the NASSCO tankers for the joint venture. In various Security and Exchange Commission (SEC) public filings the Partnership has guaranteed the obligation of USS Product Manager LLC [but not to MSC].

AR 3774-75. Based upon this, the CO found USS Product Carriers presently responsible without the need for a parent guarantee.

This complicated financial structure has clearly confused MSC. For example, on June 19, 2007, notwithstanding the language quoted above, the CO emailed USS Product Carriers stating that "[i]n USS's response to a discussion question regarding a performance guarantee from the Parent company (U.S. Shipping Partners LP), you stated that USS Product Carriers is capitalized with [redacted], [redacted] of which came from the Partnership." AR 4049. Apparently, the CO was confusing the offeror/awardee, USS Product Carriers, with the joint venture, USS



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

Product Investors LLC. Additionally, MSC notes in its January discussions with USS Product Carriers that it established a joint venture to fund specifically this project and has set aside [redacted] million in capital for this Contract. AR 3509. This was wrong. The joint venture was to finance five tankers to be built by NASSCO and was not dedicated solely to the two MSC tankers.

The fact that the CO ignored the recommendation of DCAA to secure a parent guarantee of performance of USS Product Carriers, the erroneous belief that USS Product Carriers was capitalized at [redacted] million, and the failure to make an effective financial risk assessment requires a deposition of the CO to explain her rationale and the apparent confusion in her analysis. The lack of diligence in determining the financial responsibility of USS Product Carriers stands in stark contrast to MSC's dogged pursuit of finding Product Tankers non-responsible.

**2. There is Insufficient Information in the Administrative Record Explaining Why MSC Accepted USS Product Carriers' Materially Unbalanced Pricing in Contravention of the Solicitation Requirements.**

The Administrative Record is clear that unbalanced pricing would not be allowed and that "[t]he Government may reject an offer as non-responsive if it is materially unbalanced. An offer is unbalanced when it is based on prices significantly less than cost for some work and prices which are significantly overstated for other work." *See e.g.*, AR 3264-65; *see also* AR 368 ("the proposed price will be evaluated for price reasonableness. The Government may determine that an offer is unacceptable if the option prices are significantly unbalanced").

USS Product Carriers' initial offer through its FPR was grossly unbalanced. AR 3269. MSC evaluators recognized that [redacted] AR 3271. [redacted]



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

[redacted] *Id.* MSC evaluators observed that [redacted] AR 3275. USS Product Carriers' response to the unbalanced pricing issue was that it [redacted] AR 3510. MSC responded that the Government requires balanced pricing. *Id.*

In April, MSC's Price Evaluation Committee Report reviewed USS Product Carriers' FPR and recognized that it was still materially unbalanced by front loading the first and only firm contract year. For the first vessel the price was [redacted] per diem and the second vessel was [redacted] although the daily cost of operating each vessel, including G&A, was only [redacted]. AR 208-217. In the first option year the price drops to only [redacted] for each vessel. Thus, USS Product Carriers' unbalanced pricing provides an astonishing [redacted] profit in the firm contract period and, if all options are exercised by the Government, USS Product Carriers' profit average for the entire period will be [redacted]. AR 3637.

MSC recognized that USS Product Carriers' pricing was materially unbalanced, but finally decided to accept it, perhaps to help alleviate its tenuous financial status. In this regard, the unbalanced pricing remained even though MSC addressed the termination liability problem that USS Product Carriers had used as a justification for this pricing structure. It is also incredible that MSC's CO should find that such unbalanced pricing (more than [redacted] profit in the first contract year and more than [redacted] for the entire contract period) was "fair and reasonable." No other offeror provided such front-loaded, unbalanced pricing. No other offeror required a profit even close to USS. In contrast, Product Tankers' profit factor for the charter period was only [redacted]. *See e.g.*, AR 3638. As a result, Product Tankers seeks to depose the CO to explain



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

her decision to find USS Product Carriers responsible, to accept its materially unbalanced pricing and exorbitant profit, and to find it had the ability to perform the Contract.

