**Agreed Upon Redacted Copy – May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| OSG PRODUCT TANKERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>USS PRODUCT CARRIERS, LLC,<br><br>Defendant, Intervenor. | ) | Case No. 07-561C<br>Judge Hodges |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, OSG Product Tankers, LLC ("Product Tankers"), by the undersigned counsel, respectfully moves for judgment on the Administrative Record.

Product Tankers requests this Court to find that the June 19, 2007 non-responsibility determination issued by the contracting officer ("CO") for the Military Sealift Command ("MSC") regarding Product Tankers ("Non-Responsibility Determination") was:

1. Pre-empted by MarAd's decision not to debar one of Product Tankers' ultimate parent companies, Overseas Shipholding Group, Inc. ("OSG, Inc.); or in the alternative, was



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

2. Predicated on material errors of fact and law, and illogical conclusions based upon these errors and her failure to consider all of the relevant information in the Administrative Record, and therefore lacked a reasonable or rational basis; and/or
3. Based upon an unequal standard visa vie the more lenient standard applied to USS Product Carriers, LLC ("USS"), the awardee.

As a result of improper conduct of the MSC Contracting Officer, Product Tankers is rightly entitled to:

A) Declaratory judgment that the CO's non-responsibility determination is in error and is void;

B) Declaratory judgment that the CO's responsibility determination of USS is in error and is void;

C) Declaratory judgment that Product Tankers is responsible and eligible for the award of Contract No. N00033-07-C-5416;

D) A permanent injunction ordering MSC to terminate the award of Contract No. N00033-07-C-5416 to USS and ordering the Award of Contract No. N00033-07-C-5416 to Product Tankers;

E) Alternatively, a preliminary injunction ordering MSC to terminate the award of Contract No. N00033-07-C-5416 to USS; have a different CO perform a responsibility determination of Product Tankers consistent with the Court's findings and, if Product Tankers is determined to be responsible, award Contract No. N00033-07-C-5416 to Product Tankers;

F) All costs of attorneys fees incurred in pursuing this action; and

G) Such other relief as the Court may deem just and proper.

Dated: November 19, 2007

Respectfully submitted,

s/ John J. Pavlick, Jr.__________
John J. Pavlick, Jr.
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

Of Counsel:
Lars E. Anderson
Dismas N. Locaria
Peter A. Riesen
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

William A. Shook
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006-1600
Telephone: (202) 778-9000
Facsimile: (202) 778-9100

DC1/254959



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**Agreed Upon Redacted Copy – May Be Made Public**

**BID PROTEST**

**No. 07-516C**
**(Judge Hodges)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**OSG PRODUCT TANKERS, LLC,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant,**

**and**

**USS PRODUCT CARRIERS, LLC,**

**Defendant-Intervenor.**

# REVISED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

**JOHN J. PAVLICK, JR.**
**Venable LLP**
**575 7th Street, N.W.**
**Washington, DC 20004-1601**
**Telephone: (202) 344-4000**
**Facsimile: (202) 344-8300**

**OF COUNSEL:**

**LARS E. ANDERSON**
**DISMAS N. LOCARIA**
**PETER A. RIESEN**
**Venable LLP**
**575 7th Street, N.W.**

**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**Washington, DC 20004-1601**
**Telephone: (202) 344-4000**
**Facsimile: (202) 344-8300**

**WILLIAM A. SHOOK**
**Kirkpatrick & Lockhart Preston Gates Ellis LLP**
**1601 K Street, N.W.**
**Washington, DC 20006-1600**
**Telephone: (202) 778-9000**
**Facsimile: (202) 778-9100**

**November 19, 2007**

## TABLE OF CONTENTS

## REVISED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Page

Questions Presented ....................1

Statement of the Case ....................1

Argument ....................4

I. The CO Lacked Authority to Issue Her Non-Responsibility Determination Based Upon Integrity and Business Ethics Grounds When That Issue Had Been Resolved for the Entire Government by the Lead Federal Agency ....................4

A. The federal government, including MSC's parent agency, the Department of Navy, selected MarAd to serve as the lead agency in determining the present responsibility of OSG, Inc. for government-wide application....................5

B. MarAd applied the appropriate standard of review and considered all the relevant factors with regard to integrity and business ethics stemming from the circumstances involved in the Plea Agreement....................7

C. The lead agency in a debarment proceeding is the most appropriate entity to review an entity's integrity and business ethics ....................9

1. The debarring official's authority is superior to that of a contracting officer with regard to issues involving integrity and business ethics....................9

2. To allow the CO to circumvent the finding of MarAd would return the contracting process to the pre-FAR period of chaos and uncertainty ....................12

3. The CO improperly based her determination on factors related to OSG, Inc. and decided by MarAd, rather than factors directly related to Product Tankers' performance of this Contract....................13



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

II. The CO's Non-Responsibility Determination of Product Tankers, was Arbitrary and Capricious Due to Material Errors of Fact and Law, Omissions of Material Information and Baseless Assumptions ............................15

A. Bid protests have been sustained in the past because of faulty .......................16

B. The CO's decision is based upon material errors of fact which undercut the entire Non-Responsibility Determination ..................................17

1. The CO inaccurately attributes the criminal violations as a unique problem to OSG, Inc., mischaracterizes the violations, and ignores its response ..............................................................................18

2. The CO incorrectly alleges that senior management of OSG, Inc. was involved in the violations ..........................................................21

3. The CO is incorrect as to the status of OSG, Inc.'s probation...................22

4. The CO incorrectly alleges that OSG, Inc. had only performed 15% of its required initial audits at the time of her Non-Responsibility Determination ...................................................................23

5. The CO incorrectly alleges the implementation status of OSG, Inc.'s ECP ..............................................................................................24

6. The CO incorrectly alleges that OSG, Inc. withheld information from the government for two years.......................................25

7. The CO incorrectly believes that Product Tankers is a wholly-owned subsidiary of OSG, Inc. .................................................................26

C. The CO Lacked a Rational Basis for Her Determination that Product Tankers Could not Obtain a Facility Clearance by 2010 ...................27

1. The CO used incorrect information when inquiring into Product Tankers' ability to obtain a facility security clearance.................27

2. There is no legal basis for the CO's Non-Responsibility determination ...........................................................................................29

3. There is no basis for the CO's assumption that a lengthy adjudication process would prevent Product Tankers from obtaining a facility security clearance by October 2010............................30

4. The CO lacked a rational basis for treating Product Tankers and USS differently with regard to the ability to obtain a secure facility clearance ....................32

D. The CO's Analysis in Her Non-Responsibility Determination is Based Upon Errors of Law ....................33

1. The CO relies upon outdated regulatory language for her authority to circumvent the lead agency's findings ....................33

2. The CO did not understand debarment procedures and their proper application ....................34

E. The CO Predicates her Non-Responsibility Determination on Omissions and Baseless Assumptions and Faulty Logic ....................36

1. The CO fails to address the significance of the foreign flag versus U.S. Flag history of compliance ....................36

2. The CO failed to consider highly relevant comments of the DOJ prosecutor and USCG officials responsible for the investigation and prosecution of OSG, Inc. ....................38

3. The CO's overall failure to coordinate her actions with MarAd was illogical and irrational ....................40

4. The CO penalizes Product Tankers for applying the ECP, which is recognized as the best in the industry ....................41

F. The Non-Responsibility Determination Fails to Properly Distinguish Between Product Tankers, the Actual Offeror, and one of its Ultimate Parent Companies, OSG, Inc. ....................42

1. Proposal documents clearly delineated that Product Tankers was the offeror ....................42

2. The Administrative Record demonstrates the CO had been clearly apprised that OSG, Inc. would not own the tankers servicing the contract ....................42

3. Although Product Tankers relied on other segments of OSG, Inc., it was limited to U.S. Flag segments, which were operationally separate from the offending segments ....................43

4. The CO's failure to appropriately focus her responsibility determination on Product Tankers and, at most, OSG Inc.'s U.S. Flag operation, was arbitrary and capricious ....................................44

G. The CO's Briefing of Commander, US TRANSCOM Misstated or Omitted Material Facts ........................................................................46

III. The CO Unfairly Favored USS as Compared to Product Tankers by Applying a Less Rigorous Standard in USS' Responsibility Determination ..........................................................................................48

A. The CO Ignored USS' Lack of Financial Resources ......................................49

B. The CO Allowed USS to use Prohibited, Materially Unbalanced Pricing and Receive an Exorbitant Profit to Help Alleviate its Financial Situation ..........................................................................53

Conclusion ......................................................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Art-Metal – USA, Inc. v. Solomon*, 473 F. Supp. 1 (D.D.C. 1978) ....................................10
*Aviation Enterprises, Inc. v. United States*, 8 Cl.Ct. 1 (1985) ..........................................32
*Decker and Company et al.*, B-220807, B-220808, B-20808, B-220813, B-220817, 86-1 CPD 100 (Jan. 28, 1986) ..........................................................17
*Elliott Co. v. Gannett*, 732 F. Supp. 191, 194-95 (D.D.C. 1990) .....................................10
*Fry Communications, Inc.*, B-207605, 83-1 CPD ¶ 109 (Feb. 1, 1983)...........................30
*Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613 (1983)..........................................................32
*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001).............................................................................................9, 16
*Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 421 (2002).............................................................................................................16
*International Graphics, Division of Moore Business Forms, Inc. v. United States*, 4 Cl.Ct. 186 (1983) ...................................................................................32
*Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342 (11th Cir. 1994).........16
*Peter Kiewit Sons' Co. v. US. Army Corps of Engineers, et al.*, 714 F.2d 163 (D.C. Cir 1983) ..................................................................................................10
*Schwendener/Riteway Joint Venture*, B-250865, 250865.2, 93-1 CPD ¶ 203 (Mar. 4, 1993) ..........................................................................................................16, 17
*SPM Manufacturing Corp.*, B-228078, B-228078.2, 88-1 CPD ¶ 370 (Apr. 18, 1988) ...............................................................................................................16

**Statutes**

31 U.S.C. § 3324...................................................................................................53
33 U.S.C. § 1368.....................................................................................................5

**Regulations**

2 C.F.R. Part 180 ...............................................................................................5, 6
2 C.F.R. § 180.10................................................................................................5, 6
2 C.F.R. § 180.125....................................................................................................7
2 C.F.R. § 180.140....................................................................................................9
2 C.F.R. § 180.600..................................................................................................10
2 C.F.R. § 180.620.......................................................................................6, 10, 11
2 C.F.R. § 180.625..................................................................................................35
2 C.F.R. § 180.845....................................................................................................7
2 C.F.R. § 180.855....................................................................................................7
48 C.F.R. § 15.402..................................................................................................54
48 C.F.R. Subpart 9.1.............................................................................................13
48 C.F.R. § 9.104-1.......................................................................................2, 14, 51
48 C.F.R. § 9.104-3..........................................................................................13, 37
48 C.F.R. Subpart 9.4.............................................................................................13

48 C.F.R. § 9.401-1 .......... 5, 6, 8, 9, 48
48 C.F.R. § 9.402 .......... 6, 7, 10, 11
48 C.F.R. § 9.403 .......... 35
48 C.F.R. § 9.404 .......... 11
48 C.F.R. § 9.405-1 .......... 35, 36
48 C.F.R. § 9.406-1 .......... 7, 10, 35
48 C.F.R. § 9.406-2 .......... 5
48 C.F.R. § 9.406-3 .......... 7
49 C.F.R. Part 29 .......... 6, 35
49 C.F.R. § 29.625 .......... 35
49 C.F.R. § 29.800 .......... 7
48 Fed. Reg. 42,102 (Sept. 19, 1983) .......... 12
53 Fed. Reg. 19,204 (May 26, 1988) .......... 33, 34
68 Fed. Reg. 66,534 (Nov. 26, 2003) .......... 13, 33
Debarment and Suspension Procedures Hearings, 97th Cong. (Sep. 11-12, 1981) .......... 12
DFARS 209.105-2 .......... 11
DOD 5220.22-M, February 28, 2006 .......... 29
NISPOM § 2.102 .......... 29
NISPOM § 2.109 .......... 29-30

**REVISED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, OSG Product Tankers, LLC ("Product Tankers"), by and through the undersigned counsel, hereby submits this revised memorandum of law in support of the accompanying Motion for Judgment on the Administrative Record.

## QUESTIONS PRESENTED

1. Whether the Military Sealift Command ("MSC") Contracting Officer ("Contracting Officer") lacked authority to issue her Non-Responsibility Determination regarding Product Tankers based upon integrity and business ethics grounds arising from the convictions of Overseas Shipholding Group, Inc. ("OSG, Inc.") when that issue had been resolved for the entire Government by the Lead Agency for Suspension and Debarment, the United States Maritime Administration ("MarAd").
2. Whether the CO's responsibility determination of Product Tankers was arbitrary and capricious due to material errors of fact and law, omissions of material information and baseless assumptions.
3. Whether the CO's use of unequal responsibility standards for Product Tankers as compared to USS Product Carriers, LLC ("USS"), the selected awardee, was arbitrary and capricious.

## STATEMENT OF THE CASE

The Parties have prepared a Joint Stipulation of Facts relevant in this matter, which is submitted separately. The following is a brief statement of the case.