**3. There is Insufficient Information in the Administrative Record Explaining Why MSC Accepted Indefinite Delivery Bonuses in USS Product Carriers' Proposal in Contravention of the Solicitation Requirements.**

In January 2007, MSC informed USS Product Carriers that it could not accept an "unpriced delivery/redelivery bonus." AR 3507. Regardless, on March 3, 2007, USS Product Carriers indicated that there would be significant delivery and redelivery bonus. AR 52. If delivery were the NASSCO shipyard in San Diego, California, or redelivery occurred in the [redacted], no bonus would be due. AR 58. However, if the delivery was from the NASSCO shipyard in San Diego, California to the [redacted], the bonus would be [redacted], and if redelivery was based upon [redacted] to the [redacted], the bonus would be [redacted]. *Id.* For any other delivery or redelivery options, USS Product Carriers left the value of the bonus open ended to be "adjusted proportionally based upon time, distance and applicable canal tolls." *Id.*

On March 14, 2007, MSC rescinded its earlier bar against delivery bonuses and informed USS Product Carriers that it "must provide a firm value for the ballast bonus and repositioning cost regardless of delivery/redelivery location." AR 3516. In response, USS Product Carriers' letter of Marcy 27, 2007 provided firm fixed delivery bonus of [redacted] if the vessel were delivered anywhere in the continental United States and [redacted] if it were delivered anywhere else in the world. AR 193.

Although this met MSC's requirements, USS Product Carriers' changed back to a prohibited adjustable bonus in its March 30, 2007 FPR, contrary to the Solicitation and direction of the CO. AR 184.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

The Contract awarded to USS Product Carriers on July 6, 2007 included the firm fixed delivery and redelivery bonuses from the FPR dated March 27, 2007, rather than the open-ended, indefinite bonuses of the FPR dated March 30, 2007. AR 4065. However, on the same day as Contract award, MSC issued Modification P00001, which required MSC to accept delivery at NASSCO and redelivery in [redacted] and eliminated bonuses. AR 4128.

A MSC memorandum to file indicates that there were apparently discussions after the FPR to firm the delivery and redelivery bonuses. AR 4130. Moreover, now Modification P00001 obligates MSC to fixed delivery and redelivery locations in exchange for eliminating bonuses. This means that MSC must pay the full cost of moving the vessel from NASSCO to the first loading port and the cost of returning the vessel at the end of the Contract to the [redacted]. This greatly reduced the financial risk and appears to be another attempt to benefit a financially strapped USS Product Carriers.

The circumstances surrounding these events are not resolved by the current administrative record. The record does not explain why MSC ignored the unacceptable contingent pricing in USS Product Carriers' March 30, 2007 FPR, nor why it issued the Contract with firm delivery and redelivery bonuses only to modify the Contract the same day to eliminate such bonuses. Product Tankers seeks the deposition of the CO to explain why these gaps exist in the record and to explain her highly unusual actions.

**4. There is Insufficient Information in the Administrative Record Explaining the Extension on March 28, 2007 for Final Proposal Revisions.**

MSC claims that all FPRs were submitted on time on March 28, 2007, but that Seabulk's contained contingent language that required removal for the offer to be eligible. AR 3157. Therefore, prior to the 2 PM deadline, MSC extend the FPR date to 3 PM on March 30, 2007.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

*Id.* Amendment 13, however, was not issued until 2:30 PM on March 28th, thirty minutes after the deadline to submit FPRs. *Id.*

These circumstances raise numerous questions as to why MSC began reviewing Seabulk's FPR prior to the 2 PM deadline, why MSC reopened discussions with Seabulk, and why, if MSC determined to extend the due date, it opened Product Tankers' FPR submitted at 1:30 PM on March 28, 2007 and did not return it to Product Tankers until noon the next day. AR 3481.

As a result of these unusual circumstances and the significant prejudice that could result to Product Tankers through the unlawful exposure of its FPR, Product Tankers requests the records of the exact time each FPR was received on March 28, 2007 and when they were each opened. Also, Product Tankers seeks any records of communication with Seabulk, and information on who made the decision to extend the FPR deadline until March 30, 2007. The MSC Memorandum issued by Carole Wieszek on March 29, 2007 indicates that the FPRs were improperly opened prior to the due date and discussions held with at least one offeror. Ms. Wieszek's deposition is required to determine the full facts surrounding this extension. It is noted that MSC has a history of improper *post hoc* extension of proposed due dates. *See Geo-Seis Helicopter, Inc.,* No. 07-155C__, Fed. Cl. __ (July 30, 2007).