On August 31, 2006, MSC issued solicitation number N00033-06-R-5416 ("Solicitation") for two T-5 replacement tankers ("Procurement") that complied with the requirements of the Jones Act. To comply with the Jones Act, the tankers must be built in the United States and be owned and crewed by U.S. citizens. AR 2930-31, 2975-76. Although six prospective contractors submitted initial offers, MSC deemed only two offerors technically acceptable at the end of the procurement process, Product Tankers and USS. AR 3255, 3574-77. Product Tankers offered a substantially lower price than USS. AR 3575-76. However, the CO responsible for the Procurement concluded that an award could not be made to Product Tankers because it was not responsible pursuant to Federal Acquisition Regulation ("FAR") 9.104-1 (codified at 48 C.F.R. § 9.104-1). AR 1782.

The CO based her June 19, 2007 non-responsibility determination of Product Tankers ("Non-Responsibility Determination") upon the fact that one of Product Tankers' ultimate parent companies, OSG, Inc., had pled guilty to various criminal violations involving its foreign flag operations ("Plea Agreement"). *See id; see also* AR 2569-95. This determination, however, directly conflicted with a prior finding of present responsibility by MarAd, which had been selected by the federal Government as the lead agency to determine whether OSG, Inc. lacked the necessary integrity and business ethics and should be debarred or suspended from contracting with the federal Government or participating in federal assistance programs. AR 1961.

MarAd based its decision on the extraordinary efforts by OSG, Inc. to cooperate with the Department of Justice ("DOJ") during the investigation. AR 1963. Additionally, as part of OSG, Inc.'s response to the violations, it developed and implemented an unprecedented environmental compliance program ("ECP") (AR 3896), considered by DOJ and the U.S. Coast Guard ("USCG") officials most closely associated with the investigation and prosecution of

OSG, Inc. as the "gold standard" in the industry. *See id.* The ECP included both innovative state-of-the-art technical improvements to pollution control equipment aboard vessels to directly address the past non-compliance, and other groundbreaking compliance practices. AR 3839.

Significantly, while there was no evidence of any wrongdoing or past violations by Product Tankers, the offeror, or by any other person or entity in OSG, Inc.'s U.S. flag unit, the vessels and operations of Product Tankers and OSG, Inc.'s "U.S. Flag Strategic Business Unit" are subject to this robust and comprehensive ECP. AR 3807. Regardless, the CO contended that more time was needed to assess the effectiveness of the ECP. AR 1783.

Subsequently, with the elimination of Product Tankers, MSC was left with only one technically acceptable offeror, USS. *See* AR 3574-77. In stark contrast to the extensive and highly detailed scrutiny of Product Tankers' responsibility, the CO performed a hurried review of USS (*See* AR 3775.); she either ignored or did not comprehend the lack of financial resources available to USS in performing the contract. *See* AR 4049, 3774-75; *see also* AR 3996-4029. In doing so, during her evaluation of the proposals, she failed to follow the strong recommendation of the Defense Contract Audit Agency ("DCAA") that the CO obtain a corporate guarantee of performance (DCMA Form 1620) from USS' parent corporation. AR 3964. Even though USS' parent refused the CO's request for a corporate guarantee and no financially responsible entity guaranteed USS' performance, the CO found USS responsible and awarded it the $250 million T-5 tanker replacement contract ("Contract"). AR 3409-10.

On July 25, 2007, Product Tankers filed its complaint in this bid protest action challenging the award of the Contract on three counts. The first asserts that the CO lacked the authority to issue her Non-Responsibility Determination on integrity and business ethics grounds relating to Product Tankers' indirect parent corporation, OSG Inc., when that issue had already

been determined for the entire federal Government by the lead agency, MarAd. The second asserts that the CO acted arbitrarily and capriciously and her Non-Responsibility Determination was unreasonable and without basis due to material errors of fact, law, omissions of material information, and baseless assumptions. The third asserts that the CO's use of unequal responsibility standards for Product Tankers and USS was arbitrary and capricious. Given the nature of the counts, the protest could be granted on one or all of these three protest grounds.

## ARGUMENT

### I. THE CO LACKED AUTHORITY TO ISSUE HER NON-RESPONSIBILITY DETERMINATION BASED UPON INTEGRITY AND BUSINESS ETHICS GROUNDS WHEN THAT ISSUE HAD BEEN RESOLVED FOR THE ENTIRE GOVERNMENT BY THE LEAD FEDERAL AGENCY.

The CO's determination that Product Tankers was not a responsible offeror was not based upon any finding that Product Tankers lacked the capability or resources to satisfactorily perform the Government's requirements to build and operate two T-5 Replacement Tankers. AR 3575. Rather, the CO's Non-Responsibility Determination was based solely on her finding that OSG, Inc., one of two ultimate parent corporations of Product Tankers, did not have a satisfactory record of integrity and business ethics because of its Plea Agreement and resultant convictions. *See* AR 1766-83. However, she lacked the authority to make this determination because the lead federal agency for suspension and debarment purposes had already determined that OSG, Inc. had demonstrated its present responsibility. *See* AR 1961-64, 4157-63. The CO's actions are extraordinary and mark the only time since the implementation of the uniform Government-wide debarment regulations in 1983 that a contracting officer has found a contractor non-responsible after a lead agency debarring official's decision not to debar.

Prior to making her decision, the CO knew that MarAd had been designated as the lead agency and knew of its determination that OSG, Inc. was presently responsible and should not be

debarred. *Id.; see also* AR 4155-56. The Administrative Record reflects that MarAd properly applied the appropriate standard when it reviewed OSG, Inc. for the violations contained in its Plea Agreement. *See* AR 1961-64. For the following reasons, it was inappropriate and arbitrary and capricious for the CO to issue her Non-Responsibility Determination since she lacked authority to do so in light of MarAd's determination.[1]

**A. The federal Government, including MSC's parent agency, the Department of Navy, selected MarAd to serve as the lead agency in determining the present responsibility of OSG, Inc. for Government-wide application.**

OSG, Inc.'s Plea Agreement subjected it to both statutory[2] and discretionary and debarment actions. *See* 48 C.F.R. § 9.406-2. The federal Government has two uniform regulations to handle discretionary suspension and debarment matters, the provisions of the FAR Subpart 9.4, for Government contracts and subcontracts and a "Common Rule" adopted by all agencies to address nonprocurement suspension and debarment *i.e.*, federal loans, grants, and other forms of federal assistance.[3] They are both uniform, affecting matters across federal agencies and reciprocal to one another, *i.e.*, a debarment under the FAR effects a reciprocal debarment of the company under the nonprocurement regulations, and vise versa. 2 C.F.R. § 180.10(b)(2); *see also* 48 C.F.R. § 9.401-1.

---

[1] The CO's Non-Responsibility Determination does not discuss the imputation of OSG, Inc.'s integrity and business ethics to Product Tankers because she makes the egregious error of viewing the two legally distinct entities synonymously with one another. This error is discussed separately below (*see infra* Section II.F), however, if the CO had proffered some reason for the imputation of OSG, Inc.'s violations to Product Tankers, it would still be inappropriate in this circumstance because, as discussed below, MarAd had found OSG, Inc. presently responsible. *See* AR 1961-64, 4157-63.

[2] The Clean Water Act ("CWA") provides that for violations under section 1319(c), federal agencies are prohibited from entering into contracts "if such contract is to be performed at any facility at which the violation which gave rise to such conviction occurred." 33 U.S.C. § 1368.

[3] OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement), 2 C.F.R. Part 180.

Due to the nature of OSG, Inc.'s business, several federal agencies – USCG, MarAd, the Department of the Navy, and the United States Environmental Protection Agency ("EPA") – had an interest in reviewing OSG, Inc.'s present responsibility. When multiple agencies are involved, as here, both the procurement and nonprocurement regulations provide for a lead agency to make the suspension and debarment decision for all federal agencies. *See* 2 C.F.R. § 180.620; *see also* 48 C.F.R. § 9.402 (c). With regard to this matter, the various federal agencies, including MSC's parent agency, the Department of the Navy, agreed that MarAd would serve as the lead agency.[4] AR 1961.

In its role as the lead agency, MarAd reviewed OSG, Inc.'s present responsibility under the United States Department of Transportation's ("DOT") Governmentwide Debarment and Suspension (Nonprocurement) regulation, 49 C.F.R. Part 29. *Id.; see also* 49 C.F.R. Part 29, 2 C.F.R. Part 180. MarAd's decision under these nonprocurement regulations had a reciprocal effect in the procurement debarment provision of the FAR. 2 C.F.R. § 180.10(b)(2); *see also* 48 C.F.R. § 9.401-1. Therefore, whatever decision MarAd reached applies with the same force and effect to all federal agencies whether it is for nonprocurement or procurement related matters. *Id.*

The CO was fully apprised of MarAd's activities, its designation as the lead federal agency, and its ultimate decision not to debar OSG, Inc. or any of its operating entities. *See, e.g.*, AR 4155-56. In fact, MSC received the MarAd Report weeks before the CO executed her Non-Responsibility Determination. *Id.* Thus, the CO was well aware that MarAd had found that

[4] The EPA retained jurisdiction over the statutorily mandated exclusionary action concerning the one ship where the single CWA violation was committed.

OSG, Inc. was presently responsible and that debarment was not appropriate.[5] *See id.* However, the CO effectively usurped MarAd's authority by finding Product Tankers non-responsible on integrity and business ethics grounds based on the violations to which OSG, Inc. pled guilty under its Plea Agreement. She was without authority to do so.

**B. MarAd applied the appropriate standard of review and considered all the relevant factors with regard to integrity and business ethics stemming from the circumstances involved in the Plea Agreement.**

When deciding whether to debar a party, in this case on grounds related to integrity and business ethics, the debarring official must determine whether the party proposed for debarment has satisfactorily demonstrated its present responsibility. *See* 49 C.F.R. § 29.800; *see also* 48 C.F.R. § 9.406-1(a). If an enumerated cause for debarment is found to exist, the company or individual has the burden of demonstrating that it is presently responsible and should not be debarred. 2 C.F.R. § 180.855; *see* also 48 C.F.R. § 9.406-1(a). To make a determination, debarring officials examine information in favor of and in opposition to a possible debarment. 2 C.F.R. § 180.845(b); *see also* 48 C.F.R. § 9.406-3(b). If the record and the presentation satisfactorily demonstrate that an entity is presently responsible, then debarment should not be imposed. *See* 2 C.F.R. § 180.125; *see also* 48 C.F.R. § 9.402. In making the determination regarding OSG, Inc., the Chief Counsel for MarAd reviewed various documents, met with company representatives and reviewed materials provided by OSG, Inc., and consulted with other informed agencies, including the lead agencies responsible for investigating and prosecuting OSG, Inc. – DOJ and USCG. AR 1962-64.

The investigation revealed that "OSG has accepted responsibility for the wrongdoing of its employees and recognizes the seriousness of the misconduct…" and that, despite certain

[5] MSC also received the fully executed compliance agreement between OSG, Inc. and MarAd prior to the CO announcing her decision to award the Contract to USS. AR 4155-56.

failures by shipboard officers, "the investigation did not show that any corporate officials were involved in, planned, directed or condoned the misconduct." AR 1963. The DOJ and USCG also confirmed OSG, Inc.'s cooperation during the investigation and its extraordinary remedial measures, including the development and implementation of an ECP that is now considered the best in the industry. *Id.* The Chief Counsel of MarAd found that the efforts by OSG, Inc. were substantial and "constitute a significant corporate commitment to combat and eliminate the criminal conduct." AR 1964.

In sum, MarAd found that:

> OSG cooperated to a great extent with the investigation and half the violations to which OSG pled were self-reported violations that occurred after the commencement of the investigation. OSG conducted its own internal investigation once it became aware of the misconduct and provided many of the results to the government, waiving privilege in some instances. OSG terminated the employment of the Chief Engineers involved, declined to reemploy some engine room personnel involved in the misconduct and took other appropriate personnel action against subordinates. Even so, OSG worked with DOJ to ensure that any employees it needed for the criminal investigation, including those OSG would otherwise have terminated, remained available for DOJ's use in the appropriate jurisdiction.

AR 1963.

Considering all of the available evidence, MarAd's Chief Counsel effectively determined that OSG, Inc. had demonstrated its present responsibility and found that debarment of OSG, Inc. was not necessary to protect the Government's interest. AR 1964. As a result, the Chief Counsel recommended to the MarAd Administrator, acting as the Debarring Official, that MarAd enter into a settlement compliance agreement with OSG, Inc. *Id.* The MarAd Debarring Official approved the recommendation and entered into a settlement compliance agreement with OSG, Inc. on June 25, 2007 ("Compliance Agreement"). AR 4157-63.

In making this determination, MarAd acted for all federal agencies. Just as a debarment by the lead agency would have bound all federal agencies and contracting officers, 2 C.F.R. § 180.140; *see also* 48 C.F.R. § 9.401, the decision not to suspend or debar OSG, Inc. precludes such federal contracting officers from denying a contract award to OSG, Inc. or any of its subsidiaries on the basis of a lack of integrity and business ethics, the same basis reviewed and ruled on by MarAd.