### C. The Need for Supplementation of the Administrative Record Regarding Relevant Documents and Communications.

#### 1. There is Insufficient Information in the Administrative Record Regarding Communications between MSC and Other Federal Agencies Regarding the Present Responsibility of OSG and Product Tankers

Product Tankers is aware that MSC officials have communicated with other federal agencies regarding Product Tankers' and/or OSG's participation and eligibility for the T-5 Tanker Replacement Procurement and who would take the lead in determining OSG's present



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

responsibility. As a minimum, we believe that MSC communicated with MarAd and other federal agencies regarding MarAd taking responsibility for assessing the impact of OSG's Plea Agreement on its ability to receive future government contracts as the lead federal agency on behalf of the entire federal government. We also are aware that there have been communications with U.S. Transportation Command regarding OSG's eligibility for being awarded government contracts, including the T-5 Tanker Replacement Procurement. The Administrative Record does not reflect any such communications. These communications are relevant to the apparent predisposition to not award the contract to Product Tankers, as evidenced by the CO's email of January 2007 cited above. These are also relevant to Count I of Product Tankers' Complaint regarding the preemption of the CO's authority in light of the decision for MarAd as the lead federal agency not to debar OSG from future contracts.

MSC should be ordered to produce all communications or evidence of communications between MSC officials and other components of the Navy, or any other Department of Defense ("DoD") or civilian agency officials that related to the subject of OSG's participation in the T-5 Tanker Replacement Procurement and its eligibility for award for this and other contracts.

**2. Additional Briefing Materials Regarding the Award of the T-5 Replacement Tanker Procurement to USS Product Carriers and the Disqualification of Product Tankers.**

The Administrative Record only contains one set of briefing slides relating to this procurement, dated June 12, 2007. *See* AR 4137-53. However, it is improbable to believe that there was only one briefing throughout the entire period of this procurement. Given the size of the procurement and the issues involved, there were undoubtedly numerous other interim and final briefings addressing the award to USS Product Carriers and the disqualification of Product Tankers. Accordingly, the government should produce all briefing charts, presentation materials,



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

or supporting memoranda used to brief or discuss this procurement with MSC, the Navy, including the Navy Secretariat, other DOD agencies, including U.S. Transportation Command, and any other federal agency. These documents are necessary to provide a complete record and provide relevant information on any predisposition to not award to OSG.

## III. REQUESTED SUPPLEMENTATION THROUGH DISCOVERY.

As a result of the foregoing, Product Tankers seeks to supplement the administrative record with the following:

h. The deposition of the MSC CO, Ms. Diana Fischer;

i. The deposition of Carole Wieszek, Director Chartering & Ship Operations for MSC;

j. All communications or evidence of communications between MSC officials that relate to Product Tankers' or OSG's participation in this procurement, specifically those that relate to the Determination of Responsibility;

k. The deposition of Agent Janet Benzer of DSS, or another appropriate DSS official;

l. All records of the exact time MSC received each FPR on March 28, 2007 and when they were opened, information on who decided to extend the FPR deadline, and all communications with Seabulk relating to the submission of FPRs;

m. All communications or evidence of communications between MSC officials and any Navy or other DoD or civilian agency officials that related to Product Tankers' and/or OSG's participation in the T-5 Tanker Replacement Procurement; and,

n. All briefing charts or presentation materials, or other presentation summaries, regarding the T-5 Tanker Replacement Procurement, the decision to award to USS Product Carriers, or the decision to find Product Tankers non-responsible.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**REDACTED VERSION**

## CONCLUSION

The current Administrative Record is inadequate and for the reasons discussed herein, Product Tankers respectfully requests that this Court grant its Motion to Supplement the Administrative Record.

Dated: August 20, 2007

Respectfully submitted,

s/ John J. Pavlick, Jr.
John J. Pavlick, Jr.
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

Of Counsel:
Lars E. Anderson
Dismas N. Locaria
Peter A. Riesen
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

William A. Shook
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006-1600
Telephone: (202) 778-9000
Facsimile: (202) 778-9100

DCDOCS1//#251635



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**