**C. The lead agency in a debarment proceeding is the most appropriate entity to review an entity's integrity and business ethics.**

The CO relies on the authority of 48 C.F.R. § 9.104-1(d) for her ability to review a contractor's integrity and business ethics. AR 1782. However, this authority, since the inception of the FAR, has been limited for issues of integrity and business ethics only in which a debarring official has not reviewed an entity on the same basis using the same factual record.

**1. The debarring official's authority is superior to that of a contracting officer with regard to issues involving integrity and business ethics.**

The Federal Circuit has found on several occasions that "the regulations concerning [contracting officer's] responsibility determinations are cryptic." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1335 (Fed. Cir. 2001). As a result, the Federal Circuit and Comptroller General allow the review of "the more extensive debarment regulations for guidance, at least on questions related to the 'integrity and business ethics' requirement." *Id.* This reliance is significant, as it recognizes the contracting officer's authority is not precisely defined and that the debarment regulations are more elaborate because the debarring officials are the primary officials charged with determining the present responsibility of contractors when the basis is integrity and business ethics. Moreover, in matters involving integrity and business ethics, both the procurement and nonprocurement regulations indicate that

debarring officials are primarily tasked with determining whether a party is presently responsible for purpose of all federal agencies. *See* 2 C.F.R. §§ 180.600, 180.620; *see also* 48 C.F.R. §§ 9.402(c), 9.406-1.

This focus on the debarring official as the primary decision maker on cases involving integrity and business ethics is also reflected in the *de facto* debarment cases. In *de facto* debarment cases, the fundamental issue is that the contracting officer is making a responsibility decision which affects more than one contract award and that amounts to a debarment that should be the subject of due process protections of the more formal suspension and debarment proceedings. The cases reflect the principle that the debarring official is the one who should be making such decisions using the formal debarment process. *See, e.g., Peter Kiewit Sons' Co. v. Us. Army Corps of Engineers, et al.*, 714 F. 2d. 163 (D.C. Cir 1983). In one of the early seminal cases on *de facto* debarment, the Court of Appeals for the District of Columbia drew a contrast between the rather simple and practically oriented responsibility decisions made by a contracting officer and the more sophisticated and elaborate procedures of a debarring official.[6] *Id.* at 167 n.18

While the CO must make a finding on present responsibility, she must yield to the debarring official on issues involving integrity and business ethics as that official has the specific authority to make such findings and to bind all federal agencies. This deference is evident throughout the regulations. For example, before awarding a contract contracting officers are required to check the Excluded Party List System to make sure a debarring official has not

[6] While the CO and MSC have taken a position that Product Tankers may bid on future work with MSC (AR 1783), the Government has indicated that "OSG would be welcome to compete for future procurements with different requirements, [but] not for a resolicitation for the same contract . . .," Def.'s Resp. to Mot. For Recons. at 9. This position, however, amounts to a *de facto* debarment and is therefore illegal. *See Elliott Co. v. Garrett,* 732 F. Supp. 191, 194-95 (D.D.C. 1990); *see also Art-Metal – USA, Inc. v. Solomon,* 473 F. Supp. 1 (D.D.C. 1978).

already acted. *See* 48 C.F.R. § 9.404(c)(7) (g). Additionally, under the Department of Defense FAR Supplement ("DFARS"), when a contracting officer makes a non-responsibility determination on integrity grounds, the debarring official must be advised. *See* DFARS 209.105-2(a). Both of these provisions reflect the reality that the federal procurement system looks first and primarily to the debarring official to make the decision on present responsibility, especially when it is based on integrity and business ethics.

Under the Government-wide debarment system the action of a lead agency to debar a contractor binds the entire Government. 48 C.F.R. § 9.402 (c); 2 C.F.R. § 180.620. Likewise, a decision not to debar takes precedence and has similar Government-wide effect. MSC apparently would have the Court believe that the CO's authority to make this determination is unfettered. However, this is not correct. For example, where a contractor has been debarred, a contracting officer could not find the contractor presently responsible.

Finally, the CO justified her authority to overturn MarAd's decision by stating that MSC's interest in OSG, Inc. was greater than that of MarAd and that "MARAD has no operational risk in its decision." AR 1782. Significantly, had MSC, or rather its parent agency, the Department of the Navy, believed it had sufficient interest in reviewing OSG, Inc.'s present responsibility, it could have sought designation as the lead agency. However, the Navy ceded the lead agency role to MarAd, which precludes MSC from making a contrary responsibility determination on integrity and business ethics matters based on the same information. The CO in this case had no authority to ignore the decision of its superior headquarters and the organization, MarAd, that was designated to take the lead for all federal agencies.

**2. To allow the CO to circumvent the finding of MarAd would return the contracting process to the pre-FAR period of chaos and uncertainty.**

The CO asserts that, despite MarAd's finding of responsibility, she maintains her authority to review a prospective contractor with regard to integrity and business ethics. *See id.* This position, however, ignores over twenty-four years of federal procurement practice. In fact, to agree with the CO's position would return the procurement process to the pre-FAR era when each agency acted as an island unto its own, *see infra* fn. 7, something the executive agencies and Congress have taken great pains to resolve.

In 1983, the Government published the first iteration of the FAR. *See* 48 Fed. Reg. 42,102 (Sept. 19, 1983). Among the many processes the FAR sought to better organize and streamline in the procurement process was the coordination of responsibility findings, which included the intersection of contracting officers' responsibility determinations and suspension and debarment decisions made by debarring officials. *See id*. In fact, prior to the FAR, the federal contracting arena was plagued by instances of agency conflict relating to the responsibility of contractors.[7] As a result, FAR Part 9 created a dual system under which contracting officers ensure that contracts are awarded only to responsible contractors, but

---

[7] On March 11 and 12, 1981, the Senate Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs heard testimony regarding the disparate system of responsibility determinations and the lack of a coherent and binding Government-wide system. *Government-wide Debarment and Suspension Procedures Hearings Before the Senate Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs*, 97th Cong. 1, 250 (Sep. 11-12, 1981) (hearing testimony that expounded upon the "troubling and appalling [issue of] why, agencies repeatedly and knowingly choose to ignore other agencies' suspension and debarment actions."). This hearing ultimately led to the provisions of FAR Part 9, Contractor Qualifications, which impose consistency and certainty in the responsibility portion of the procurement process. *See* 48 Fed. Reg. 42,102, 42,129 (Oct. 3, 1983); *see also supra Government-wide Debarment and Suspension Procedures Hearings*, 97th Cong. at 251, 397, 429-30 (demonstrating, overwhelmingly, that interested and experienced Government officials identified the need for a system under which each federal agency would be bound by the decision of another lead federal agency).

recognizes the authority and decision of lead agencies' determinations with regard to suspensions and debarments. *Compare* 48 C.F.R. Subpart 9.1 *with* 48 C.F.R. Subpart 9.4. Indeed, the effort to eliminate hurdles to Government-wide recognition of an agency's actions in order to ensure consistency has, over the course of these twenty-four years, not been static. *See, e.g.,* 68 Fed. Reg. 66,534 (Nov. 26, 2003) (removing the provision from the non-procurement debarment regulation that "a decision not to impose debarment shall be without prejudice to a subsequent imposition of debarment by any other agency.").

This system operated smoothly and without disturbance for nearly twenty-four years, until the CO in this matter made her Non-Responsibility Determination on June 19, 2007, whereby she ignored the contrary determination of the lead agency debarring official and found a prospective contractor non-responsible. Even more egregious, the CO made her decision despite being fully informed that the lead agency had reviewed the same information just weeks before, with no intervening adverse information or circumstances, and had arrived at a contrary conclusion. *See* AR 1961-64, 4155-56.

The CO was without authority to deny this Contract to the offeror, Product Tankers, based upon the conviction and Plea Agreement by one of its ultimate parent corporations, OSG, Inc., whose present responsibility relating to integrity and business ethics had already been resolved by the lead federal agency. To do otherwise undermines the overall goal of the lead agency concept in the regulations that have been in practice for over twenty-four years.

**3. The CO improperly based her determination on factors related to OSG, Inc. and decided by MarAd, rather than factors directly related to Product Tankers' performance of this Contract.**

The CO reviewed the same facts, circumstances and information as reviewed by MarAd. However, it focused on the general effect of violations of foreign-flag vessels operated by

foreign subsidiaries of OSG, Inc. rather than the responsibility of the actual offeror, Product Tankers, which is an indirect and separate vessel-operating subsidiary of OSG, Inc. that operates only U.S. flag vessels. *See* AR 1766-83. This effort exceeded the limits of the CO's authority under the FAR, which provides that the responsibility determination be of "a prospective contractor," *see* 48 C.F.R. § 9.104-1, and only extends to affiliates, such as Product Tankers' parent companies, "when they adversely affect the prospective contractor's responsibility." *Id.* at § 9.104-3(c). By issuing a Non-Responsibility Determination adverse to Product Tankers that focused almost exclusively on OSG, Inc., the CO functionally supplanted and overturned the decision by MarAd. Furthermore, the CO failed to justify her imputation of OSG, Inc.'s violations to Product Tankers. Significantly, no individuals responsible for the violations of OSG, Inc.'s foreign flag vessels have any involvement with Product Tankers, OSG, Inc.'s other U.S. flag operations, or the performance of the Contract. *See generally* AR 1766-83, 3806. In fact, the only area where the foreign flag and U.S. flag vessels of OSG, Inc.'s subsidiaries share common ground is in their participation in the company's world class ECP. *See* AR 2533-34, 3807.

The appropriate review for the CO in this situation, where a lead agency has already reviewed the integrity and business ethics of an entity, is to explore the various other factors outlined in FAR 9.104-1. These include questions relating to the ability of the prospective contractor to actually perform the contract. 48 C.F.R. § 9.104-1. The CO ostensibly reviewed these various factors in her Non-Responsibility Determination. *See* AR 1766-83. Although she purportedly found Product Tankers deficient in some of these areas, her conclusions were based entirely on the integrity issues that stemmed from OSG, Inc.'s convictions. AR 1782. ("In summary, OSG's integrity and business ethics have not been proven."); *see also* Gov's Opp'n to

Mot. to Suppl. at 14 (stating that "[t]he basis of the contracting officer's decision was that OSG's parent company, OSG, Inc., had pled guilty to 33 felonies.").

In her Non-Responsibility Determination, the CO acknowledged MarAd's review of OSG, Inc. AR 1782. However, what she failed to explain was how, after both agencies reviewed the same key documents (the Plea Agreement, the Joint Factual Statement ("JFS") and the ECP), met with some of the same representatives from OSG, Inc., and spoke with the same individuals involved in the investigation and prosecution of OSG, Inc. at DOJ and USCG, she arrived at a conclusion completely contrary to that of the lead agency, MarAd. *Compare* AR 1766-67 *with* AR 1962-64. Had there been a new allegation or conviction against Product Tankers, or OSG, Inc., relevant to the work required under the Contract, the CO may have had the authority to re-examine the information. However, nothing new had been presented in the weeks following MarAd's decision. As a result, it is now unreasonable to allow the CO to overturn a lead agency decision based on the same grounds and the same information considered by MarAd's debarring official. Consequently, the CO's Non-Responsibility Determination is not supported by law or regulation and is arbitrary and capricious.

## II. THE CO'S NON-RESPONSIBILITY DETERMINATION OF PRODUCT TANKERS WAS ARBITRARY AND CAPRICIOUS DUE TO MATERIAL ERRORS OF FACT AND LAW, OMISSIONS OF MATERIAL INFORMATION, AND BASELESS ASSUMPTIONS.

Apart from her lack of authority to issue her determination based upon OSG, Inc.'s Plea Agreement and convictions, the CO's Non-Responsibility Determination is fundamentally and fatally flawed when considered on its own merits. While it gives the impression of a well-considered analysis, it is in fact based upon material factual inaccuracies that go to the very heart of the CO's analysis. Material facts are also omitted or buried in her analysis. It contains significant errors of law and regulation that the CO depended upon when she made her decision.

Finally, the CO's analysis is premised upon baseless assumptions and there is no explanation as to why she reached such opposing conclusions to those of MarAd. Moreover, these assumptions and factual inaccuracies were included in a briefing to the U.S. Transportation Command on June 12, 2007 to obtain approval for the award to USS. AR 4137-53. The material errors of facts, law, and baseless assumptions renders the Non-Responsibility Determination unreasonable and irrational.

**A. Bid protests have been sustained in the past because of faulty responsibility determinations.**

The Federal Circuit provides that while a contracting officer is afforded deference in his or her decision, "this discretion is not absolute." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1335 (Fed. Cir. 2001). In fact, the Federal Circuit has held that if the contracting officer lacked a rational basis in a responsibility determination, it may be set-aside. *Id.* at 1332. It is incumbent upon the contracting officer to "provide[] a coherent and reasonable explanation of this exercise of discretion." *Id.* at 1332-33 *quoting Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994) (internal quotations omitted). Indeed, on numerous occasions, responsibility determinations have been set-aside for reasons such as insufficient information, outdated information, inaccurate information or the failure of the contracting officer to review the actual offeror. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 421, 427 (2002) (sustaining a protest due to the contracting officer's failure to "conduct an independent and informed responsibility determination."); *SPM Manufacturing Corp.*, B-228078, B-228078.2, 88-1 CPD ¶ 370 (Apr. 18, 1988) (sustaining a protest due to the contracting officer's reliance on outdated information in a responsibility determination); *Schwendener/Riteway Joint Venture*, B-250865, 250865.2, 93-1 CPD ¶ 203 (Mar. 4, 1993) (sustaining a protest due to the contracting officer's reliance on

inaccurate and incomplete information in a responsibility determination); *Decker and Company et al.*, B-220807, B-220808, B-20808, B-220813, B-220817, 86-1 CPD ¶ 100 (Jan. 28, 1986) (sustaining a protest due to the contracting officer's failure to review the past performance of the actual offeror in the responsibility determination).

**B. The CO's decision is based upon material errors of fact which undercut the entire Non-Responsibility Determination.**

The CO's Non-Responsibility Determination is riddled with incontrovertible material, factual errors. Here we are not contesting the CO's judgment or interpretation, but rather, her reliance on "facts" that are simply objectively wrong. If the Plaintiff were to discuss each factual error in detail, this already substantial brief would be lengthened considerably. Accordingly, rather than overburden this Court with a complete discussion of all the factual errors which occur on almost every page of the Non-Responsibility Determination, Product Tankers has included a table as Appendix 1 that details these errors and identifies the evidence in the Administrative Record that demonstrates their inaccuracy. *See* Appendix 1. We have summarized the most significant errors below. Responsibility findings have been set-aside due to material errors of fact before, and should appropriately be set-aside here. *See, e.g.*, *Schwendener/Riteway Joint Venture*, B-250865, 250865.2, 93-1 CPD ¶ 203 (Mar. 4, 1993) (sustaining a protest due to the contracting officer's reliance on inaccurate and incomplete information in a responsibility determination).

The CO bases her Non-Responsibility Determination on several fundamental allegations, all of which she erroneously claims are factually supported by the Administrative Record. However, the Administrative Record demonstrates that the key "facts" that the CO relies upon are demonstrably incorrect. *See infra*; *see also* Appendix 1. Consequently, if the inaccurate material facts were stripped from the Non-Responsibility Determination, the CO's foundational

allegations or assumptions lose their support and the entire determination becomes irrational and unreasonable. Likewise, with these factual errors and baseless assumptions included in the Non-Responsibility Determination, they render her conclusions meaningless, irrational and unreasonable.

**1. The CO inaccurately attributes the criminal violations to OSG, Inc., as a unique problem, mischaracterizes the violations, and ignores its response.**

The CO attempts to aggravate the criminal violations of one of Product Tankers' parent organizations by making the completely unsupported statement that if the equipment problems OSG, Inc. faced in meeting its environmental obligations were true, such problems "would be widespread throughout the industry. This does not appear to be the case." AR 1778. However, all the evidence in the Administrative Record unequivocally contradicts this claim. Even more surprising, in three separate instances, the Administrative Record shows conclusively that the CO was specifically apprised that these issues were problems throughout the industry and not unique to OSG, Inc.:

- On April 26, 2007, the CO and members of the Review Panel met with the DOJ and USCG officials most involved in the investigation and prosecution of OSG. AR 3896-97. In notes from that meeting, the DOJ prosecutor "estimated that his office has worked on approximately 50 to 60 cases" relating to violations similar to those to which OSG, Inc. pled guilty. AR 3896.
- On May 3, 2007, Captain Cynthia Varner of MSC, the CO's direct supervisor, emailed the CO, as well as others involved in the Procurement, an article regarding the plea of an employee of another oil tanker company that pled to similar violations as OSG, Inc. AR 4180-81. Significantly, Captain Varner commented that these types of incidents were "an epidemic…." AR 4180.

- Also on May 3, 2007, James Fernan of MSC, and a member of the CO's Review Panel emailed the CO a document from the International Maritime Organization's Marine Environment Protection Committee. AR 3900-08. This document discussed the "widespread deliberate bypassing of the [oily water separator] and the apparently pervasive and regionally recognized chronic problems of illegal oily waste discharges." AR 3902 (emphasis added).

Notwithstanding this credible and corroborated information, the CO made the inexplicable and unsupported finding that the issues that OSG, Inc. was combating on its foreign flag vessels were unique to it. *See* AR 1778. The Administrative Record is completely devoid of any factual information supporting the CO's premise. In fact, at one point, the Review Panel indicated its belief that "[o]ther companies are probably engaging in the same illegal activities, but they just haven't been caught yet." AR 3923. Throughout these proceedings, the Government has been unable explain its allegation that this is not an industry-wide problem, and rather has chosen to side-step the inaccuracy of the Non-Responsibility Determination by arguing that the mistake is irrelevant because it does not relieve OSG, Inc. or Product Tankers from its compliance obligations. *See, e.g.,* Gov.'s Resp. to Mot. to Supp. at 23.

Product Tankers does not challenge this error to justify the violations of one of its parent companies, nor to avoid its compliance obligations. Product Tankers raises this error because it is a key allegation upon which the CO rests her Non-Responsibility Determination and it demonstrates either a disregard of the factual record by the CO or her lack of understanding the actual facts.

Likewise, while Product Tankers acknowledges, as does OSG, Inc., the severity of the violations in the Plea Agreement, the CO grossly exaggerates the offenses. The CO stated and

implied throughout her Non-Responsibility Determination that the company pled to "33 environmental pollution charges." *See, e.g.*, AR 1783. Yet, the Administrative Record correctly provides in several places, including in the Plea Agreement and the JFS, that OSG, Inc. had actually pled to only one pollution charge, and that the other violations related to recordkeeping issues. *See, e.g.*, 2569-95. Her Review Panel also believed that these violations involved repeated and deliberate pollution in six U.S. ports, a statement that is absolutely false. AR 3946.

In mischaracterizing the record, the CO attempts to portray OSG, Inc. as a company that had a unique problem that it aggressively failed to address and implied that it hid the issues from the Government. As noted above, the issues faced by OSG, Inc. in its overseas operations was common throughout the industry and indeed, the company's extraordinary response and cooperation are what was unique. *See* AR 3932 ("This isn't another Enron to Tyco . . ."). However, the latter was ignored in the CO's zeal to paint OSG, Inc. as a bad company.

The CO ignores the efforts by OSG, Inc. to ferret out the problem (AR 1890, 1963, 2530-32), take corrective action (AR 2533, 3896), and to cooperate with the investigation. AR 1963, 2530-32, 3932. Significantly, OSG, Inc. voluntarily and at the company's expense brought foreign crew members who were outside the subpoena jurisdiction of the Government to the United States, paid them wages, housed them, and made them available to the Government investigators. AR 2530-32. The number of violations is much greater because OSG, Inc. helped the Government make its case and voluntarily disclosed almost half of the violations. OSG, Inc.'s extraordinary cooperation and the magnitude of the company's corrective action is completely ignored by the CO. This, however, is a significant issue for debarring officials who have much greater experience and are in a better position to judge the relative cooperation of OSG, Inc.

### 2. The CO incorrectly alleges that senior management of OSG, Inc. was involved in the violations.

In several instances, the CO's Non-Responsibility Determination alleges that OSG, Inc.'s noncompliance pervaded the company's top management. *See* AR 1775. In support of this theory, the CO cites the JFS and MarAd's findings. The JFS, however, describes only one instance of management knowledge that occurred in 2002. AR 1897-99. Moreover, this instance was specifically found by the Government to have been "an isolated act." AR 1898. In fact, at the outset the JFS provides that "[a]ccording to crew members they participated in illegal conduct despite [OSG, Inc.'s] explicit policies forbidding such activities." AR 1889-90. The statement in the MarAd Report relates to officers aboard vessels (*compare* AR 1775 *with* AR 1963), not land-based officers or officials of corporate management as the CO alleges. To the contrary, the MarAd Report specifically indicates that the DOJ advised that "the investigation did not show that any corporate officials were involved in, planned, directed or condoned the misconduct." AR 1963. This error by the CO completely undermines her Non-Responsibility Determination and her conclusion that there were continuing concerns about future compliance.

Furthermore, notes from the April 26th meeting between the CO, the Review Panel and the DOJ and USCG officials responsible for investigating and prosecuting OSG, Inc. provide that "DOJ did not find any evidence that OSG ordered or supported this corrupt behavior." AR 3896. Also on May 16, 2007 James Fernan of MSC sent an email to various individuals regarding the responsibility of Product Tankers, including the CO, whereby he pointed out that this was not another Enron or Tyco, in which the crimes were committed by senior management. Rather, he stated, "[t]here is evidence that when OSG became aware their efforts were not successful, they took further action to correct it. . . . The corrective actions OSG took support a determination of integrity and business ethics." AR 3932.

The CO's only other support for this unfounded claim was the Government's Sentencing Memorandum in Support of the Plea Agreement ("GSM"), which she mischaracterizes as a factual finding by the presiding court. *See* AR 1775. This mischaracterization of course is itself another egregious error as the GSM is an advocacy document, which by its very nature presents unproven argument and allegations. It is not an agreed upon finding of fact like the JFS or a finding by a Court or a rendition of findings by a neutral third party, such as MarAd. As a result, it cannot be relied upon as a factual finding. In addition, it is contradicted by the finding of MarAd (AR 1963) and the DOJ attorney who met with the CO and Review Panel on April 26th. AR 3896-97. Consequently, without any credible evidence to sustain the CO's allegation that noncompliance pervaded OSG, Inc.'s top management in the Administrative Record, it cannot rationally support the Non-Responsibility Determination. The uncontested and determinative fact is that according to the DOJ prosecutor, none of the mid- or top-level OSG, Inc. management were charged with any violation, nor is there any evidence that they were involved in the violations. AR 3896.

**3. The CO is incorrect as to the status of OSG, Inc.'s probation.**

The CO alleges in her Non-Responsibility Determination that OSG, Inc.'s probation had not begun. AR 3931. This, however, is an incontrovertible error of fact, which is indeed material since the CO uses it as a primary basis for her conclusion that the ECP had not been given sufficient time to demonstrate its efficacy. AR 1779-83.

The Government and OSG, Inc. executed the Plea Agreement in December 2006. AR 2595. On March 21, 2007, OSG, Inc. pled guilty and was sentenced to probation, which began that day. AR 2532. The delay mentioned in the CO's Non-Responsibility Determination related to the delay in the judgment order, which was ultimately issued on May 24, 2007. *See* AR 1779.

Thus, regardless of which date the CO chose to acknowledge, OSG, Inc. began serving its probation before the CO signed her Non-Responsibility Determination.

For the CO to heavily rely on this fact, and yet, fail to obtain the correct information provides yet another indication that her Non-Responsibility Determination is faulty and lacks a rational basis.

**4. The CO incorrectly alleges that OSG, Inc. had only performed 15% of its required initial audits at the time of her Non-Responsibility Determination.**

The CO claims in her Non-Responsibility Determination that OSG, Inc. had only conducted its required initial audits on 15% of its vessels at the time she signed her determination. AR 1779. There is incontrovertible evidence in the Administrative Record that this was not correct and in fact the Government officially acknowledged that the initial audits under the ECP had already been conducted. AR 2025. More troubling is that the CO was specifically apprised of this fact.

The Appendix to the ECP clearly states that the USCG found that the initial audits had been completed:

> Initial Audits mandated by Section VII [of the ECP] have been satisfied by the OI Department and EAG Audits that have been previously conducted by and on behalf of OSG. The Government recognizes that OSG has conducted numerous audits under its current [Management System] and other internal policies. As a result, the Government accepts the previously conducted audits as satisfying the requirements for an initial audit.

*Id.* (emphasis added). Further, in written responses to questions posed by the CO, OSG, Inc. specifically addressed her confusion over the audits, directed her to the ECP, and explained:

> The ECP Appendix establishes that the requirement for initial audits of all vessels [over 90 vessels at the time] has been met by the series of audits that were conducted prior to the plea agreement and the development of the ECP agreement. . . . Additionally, OSG completed the engineering survey of all vessels in the fleet required under the ECP. . . . Since June 2006, there have been

> 13 ongoing audits conducted by the [External Auditing Group] and 5 EAG-type audits conducted by [the Operational Integrity Department], including two management office audits. The vessel audits take approximately four or five days, and are conducted while the ships are underway. There are currently two more EAG-type audits being conducted by [the Operational Integrity Department] at this time. These audits have all been conducted prior to sentencing, but are considered toward the total of 24 audits that are required to be conducted during the first year of probation under the ECP. To date, only minor environmental deficiencies have been discovered during both external and internal audits.

AR 3825-26 (emphasis added).

This is yet another example where the CO failed to review documented evidence in the Administrative Record and in turn relied on incorrect information to support one of her key allegations – that more time is necessary to determine the efficacy of the ECP. It also demonstrates that the CO and the panel she used to investigate did not have an understanding of the ECP, and either did not bother to try to understand the agreement negotiated by the DOJ and USCG or was it beyond their ability to understand. Regardless, this is fundamental factual error that undermines the core of her analysis, rendering the entire decision unreasonable.

**5. The CO incorrectly alleges the implementation status of OSG, Inc.'s ECP.**

The CO's characterization of the status of OSG, Inc.'s ECP presents two mistakes. First, she wrongly asserts that the ECP and its various components have only been recently implemented. AR 1779-83. Additionally, she erroneously concludes that due to the ECP's recent implementation, sufficient time had not passed to demonstrate its efficacy. AR 1779. The CO's mistaken belief relating to the status of OSG, Inc.'s probation and audits no doubt buttress this erroneous belief as well. *See supra* Section II.B.3-4. The Administrative Record, on the other hand, provides an abundance of evidence that discredits this claim and demonstrates that these allegations are simply not true.

The JFS acknowledges that the ECP, which is part of OSG, Inc.'s Safety Management System, had been in place since 2005. AR 1893. Furthermore, the Appendix to the ECP details numerous compliance measures that the Government recognized and credited OSG, Inc. for prior to the ECP's execution in 2006, including over one year's worth of audits spanning the entire fleet, performance of a fleet engineering survey, establishment of a comprehensive environmental management system, and the installation of compliance equipment. AR 2024-28. Significantly, OSG, Inc. further reported to the CO that of the more than a dozen second phase audits already performed, only minor environmental deficiencies had been discovered. AR 2841, 3826. Perhaps most telling have been the endorsements made of OSG, Inc.'s ECP:

> DOJ and Coast Guard personnel involved in investigating the misconduct and negotiating the ECP confirmed OSG's assertion that its ECP and the other corrective actions being implemented by OSG were more extensive and comprehensive than any previous agreement; the ECP is considered the benchmark by which future compliance plans will be measured.

AR 1963. It is unreasonable and unsupported by the facts for the CO to assert that sufficient time has not passed to demonstrate the efficacy of the ECP when many of the ECP components have been in place for a year or more, and numerous audits of offices and vessels operating under the ECP have revealed no major compliance problems, facts that Product Tankers informed the MSC of on more than one occasion. *See, e.g.*, AR 3825-26.

**6. The CO incorrectly alleges that OSG, Inc. withheld information from the Government for two years.**

The CO alleges that OSG, Inc. "waited more than two years after the [Government] investigation had begun to engage in self disclosure." AR 1773. For this proposition, the CO's sole support is the GSM, a one-sided advocacy piece, and not agreed upon facts like the JFS or findings by an impartial third party. *Id.* To the contrary, OSG, Inc. did not *wait* to engage in self disclosure, rather, the company had no independent knowledge of conduct that required self-

disclosure between 2003, when the Government's investigation began, and 2005, when the company self disclosed issues aboard the first of what would ultimately be six vessels. The MarAd Report noted, as confirmed by DOJ and Coast Guard, that "OSG cooperated to a great extent with the investigation and half the violations to which OSG pled were self reported violations . . ." AR 1963. Credible evidence within the Administrative Record does not support the CO's contention, therefore, her claim is unfounded, incorrect, and arbitrary and capricious.

**7. The CO incorrectly believes that Product Tankers is a wholly-owned subsidiary of OSG, Inc.**

At the outset of her Non-Responsibility Determination, the CO states that "OSG Product Tankers, LLC is a wholly-owned subsidiary of Overseas Shipholding Group, Inc." AR 1767. This statement is incorrect and foreshadows a major deficiency in her Non-Responsibility Determination.

During the May 4th Meeting, a question posed by the CO explicitly inquired "[w]hat is the relationship between OSG Product Tankers … and Overseas Shipholding Group, Inc.? " AR 3783. Both orally and in writing, OSG, Inc. responded that "OSG Product Tankers, LLC is an indirect subsidiary of Overseas Shipholding Group, Inc." AR 3818 (emphasis added). Regardless, the CO incorrectly asserts in her Non-Responsibility Determination that Product Tankers was a wholly-owned subsidiary of OSG, Inc. AR 1767. This is a clear error with important legal ramifications, both in terms of her subsequent conclusions and in the overall rationality of her Non-Responsibility Determination.

The CO's error casts further doubt on an already dubious link made by the CO to impute the violations of OSG, Inc. to Product Tankers. *See infra* Section II.F. Throughout this proceeding, the Government has asserted that the CO's actions were appropriate, however, this is based on the faulty belief that Product Tankers was a wholly-owned subsidiary of OSG, Inc.

### C. The CO lacked a rational basis for her determination that Product Tankers could not obtain a facility clearance by 2010.

Section C-8 of the Solicitation required the owner of the vessel(s) "to have a facility clearance up to Secret level." AR 2934. On December 22, 2006, MSC evaluators rated Product Tankers as "Acceptable" in this regard. AR 3228. Not a single question posed to either Product Tankers or OSG, Inc. throughout the entire procurement process raised any question or concern regarding Product Tankers' ability to obtain a secret facilities security clearance. Indeed, even though MSC raised the Plea Agreement during discussions, it did not raise any questions regarding Product Tankers' ability to obtain a facility security clearance because of the convictions.

Regardless, the CO alleges in her Non-Responsibility Determination that it "remains uncertain" due to the misconduct of one of its parent companies whether Product Tankers could obtain a facility security clearance "prior to contract performance. . . . scheduled to begin [in] October 2010." AR 1768-69. This "fact" becomes an essential component of her argument that Product Tankers is not responsible. However, her argument is flawed and lacks both a factual or legal basis because the CO bases her conclusion on several false beliefs relating to hasty telephonic inquiries she made at the last minute with the Defense Security Service ("DSS").[8] Moreover, the CO's disparate treatment of Product Tankers and USS on this issue is unfair and prejudicial to Product Tankers.

#### 1. The CO used incorrect information when inquiring into Product Tankers' ability to obtain a facility security clearance.

The only document in the entire Administrative Record upon which her adverse determination is based is a single e-mail from and to herself, dated May 16, 2007, apparently

[8] As the CO's argument is flawed on many levels we have consolidated the discussion of this issue in one section for ease.

memorializing all of the research she did on these determinative factors, which consisted of just two telephone calls. *See* AR 4134. One of those two telephone calls was to the DSS Center's general toll-free number to determine whether OSG, Inc. (and not Product Tankers) had a current facility clearance. *Id*. The second telephone call was to a staff "Industrial Security Representative" in the DSS regional field office responsible for assisting contractors located only in New York[9] — an individual who does not occupy a position of Governmental, policymaking authority with regard to the granting of facility clearances. *Id*. The CO stated that in this telephone call that she asked the DSS representative:

> …if multiple fraud convictions could impact a company's ability to obtain a facility's clearance. Agent advised that although a felony conviction could preclude a company from obtaining a clearance it was not impossible to obtain. A lengthy adjudication process (Dobbins Hearings and Appeals) would be required and all the facts considered before a final decision was made.

*Id*. The CO's decision to base her Non-Responsibility Determination on such a telephone call lacks a rational basis and must be characterized as arbitrary and capricious.

First, the CO inquired whether OSG, Inc. held a facility clearance. *Id*. This inquiry was irrelevant, since the actual offeror was Product Tankers. It is axiomatic that it is the actual contractor that must have the secret facilities security clearance, not a parent or affiliate. The correct inquiry should have focused on whether Product Tankers had a facility clearance, not one of its ultimate parent companies. Second, the CO inquired whether "multiple fraud convictions would impact a company's ability to obtain a facility's clearance." *Id*. This inquiry is not only slanted against Product Tankers, but also factually inaccurate since Product Tankers has never been convicted of any criminal violations. Moreover, prefacing her inquiry by stating that the

[9] Product Tankers is headquartered in Florida and its application for a facility clearance would be handled by the DSS Southern Region Field Office in Florida.

applicant for a facility's security clearance had "multiple fraud convictions" is clearly intended to solicit a negative response from the DSS representative.

An accurate inquiry, at worst, would have been whether a company with an ultimate parent organization that had multiple convictions could obtain a facility clearance. Such an inquiry may have also led to relevant questions regarding the fact that Product Tankers: (1) was not a wholly-owned subsidiary; and (2) that management and operational duties for Product Tankers and all of OSG, Inc.'s U.S. flagged vessels were completely separate from those of the offending subsidiaries of OSG, Inc. (*i.e.*, its foreign-operating offices and flag vessels).

Regardless, the CO's cryptic inquiry was flawed because of the incorrect facts presented.

**2. There is no legal basis for the CO's Non-Responsibility Determination.**

The granting of "facility clearances" ("FCLs")[10] is governed by the National Industrial Security Program Operating Manual ("NISPOM"), DOD 5220.22-M, February 28, 2006. Eligibility requirements for a facility clearance are listed at Section 2.102 of the NISPOM and include: a Government need for a company to have a facility clearance; a company organized and located in one of the 50 states; a company with a reputation for integrity and lawful conduct and not barred from doing business with the Government; and, a company not under foreign ownership, control, or influence. NISPOM § 2.102.

Of critical importance to the CO's erroneous determination is the NISPOM requirement that parent corporations and subsidiaries are considered separately for facility clearances. The NISPOM states:

> When a parent-subsidiary relationship exists, the parent and the subsidiary will be processed separately for an FCL. As a general rule, the parent must have an FCL at the same, or higher, level as the subsidiary. However, the CSA [cognizant

[10] A "Facility Clearance" is granted to companies, while a "Personnel Security Clearance" is granted to individuals who work for companies with a facility clearance.

> security agency] will determine the necessity for the parent to be cleared or excluded from access to classified information. The CSA will advise the companies as to what action is necessary for processing the FCL.

NISPOM § 2.109. As this section indicates, the Cognizant Security Agency can determine that a parent corporation, such as OSG, Inc., need not have a facility clearance when of one of its subsidiaries has one. In this case, while OSG, Inc. never was required to hold a clearance, its subsidiary, OSG Car Carrier, Inc. held a clearance at the time of the CO's inquiry and maintained that facility security clearance through September of 2007 when the contract requiring the clearance ended.

As a result, the CO did not have a rational legal basis for her determination that Product Tankers would be unable to obtain a security clearance by the year 2010, as a result of the actions of its indirect corporate parent, OSG, Inc.

**3. There is no basis for the CO's assumption that a lengthy adjudication process would prevent Product Tankers from obtaining a facility security clearance by October 2010.**

Despite the CO's flawed inquires, the DSS agent still responded that "it was not impossible to obtain" the clearance, which the CO interpreted in the least favorable light to Product Tankers. The Administrative Record is silent regarding her inquiries into the length of time that might be required to obtain a facility clearance. However, based upon the DSS representative's response, it is irrational for the CO to extrapolate these vague statements into a firm conclusion that obtaining a clearance would take over three years. There is simply no support in the record for this conclusion. If this were the case, numerous federal contracts would require extensive lead times so contractors could meet contract requirements. *See Fry Communications, Inc.*, B-207605, 83-1 CPD ¶ 109 (Feb. 1, 1983) (indicating that a facilities security clearance ideally takes between 60 and 90 days, but could take as long as 6 months).

The CO states, in the single document in the Administrative Record upon which her determination with regard to the lack of responsibility due to the inability to obtain a facility clearance, that:

> A lengthy adjudication process (Dobbins Hearings and Appeals) would be required and all the facts considered before a final decision was made.

AR 4134 (emphasis added). In fact, there is no such process known as a "Dobbins Hearings and Appeals." A search of the DSS website does not locate a reference to it; a search of www.google.com does not locate a reference to it; a search of www.msn.com does not locate a reference to it; and, a call to DSS officials will not locate a reference to it. Furthermore, there is no process at DSS, or one referenced in the NISPOM, with regard to a hearings and appeals process for facility clearances. In other words, the CO based her determination that Product Tankers was non-responsible on the false fact of a "lengthy adjudication process," which simply does not exist, thereby creating a complete lack of a rational basis for her determination.

In contrast to the CO's erroneous determination that the conduct of corporate parents would lead to a "lengthy adjudication process" (somehow spreading over the three years between 2007 and 2010 when the facility clearance would be necessary), the CO simply ignored the fact of recent public examples of companies that had corporate conduct issues, but nevertheless maintained their facility clearance, including The Boeing Company, which paid a $565 million civil penalty and a $50 million criminal penalty related to the Darleen Druyan matter[11], and ITT Corporation, which paid a $100 million penalty and pled guilty to illegally exporting secret military data overseas.[12]

---

[11] *See* http://www.usdoj.gov/opa/pr/2006/June/06_civ_412.html.
[12] *See* http://www.usdoj.gov/opa/pr/2007/March/07_nsd_192.html.

The CO simply and erroneously concluded that some sort of nonexistent, lengthy adjudication process would prevent Product Tankers from receiving a facility clearance in 2010 as a result of the actions of OSG, Inc. in 2006. This erroneous conclusion is a product of her cursory inquiry and extrapolation of vague statements into a firm conclusion.

**4. The CO lacked a rational basis for treating Product Tankers and USS differently with regard to the ability to obtain a secure facility clearance.**

In contrast to the treatment of Product Tankers, MSC evaluators found USS deficient in its response to the requirement for a facility clearance, and requested that USS "comply with this requirement." AR 3393. Yet, USS merely responded that it "intends to start the process long before performance is due and immediately following award." AR 4. A statement that the CO readily accepted. Thus, USS was able to cure a "deficiency" by promising that it would promptly apply for the clearance after award. This stands in stark contrast to the treatment of Product Tankers, which was not given the opportunity to address the CO's concerns about this issue, and against which every negative inference was drawn against it.

There is no rational basis for the CO's decision to treat these offerors unequally. At the core of all procurement decisions is the need for fairness and equality. *Aviation Enterprises, Inc. v. United States*, 8 Cl.Ct. 1, 5 (1985) ("The obligation of the government upon the issuance of a solicitation is to treat all bidders fairly and to give full consideration to all bids."); *Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613, 618 (1983) (as cited in *International Graphics, Division of Moore Business Forms, Inc. v. United States*, 4 Cl.Ct. 186, 192 (1983)). Had the CO raised any concerns about Product Tanker's ability to obtain a facility clearance in 2010, they could have responded in a like manner as the awardee, or further addressed any specific concerns she might have had, and would have had the opportunity to demonstrate that her concerns had no legal or

factual basis. For example, Product Tankers would have pointed out that another subsidiary of OSG, Inc., OSG Car Carrier, Inc., maintained a facility security clearance at the Secret level.

The CO predicated her determination that Product Tankers could not obtain a security clearance on erroneous facts, faulty assumptions, and a misunderstanding of the applicable regulations; thereby, her conclusion is arbitrary and capricious.

**D. The CO's analysis in her Non-Responsibility Determination is based upon errors of law.**

In addition to the overwhelming errors of fact, the Non-Responsibility Determination is based on several erroneous understandings and conclusions of law. These errors are material and call into question the CO's understanding of her responsibilities under the FAR, as well as the reasoning and judgment she applied throughout the Non-Responsibility Determination.

**1. The CO relies upon outdated regulatory language for her authority to circumvent the lead agency's findings.**

In the CO's Non-Responsibility Determination, she attempted to address why she was making a finding regarding OSG, Inc.'s present responsibility by relying upon language from what she apparently believed was the most current version of the Nonprocurement Debarment regulation. AR 1782. She relied upon specific language in that regulation to justify her taking action inconsistent with the action of the lead federal agency, MarAd – "a decision not to impose debarment shall be without prejudice to a subsequent imposition of debarment by any other agency." *Id.* (citing 53 Fed. Reg. 19,204, 19,208 (May 26, 1988)). However the regulation she was referencing had been superseded, and the language and underlying principle she relied upon was removed when the regulation was revised in 2003. *See* 68 Fed. Reg. 66,534 (Nov. 26, 2003). Thus, the language she relied upon had been specifically taken out of the language in the current regulation, removing of one of her linchpin authorities she relied upon to take this highly

unusual and irregular action. Further, the CO's use of this principle is flawed because it applies to the actions of a debarring official and not to those of a contracting officer. *See* 53 Fed. Reg. at 19,207-08. Accordingly, her authority to act in this manner did not exist and her actions must be found to be unreasonable and without a rational basis.

**2. The CO did not understand debarment procedures and their proper application.**

One of the key premises of the CO's Non-Responsibility Determination was her erroneous conclusion that based upon the MarAd decision, a violation by OSG, Inc. of its Probation Agreement would lead to a debarment of Product Tankers, thus prohibiting it from performing the Contract. AR 1769. This analysis is flawed for numerous reasons, including her confusion over who the actual offeror was and the premise that there would likely be a material violation of the Probation Agreement. It also reflects a lack of understanding or misunderstanding of the debarment rules. Specifically, she asserted that if OSG, Inc. materially violated its probation, MarAd could reinitiate debarment proceedings that would somehow lead to the debarment of Product Tankers. *See id.* As a result, the CO concludes that compliance by OSG, Inc. with the obligations of probation, the ECP and the Compliance Agreement, was a serious risk to performance under the Contract by Product Tankers. *Id.* This conclusion, however, misapplies debarment law and procedures.

Unfortunately, throughout her Non-Responsibility Determination, the CO used the acronym "OSG" interchangeably to refer to both OSG, Inc., an ultimate parent of Product Tankers, and to Product Tankers, the actual offeror. *See* AR 1766-83. Regardless of her confusion, they are two separate entities and are treated as such under laws and regulations. Here is an example of where the differences in legal entities make a significant difference. Specifically, for purposes of debarment, this merging of entities is unauthorized. Under the

FAR, the Common Rule, and the Department of Transportation ("DOT") suspension and debarment regulations, all of which MarAd is subject to, OSG, Inc. and Product Tankers are considered "affiliates." 48 C.F.R. § 9.403 (the procurement rules under the FAR); 2 C.F.R. § 180.625(b) (the Nonprocurement Common Rule); 49 C.F.R. § 29.625(b) (DOT's suspension and debarment regulations). Suspension or debarment does not automatically affect subsidiaries or other affiliates. Rather, affiliates of a named party to a debarment action may only be included in such action if they too are named in the action and given separate written notice and a separate opportunity to respond. *See, e.g.,* 48 C.F.R. § 9.406-1(b). Moreover, they must be shown to have been involved in or affected by the wrongdoing that is the subject of the suspension or debarment. *See id.*

Product Tankers was not a named party to MarAd's debarment proceeding. *See* AR 4157. Therefore, if MarAd reinitiated its debarment action against OSG, Inc., Product Tankers would have to be added to the proceedings. 49 C.F.R. § 29.625(b). This would necessarily require a nexus relating Product Tankers to the basis of the original debarment action – the violations to which OSG, Inc. pled guilty and whatever hypothetical violation that would occur in the future. *See id.* Part 29, Subpart H. DOJ and the USCG have already acknowledged in the record, however, that none of OSG, Inc.'s U.S. flag operations or vessels, of which Product Tankers and the vessels it controls are a part, were charged for the violations involved. *See, e.g.,* AR 3554, 3806, 3896. Further, MarAd has found that none of OSG, Inc.'s corporate officials, that includes the U.S. Flag Strategic Business Unit, were involved in any misconduct. AR 1963. Thus, the necessary nexus relating the offeror, Product Tankers, to the violations of OSG, Inc. does not exist. Furthermore, for MarAd to initiate a new debarment action against Product Tankers, an independent basis for debarment would be required. *See* 49 C.F.R. § 29.625(b).

Furthermore, a suspension and debarment, except in the most unusual and egregious situations does not affect current contracts. *See* 48 C.F.R. § 9.405-1. Therefore, even if a new debarment action were somehow initiated against Product Tankers in the future, it would have no affect on the ability of Product Tankers to continue performance of the then existing contract. *Id.*

Consequently, since the debarment proceeding against OSG, Inc. has no bearing on Product Tankers, the CO's claim that Product Tankers poses a performance risk on such grounds is speculative and has no basis in law or the Administrative Record. Indeed, the Administrative Record supports the opposite conclusion because it establishes that Product Tankers participates in the best ECP in the industry and it is "highly probable that the corrective action required will be fully implemented by OSG." AR 1963.

**E. The CO predicates her Non-Responsibility Determination on omissions and baseless assumptions and faulty logic.**

In addition to the egregious factual and legal errors that riddle the CO's Non-Responsibility Determination, she also failed to mention and logically address significant and substantial information in the Administrative Record that speaks to Product Tankers' responsibility.

**1. The CO fails to address the significance of the foreign flag versus U.S. flag history of compliance.**

The Contract is subject to the Jones Act, which requires that only U.S. flagged and U.S. crewed vessels service the Contract. AR 2930-31, 2975-76. Therefore, the fact that no U.S. flag vessels were involved in OSG, Inc.'s violations is an extremely relevant factor that the CO should have considered. On numerous occasions OSG, Inc. and Product Tankers apprised the CO that the violations pertained only to foreign vessels and crew. *See, e.g.,* AR 3806. DOJ and USCG even explained to the CO that "[a]ll the violations occurred on vessels owned by OSG's

foreign subsidiaries and operated by foreign mariners" and that none of OSG, Inc.'s U.S. flag vessels were charged. AR 3896. Initially, the CO fully recognized the importance of this factor, noting in her January 2007 discussions with the Director of Chartering & Ship Operations for MSC that OSG, Inc.'s "violations were not on U.S. flag ships." AR 3554. Nevertheless, aside from mentioning that the violations had not occurred on U.S. flag vessels in her Non-Responsibility Determination, the CO applied her determination equally to the two distinct operations of OSG, Inc. – foreign v. U.S. flagged vessels.

The Review Panel noted in its findings to the CO that because the U.S. and foreign flag fleets "are treated the same for their Environmental Compliance Plan (ECP) and management system . . . the company's business ethics are applicable across the entire fleet." AR 1959. However, to make a negative inference from the application of the ECP fleet-wide (*e.g.*, to the U.S. flag vessels, as well as the offending foreign flag vessels) is nonsensical since the ECP is considered "World Class;" it "exceeds anything in the industry today either US or Foreign," as acknowledged by Review Panel members (AR 3931); and, it "is considered the gold standard among environmental standard programs," as acknowledged by DOJ and USCG. AR 3896. Nevertheless, the Non-Responsibility Determination is silent on this issue. Therefore, in ignoring the distinction between U.S. and foreign flag vessels, it is unknown if the CO adopted the Review Panel's unreasonable rationale, or some other rationale, or even considered the distinction at all.

Significantly, the FAR provides contracting officers with only the authority to consider the "past performance and integrity [of an affiliate] when they [the affiliate] may adversely affect the prospective contractor's responsibility." 48 C.F.R. § 9.104-3(c). There is no evidence in the record that any environmental violations have ever been committed by Product Tankers, or for

that matter, any OSG, Inc. U.S. flag vessel operation. In fact, the Administrative Record affirmatively demonstrates that there have never been any such violations. *See* AR 3896. There is no reason to impute the violations on foreign flag vessels to U.S. flag vessel operations or the personnel managing such operations. It was illogical and unreasonable for the CO to consider a wholly separate operation of one of the offeror's ultimate parent companies as the primary basis for her determination.

**2. The CO failed to consider highly relevant comments of the DOJ prosecutor and USCG officials responsible for the investigation and prosecution of OSG, Inc.**

As previously referenced, on April 26, 2007, the CO and the Review Panel met with the officials from DOJ and USCG who were responsible for investigating and prosecuting OSG, Inc. AR 3896. Among other issues, they informed the CO and Review Panel that:

> [H]is [the DOJ attorney] office has worked on approximately 50 to 60 cases relating to the falsification of records to conceal pollutant activities.
>
> * * *
>
> The Chief Engineers were deemed responsible for the illegal action [and that] DOJ did not find any evidence that OSG ordered or supported this corrupt behavior.
>
> * * *
>
> Employees lied during [OSG, Inc.'s internal investigations].
>
> * * *
>
> All the violations occurred on vessels owned by OSG's foreign subsidiaries and operated by foreign mariners.
>
> * * *
>
> While under investigation, OSG cooperated with the DOJ by providing necessary records and witnesses. The company developed a compliance program for all ships in its fleet that is considered the gold standard among environmental standard programs.
>
> * * *
>
> OSG also now provides training to encourage employees to contact the corporate office in the event of corrupt actions. There is an employee hotline so that employees can report such problems.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

*Id*.

The MarAd Report made available to the CO referenced the opinion by DOJ and USCG that the ECP implemented by OSG, Inc. was "more extensive and comprehensive than any previous agreement" and "is considered the benchmark by which future compliance plans will be measured." AR 1963. Moreover, MarAd reported in the version considered by the CO that:

> DOJ and Coast Guard also indicated that OSG's significant cooperation in the investigation and self-reporting of half the violations to which they pled guilty should mitigate against debarment. They felt debarment of OSG could even be counter-productive to their enforcement efforts since it would set a bad example to further penalize a company that has cooperated extensively.

AR 1963.

Yet, despite these favorable views from the Government officials most knowledgeable of OSG, Inc., the CO scarcely mentioned these views in her Non-Responsibility Determination, merely noting that a meeting with DOJ and USCG had in fact occurred. *See* AR 1766-83. Indeed, many of these favorable comments from more knowledgeable Government officials were left completely unaddressed and were coincidentally omitted from the Non-Responsibility Determination. Much of this information, however, directly refutes the allegations of the CO, *e.g.*, the notion that OSG, Inc.'s senior management was involved in the violations or that the problems OSG, Inc. faced were not industry-wide. *Id.*

The CO's complete disregard for the highly relevant comments and information provided by DOJ and USCG officials involved in the investigation and prosecution of OSG, Inc. is shocking and lacks any sort of explanation. As a result, the Non-Responsibility Determination cannot be considered rational and reasonable.



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

### 3. The CO's overall failure to coordinate her actions with MarAd was illogical and irrational.

If the CO believes that a risk of debarment existed, it would only seem logical and reasonable that she contact and confer with MarAd regarding its investigation of OSG, Inc. Aside from possessing the MarAd Report and the Compliance Agreement, the Administrative Record is silent as to any communications by the CO, or any MSC official for that matter, with MarAd. Since the Government has vehemently asserted that it has provided all relevant documents, this Court must conclude that there were no communications. Further, since MarAd's investigation report was provided to the CO a month prior to the issuance of her Non-Responsibility Determination (*see* AR 1961-64), and based upon other evidence in the Administrative Record, the CO clearly knew of MarAd's role as the lead agency as far back as January 2007. AR 3554. Given the tens of millions of dollars that would be saved by an award of the Contract to Product Tankers, the CO's failure to consult with MarAd is irrational.

A prime example of this failure to coordinate is the diametrically opposed views of MarAd and MSC concerning the possibility of a future violation and its effect on the Contract. As indicated above, the CO concluded that there was a significant risk that OSG, Inc. would materially violate its probation agreement leading to a debarment that would somehow prohibit Product Tankers from performing the Contract. In addition to demonstrating the CO's lack of knowledge of debarment regulations it is illogical and fails to take into account the ECP and the fact that Product Tankers, or indeed the entire OSG, Inc. U.S flag operations, has no record of environmental violations or any other misconduct. Therefore, Product Tankers would be no more likely as any contractor to commit a crime during the next three years that would lead to its debarment. There is simply no rational basis for the CO's assumption.

MarAd concluded just the opposite that "[s]ince OSG's three-year probation is dependent upon full compliance with the ECP, it is highly probable that the corrective action required will be fully implemented by OSG." AR 1963. This is the most logical conclusion considering OSG, Inc. has implemented what DOJ, USCG, MarAd and even MSC officials consider the most comprehensive ECP in the industry. AR 3931. Moreover, it is especially important to consider that many of the aspects of the ECP were implemented prior to its execution in 2006. AR 1892-93, 2024-28. There was no attempt at reconciling these completely different analyses on what was one of the most critical issues for the CO and only further demonstrates that the CO's Non-Responsibility Determination is not logical or rational.

**4. The CO penalizes Product Tankers for applying the ECP, which is recognized as the best in the industry.**

The only rationale in the Administrative Record for imputing the misconduct of a handful of OSG, Inc.'s foreign flag fleet to Product Tankers, a U.S. flag operation, was the fact that they would be operating under the same ECP. *See* AR 1959. This reasoning in essence penalizes Product Tankers for participating in what is considered the best ECP in the industry. AR 1963, 3931. Indeed, it would make more sense to penalize Product Tankers for not implementing this ECP.

Product Tankers does not share management or operational aspects of its vessels with the convicted components of OSG, Inc. The entire U.S. flag fleet, including the entities upon which Product Tankers draws for support in its proposal for this Contract (*e.g.*, OSG America, Inc. and OSG Ship Management, Inc.) are members of OSG, Inc.'s U.S. Flag Strategic Business Unit. AR 1661-72. None of these entities share management or operational responsibilities of their vessels with the entities involved in the offending conduct to which OSG, Inc. pled guilty. Therefore, it is completely irrational and nonsensical to impute the misconduct of an

operationally separate component of one of its parents to the offeror simply because they commonly participate in the best ECP in the industry.

**F. The Non-Responsibility Determination fails to properly distinguish between Product Tankers, the actual offeror, and one of its ultimate parent companies, OSG, Inc.**

**1. Proposal documents clearly delineated that Product Tankers was the offeror.**

Throughout the procurement process, Product Tankers was consistently listed as the offeror. In fact, on November 30, 2006, the Washington Maritime Shipping Corporation ("Washington Maritime"), a shipbroker, presented an offer in response to the Solicitation on behalf of Product Tankers. AR 1642. When questions were posed by MSC in January 2007, it was Product Tankers that responded. AR 1605, 1612-23. In fact, MSC was given Product Tankers' Dun & Bradstreet number and was informed that Product Tankers had registered in the Central Contractor Registration database. AR 1618-19. Product Tankers also confirmed that: "OSG Product Tankers, LLC will be signing the contract ..." AR 1619. Finally, on March 30, 2007, Washington Maritime submitted a timely final proposal revision ("FPR") on behalf of Product Tankers. AR 1582-83. Significantly, the CO had also been apprised that Product Tankers was not even a wholly-owned subsidiary of OSG, Inc. AR 3818. ("OSG Product Tankers, LLC is an indirect subsidiary of Overseas Shipholding Group, Inc.") The Non-Responsibility Determination, however, is based upon her erroneous belief that Product Tankers was wholly-owned by OSG, Inc. AR 1767; *see also supra* Section II.B.7.

**2. The Administrative Record demonstrates the CO had been clearly apprised that OSG, Inc. would not own the tankers servicing the Contract.**

Product Tankers' November 30, 2006 proposal explained to MSC that Aker Philadelphia Shipyard, Inc. ("APSI"), a subsidiary of Aker American Shipping, Inc. ("Aker"), was building 10 to 13 newly constructed product tankers eligible to operate in the domestic coastwise trade



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

(*e.g.,* "Jones Act" eligible). AR 1722. Once constructed, each tanker would be owned by a U.S. leasing company that was a subsidiary of American Shipping Corporation, an affiliate of APSI. *Id*. Each tanker would then be bareboat chartered to a subsidiary of OSG, Inc. and, in turn, all the tankers would be time chartered to Product Tankers. *Id*. Thus, Product Tankers would ultimately control all 10 to 13 newly constructed Jones Act tankers. *Id*. Under the proposal submitted to MSC, Product Tankers would charter two of those tankers to MSC. *Id*. Moreover, in February and March 2007, MSC obtained press releases that Aker was going to build up to 16 Jones Act tankers in conjunction with OSG, Inc. AR 1601-02. The articles noted that the tankers would be owned by a subsidiary of Aker, bareboat chartered to a subsidiary of OSG, Inc. and time chartered to Product Tankers "under a structure that allows Aker to participate in earnings from the time charters." *Id*. Thus, MSC was fully aware that OSG, Inc. would not own the tankers to be chartered to MSC and that Aker would have an interest in the time charter to Product Tankers.

Given the fact that OSG, Inc. would not have an ownership interest in the tankers, there is no rational basis for the CO's assumption that these new Jones Act tankers would not be built if OSG, Inc. violates its probation.

**3. Although Product Tankers relied on other segments of OSG, Inc., it was limited to U.S. flag segments, which were operationally separate from the offending segments.**

Product Tankers' proposal documents indicated that segments of OSG, Inc.'s U.S. Flag Strategic Business Unit would provide assistance at various stages of the Procurement. AR 1661-72. Product Tankers identified and provided resumes for sixteen key managerial personnel that would be involved in the construction and operation of the tankers for MSC. *Id*. All had extensive experience in operating U.S. flag tankers. *Id*. Only one OSG, Inc. manager or

supervisor that was identified as being involved in the Procurement had any role in regard to the oversight of OSG, Inc.'s foreign flag operations – [redacted], a senior vice president and Worldwide Head of Shipping Operations. AR 1665-66. [redacted] was not found to be responsible for any of the environmental violations committed by the foreign flag vessels. AR 3896, 1963. However, [redacted] had a primary role in the development and enforcement of the "gold standard" ECP, which was adopted by the U.S. flag vessels even though none had been involved in the violations. AR 2009.

Furthermore, MSC's notes of the discussions with Product Tankers that took place on January 23, 2007 indicate that the "Offeror needs to provide [sic] statement that its parent company, OSG America Inc., has the necessary assets to finance the contract and will guarantee performance of [Product Tankers]." AR 3495. Significantly, these notes show that Product Tankers informed MSC that OSG, Inc. was not the direct parent of Product Tankers. AR 3491-95. Rather a more direct parent, OSG America, Inc., was a member of the U.S. Flag Strategic Business Unit. *Id*. MSC notes of the meeting also indicate that MSC was informed that none of the vessels involved in the violations were U.S. flag vessels. AR 3497. Thus, no later than January 23, 2007, the CO was well aware that the offeror was Product Tankers, and Product Tankers was only subject to potential control, or to influence or support, by U.S. flag subsidiaries and officers of OSG, Inc. who had nothing to do with the criminal violations or convictions.

**4. The CO's failure to appropriately focus her responsibility determination on Product Tankers and, at most, OSG, Inc.'s U.S. flag operation, was arbitrary and capricious.**

Rather than determine the present responsibility of the offeror, Product Tankers, to build and charter two Jones Act tankers to MSC, the CO based her determination almost exclusively upon the Plea Agreement entered into by OSG, Inc. for past environmental violations aboard

foreign flag vessels manned by foreign crews and operated by foreign subsidiaries. AR 1766-83. The CO knew a number of crucial facts that should have focused her attention on Product Tankers and the U.S. flag subsidiaries of OSG, Inc. These crucial facts included:

- All the environmental violations had occurred aboard foreign flag vessels, manned by foreign crews and owned by foreign subsidiaries of OSG, Inc. AR 3806-07, 3896.
- None of OSG, Inc.'s U.S. flag operations or personnel, either shipboard or supervisory, was guilty of any of the environmental violations. *Id*.
- Product Tankers identified the specific key personnel that would be involved at various stages of building and operating the tankers to be chartered to MSC and none of them were found responsible for the past environmental violations or any other act or omission that indicated any lack of integrity. AR 1661-72, 1963.
- The Jones Act tankers being built by Aker for Product Tankers would come equipped with the most advanced environmental safeguards in the business. AR 1979-2028, 3818.
- The Jones Act tankers to be chartered to MSC by Product Tankers would be owned by a subsidiary of Aker, not OSG, Inc.[13] AR 1722.
- Product Tankers, not OSG, Inc., would be applying for the secret facilities clearance and Product Tankers had not committed any felonies.
- Product Tankers was only an indirect subsidiary of OSG, Inc. and thus there was no basis for the CO to assume that Product Tankers would be debarred in the event of future violations by OSG, Inc. AR 3807, 3818.

[13] The fact that all the Jones Act tankers would be built by one subsidiary of Aker and owned by another subsidiary of Aker meant that without a doubt the tankers would be built regardless as to whether OSG, Inc. violated its probation or was debarred for some future criminal activity. Thus there was absolutely no basis for the CO to assume that there was a risk that a future violation by OSG, Inc. would result in the new Jones Act tankers not being built.

- OSG, Inc. was providing the financial resources to guarantee performance by Product Tankers, and there was no basis to assume that even if OSG, Inc. committed future violations and was debarred, such an event would prevent OSG, Inc. from continuing to provide the necessary financial support of Product Tankers. AR 1619.

If the CO had focused her responsibility determination on Product Tankers' present responsibility and ability to perform the Contract, there would have been no question that the offeror, Product Tankers, was responsible. Under the structure of the proposal provided by Product Tankers, there was virtually no risk that OSG, Inc.'s Plea Agreement and probationary status would prevent the construction of the Jones Act tankers or the satisfactory performance of the Contract by Product Tankers.

### G. THE CO'S BRIEFING OF COMMANDER, US TRANSCOM MISSTATED OR OMITTED MATERIAL FACTS.

Prior to signing her Non-Responsibility Determination and eliminating Product Tankers from the Procurement, the CO prepared a briefing for General Schwartz of the U.S. Transportation Command ("TRANSCOM").[14] This briefing is dated June 12, 2007 and contains numerous factual representations that are contrary to the Administrative Record and omits crucial facts. AR 4137-53. These factual errors and omissions in the briefing demonstrate the crucial and determinative nature of the errors in the Contracting Officer's Non-Responsibility Determination. The key factual misstatements, with references to where they are discussed above, include:

- "Overseas Shipholding Group, Inc. (OSG)" is the offeror. AR 4140 (incorrect, *see supra* Section II.F).

[14] The US TRANSCOM is a joint Department of Defense ("DoD") Command having oversight of all DoD transportation requirements and assets, such as tankers and transportation activities of the individual military services, including MSC.

- "OSG pled guilty to 33 felony counts of environmental pollution violations." AR 4143 (incorrect, *see supra* Section II.B.1).
- Statements in the GSM are quoted as if proven or agreed facts or findings by a Court instead of a DOJ pretrial advocacy document. AR 4144-46 (incorrect, *see supra* Section II.B.2).
- "OSG's Remedial Actions are Unproven." AR 4147 (incorrect, *see supra* Sections II.B.4-5).
- "Single OSG Fleet (U.S. Flag Not Separate)." *Id.* (incorrect, *see supra* Section II.E.4).
- "The 3-Year Probationary Period Has Not Yet Begun." *Id.* (incorrect, *see supra* Section II.B.3).
- "MarAd's decision not to debar OSG does not control MSC's Responsibility Determination." AR 4148 (incorrect, *see supra* Section I).
- "OSG's conviction may interfere with ability to obtain required Facility security clearance." AR 4149 (incorrect, *see supra* Section II.C).
- "Potential loss of clearance (if granted) for probation violation during performance may preclude further contract performance." *Id*. (incorrect, *see supra* Section II.C.3).
- "Probation violation of OSG may leave DoD with inadequate Jones Act coverage." *Id*. (incorrect, *see supra* Section II.F.4).
- [OSG, Inc's] "Ethical corporate behavior undemonstrated" AR 4150 (incorrect, *see supra* Sections II.B. 2, 4-5).
- Quotes the MarAd Report as stating: "…the crimes involved demonstrate a lack of integrity or honesty essential from a company doing business with the government." AR 4151 (incorrect, *see supra* Section I).

As explained above, and in the attached Appendix 1, these factual representations are demonstrably incorrect or are misleading by omission of contrary factual information. The omissions include the crucial findings and recommendations favorable to OSG, Inc., by the DOJ, USCG and MarAd. *See* AR 3896-97, 1961-64. The CO fails to inform TRANSCOM that all the violations occurred aboard foreign flag vessels and that no OSG, Inc., or Product Tankers' corporate officials were responsible for those violations. AR 1963. Furthermore, the CO failed to mention that the ECP is considered "World Class" by her Review Panel, "exceed[ing] anything in the industry today either US or Foreign," (AR 3931); and "is considered the gold standard among environmental standard programs" by DOJ and USCG. AR 3896.

In regard to USS the CO represented that the USS "price is fair and reasonable," AR 4152. The CO failed to inform TRANSCOM that the USS price included a [redacted]% profit in the first year and more than [redacted]% profit over five years (AR 3637) or that no financially responsible party had guaranteed performance by USS, which had no capital assets and almost a billion dollars in potential liability.

## III. THE CO UNFAIRLY FAVORED USS AS COMPARED TO PRODUCT TANKERS BY APPLYING A LESS RIGOROUS STANDARD IN USS' RESPONSIBILITY DETERMINATION.

In stark contrast to the strict scrutiny Product Tankers, and reliance on incorrect and inaccurate facts and factual assumptions in her Non-Responsibility Determination of Product Tankers, the CO applied a highly deferential standard to USS and ignored major deficiencies, which called into question its financial responsibility. This unequal treatment demonstrated that Product Tankers was subjected to an unreasonable scrutiny, in addition to the factual and legal errors described above. If the same level of scrutiny had been applied to both offerors, Product Tankers would have likely been found responsible and awarded the Contract.

### A. The CO Ignored USS' Lack Of Financial Resources.

Consistent with one of the factors in FAR 9.104-1 required for present responsibility, Section L-7(d) of the Solicitation required that an "Offeror must furnish evidence of adequate financial resources to perform the Contract or the ability to obtain such resources." AR 364. USS, however, only provided the 2005 annual report of its parent company, U.S. Shipping Partners L.P. ("USSP LP"). AR 3256. Additionally, early in the procurement process, MSC evaluators were concerned about the financial viability of USS and recommended that [redacted] AR 3257. Prior to January 19, 2007, the CO asked if USS was signing the Contract, "will the parent company guarantee the performance of the subsidiary?" AR 3394.

MSC also requested the DCAA to perform a risk analysis of offerors in the competitive range. AR 3256. DCAA responded on March 2, 2007, with regard to USS, that:

> It should be noted that this assessment pertains only to the parent company, U.S. Shipping Partners, L.P. Financial data was not provided for its subsidiary, USS Product Carriers nor USS Product Investors [sic]. Therefore, should a contract be awarded to either of these subsidiaries, we recommend MSC obtain a corporate Guarantee (Form DCMA 1620) from the U.S. Shipping Partners, L.P.

AR 3964. The MSC Post-Contract Review Board noted that DCAA had recommended that "USS be requested to submit a Corporate Guarantee Form (SF 1620) . . ." AR 3573.

This was critical because, in order to perform the Contract, USS would need to arrange for the construction and financing of two tankers costing approximately $[redacted] million. *See* AR 53. The financing would require two phases, [redacted] *Id.* Operating and maintaining the two tankers for the MSC five-year charter period would also cost well over $200 million. AR 53.

In August 2006, [redacted] AR 4039-40. Construction financing was arranged for the first five tankers with investors contributing $[redacted] million and USSP LP contributing $[redacted] million to capitalize USS Products Investor LLC, not USS. AR 4039. However, USS is liable to NASSCO to finance the construction of four additional tankers costing $[redacted]. No party is committed to purchase the two MSC tankers upon delivery, so USS may have to find third parties to purchase those two tankers for $[redacted] million.

Another subsidiary of USSP LP, USS Product Manager LLC, will be supervising construction of the tankers and then operating the tankers for USS. AR 9. USSP LP has only guaranteed the performance of USS Product Manager LLC as supervisor of construction and operator of the tankers to the joint venture financing construction of the first five tankers, but has not guaranteed performance to USS or MSC.

Thus, the contract awardee, USS, is obligated to: [redacted], no financial information was provided by USS to MSC as part of the proposal, and there is no indication in the current Administrative Record that the awardee has any net worth or financial assets with adequate financial resources to perform the Contract.

Despite the request by MSC, USSP LP refused to guarantee the performance of USS. Rather, the CO noted in her responsibility determination of USS that:

> USS has entered into a joint venture with USS Products Investor LLC to finance construction of the first five NASSCO tankers. The joint venture [but not USS] is

> capitalized with $[redacted]M, of which $[redacted]M came from the Partnership. US [sic] Product Manager LLC is another wholly owned subsidiary of the Partnership that manages the construction and operation of the NASSCO tankers for the joint venture. In various Security and Exchange Commission (SEC) public filings the Partnership has guaranteed the obligation of USS Product Manager LLC [but only to USS Products Investor LLC].

AR 3774-75. Although she correctly recites that USS' financial arrangements, the CO fails to address the glaring issue that no one has guaranteed performance of the actual offeror, USS, to MSC. Moreover, it is only the joint venture, USS Products Investor LLC, that has been capitalized for $[redacted] million, which is to cover part of the construction cost of all five tankers at $[redacted] million each, not just the two tankers to be delivered to MSC.[15]

With regard to DCAA's recommendation that MSC receive a guarantee from USS' parent company, the CO stated that:

> To further assist the Contracting Officer in determining that USS has adequate financial resources, USS was requested to submit documentation to support its financial resources as a subsidiary to U.S. Shipping Partners [LP]. USS submitted a copy of its Funding Agreement with NASSCO shipyard dated August 7, 2006 (referenced in paragraph 1 above) which includes [redacted] USS has also submitted a copy of [redacted] The documented balance in this account is $[redacted]M. Based on this information, the Form 1620 recommended by DCAA is no longer needed.
>
> Conclusion: Based upon the information provided above, I have determined that USS has "adequate financial resources to perform the contract or the ability to obtain them." FAR 9.104-1(a).

AR 3775.

[15] The Administrative Record indicates that the CO may have been confused earlier about which entity was being capitalized. Email correspondence seems to indicate that she believed that USS, the offeror, was being capitalized. AR 4049. However, she correctly describes the financial arrangement in her Responsibility Determination. AR 3774-75.

This explanation, however, only refers to entities other than the awardee, USS. No party has assumed the substantial financial obligations of USS nor guaranteed its performance of the Contract to MSC. The only party that MSC can hold responsible for performing the Contract is USS, and the Administrative Record is absolutely devoid of any evidence that USS is anything other than a corporate shell with no financial assets.

The CO's conclusion is so superficial and illogical as to be arbitrary and capricious. This is easily demonstrated by looking at the DCMA Form 1620 referenced above that the DCAA believed had to be executed by the offeror's parent. We have attached a copy of the form at Appendix 2. It requires a very detailed and extensive guarantee of the entire Contract's performance, not just the building of the ships. The Administrative Record reveals that the financial and performance protection the DCAA sought, and which the CO initially requested, do not exist. The acceptance of basically no protection for the Government simply because USS' parent corporation refused to guarantee performance is irrational and demonstrates that an unequal standard was applied to Product Tankers and USS.

The dogged pursuit of information regarding the environmental violations of one of Product Tanker's ultimate parent companies, and the skepticism of an ECP program heralded by the DOJ and USCG stands in stark contrast with the lackluster efforts to obtain a parent guarantee for, or even financial information regarding, USS on which to base an informed determination regarding the financial responsibility of that bidder. The CO ignored the consequences of the utter lack of capitalization in the offeror and failed to insist upon a parent guarantee of performance. Further, there is no indication in the Administrative Record that the CO made any attempt to determine the magnitude of the financial liability of USS or to determine the financial resources required to ensure adequate performance of the Contract. As a

result, when a comparison is made between the responsibility determinations of the awardee and that of Product Tankers, it is obvious that the CO unreasonably applied two different and quite unequal standards.

**B. The CO allowed USS to use prohibited, materially unbalanced pricing and receive an exorbitant profit to help alleviate its financial situation.**

USS offered, and the CO allowed, materially unbalanced pricing in direct contravention of the Solicitation. This pricing structure appears to be an attempt to alleviate the financial pressure on USS discussed above. The Solicitation stated that:

> The Government may reject an offer as non-responsive if it is materially unbalanced. An offer is unbalanced when it is based on prices significantly less than cost for some work and prices which are significantly overstated for other work.

AR 3264. The Solicitation also provided that "the proposed price will be evaluated for price reasonableness. The Government may determine that an offer is unacceptable if the option prices are significantly unbalanced." AR 368.

USS' pricing, from its initial offer through its FPR, was grossly unbalanced because it had excessive charter hire in the first contract year. *See, e.g.*, AR 3641. This front-loading is, in effect, an improper advance payment,[16] and apparently deemed necessary by USS to reduce risk and provide some relief from its precarious financial condition.

The MSC Price Evaluation Committee Report on the initial proposals found that USS had front-loaded the firm Contract period with high profit and stated: "The rates proposed by USS are obviously 'unbalanced,' . . . although USS does not request termination liability, it is still

---

[16] The U.S. Code prohibits advance payments except in limited circumstances, none of which are present here:

> Except as provided in this section, a payment under a contract to provide a service or deliver an article for the United States Government may not be more than the value of the service already provided or the article already delivered.

31 U.S.C. § 3324(a).

almost [redacted]% higher than the Government Estimate and its unbalanced price structure will be an issue." AR 3275.

This issue was raised during discussions, and the CO advised USS that the Government requires the offeror to submit balanced pricing. AR 3395, 3510. However, USS' FPR dated March 27, 2007 was still front-loaded, substantially unbalanced, and had an even higher profit. *See* AR 196. For the first (firm) contract year, the price for the first tanker was $[redacted] per diem, and the second tanker was $[redacted] per diem, although the daily cost of operating each tanker, including G&A, was only $[redacted]. *Id.; see also* AR 208-217.

USS' unbalanced pricing was noted in MSC's April 2007 Price Evaluation Committee Report. AR 3630-44. Specifically, the proposed per diem rate for the Contract year one ($[redacted]) was [redacted]% higher than its rate for the second contract period, $[redacted]. *Id.* Significantly, the report also stated that USS' profit average for the entire charter period was [redacted]%, and that in the first year, the profit was $[redacted] per day, or a staggering [redacted]%. *Id.*[17]

However, this fact was ignored by the CO in deciding that USS was financially responsible and offered a "fair and reasonable" price, a requirement for award. *See* 48 C.F.R. § 15.402(a). Moreover, there is nothing in the Administrative Record that would support the CO's conclusion that a [redacted]% profit factor on a tanker charter is either fair or reasonable.

## CONCLUSION

The CO bases her June 19, 2007 Non-Responsibility Determination on an erroneous understanding of her authority under the FAR. As the lead federal agency for suspension and debarment, MarAd, had already resolved the present responsibility of OSG, Inc., the CO lacked the authority to find Product Tankers not responsible due to a lack of integrity and business

[17] In contrast, Product Tankers' profit factor for the entire Contract was only [redacted]%. AR 3637.

ethics based upon OSG, Inc.'s convictions. This is the first time in twenty-four years that a contracting officer had made a non-responsibility determination after the lead agency had determined present responsibility and decided that there was no need to debar. This usurpation of authority by the CO harkens back to the pre-FAR era when each agency acted as its own authority and the Government failed to speak with one coherent voice. To allow the CO to inappropriately usurp this authority would return the federal procurement process to this earlier time of inconsistency and chaos in the federal procurement arena.

Notwithstanding the CO's inappropriate action, she also bases her Non-Responsibility Determination on numerous material errors of fact and law detailed above, and reaches illogical conclusions based upon these errors and her failure to consider all of the relevant information available to her. For instance, she ignored the advice and analysis by the DOJ and USCG investigators most familiar with the violations and corrective action of OSG, Inc.; she incorrectly attributed the violations committed by some of OSG, Inc.'s foreign flag vessels and foreign mariners to Product Tankers, without justification; she unreasonably concluded that Product Tankers would be unable to receive a facility security clearance within three years, and, she assumed, with no basis in fact or law or any support in the Administrative Record, and without consultation with MarAd, that a violation of OSG, Inc.'s probation would somehow result in a debarment of Product Tankers by MarAd. Also, she fundamentally misstates or misunderstands the degree to which the ECP has been implemented and the underlying audits completed. As a result, her decision is unreasonable and arbitrary and capricious.

The CO improperly applied two distinct and unequal responsibility standards to Product Tankers, the lowest priced, technically acceptable offeror, and USS, the awardee. The standard applied to Product Tankers was more strict and rigorous than that applied to USS. Had the CO

applied to Product Tankers the same standard she applied to USS, Product Tankers would have been found responsible and awarded the Contract. As a result of her application of these unequal standards, the Non-Responsibility Determination is arbitrary and capricious.

The CO's Non-Responsibility Determination of Product Tankers and the responsibility determination of USS have prejudiced the Plaintiff. Plaintiff respectfully requests that this Court grant its Motion for Judgment on the Administrative Record. Alternatively, the CO's Non-Responsible Determination of Product Tankers and her Responsibility Determination of USS are so replete with significant factual errors and unsupported assumptions, that the Court should remand the Procurement for new determinations by a different MSC contracting officer.

Dated: November 19, 2007

Respectfully submitted,

s/ John J. Pavlick, Jr.__________

John J. Pavlick, Jr.
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

Of Counsel:
Lars E. Anderson
Dismas N. Locaria
Peter A. Riesen
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300



**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

William A. Shook
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006-1600
Telephone: (202) 778-9000
Facsimile: (202) 778-9100

DCDOCS1//#258125