Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

Case No. 07-561C
Judge Hodges

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

OSG PRODUCT TANKERS LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant, and

USS PRODUCT CARRIERS, LLC,

Intervenor.

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972
Attorneys for Defendant

OF COUNSEL
CARA CONLIN
JOEL WEGER
Military Sealift Command
914 Charles Morris Ct. SE
Washington Navy Yard
Washington, D.C. 20398

December 13, 2007

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

TABLE OF CONTENTS

STATEMENT OF THE ISSUES........................................................................................ 2

STATEMENT OF THE CASE........................................................................................ 2

I. Nature Of The Case........................................................................................ 2

STATEMENT OF FACTS. ........................................................................................ 3

A. The Solicitation. ........................................................................................ 4

B. OSG, Inc.'s Plea to Thirty-Three Felonies. ........................................................ 4

C. OSG's Offers. ........................................................................................ 6

D. The Contracting Officer's Responsibility Investigation. ........................... 8

E. MarAd's Settlement Agreement With OSG, Inc.. .................................. 10

F. The Contracting Officer's Responsibility Determination. ....................... 11

G. The Award to USS. ........................................................................................ 14

SUMMARY OF THE ARGUMENT. ........................................................................................ 15

ARGUMENT. ........................................................................................ 20

I. The Standard of Review........................................................................................ 20

A. Standard Of Review For Procurement Challenges. ................................ 20

B. Standard of Review for Contracting Officer's Responsibility Determinations. ........................................................................................ 22

II. The Contracting Officer Was Legally Required to Make An Affirmative Determination That OSG Was A Responsible Offeror For Contract N00033-06-R-5416, Including A Determination That OSG Had A Satisfactory Record of Integrity and Business Ethics. ........................................ 24

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

A. The Requirements of the Federal Acquisition Regulation. ....................... 24

B. OSG Fails to Recognize That A Contracting Officer's Non-Responsibility Determination and A Debarment Are Not The Same . ........................................................................................ 27

C. The Contracting Officer's Decision Was Consistent With MarAd's Recommendation . ................................................................. 31

IV. The Contracting Officer's Decision To Consider OSG, Inc.'s 33 Felonies In Her Responsibility Determination For OSG Was Rationa................ 34

A. Pursuant To The FAR, the Contracting Officer Properly Considered The Ethics and Business Integrity Of OSG, Inc. . ................ 34

B. The Contracting Officer Recognized That OSG Was the Offeror........................................................................................ 38

V. The Contracting Officer's Decision That She Could Not Find OSG Responsible, Despite OSG's Statement Regarding U.S. Flag Vessels, Was Rational. ........................................................................................ 40

VI. The Contracting Officer's Determination That OSG Had Not Acknowledged The Role Of OSG, Inc.'s Management Was Rational. ................ 42

VII. The Contracting Officer's Determination That Insufficient Time Had Passed To Establish The Effectiveness of OSG, Inc.'s ECP Was Rational . ........................................................................................ 47

VIII. The Contracting Officer's Decision That She Could Not Make An Unqualified Determination That OSG Could Comply With the Performance Schedule Was Rational. ............................................................ 50

A. The Contracting Officer's Decision That She Could Not Make an Unqualified Determination that OSG Would Be Able to Obtain A Security Clearance Was Rational . ..................................................... 51

B. The Contracting Officer's Decision That The Effect of A Parole Violation Upon The Performance Schedule Was Unknown Was Rational . ........................................................................................ 54

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

IX OSG Has Failed To Establish That Any Errors of Fact Were Material, Such That The Contracting Officer's Decision Was Irrational, Or Prejudicial, Such That OSG Would Have A Substantial Chance of Receiving The Award But For the Error ... 57

A. OSG Has Not Established That It Is Relevant Whether OSG Is An Indirect Or Wholly Owned Subsidiary of OSG, Inc. ... 58

B. The Fact That OSG, Inc., Had Been On Probation For Its Thirty-Three Felonies For Three, As Opposed to Zero Months Does Not Establish That Ms. Fischer's Decision Lacked A Rational Basis ... 60

C. Ms. Fischer's Statement Regarding OSG, Inc.'s Audits Does Not Demonstrate That Her Decision Lacked A Rational Basis. ... 61

D. The Contracting Officer's Mention of 53 Fed. Reg. 19,208 Does Not Render Her Decision Irrational ... 63

X. OSG Has Failed To Establish That Ms. Fischer Treated OSG and USS Unequally. ... 64

A. OSG's Attacks Upon The Responsibility of the Awardee, USS, Are Not Evidence of Unequal Bid Treatment ... 64

B. OSG and USS Were Treated Equally With Regard To Environmental Protection And Felony Convictions ... 65

C. The Contracting Officer Did Not Treat OSG and USS Unequally With Regard to The Ability To Obtain A Security Clearance; Rather OSG and USS Were Not Similarly Situated ... 67

D. Ms. Fischer Properly Pursued Information Regarding the Environmental Violations Of OSG, Inc., And There Is No Evidence That She Acted In Bad Faith ... 67

E. The Contracting Officer Did Not Find That OSG, Inc., Was The Only Company That Had Ever Committed An Environmental Crime ... 69

XI. OSG Has Not Demonstrated That It Would Have A Substantial Chance of Receiving The Award But For the TRANSCOM Briefing, Because The Contracting Officer Made The Responsibility Determination For OSG, And MSC Awarded The Contract, Not TRANSCOM ... 71

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

CONCLUSION. ........................................................................................................... 73

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

# TABLE OF AUTHORITIES

## CASES

ARINC Eng'g Servs., LLC v. United States,
77 Fed. Cl. 196 (2007). .......... 53

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 (Fed. Cir. 2000).......... 21

Alfa Laval Separation, Inc. v. United States,
175 F.3d 1365 (Fed. Cir. 1999).......... 22, 72

Andersen Consulting v. United States,
959 F.2d 929 (Fed. Cir. 1992).......... 57

Axiom Res. Mgmt. v. United States,
78 Fed. Cl. 576 (2007). .......... 61

Banknote Corp. of Am., Inc. v. United States,
365 F.3d 1345 (Fed. Cir. 2004).......... 21, 26

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005).......... 21, 72

Bender Shipbuilding & Repair Co., Inc. v. United States,
297 F.3d 1358 (Fed. Cir. 2002).......... 23, 24, 47

Burke v. Envtl. Prot. Agency,
127 F. Supp. 2d 235 (D.D.C. 2001). .......... 29, 31

C & G Excavating v. United States,
32 Fed. Cl. 231 (1994). .......... 22

CRC Marine Servs. v. United States,
41 Fed. Cl. 66 (1998). .......... 29

Cincom Sys. Inc. v. United States,
37 Fed. Cl. 663 (1997). .......... 22

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996)........................................................................ 57

Dep't of the Navy v. Egan,
484 U.S. 518 (1988)..................................................................................... 54

Electro-Methods, Inc. v. United States,
7 Cl. Ct. 755 (1985). ..................................................................................... 21

Ellsworth Assocs., Inc. v. United States,
45 Fed. Cl. 388 (1999). ................................................................................. 21

Enter. & Assocs. v. United States,
70 Fed. Cl. 1 (2006). ........................................................................... 23, 24, 33

Four Points By Sheraton v. United States,
63 Fed. Cl. 341 (2005). ................................................................................. 22

Galen Med. Assocs., Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004)................................................................ 59, 68, 69

Geo-Con, Inc. v. United States,
783 F. Supp. 1 (D.C. 1992). ........................................................................... 29

Geo-Con, Inc. v. United States,
853 F. Supp. 537 (D.C. Cir. 1994)................................................................ 22, 59

Government Contract Advisory Servs., Inc., B-255918; B-255919
94-1 CPD ¶ 181 (Mar. 8, 1994). .................................................................... 29

H.W.A., Inc. v. United States,
78 Fed. Cl. 685 (2007). ................................................................................. 63

Hayes International Corp. v. United States,
7 Cl. Ct. 681 (1985). .......................................................................... 23, 33, 40

Hesse v. Dep't of State,
217 F.3d 1372 (Fed. Cir. 2000)....................................................................... 54

Iceland Steamship Co., Ltd. v. United States Dept. of Army,
201 F.3d 451 (D.C. Cir. 2000). ....................................................................... 23

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001)........................................................................ passim

Ironclad/EEI v. United States,
78 Fed. Cl. 351 (2007)........................................................................ 53, 54

JWK Int'l Corp. v. United States,
52 Fed. Cl. 650 (2002), aff'd,
56 Fed. Appx. 474 (Fed. Cir. 2003)........................................................................ 21

John C. Grimberg Co., Inc., v. United States,
185 F.3d 1297 (Fed .Cir. 1999)........................................................................ passim

Keco Indus., Inc. v. United States,
203 Ct. Cl. 566 (1974)........................................................................ 23

Lockheed Corp. v. Widnall,
113 F.3d 1225 (Fed. Cir. 1997)........................................................................ 26

Making Consulting Corp. v. United States,
78 Fed. Cl. 715 (2007)........................................................................ 34, 40

Metcalf Constr. Co., Inc. v. United States,
53 Fed. Cl. 617 (2002)........................................................................ 57

Mexican Intermodal Equipment, S.A. de C.V., B-270144
96-1 CPD ¶ 31 (Jan. 31, 1996)........................................................................ 29

Mgmt. Solutions & Sys. v. United States,
75 Fed. Cl. 820 (2007)........................................................................ 47, 50

Moore's Cafeteria Servs. v. United States,
77 Fed. Cl. 180 (2007)........................................................................ 57

News Printing Co. v. United States,
46 Fed. Cl. 740 (2000)........................................................................ 23

Old Dominion Dairy Products, Inc. v. Secretary of Defense,
631 F.2d 953 (D.C. Cir. 1980)........................................................................ 28

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

Peter Kiewitt Sons, Inc. v. U.S. Army Corps of Engineers, et al,
714 F.2d 163 (D.C. Cir. 1983). .......... 27

PNM Constr. v. United States,
13 Cl. Ct. 745 (1987). .......... 29

Precision Standard, Inc. v. United States,
69 Fed. Cl. 738 (2006). .......... 33

Precision Std., Inc. v. United States,
71 Fed. Cl. 216 (2006). .......... 23, 42

Southern Foods, Inc. v. United States,
76 Fed. Cl. 769 (2007). .......... 24, 51

Stapp Towing Inc. v. United States,
34 Fed. Cl. 300 (1995). .......... 29

Westech International, Inc. v. United States,
__ Fed. Cl. __, 2007
WL 3307320 ((ct 24, 2007).......... 53

YET Servs. Corp. v. United States,
28 Fed. Cl. 366 (1993). .......... 40

**STATUTES**

5 U.S.C. §§ 702, 706(2). .......... 20, 26

28 U.S.C. § 1491(b)(1), (4). .......... 26

33 U.S.C. §§ 1901-1911 (Supp. V 1981).......... 5, 6

48 C.F.R. § 9.103(a)-(b).......... passim

48 C.F.R. § 9.104. .......... 3, 30

48 C.F.R. §9.104-1.......... passim

48 C.F.R. § 9.104-3.......... 34

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

48 C.F.R. § 9.402. .......... 27, 31

48 C.F.R. § 9.405. .......... 27, 30

48 C.F.R. § 9.405-1(a). .......... 55

48 C.F.R. § 9.406-1(a). .......... 10, 28

48 C.F.R. § 9.406-2. .......... 10

48 C.F.R. § 9.406-3. .......... 27, 28

48 C.F.R. § 9.406-4(a)(1). .......... 27

48 C.F.R. § 19.101. .......... 34, 35, 36

49 C.F.R. § 29.800(a)(3). .......... 10

49 C.F.R. § 29.840. .......... 28

49 C.F.R. § 29.860. .......... 10

53 Fed. Reg. 19,204 (May 26, 1988). .......... 63

53 Fed. Reg. 19,208. .......... 63

**BOOKS**

SCHOENBAUM THOMAS J., ADMIRALTY AND MARITIME LAW § 11- 1 (4th ed. 2004). .......... 8, 9

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| OSG PRODUCT TANKERS LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 07-561C<br>Judge Hodges |
| THE UNITED STATES, | ) | |
| Defendant, and | ) | |
| USS PRODUCT CARRIERS, LLC, | ) | Protected Material To Be Disclosed Only In Accordance With U.S. Court of Federal Claims Protective Order |
| Intervenor. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court grant judgment upon the administrative record in favor of defendant, and deny plaintiff's motion for judgment upon the administrative record. The administrative record demonstrates that the contracting officer's determination that she could not affirmatively find OSG Product Tankers, LLC ("OSG") to be a responsible offeror for contract N0033-06-R-5416 was rational. OSG has failed to demonstrate that the contracting officer's decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law.

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

## STATEMENT OF THE ISSUES

1. Whether the contracting officer was legally required to make an affirmative determination that OSG was a responsible offeror for contract N0033-06-R-5416.

2. Whether the contracting officer's decision that she could not affirmatively determine that OSG was a responsible offeror for contract N0033-06-R-5416 was rational.

3. Whether OSG has demonstrated any prejudicial errors in the contracting officer's decision that she could not affirmatively determine that OSG was a responsible offeror for contract N0033-06-R-5416, such that OSG would have a substantial chance of receiving the award, but for the alleged errors.

4. Whether the contracting officer properly considered the integrity and business ethics of OSG's parent corporation, Overseas Shipholding Group, Inc., ("OSG, Inc."), which pled guilty to 33 felony violations and incurred the largest-ever criminal penalty involving deliberate vessel pollution, based upon the relationship between OSG, Inc. and OSG, and the offer submitted by OSG.

5. Whether OSG lacks standing to advance arguments regarding the responsibility and pricing of the awardee, USS Product Carriers, LLC ("USS"), pursuant to the Court's Order of November 20, 2007.

6. Whether OSG has demonstrated unequal treatment of its offer.

## STATEMENT OF THE CASE

### I. Nature Of The Case

In this post-award bid protest, OSG challenges the award of contract N00033-06-R-5416

for two T-5 replacement product tanker vessels by the Military Sealift Command ("MSC") to the awardee, USS. OSG was determined to be the lowest-priced technically acceptable offeror. AR 2994; 3429.[1] However, the contracting officer determined that she could not award the contract to OSG pursuant to 48 C.F.R. § 9.104, because she could not make an affirmative determination that OSG was a responsible offeror, in light of the ramifications of the 33 felonies of its parent corporation, OSG, Inc. AR 1766-1783. The contracting officer therefore conducted a responsibility determination for USS, which was the next lowest-priced technically acceptable offeror, made an affirmative determination of responsibility for USS, and awarded the contract to USS. AR 4064; AR 3774-79. OSG brought this bid protest action challenging the contracting officer's decision that OSG was non-responsible, and the award to USS.

## STATEMENT OF FACTS[2]

Defendant sets forth herein a brief narrative recitation of the facts most relevant to this

---

[1] "AR __" refers to pages of the administrative record that was filed with the Court on August 3, 2007.

[2] In OSG's motion for judgment upon the administrative record, OSG represents that the parties have prepared a Joint Stipulation of Facts. This is incorrect. In exchange for counsel for defendant and defendant-intervenor agreeing to withdraw their motions to strike OSG's motion for judgment upon the administrative record filed on November 12, 2007, counsel for OSG agreed to file a revised motion for judgment upon the administrative record, and a Proposed Joint Statement of Facts. See Notice, Docket Entry No. 47.

Defendant and defendant-intervenor did not participate in preparing the Proposed Joint Statement of Facts, and did not review or make comments upon the Proposed Joint Statement of Facts. Given the argumentative and selective nature of the "Proposed Joint Statement of Facts," and the time and resources already required to respond to plaintiff's excessively lengthy brief, defendant does not believe that it will be possible for the parties to file a Joint Statement of Facts.

case for the convenience of the Court.

A. The Solicitation

On August 31, 2006, the Military Sealift Command ("MSC") issued solicitation No. N00033-06-R-5416 (the "solicitation") for two T-5 replacement product tanker vessels (the "tankers") to be used to transport petroleum fuel for the Defense Energy Support Center ("DESC"). AR 2916, 2930, 2900, 2912; 2882, 2884, 2903-04. The solicitation was issued in part because MSC was concerned that its current fleet was becoming too old to meet the standards that various oil company associations required for ships to call at their terminals in order to ensure environmental compliance. AR 1782, 2903; 2887. In November 2006, OSG submitted an initial offer in response to the solicitation, as did five other offerors, including USS. AR 3187.

B. OSG, Inc.'s Plea to Thirty-Three Felonies

On December 19, 2006, OSG's parent company, OSG, Inc., entered into a consolidated plea agreement with six United States Attorney's Offices and the Environmental Crimes Section of the Environment and Natural Resources Division of the United States Department of Justice, pursuant to which OSG, Inc. agreed to plead guilty to 33 felony counts related to deliberate vessel pollution and false pollution log entries pending in six Federal district courts. AR 1918-20, 1967, 1928-1955, 4157. The felony counts that OSG, Inc., pled guilty to included a criminal violation of the Clean Water Act, multiple criminal violations of the Act to Prevent Pollution from Ships, as well as conspiracy and obstruction of justice. AR 1975, 1934.

Crew members aboard nine ships, including senior ship engineers, engaged in deliberate

discharges of oily mixtures in a manner that intentionally circumvented required pollution prevention equipment and violated United States law. AR 1889. Crew members aboard three other ships failed to maintain accurate Oil Record Books, as required by the MARPOL Protocol, a treaty implemented into United States Law by the Act to Prevent Pollution From Ships. See 33 U.S.C. §§ 1901-1911 (Supp. V 1981); AR 1889. Each of the 12 vessels involved in the felonies was owned by a separate, wholly-owned subsidiary of OSG, Inc., and operated by a wholly owned subsidiary management company, which was ultimately owned and controlled by OSG, Inc.[3] AR 1868.

The illegal discharges were concealed by use of false Oil Record Books, a required log that is regularly inspected by the Coast Guard. [4] AR 1889. The illegal discharges were also concealed by making the discharges at night, and by hiding bypass equipment during port calls. Id. Pursuant to a Joint Factual Statement by OSG, Inc., and the Government:

> One benefit of Defendant's MARPOL related crimes was financial. Costs avoided included paying for the cost of offloading sludge and oily waste in port, and, perhaps most significantly, the time (and related costs) needed to make arrangements to offload waste in port. The value of the crime can additionally be

---

[3] OSG makes much of the distinction between being a wholly owned subsidiary and an "indirect subsidiary." Memo at 26. This is a distinction without a difference. OSG never asserts that there is no corporate connection between OSG, Inc., and OSG.

[4] Interestingly, both in OSG's memorandum and in statements to Ms. Fischer, OSG characterized this behavior as "violations relating to record keeping" rather than pollution. See Plaintiff's Memorandum of Law In Support of Plaintiff's Motion for Judgment on the Administrative Record ("Memo") at 20; AR 3554, 1852-53. While this may be true in the most technical sense, defendant does not believe that it is a forthright and accurate representation of the crimes that occurred, or represents acknowledgment of the serious nature of the criminal activities.

> viewed in a different light, since Defendant gained the use of United States ports and waters through the use of false Oil Record Books. It is on this basis that Defendant has agreed to pay a criminal fine under the Alternative Fines Act totaling as much as One Million, Six Hundred Thousand Dollars ($1,600,000.00) per count.

AR 1890.

OSG, Inc's $37 million plea agreement was the largest-ever criminal penalty involving deliberate vessel pollution, and OSG, Inc. was placed upon organizational probation for a period of three years. AR 1918, 1925, 1934-36, 2577. The plea agreement was binding upon OSG, Inc., and its subsidiaries, including all subsidiaries that technically managed and/or manned vessels. AR 1946-47; 4157. Under the plea agreement, OSG, Inc. was also required to fund and implement a detailed Environmental Compliance Plan ("ECP"), which also applied to all oceangoing vessels that were technically managed or manned by OSG, Inc. AR 1936, 1980. The ECP was incorporated into OSG, Inc.'s plea agreement by reference, and compliance with the ECP was a special condition of OSG, Inc.'s probation. Id.

As a result of the 33 felonies and plea agreement of OSG, Inc., and due to OSG, Inc.'s status as a Maritime Security Program recipient, the United States Department of Transportation ("DOT") Maritime Administration ("MarAd") accepted lead agency status to determine whether OSG, Inc., should be suspended or debarred from all Government business under the DOT Governmentwide Debarment and Suspension Non-Procurement regulation, 49 C.F.R. Part 29. See AR 1961.

C. OSG's Offers

OSG submitted an initial offer in response to the solicitation on November 30, 2006. AR

1643; 4182. As part of its proposal, OSG provided a "Corporate Viability" statement required by the solicitation in the form of a U.S. Securities and Exchange Commission Form 10-Q for Overseas Shipholding Group, Inc. AR 4352-4407. OSG did not provide a separate corporate viability statement for OSG Product Tankers, LLC.

In response, MSC raised the following issue for discussion:

> OSG has provided financial data for their parent corporation. Will the parent corporation (Overseas Shipholding) or the subsidiary (OSG Product Tankers Group, Inc.) Be signing the contract? If it is the subsidiary, will the parent guarantee the performance of the subsidiary?

AR 3494. OSG responded that "OSG Product Tankers, LLC will be signing the contract and the performance will be guaranteed by the parent company." AR 1619.

The technical narrative submitted by OSG described the corporate profile and experience of Overseas Shipholding Group, Inc. AR 1652-1687 ("Overseas Shipholding Group, Inc. (OSG) is a marked leader in global energy services") ("OSG had a long and successful relationship with MSC dating back to the long term charter of three Jones Act tankers that commenced in 1982. Since that time, OSG has also chartered many U.S. Flag and Foreign Flag vessels for shorter periods."). The technical narrative did not discuss the corporate profile or experience of OSG Product Tankers, LLC. Id.

The request for proposals required that if the tankers were to be newly built, the offeror would be required to demonstrate a commitment from a United States shipyard. AR 2989. To meet this requirement, OSG provided documentation of an agreement between OSG America, Inc., and Aker Philadelphia Shipyard, Inc. ("APSI"), a wholly-owned subsidiary of Aker

American Shipping, Inc. AR 1579. The agreement provided that the vessel would be owned by an affiliate of APSI, and would be bareboat chartered to one of 13 wholly-owned subsidiaries of OSG, Inc. AR 1579. The bareboat charterers (one of the 13 wholly owned subsidiaries of OSG, Inc.) would operate the vessels.[5] Id. The wholly-owned subsidiary or subsidiaries of OSG, Inc., would time charter the vessels to OSG Product Tankers, who would charter the vessels to charterers needing Jones Act tonnage. AR 1579.

D. The Contracting Officer's Responsibility Investigation

The contracting officer for the solicitation, Diana Fischer, was aware of OSG, Inc.'s crimes and plea agreement as early as January 8, 2007, through a Department of Justice press release dated December 19, 2006.[6] AR 3187. On January 19, 2007, Ms. Fischer requested that OSG respond to the Department of Justice press release. AR 3495. Ms. Fischer then convened a panel of subject matter experts to assist her in assessing the present responsibility of OSG. AR 3888, 3781, 3898. She also consulted with representatives from the United States Coast Guard and the Department of Justice who had been involved in the case against OSG, Inc., and OSG,

---

[5] Under a time charter, the charterer engages a vessel for a fixed period of time, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs. Under a bareboat charter, the charterer takes complete control of the vessel, mans it with his own crew, and is treated by law as its legal owner. See SCHOENBAUM THOMAS J., ADMIRALTY AND MARITIME LAW § 11- 1 (4th ed. 2004).

[6] This press release represents that OSG, Inc., "agreed to plead guilty to 33 felony counts related to deliberate vessel pollution from nine ships and false pollution log entries in three additional ships, in six U.S. ports around the nation." AR 1967. In OSG's memo, OSG contends that this statement was inaccurate, but does not explain why MSC would not have been entitled to rely upon the press release. Memo at 20.

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

Inc.'s plea agreement, as well as a representative from the Environmental Protection Agency. AR 3889, 3890, 3896-97.

On April 27, 2007, Ms. Fischer sent OSG a letter stating that she had questions regarding OSG's record of integrity and business ethics in light of the 33 felony convictions of OSG, Inc. AR 3781. She also sent a list of written questions to OSG, and also invited OSG to provide whatever other information OSG believed was relevant. AR 3781-3789. She also invited OSG to give an oral presentation regarding its responsibility. Id. One of the written questions posed by Ms. Fischer was: "What is the relationship between OSG Product Tankers, LLC (the offeror under this procurement) and Overseas Shipholding Group, Inc. and how will the ECP be applied under an MSC contract?" AR 3783. On May 1, 2007, Ms. Fischer received a return letter forwarding written responses that OSG, Inc., had provided to MarAd. AR 1961, 2101, 2521-2874.

On May 4, 2007, Ms. Fischer, the panel of experts, and other representatives of MSC met with representatives of OSG and several counsel for OSG, who are also representing OSG in this bid protest action. AR 2072-73. On May 8, 2007, OSG provided written responses to the questions posed by Ms. Fischer, which were forwarded to Ms. Fischer by the same law firm that is representing OSG in this bid protest action. AR 1807-64, 3790-3841. In response to Ms. Fischer's question regarding the relationship between OSG, Inc., and OSG and the application of the ECP to a MSC contract, OSG responded that "OSG Product Tankers, LLC is an indirect subsidiary of Overseas Shipholding Group, Inc." AR 1833. OSG also responded that:

> it would be difficult for OSG to manage its vessels under differing operational standards. Because the ECP applies to all ships managed by OSG, and because it is an essential part of OSG's SMS [Safety Management System], it will be implemented on those ships operating under the MSC contract in exactly the same manner as any other ship technically managed by OSG.

AR 1833. See also AR 3916 (response to the same question at the May 4, 2007 meeting between MSC and OSG).

E. MarAd's Settlement Agreement With OSG, Inc.

On May 18, 2007, the MarAd debarring official and Maritime Administrator, Sean Connaughton, issued a "Report of Investigation and Recommendation regarding Debarment of Overseas Shipping Group, Inc."[7] AR 1961. The report was authored by Elizabeth Megginson, MarAd's chief counsel, and approved by Mr. Connaughton. Mr. Connaughton found that cause for debarment existed. AR 1962; see also 48 C.F.R. § 9.406-2; 49 C.F.R. § 29.800(a)(3). However, Mr. Connaughton also took into account mitigating and aggravating factors to determine whether OSG, Inc., should be debarred. AR 1962; see also 49 C.F.R. § 29.860; 48 C.F.R. § 9.406-1(a).

Mr. Connaughton determined that OSG, Inc.'s crimes were significant, and demonstrated "a culture that disregards the law with impunity." AR 1962. Mr. Connaughton also considered mitigating factors. AR 1962. Mr. Connaughton further considered whether OSG, Inc., had

[7] As noted in OSG's complaint, a corrected version of the MarAd recommendation was issued on June 12, 2007, which corrected the statement in the May 18, 2007 version that the Cost Guard and the Department of Justice recommended against debarment of OSG, Inc. See Compl. ¶ 17 n.1. However, the corrected version of the MarAd recommendation was not before Ms. Fischer when she made her responsibility decision.

adequate time to eliminate the circumstances that led to the wrongdoing. AR 1963. Mr. Connaughton concluded:

> The corrective measures set forth in the Plea and ECP and in the supplementary materials submitted to this office by OSG constitute a significant corporate commitment to combat and eliminate the criminal conduct engaged in by so many of its employees. The effectiveness of these measures, however, remains to be seen. Consequently, a settlement agreement contingent upon the company's continued compliance with the terms of probation is warranted.

AR 1964. Therefore, in lieu of debarment, Mr. Connaughton agreed to enter into a settlement agreement with OSG, Inc., whereby OSG, Inc., agreed to comply in all respects with the conditions of the probation imposed by the Court. AR 1964. Pursuant to the settlement agreement, if the Court found that OSG, Inc., had substantially violated the terms of its parole, this would constitute grounds for an immediate issuance of a Notice of Proposed Debarment and resumption of the debarment action. AR 1964.

F. The Contracting Officer's Responsibility Determination

On June 19, 2007, Ms. Fischer issued a responsibility determination for OSG. See AR 1766 ("This is a responsibility determination for OSG Product Tankers LLC . . . ."). In making this determination, Ms. Fischer relied upon and referenced at least 21 different resources containing a variety of information, including, but not limited to public records, press releases, Court records regarding OSG, Inc.'s crimes,[8] oral responses and written information submitted by OSG, and MarAd's memorandum of May 18, 2007. AR 1766-67.

---

[8] These records included the Joint Factual Statement submitted by OSG, Inc., and the Government, the Government Sentencing Memorandum, the Plea Agreement, and the Environmental Compliance Plan incorporated into the Plea Agreement.

In reaching her decision that she could not affirmatively find OSG to be a responsible offeror for contract N00033-06-R-5416, Ms. Fischer specifically addressed and discussed each of the factors set forth in 48 C.F.R. §9.104-1. AR 1766-1783. Ms. Fischer found that she could not make an affirmative determination that OSG would be able to comply with the required or proposed delivery or performance schedule, pursuant to 48 C.F.R. § 9.104-1(b). Ms. Fischer concluded that:

> . . . it is unclear whether OSG is capable of obtaining the requisite facilities clearance, and uncertain whether OSG can complete its parole with no violations. If OSG cannot obtain a facilities clearance, it will not be capable of performing the subject solicitation. If the event a parole violation occurs, the [e]ffect on the performance schedule is unknown.

AR 1769.

Ms. Fischer considered whether she could affirmatively find that OSG had a satisfactory record of integrity and business ethics, pursuant to 48 C.F.R. § 9.104-1(d). Ms. Fischer first discussed OSG, Inc.'s 33 felonies, and then discussed a number of proactive actions taken by OSG, Inc., in light of its criminal convictions. AR 1771-73. Ms. Fischer then addressed her remaining concerns regarding actions and inaction by OSG, Inc. AR 1773. Ms. Fischer concluded that although the Government Sentencing Memorandum in OSG, Inc.'s criminal cases recognized that OSG, Inc. provided "meaningful and significant cooperation":

> Based on information presented in the Government's record relating to OSG's criminal violations, it does not appear that OSG was forthright in divulging all pertinent and necessary information required by the Government. The record further demonstrates that OSG did not always respond to incidents of pollution with due diligence.

AR 1773. She also concluded that:

> Although the Government attributed the incidents to problems with upper management, OSG failed to adequately address the role of its upper management in relationship to the criminal activities, and only cited factors found in its root cause analysis (crew misunderstandings and third party inspections) as well as repeatedly citing ethnic and cultural differences between ships' crews and officers.

AR 1774.

Ms. Fischer also determined that uncertainty existed regarding the causes of OSG, Inc.'s criminal activity. AR 1775. She noted that it seemed coincidental that crews on a number of different ships devised similar ways to work around OSG, Inc.'s control systems, and that she felt that OSG had not been able to explain the cause of this behavior. AR 1776. She concluded:

> because OSG admittedly cannot identify the reasons behind crewmembers' alterations of the environmental equipment, questions remain as to the efficacy of any changes made, in an effort to prevent future criminal activity. Overall, OSG did not satisfactorily address its inability to recognize the criminal actions taking place, despite the frequency of the violations, spread across twelve known vessels, over an extended period of time. At this point in time, in regards to this particular procurement, due to the proximity in time between the incidents and proposed remedies, MSC cannot be certain that this criminal behavior will not reoccur during the course of the contract that would be awarded under this solicitation.

AR 1775.

Ms. Fischer also noted her concern that environmental violations continued during the Government's investigation of OSG, Inc., and after OSG had created new compliance measures. AR 1776. She also noted that, according to the Joint Factual Statement submitted by OSG, Inc., and the Government, control technology placed upon ships by OSG, Inc., had been tricked by senior ship engineers. AR 1777. Ms. Fischer found:

> If the preventative steps taken by OSG in the past did not work, I cannot be confident similar preventative measures will work in the future. Again, due to the

proximity in time to the subject procurement, OSG lacks a record of compliance.

AR 1777.

Ms. Fischer also found that there were discrepancies concerning "potential financial motivations as a potential cause for the criminal behavior. " AR 1778. She found that:

> OSG never attributed financial motivations for any of their crimes, however, the JFS noted that "one benefit of the MARPOL related crimes was financial" as OSG avoided costs including the "cost of offloading sludge and oily waste in port, and perhaps most significantly, the time (and related costs) needed to make arrangements to offload the waste in port." (Ref P).

AR 1778. However, Ms. Fischer noted that OSG "has never clearly indicated or admitted, in any of its responses, a financial incentive for any of its crimes." AR 1778.

Finally, Ms. Fischer concluded that the shortness of time between the criminal violations and the award of the solicitation did not allow OSG to reestablish a record of integrity and business ethics. AR 1779. For these reasons, she found that OSG did not have a satisfactory record of integrity and business ethics, "at this point and time, for this solicitation." AR 1779.

G. The Award to USS

Ms. Fischer then conducted a responsibility determination for USS, the next lowest-priced technically acceptable offeror. AR 3774-79. She contacted the Coast Guard, the Department of Justice, and USS Vessel Management, LLC (USS's parent) to ensure that USS did not have issues with environmental violations. AR 3967; 3971; 3976. Ms. Fischer made an affirmative determination of responsibility for USS and on July 6, 2007, the contract was awarded to USS. AR 4064. On July 25, 2007, OSG filed its complaint for this bid protest action,

challenging Ms. Fischer's decision that she could not affirmatively determine that OSG was a responsible offeror and the award to USS.

## SUMMARY OF THE ARGUMENT

The Federal Acquisition Regulation ("FAR") required Ms. Fischer to make an affirmative determination that OSG was a responsible offeror. Ms. Fischer properly fulfilled her regulatory requirement to determine whether OSG was responsible. OSG's argument that Ms. Fischer lacked authority to make a responsibility determination for OSG, because MarAd did not debar OSG, Inc., is a policy argument advocating for a change in the law, which has no place in a bid protest action. Ms. Fischer's requirement to conduct a responsibility determination was not conditioned upon whether MarAd decided not to debar OSG, Inc. based upon integrity and business ethics. Contrary to OSG's assertions, a non-debarment decision is not the same as an affirmative responsibility determination for a particular contract.

Moreover, OSG's allegations that Ms. Fischer's responsibility determination conflicts with MarAd's recommendation misconstrues many of Ms. Fischer's findings. MarAd explicitly found that the effectiveness of OSG, Inc.'s corrective measures remained to be seen, and therefore, MarAd should enter into a conditional settlement agreement with OSG, Inc., in lieu of debarment. Similarly, Ms. Fischer found that she could not affirmatively find OSG to be a responsible offeror because there were "too many uncertainties as to the ultimate effectiveness of OSG's corrective measures." AR 1783.

The administrative record demonstrates that Ms. Fischer's decision that she could not

affirmatively find OSG to be a responsible offeror for contract N0033-06-R-5416 was rational. Ms. Fischer undertook an extensive investigation, relied upon numerous references, convened a panel of experts, and provided OSG with the opportunity to respond to questions, make an oral presentation, and submit whatever information OSG believed was relevant. After undertaking this extensive investigation, Ms. Fischer rationally concluded that she could not affirmatively determine that OSG was a responsible offeror in light of the ramifications of the 33 felony violations relating to deliberate pollution and false pollution log entries of OSG's parent, OSG, Inc.

Ms. Fischer's decision to consider the 33 felony convictions and the largest-ever criminal penalty involving deliberate vessel pollution of OSG's parent, OSG, Inc., in assessing OSG's responsibility was also rational. OSG met the requirements of the solicitation by providing technical and financial information from its parent, OSG, Inc. In addition, OSG was to obtain the contract tankers through a time charter from wholly-owned subsidiaries of its parent, OSG, Inc. Furthermore, the ECP mandated by OSG, Inc.'s plea agreement applied to the MSC contract because the ships were technically managed by OSG, Inc. In this situation, it was proper for Ms. Fischer to consider the past performance and integrity of OSG, Inc., because OSG and OSG, Inc., are affiliates as defined by the Federal Acquisition Regulation ("FAR") and OSG, Inc.'s integrity and past performance could affect the present responsibility of OSG.

Unsurprisingly, when Ms. Fischer informed OSG that she had questions regarding OSG's present responsibility relating to the 33 felonies of its parent, OSG, Inc., OSG did not respond that she was asking questions regarding the wrong entity. Instead, OSG provided the same

information that had been provided to MarAd regarding OSG, Inc. Ms. Fischer provided OSG with every opportunity to tell her that she was considering the criminal history of the wrong entity during her responsibility determination, and that OSG was so separate and far-removed from OSG, Inc., that the criminal activity of OSG, Inc., would not affect OSG's responsibility.

OSG did not raise these issues in response to Ms. Fischer's inquiry, although OSG was represented by the same counsel presently endeavoring to raise these arguments in this bid protest action, and was given every opportunity to present whatever issues and arguments it wished to Ms. Fischer. OSG bore the burden of demonstrating that it was a responsible offeror. To the extent that OSG chose not to present arguments regarding the significance of its alleged "separateness" to Ms. Fischer during her several-month investigation, OSG failed to meet that burden. However, that does not mean that Ms. Fischer's decision, based upon the record and the information provided by OSG, was irrational.

The reason that OSG did not argue that it was separate from OSG, Inc., is evident. It is exceedingly unlikely that OSG would have been found technically or financially qualified for the contract without OSG, Inc., as OSG was a company that had been identified as having 25 employees, could provide no independent technical narrative, and had no independent financial information available.

Contrary to OSG's assertions, Ms. Fischer's decision was not irrational because OSG, Inc.'s crimes occurred on foreign flag, as opposed to U.S. flag, vessels. Although OSG mentioned that no U.S. flag ships were involved in OSG, Inc.'s criminal violations, OSG did not explain why that distinction should be relevant. Instead, OSG bragged that the ECP would apply

to the MSC contract because it "it would be difficult for OSG to manage its vessels under differing operating standards." AR 1830-1833. If OSG, Inc., could not manage its foreign and U.S. flag ships under different operating standards, it is unclear why OSG believes that Ms. Fischer should be completely unconcerned about criminal activity on foreign flag ships. If, in fact, the Government's concern regarding OSG, Inc.'s crimes had been limited to foreign flag vessels, the Government would not have required both OSG, Inc.'s U.S. flag and foreign flag subsidiaries to be bound by the plea agreement, and required the ECP to apply to all ships technically managed or manned by OSG, Inc., both foreign and U.S. flag.

In hopes of confusing the Court, OSG has mischaracterized numerous statements in Ms. Fischer's responsibility determination. OSG endeavors to place the burden upon Ms. Fischer to demonstrate that there was no possible way that OSG could have successfully performed the contract, or complied with the plea agreement and ECP. However, that is not the relevant legal inquiry. OSG bears the burden of affirmatively demonstrating that it was a responsible offeror, and Ms. Fischer could not make an award to OSG unless she could make an affirmative finding that OSG met each of the criteria set forth at 48 C.F.R. § 9.104-1.

OSG also argues that the non-responsibility determination was irrational because Ms. Fischer made errors of fact. However, many of OSG's alleged errors of fact amount to nothing more than disagreements with Ms. Fischer's conclusions regarding the meaning or significance of various facts in the record. In light of the deferential standard of review of responsibility determinations, and deference to the contracting officer's business judgment, disagreements with Ms. Fischer's conclusions about the meaning of facts do not demonstrate that her decision was

not rational. Furthermore, the possibility that a different conclusion regarding the meaning of facts could be reached does not establish that Ms. Fischer's decision lacked a rational basis - the only relevant inquiry is whether her evaluation was within the bounds of reasoned decision making.

Furthermore, the fact that Ms. Fischer's may have made three minor factual errors in the course of an 18-page long single-spaced responsibility determination does not establish that her non-responsibility determination lacked a rational basis. It is obvious that the two law firms representing OSG in this bid protest action have spent considerable time scouring the administrative record in the approximately five months during which this bid protest has been pending, fishing for any and all potential factual errors in hopes of overturning the award. However, for the award to be sustained, Ms. Fischer's determination is not required to be perfect, because the relevant inquiry is not whether Ms. Fischer's determination was free of any and all factual errors. The inquiry is whether the decision as a whole was rational, and whether OSG can demonstrate that any errors were prejudicial, such that there was a substantial chance that OSG would have received the award absent the errors. OSG cannot meet this burden, because Ms. Fischer's decision was supported by numerous facts and references, not just the few that OSG contends are incorrect. In addition, to overturn the award, OSG would need to demonstrate that Ms. Fischer's determinations regarding each factor in 48 C.F.R. § 9.104-1 were incorrect, as all factors must be met for OSG to be responsible.

Lastly, it has been established numerous times in this case that OSG lacks standing to challenge the responsibility of USS, most recently pursuant to the Court's Order of November

20, 2007. However, OSG simply refuses to stop making essentially the same arguments regarding the responsibility of USS, repackaging its original contentions as evidence of "unequal treatment of bids," and complaining that Ms. Fischer applied a lenient standard when evaluating whether USS had adequate financial resources to perform the contract, and accepted unbalanced pricing from USS. This argument ignores the fact that OSG was not found non-responsible because of its financial resources. Nor has the Government ever asserted that the pricing of USS was superior to that of OSG. OSG also conveniently fails to mention that Ms. Fischer conducted an extensive investigation of USS's record of business ethics and integrity, the primary basis upon which OSG was found non-responsible. OSG's repeated efforts to re-focus this litigation upon USS only evidences the weakness of OSG's claims regarding its own responsibility determination.

## ARGUMENT

### I. The Standard of Review

#### A. Standard Of Review For Procurement Challenges

This Court reviews bid protest actions pursuant to the standards set forth in the Administrative Procedure Act ("APA"). Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). It is well-settled that the APA does not permit the Court to undertake a de novo review of agency action; rather, it limits the Court to a consideration of whether the action was "arbitrary, capricious, or otherwise not in accordance with the law," based solely upon the record before the agency. 5 U.S.C. §§ 702, 706(2)(A).

Therefore, the award of a contract may be set aside only "if either: (1) the procurement

official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332 (citations omitted). When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004);(citations omitted). Impresa, 238 F.3d at 1333. In this regard the existence of minor errors or oversights in the evaluation process is not sufficient. Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 393 (1999).

The plaintiff cannot carry this burden by merely demonstrating that the record can support a different decision. Courts have recognized that contracting officials may properly exercise wide discretion in applying procurement regulations. See Impresa, 238 F.3d at 1332; Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985). The arbitrary and capricious standard, by definition, acknowledges a "zone of acceptable results in a particular case which consider[s] the relevant factors and is within the bounds of reasoned decisionmaking." JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n. 8 (2002), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003) (quotation omitted). Therefore, as long as a rational basis is articulated and relevant factors are considered, the agency's action must be sustained. Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000),

Additionally, if the protestor can show any errors in the procurement process, the plaintiff must then show that it was “significantly prejudiced” by those errors. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005) (citations omitted). To meet its burden of proof, the

plaintiff must demonstrate the existence of prejudicial error or impropriety "by clear and convincing evidence." Cincom Sys. Inc. v. United States, 37 Fed. Cl. 663, 671 (1997) (internal citation omitted). To establish significant prejudice, the plaintiff must show that “there was a ‘substantial chance’ it would have received the contract award but for the errors . . .” Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (internal citation omitted); see also Four Points By Sheraton v. United States, 63 Fed. Cl. 341, 345 (2005).

B. Standard of Review for Contracting Officer’s Responsibility Determinations

No purchase or award may be made to an offeror unless the contracting officer makes an affirmative determination of responsibility for the awardee. See 48 C.F.R. § 9.103(a)-(b); Impresa, 238 F.3d at 1329; John C. Grimberg Co., 185 F.3d at1301. The prospective contractor always bears the burden of persuading the contracting officer that it is responsible. Geo-Con, Inc. v. United States, 853 F. Supp. 537, 543 (D.C. Cir. 1994); C & G Excavating v. United States, 32 Fed. Cl. 231, 244 (1994). In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer must make a determination of non-responsibility. 48 C.F.R. § 9.103(b); Impresa, 238 F.3d at 1334. To determine that an offeror is responsible, the Contracting Officer must be able to make an affirmative determination that the offer meets all of the following criteria:

> (a) Has adequate financial resources to perform the contract, or the ability to obtain them;
> (b) Is able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
> (c) Has a satisfactory performance record;
> (d) Has a satisfactory record of integrity and business ethics;

> (e) Has the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them;
> (f) Has the necessary production, construction, and technical equipment and facilities, or the ability to obtain them; and
> (g) Is otherwise qualified and eligible to receive an award under applicable laws and regulations.

48 C.F.R. § 9.104-1; see also 48 C.F.R. § 9.103(b).

Responsibility determinations are of necessity a matter of business judgment. United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 29 (2006); see also Hayes International Corp. v. United States, 7 Cl. Ct. 681, 685 (1985). A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance." News Printing Co. v. United States, 46 Fed. Cl. 740, 746 (2000). Indeed,

> correct appraisal of the responsibility of a prospective contractor is clearly in the self-interest of the procuring agency; there is a built-in stimulus against error. If the determination is erroneous, and the contractor ultimately defaults on his obligation, the Government will likely suffer substantial delay and inconvenience, even though the defaulting party will be liable to answer in damages, including perhaps reprocurement costs.

Precision Std., Inc. v. United States, 71 Fed. Cl. 216, 220 (2006) (quoting Keco Indus., Inc. v. United States, 203 Ct. Cl. 566 (1974); see also Iceland Steamship Co., Ltd. v. United States Dept. of Army, 201 F.3d 451, 462 (D.C. Cir. 2000).

Contracting officers are given wide discretion not only in making responsibility determinations but also in determining the amount of information that is required to make a responsibility determination. Impresa, 238 F.3d at 1334-35; Bender Shipbuilding & Repair Co., Inc. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002); John C. Grimberg Co., 185 F.3d at

1303 ("Although FAR 9.105-1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs."); United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 29 (2006).

II. The Contracting Officer Was Legally Required to Make An Affirmative Determination That OSG Was A Responsible Offeror For Contract N00033-06-R-5416, Including A Determination That OSG Had A Satisfactory Record of Integrity and Business Ethics

A. The Requirements of the Federal Acquisition Regulation

Pursuant to the Federal Acquisition Regulation ("FAR"), Ms. Fischer was required to make a determination that OSG was a responsible offeror to award the contract to OSG. The FAR clearly provides that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." 48 C.F.R. § 9.103(b) (2006); see also Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1361 (Fed. Cir. 2002); Southern Foods, Inc. v. United States, 76 Fed. Cl. 769, 782 (2007). In addition, the FAR sets forth the criteria that the contracting officer must find have been met for a prospective contractor to be responsible, which include having "a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104-1(d).

Therefore, by law, Ms. Fischer could not make an award to OSG without first affirmatively determining that OSG met all of the criteria set forth in 48 C.F.R. § 9.104-1, including a satisfactory record of integrity and business ethics. See Impresa, 238 F.3d at 1334-35 ("In making the responsibility determination, the contracting officer must determine that the contractor has 'a satisfactory record of integrity and business ethics.'"). Ms. Fischer

fulfilled her regulatory responsibility to review OSG's present responsibility, including OSG's record of integrity and business ethics, by conducting a thorough investigation, convening a panel of experts, consulting with representatives of the Department of Justice and the Coast Guard, reviewing and relying upon numerous references, posing oral and written questions to OSG, and providing OSG with the opportunity to provide any additional information that OSG believed was relevant.

However, although the FAR specifically provides that a contracting officer is required to make a responsibility determination, OSG contends that Ms. Fischer lacked authority to do so. Memo at 5-13. Specifically, OSG argues that because MarAd served as the lead agency for purposes of determining whether OSG, Inc., should be debarred from contracting with all Executive agencies, Ms. Fischer lacked authority to make a responsibility determination of OSG for contract N00033-06-R-5416. Memo at 4-13. OSG makes some amazingly broad assertions, while citing absolutely no legal authority. See Memo at 9 ("[t]he decision not to suspend or debar OSG, Inc. precludes such federal contracting officers from denying a contract award to OSG, Inc., or any of its subsidiaries on the basis of a lack of integrity and business ethics . . . .").

Essentially, OSG is asking the Court to hold that, as a policy matter, a contracting officer should not be allowed to make a responsibility determination for a given solicitation based upon a contractor's record of integrity and business ethics where a lead agency for debarment proceedings decided not to debar the contractor upon that same basis. See November 14, 2007 Hearing Transcript at 5, lines 16-20; id. at 24, lines 3-9. However, policy

arguments, such as the arguments advanced by OSG, are singularly inappropriate in a bid protest action, where the relevant inquiry is whether the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A). If OSG believes that it would be preferable for the requirements of the FAR to be changed or limited, OSG should advocate for an amendment to the FAR in an appropriate forum. In the context of a bid protest action, however, the relevant inquiry is whether the disappointed bidder has shown a clear and prejudicial violation of applicable statutes or regulations. See Banknote Corp. of Am., Inc., 365 F.3d at 1351. The relevant standard is not whether it would be preferable for the applicable statutes or regulations to be different.

OSG argues that the contracting officer's authority is "not precisely defined." Memo at 9. However, the FAR specifically states that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." 48 C.F.R. § 9.103(b). The FAR also clearly states that, to find a contractor responsible, the contracting officer must make an affirmative finding that the contractor has " a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104-1(d); 48 C.F.R. § 9.103(b). The Court must interpret this straightforward language by looking at the plain language and considering the terms in accordance with their common meaning. See Lockheed Corp. v. Widnall, 113 F.3d 1225, 1227 (Fed. Cir. 1997). Ms. Fischer not only had authority to make a responsibility determination, but was legally required to do so. See 48 C.F.R. § 9.103(b). Despite its presumptive tone and repeated assertions, OSG has no basis for its argument to the contrary. Its lengthy argument is

starkly devoid of authority to supplement OSG's policy preferences. Thus, the Court has been given no basis to adopt OSG's distorted legal position.

B. OSG Fails to Recognize That A Contracting Officer's Non-Responsibility Determination and A Debarment Are Not The Same

OSG's also fails to recognize the distinction between a debarment and a responsibility determination. Debarment is a serious sanction that is imposed through administrative proceedings in the public interest for the Government's protection. See 48 C.F.R. § 9.402; 48 C.F.R. § 9.406-3. When a contractor is debarred, no Executive agencies can solicit offers from, or award contracts to that contractor, unless an agency head determines that there is a compelling reason for such action. See 48 C.F.R. § 9.405. The FAR provides that, generally, debarment should not last for more than three years. See 48 C.F.R. § 9.406-4(a)(1). Therefore, in essence, a debarment decision is a decision that a contractor is not responsible to contract with ***any*** Executive agency, for ***any*** contract, for a period of up to three years.

In comparison, a responsibility determination is made by a particular contracting officer for a particular contract offered by a particular Executive agency, as a routine part of contracting procedure. See 48 C.F.R. § 9.103(b) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."). It is not the same as a debarment decision, because it affects only a single contract by a particular agency. See Peter Kiewitt Sons, Inc. v. U.S. Army Corps of Engineers, et al, 714 F.2d 163, 167 (D.C. Cir. 1983)(discussing "differences in focus, criteria, scope, and decisionmaking personnel" in responsibility and debarment decisions).

Because of the difference in scope and consequences, the legal standard for debarment decisions differs from the standard for responsibility determinations by contracting officers. The FAR requires that, in a debarment proceeding, the contractor be provided the opportunity to submit information and argument in opposition to the proposed debarment. 48 C.F.R. § 9.406-3(b)(1). Furthermore, in actions not based upon a conviction or civil judgment, where there are disputes of material fact, the contractor must be afforded an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person that the agency presents. 48 C.F.R. § 9.406-3(b)(2); see also 49 CFR § 29.840. However, a formal hearing process is not required in a responsibility determination. John C. Grimberg Co. v. United States, 185 F.3d at 1303; Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d 953, 968 (D.C. Cir. 1980).

In addition, according to the FAR, the existence of a cause for debarment does not necessarily require that the contractor be debarred. See 48 C.F.R. § 9.406-1 ("The existence of a cause for debarment, however, does not necessarily require that the contractor be debarred . . ."). Instead, the debarring official is to consider the seriousness of the contractor's acts or omissions and any remedial measures or mitigating factors in making a debarment decision. Id. In contrast, in the absence of information clearly indicating that a prospective contractor is responsible, the contracting officer simply must make a determination of nonresponsibility. 48 C.F.R. § 9.103.

The distinction between debarment and responsibility determinations is further

evidenced in cases in which contractors allege "de facto debarments."[9] A de facto debarment occurs when a firm is excluded from contracting because a contracting firm makes repeated determinations of non-responsibility, or a single determination of non-responsibility as part of a long-term disqualification attempt, without following the procedures for suspension or debarment set forth in the FAR. Mexican Intermodal Equipment, S.A. de C.V., B-270144; 96-1 CPD ¶ 31 (Jan. 31, 1996); Government Contract Advisory Servs., Inc., B-255918; B-255919, 94-1 CPD ¶ 181 (Mar. 8, 1994). The relevant inquiry in determining whether there has been an improper "de facto debarment" is whether a disappointed bidder has shown evidence of "a systematic effort by the procuring agency to reject all of the bidder's contract bids." CRC Marine Servs. v. United States, 41 Fed. Cl. 66, 87 (1998); Stapp Towing Inc. v. United States, 34 Fed. Cl. 300, 312 (1995). When this high standard not has been met, non-responsibility determinations do not constitute de facto debarments, and are permissible, clearly evidencing that debarment and responsibility are distinct. See Stapp Towing Inc., 34 Fed. Cl. at 312; Geo-Con, Inc. v. United States, 783 F. Supp. 1, 2 (D.C. 1992); PNM Constr. v. United States, 13 Cl. Ct. 745, 749-50 (1987); Quality Trust, Inc., B-289445, 2002 CPD ¶ 41 (Feb. 14, 2002).

---

[9] Despite the fact that both Ms. Fischer and MSC have stated that OSG would be considered for other solicitations with differing requirements in the future, OSG continues to insinuate that there has been a de facto debarment. See AR 3444, 3463-64; Memo at 10. In so doing, it appears that OSG now wishes to argue that counsel for defendant, who has no authority whatsoever to award any MSC contracts, is somehow de facto debarring OSG by taking the position that OSG has not established standing to challenge the responsibility of USS. See Memo at 10. That is absurd.

OSG's argument that Ms. Fischer could not find that OSG lacked a satisfactory record of business ethics and integrity to be responsible for contract N00033-06-R-5416, because MarAd did not find that OSG, Inc., lacked a satisfactory record of business ethics and integrity to perform ***any*** Government contract with ***any*** Executive agency makes no sense. Under OSG's theory, a contractor that had been found to have an adequate record of integrity and business ethics to be awarded a contract to sell Kleenex to the Government would also necessarily have an adequate record of integrity and business ethics for a contract to perform security services in Iraq. That would mean that the specific requirements of the contract and the agency could never be taken into account in determining whether a contractor had a satisfactory record of business ethics and integrity for a given contract. See AR 1782 ("The environmental crimes committed by OSG as described herein, go to the heart of MSC's requirement."). It would also mean that Ms. Fischer could not take into account whether OSG's integrity and business ethics posed any performance risks for the MSC contract. See 48 C.F.R. § 9.104-1. As a simple matter of common sense, this cannot be the case.

Similarly, OSG contends that because agencies are required to check the Excluded Parties List system prior to making an award, the decision of a debarring official preempts the authority of a contracting officer to make a responsibility determination. Memo at 10-11. This argument ignores the fact that an offeror is not listed in the Excluded Parties List System is necessary, but not sufficient, for a contracting officer to find the offeror responsible. See 48 C.F.R. § 9.104(a)-(g). OSG is correct that the contracting officer, without intervention from the agency head, could not award a contract to a contractor that had been debarred. See 48

C.F.R. § 9.405. What OSG has not, and can not establish, is that Ms. Fischer was required to award a contract to a contractor because the contractor had not been debarred.

Furthermore, it is unclear for whom OSG contends that "chaos and uncertainty" would result if a contracting officer made a responsibility determination based upon business ethics and integrity where a debarring official had not elected to debar a contractor upon that basis. Memo at 12-14. The purpose of imposing debarment is for the Government's protection. See 48 C.F.R. § 9.402; see also Burke v. Envtl. Prot. Agency, 127 F. Supp. 2d 235, 238 (D.D.C. 2001) ("Debarment . . . serves a remedial purpose of protecting the federal government from the business risk of dealing with an individual who lacks 'business integrity or business honesty.'"). But a contracting officer's determination that a contractor was non-responsible for a given contract would not result in less protection for the Government. The only "uncertainty" that would result would be for contractors with potential business ethics and integrity issues, who could not be assured that they would be found responsible for each and every Government contract based upon business ethics and integrity after passing the initial hurdle of a debarment proceeding.

### C. The Contracting Officer's Decision Was Consistent With MarAd's Recommendation

OSG also contends that it was irrational for Ms. Fischer to determine that OSG was a non-responsible offeror for contract N00033-06-R-5416, because MarAd had determined that OSG, Inc., should not be debarred from all contracts with Executive agencies based upon its record of integrity and business ethics. Memo at 13-15. As discussed above, a responsibility

determination for a given contract is not the same as a debarment decision.

However, OSG also ignores the fact that MarAd did not find that OSG, Inc., was responsible or simply that it should not be debarred. Rather, MarAd found that OSG, Inc., should be permitted to enter into a conditional settlement agreement in lieu of debarment, and that if OSG, Inc., violated the terms of its parole, it would constitute grounds for an immediate resumption of debarment proceedings. AR 1964. Furthermore, MarAd found that although OSG, Inc.'s corrective measures constituted a significant commitment to eliminate criminal conduct:

> [t]he effectiveness of these measures, however, remains to be seen. Consequently, a settlement agreement contingent upon the company's continued compliance with the terms of probation is warranted.

AR 1964.

Ms. Fischer also noted that OSG, Inc., had taken many positive steps, including increasing management oversight, the termination of shipboard offenders, equipment upgrades, and the ECP. AR 1771-73. However, like MarAd, Ms. Fischer also found that insufficient time had passed for OSG, Inc., to re-establish a satisfactory record of integrity and business ethics. AR 1779; 1781 ("while even newer compliance measures have been implemented by OSG, the effectiveness of these new measures has yet to be proven."). OSG cannot contend that Ms. Fischer's decision was arbitrary and capricious in light of MarAd's decision, when she reached essentially the same conclusion as MarAd.[10] The only distinction between MarAd's

---

[10] Furthermore, OSG fails to recognize that, even if responsibility determinations and debarment were the same ***and*** Ms. Fischer had made a determination contrary to MarAd, this

conclusion and Ms. Fischer's is that Ms. Fischer determined that she could not award a particular contract to OSG until the effectiveness of the remedial measures was further demonstrated.

Similarly, OSG's contention that Ms. Fischer's decision was arbitrary and capricious because she did not consult with MarAd lacks merit. Memo at 40-41. Ms. Fischer considered MarAd's May 18, 2007 memorandum in making her responsibility determination, and it is cited in her responsibility determination as a reference upon a number of occasions. See AR 1767; 1769; 1774; 1779. In fact, Ms. Fischer specifically cited the MarAd recommendation's comment that the effectiveness of OSG, Inc.'s remedial measures remained to be seen. See AR 1779; 1963-64. Ms. Fischer was the "arbiter of what, and how much information [s]he needs" to make a responsibility determination. Precision Standard, Inc. v. United States, 69 Fed. Cl. 738, 752 (2006) (citing John C. Grimberg Co., Inc., v. United States, 185 F.3d 1297, 1303 (Fed .Cir. 1999). Contrary to OSG's arguments, she was not required to place a call to MarAd officials in addition to considering MarAd's written recommendation.

---

would not demonstrate that the contracting officer's decision was not rational. Responsibility determinations are of necessity a matter of business judgment. United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 29 (2006); see also Hayes International Corp. v. United States, 7 Cl. Ct. 681, 685 (1985) ("the criteria for determining bidder responsibility are not readily susceptible to reasoned judicial review and essentially involve a matter of business judgment . . . ."). Therefore, responsibility determinations are inherently judgmental, and two people can reach opposite conclusions as to a firm's responsibility on the same facts, without either being unreasonable or in bad faith. S.A.F.E. Export Corporation, B- 208744, 83-1 CPD ¶ 437 (Apr. 22, 1983).

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

## IV. The Contracting Officer's Decision To Consider OSG, Inc.'s 33 Felonies In Her Responsibility Determination For OSG Was Rational

### A. Pursuant To The FAR, the Contracting Officer Properly Considered The Ethics and Business Integrity Of OSG, Inc.

Ms. Fischer properly considered the responsibility of OSG, Inc., in her responsibility determination for OSG, because in the context of the MSC contract, the past performance and integrity of OSG, Inc, could adversely affect the responsibility of OSG. Pursuant to 48 C.F.R. § 9.104-3, affiliated concerns are normally considered separate entities in determining whether the concern to perform the contract meets the applicable standards for responsibility. 48 C.F.R. § 9.104-3. However, a contracting officer shall consider an affiliate's past performance and integrity when they may adversely affect the prospective contractor's responsibility. Id. Bid protests have been denied in the past where a contracting officer properly found an offeror non-responsible based upon the environmental violations of an affiliate. See Standard Tank Cleaning Corp., B-245364, 92-1 CPD ¶ 3 at 3. (Jan. 2, 1992) ("Under the circumstances, it was reasonable for the Navy to consider the New York action and other environmental violations and alleged violations by affiliates of Standard Tank in a determination of Standard Tank's responsibility.").

Business concerns are affiliates of each other if, directly or indirectly, either one controls or has the power to control the other, or another concern controls or has the power to control both. 48 C.F.R. § 19.101. Control may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists. Id. Factors to be considered in determining whether affiliation exists include stock ownership, common ownership,

management, and contractual relationships. Id.

It appears that OSG concedes that OSG was subject to potential influence or control by OSG, Inc. See Memo at 44 ("[t]he CO was well aware that the offeror was Product Tankers, and Product Tankers was only subject to potential control . . . by United States flag subsidiaries and officers of OSG, Inc. . . ."). However, OSG now contends that Ms. Fischer should ignore the fact that OSG is subject to potential control by OSG, Inc., because OSG alleges that OSG is only subject to control by OSG, Inc., through United States flag subsidiaries of OSG, Inc. Memo at 14.

The relevant standard, however, is whether OSG, Inc., had the power to control OSG "directly or indirectly." See 48 C.F.R. § 19.101. Furthermore, OSG did not provide a corporate viability statement for a separate United States flag subsidiary of OSG, Inc. as part of its offer; it provided a corporate viability statement for OSG. See AR 4352-4407. OSG represented that its financial information was consolidated with OSG, Inc.'s, not some separate United States flag subsidiary of OSG, Inc. AR 1618. OSG presented a technical narrative for OSG, Inc., as part of its offer, not a technical narrative for some separate United States flag subsidiary of OSG, Inc. 1652-1659. OSG's performance was to be guaranteed by OSG, Inc., not some separate United States flag subsidiary of OSG, Inc. AR 1619.

Pursuant to the FAR, the requisiste control exists for purposes of affiliation where:

> Former officers, directors, principal stockholders, and/or key employees of one concern organize a new concern in the same or a related industry or field operation, and serve as its officers, directors, principal stockholders, and/or key employees, and one concern is furnishing or will furnish the other concern with subcontracts, financial or technical assistance, and/or facilities, whether for a fee

or otherwise.

48 C.F.R. § 19.101(6).

According to the Dun & Bradstreet report obtained by Ms. Fischer, the president of OSG, Captain Robert E. Johnston, is also the Senior Vice President and Head of Shipping Operations for OSG, Inc. AR 1665-1666; 3704. On October 30, 2006, a "self request" was made by Captain Johnston to establish a Dun & Bradstreet record for OSG. AR 3704. Not only was OSG's performance on the MSC contract guaranteed by OSG, Inc., but the contract tankers were to be time chartered to OSG through one of thirteen wholly owned subsidiaries of OSG, Inc. AR 1722, AR 1619. OSG was unable to provide financial information for OSG that was not consolidated with information for OSG, Inc. AR 1618. In addition, although OSG now contends that it is headquartered in Florida, OSG's offers for the solicitation all used the same New York address as OSG, Inc. See 1691, 4187, 1585-88, 1610, 1625-34; Memo at 28 n.9; see also 48 C.F.R. §19.101(6)(ii).

OSG also incorrectly claims that "no individuals responsible for the violations of OSG, Inc.'s foreign flag vessels have any involvement with Product Tankers, OSG, Inc.'s other United States flag operations, or the performance of the contract." Memo at 14. With OSG's offer, OSG included the resume of Captain Robert E. Johnston, the Senior Vice President and Head of Shipping Operations for OSG, Inc. AR 1665-1666; see 48 C.F.R. § 19.101(6)(I). Captain Johnston is also the Chief Executive and President of OSG. AR 3704. When OSG was found non-responsible for the solicitation, Captain Johnston called MSC to complain, and informed MSC that he might instruct OSG's attorneys to pursue this bid protest. AR 4165.

Although OSG contends that Captain Johnston was not "found to be responsible for any of the environmental violations committed by the foreign flag vessels," see Memo at 44, Captain Johnston was the same individual who was responsible for executing OSG, Inc.'s plea agreement. AR 1954. He was also responsible for executing the settlement agreement with MarAd on OSG, Inc.'s behalf. AR 4157-63. Captain Johnston was also responsible for executing the ECP that was incorporated into OSG, Inc.'s plea agreement, along with Department of Justice Attorneys from the Environmental Crimes Section of the Environment and National Resources Division, as well as several Assistant United States Attorneys. AR 2006-08. Defendant agrees that Captain Johnston was not found to have personally committed environmental violations, but OSG overlooks the fact that the Government found that "OSG's criminal conduct amounted to a serious failure of corporate and shore-side management." AR 1875.

The relevant inquiry, therefore, is whether it was rational for Ms. Fischer to believe that the 33 felonies and largest ever criminal penalty regarding deliberate vessel pollution of OSG, Inc., might adversely affect the present responsibility of its subsidiary, OSG, where the following conditions related to the subject solicitation: (1) OSG is so closely connected with OSG, Inc., that it was either unable or unwilling to provide separate technical and financial information, AR 1652-1659; 1618; 4352-4407; (2) OSG relied upon the technical narrative and performance references of OSG, Inc., in its offers, AR 1652-1687; AR 4570.; (3) OSG was to obtain the contract vessels through a time charter from one of thirteen wholly-owned subsidiaries of OSG, Inc., AR1579; (4) the contract vessels were to be technically managed by

OSG, Inc., AR 1833.; (5) OSG, Inc.'s plea agreement bound all subsidiaries of OSG, Inc., AR 1946-47; 4157; (6) OSG's performance was to be guaranteed by OSG, Inc., AR 1619; (7) OSG was required to participate in the ECP required by OSG, Inc.'s plea agreement, AR 1936, 1980; (8) despite being given numerous opportunities to do so, OSG did not assert that the responsibility of OSG, Inc., was not relevant, AR 1961, 2521-2874, 1807-64, 3790-3841; and (9) OSG had represented that it would be difficult to manage its vessels under different operating standards, AR 1833.

In light of OSG's own representation that the ECP required by OSG, Inc.'s plea agreement would apply to the MSC contract because the vessels would be technically managed by OSG, Inc., during the probation period, and that the tankers could not be managed under differing operational standards than the ships involved in OSG, Inc.'s 33 felonies, it is difficult to imagine how Ms. Fischer in good faith could not have considered the business integrity and ethics of OSG, Inc. See AR 1833. For these reasons, Ms. Fischer's decision to consider the responsibility of OSG, Inc., was entirely rational.

B. The Contracting Officer Recognized That OSG Was the Offeror

OSG argues that it was improper for Ms. Fischer to consider the 33 felonies of OSG, Inc., because OSG was the actual offeror. See Memo at 42-43. Ms. Fischer was fully aware that OSG was the offeror. See AR 3494; AR 1766 ("This is a Responsibility Determination for OSG Product Tankers LLC . . . ."). In fact, during her responsibility investigation, Ms. Fischer asked OSG:

"What is the relationship between OSG Product Tankers, LLC (the offeror

> under this procurement) and Overseas Shipholding Group, Inc and how will the ECP be applied under an MSC contract?"

AR 3783.

To the extent that Ms. Fischer evidenced any confusion regarding the offeror, it was confusion that was encouraged by OSG. As previously discussed, OSG met numerous requirements for the solicitation through submission of information for OSG, Inc., including a corporate viability statement and technical narrative for OSG, Inc. AR 4352-4407, 1652-87. Furthermore, as OSG itself admits, in its technical proposal, it included numerous employees of OSG, Inc.'s U.S. Flag Strategic Business Unit, and no but no resumes identified as belonging to employees of OSG Product Tankers, LLC. AR 1667-72.

In addition, during the responsibility investigation, OSG did not argue that Ms. Fischer was asking questions about the wrong entity. In fact, when Ms. Fischer sent a letter was addressed to "OSG Product Tankers, LLC," stating that she had questions regarding the present responsibility of OSG, she received a return letter on letterhead of "OSG Ship Management, Inc.," with the subject line, "Re: The Present Responsibility of Overseas Shipholding Group, Inc.," forwarding written responses that OSG, Inc., had provided to MarAd. AR 1961, AR 2101, AR 2521-2874, AR 3781. Similarly, although OSG was represented by counsel and had the opportunity to present whatever information it wished regarding its present responsibility, Ms. Fischer was not informed that she was asking about the wrong company. Instead, OSG chose to blame OSG, Inc.'s 33 felonies on the fact that the ships were foreign flag vessels crewed by foreign nationals, but never explained what the significance of this was, where OSG

itself represented that it would be difficult for OSG, Inc., to manage its ships under different operational standards. AR 1833, 3806.

## V. The Contracting Officer's Decision That She Could Not Find OSG Responsible, Despite OSG's Statement Regarding U.S. Flag Vessels, Was Rational

OSG argues that Ms. Fischer's decision lacked a rational basis because she failed to consider that United States flag vessels were not involved in OSG, Inc.'s crimes. In fact, in her responsibility determination, Ms. Fischer specifically noted that OSG had stated that none of the vessels involved in OSG, Inc.'s crimes were United States flag vessels, and the ships were not crewed with U.S. mariners. See AR 1775. Therefore, OSG's argument necessarily is that Ms. Fischer's business judgment regarding the significance of this fact was incorrect, not that Ms. Fischer failed to consider it.[11] However, this Court has found that the business judgments of contracting officers in making responsibility determination are not "subject to reasoned judicial review." See YET Servs. Corp. v. United States, 28 Fed. Cl. 366, 394 (1993); Hayes International Corp. v. United States, 7 Cl. Ct. 681, 685 (1985). The only relevant inquiry is whether Ms. Fischer considered the relevant factors and whether her decision was "within the bounds of reasoned decisionmaking." Making Consulting Corp. v. United States, 78 Fed. Cl. 715, 722 (2007) (internal citations omitted).

[11] OSG's attempts to mischaracterize the record are startling. For example, citing page 3554 of the Administrative Record, OSG contends that Ms. Fischer "fully recognized the importance" of the fact that OSG's violations had not occurred on U.S. flag ships. Memo at 37 In reality, Ms. Fischer was simply summarizing what representatives of OSG stated during their meetings with MSC, and represented nothing more than: "[t]hey [OSG] asserted that the vessels involved in this violation were not U.S. flag ships." AR 3554.

OSG misrepresents the degree to which OSG itself represented that the distinction between United States flag ships and foreign flag vessels was relevant. OSG itself believed that the past performance of OSG, Inc., or foreign subsidiaries of OSG, Inc., were relevant, as it elected to provide past performance information for non-Jones Act vessels. AR 4570. In addition, in OSG's 46 page long response to Ms. Fischer's written questions, the issue was explicitly discussed once. AR 1821, 1808-53. OSG also asserted that:

> it would be difficult for OSG to manage its vessels under differing operational standards. Because the ECP applies to all ships managed by OSG, and because it is an essential part of OSG's SMS [Safety Management System], it will be implemented on those ships operating under the MSC contract in exactly the same manner as any other ship technically managed by OSG.

AR 1833; see also AR 1800. Furthermore, OSG bragged that in 2006, OSG, Inc., called for a "fleet-wide stand down" to ensure environmental compliance, not a "foreign-flag vessel stand-down." AR 1820-21. The responsibility panel concluded that:

> During their oral presentation, OSG stated that their organization is "One OSG" - not divided into US v. foreign flag - and they are treated the same for their ECP and management system. Therefore, the company's business ethics are applicable across their entire fleet.

See AR 3948, 3938.[12]

Furthermore, Ms. Fischer's decision was inherently rational. If OSG, Inc., had the same

---

[12] OSG argues that this "penalizes" OSG for participating in the ECP, and that "it would make more sense to penalize Product Tankers for not implementing this ECP." Memo at 41. Of course, if OSG did not implement the ECP, there would indeed be penalties, as OSG was required to do so under the Plea Agreement. AR 1936, 1980. Furthermore, Ms. Fischer and the panel were not penalizing OSG for participating in the ECP required by the Plea Agreement, but rather, recognizing that the operational standards of OSG, Inc., were consistent company-wide.

operating standards for United States flag and foreign flag vessels, there was no reason that Ms. Fischer should be unconcerned about 33 felonies that occurred on foreign flag vessels. The Government did not determine that United States flag vessels or subsidiaries should be excluded from OSG, Inc.'s plea agreement, or the ECP incorporated into that plea agreement. Nor has OSG explained why foreign crews would be inherently more likely to want to commit felonies and harm the environment. It cannot be true that all foreign crew members necessarily operate with blatant disregard for the environment, as the whistle blowers who disclosed OSG, Inc.'s crimes were themselves foreign crew members. AR 2030-2044. Ms. Fischer's business judgment that she could not affirmatively find OSG to be a responsible offeror, despite the fact that OSG stated that only foreign flag vessels were involved in the 33 felonies, was rational.

## VI. The Contracting Officer's Determination That OSG Had Not Acknowledged The Role Of OSG, Inc.'s Management Was Rational

In finding that she could not determine that OSG had a satisfactory record of integrity and business ethics, Ms. Fischer found that OSG had "failed to adequately address the role of its upper management in relation to the criminal activities." AR 1775. She also found that, "[overall, OSG did not satisfactorily address its inability to recognize the criminal actions taking place, despite the frequency of the violations, spread across twelve known vessels, over an extended period of time." AR 1776. What Ms. Fischer considered to be "satisfactory" or "adequate", is, of course, within the purview of Ms. Fischer's business judgment. See Precision Standard, 71 Fed. Cl. at 219.

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

OSG asserts that Ms. Fischer incorrectly alleges that the senior management of OSG, Inc., was involved in OSG, Inc.'s criminal activities, in an attempt to construe her decision as unreasonable. Memo at 21-22. Ms. Fischer did not assert that OSG, Inc.'s upper management directly planned or participated in OSG, Inc.'s criminal activity. AR 1773-75. However, she did recognize that management had an obligation to ensure environmental compliance, and failed to do so. In fact, OSG itself admitted that, while OSG, Inc.'s shore-side management did not direct the environmental violations, there was an "inadequacy of supervision and management controls." AR 1829.

In reaching her decision, Ms. Fischer relied upon numerous references that supported her decision. She specifically relied upon:

- The Joint Factual Statement submitted by OSG, Inc., and the Government, which provided that "While [] crew members engaged in the knowing and deliberate violation of the law, Defendant's shore-side management failed to provide and exercise sufficient supervision and management controls to prevent or detect criminal violations by its employees." AR 1773-74; 1889.
- The discussion in the Joint Factual Statement of an instance where "at least three top ship management personnel" had knowledge of a pollution incident onboard the M/T Neptune in March 2002, but did not investigate the incident or report it to the flag state. AR 1774, 1897-1900.

- MarAd's recommendation regarding the potential debarment of OSG, Inc., which stated that "OSG also accepts responsibility for the management failures which allowed such pervasive conduct to flourish undiscovered." AR 1773-74; 1963.
- MarAd's finding that: "The frequency and duration of wrongdoing and its pervasiveness among high-ranking officials who directed subordinates to break the law, are of particular concern since these facts demonstrate a culture that disregards the law with impunity." AR 1773-74; 1962.[13]
- The Government's finding in the Government Sentencing Memorandum that "Defendant's criminal conduct did not involve a solitary violation that might be explained as a single instance of bad judgment or the acts of a rogue employee. The violations at issue in this case were so systematic, repetitive, and longstanding that the criminal conduct amounted to a serious failure of corporate and shore-side management. OSG and its shore-based managers are ultimately accountable for this failure. It would not be accurate to suggest that OSG's convictions are due to the bad acts of only a few company employees." AR 1773-74; 1875.
- The Government's finding in the Government Sentencing Memorandum that "Defendant's shore-side management failed to provide and exercise sufficient

[13] OSG complains that this statement refers to the management on OSG, Inc.'s ships, not shore-side management. Memo at 21. However, the statement is referenced in a section of Ms. Fischer's determination entitled "The Role of OSG Management," not "The Role of OSG Shore-Side Management." AR 1773. Furthermore, OSG cannot honestly contend that OSG, Inc.'s shore side management bore no responsibility for allowing the existence of "a culture that disregards the law with impunity" onboard its vessels. AR 1962.

supervision and management controls and resources to prevent or detect criminal violations by its employees. AR 1773-74; 1876.

Amazingly, OSG contends that Ms. Fischer should not rely upon the Government Sentencing Memorandum because it is an "advocacy document." [14] Memo at 22. The Government Sentencing Memorandum is no more an advocacy document than the responses that OSG prepared to Ms. Fischer's questions regarding OSG's present responsibility. OSG has presented no valid reason that Ms. Fischer would not be entitled to rely upon a sentencing memorandum prepared by the Department of Justice.[15] In fact, elsewhere in OSG's memo, OSG argues that Ms. Fischer was wrong because she allegedly did not place sufficient reliance upon the recommendations of the Department of Justice. See Memo at 22. Apparently, it is OSG's contention that it is irrational for Ms. Fischer to rely upon unfavorable information from the Department of Justice, and simultaneously irrational for her not to rely upon favorable information from the Department of Justice.

Ms. Fischer was rationally concerned that the management of OSG, Inc., was unable to recognize that the illegal actions were taking place, despite the number of occurrences, and the

---

[14] OSG also complains that the Government Sentencing Memorandum, by its very nature presents unproven argument and allegations. Memo at 22. Of course, the Government did not have the opportunity to "prove" these allegations in Court, because OSG, Inc., pled guilty.

[15] In OSG's Memo, OSG complains that Ms. Fischer mischaracterizes the GSM as a finding of the Court. Memo at 22. However, OSG has failed to show how such an error would be prejudicial, because Ms. Fischer would be equally entitled to rely upon a filing by the Department of Justice.

cost savings from not discharging the oily wastes and mixtures legally. AR 1776. As previously discussed, the Joint Factual Statement provided that:

> One benefit of Defendant's MARPOL related crimes was financial. Costs avoided included paying for the cost of offloading sludge and oily waste in port, and, perhaps most significantly, the time (and related costs) needed to make arrangements to offload waste in port.

AR 1890. In light of these significant cost savings, Ms. Fischer questioned why OSG, Inc.'s management failed to recognize that something was wrong. AR 1776, 1779. She also noted that OSG did not cite monetary causes as part of its root cause analysis for the environmental violations, although OSG chose to separate the environmental and operating budgets of its ships after the plea agreement. [16] AR 1774. These issues also raised concerns for Ms. Fischer regarding the role of OSG, Inc.'s management. AR 1774-1776.

OSG argues that the contracting officer's decision was arbitrary and capricious because a member of the responsibility panel, James Fernan, sent Ms. Fischer an e-mail stating, "[t[his isn't another Enron or Tyco where the crimes were deliberately committed by senior management. . . ." AR 3932; Memo at 21. First, Ms. Fischer never found that the crimes were committed deliberately by senior management. Second, the purpose of the panel was to provide comments and observations to Ms. Fischer for use as "she deem[ed] appropriate." AR 1957. The decision was ultimately Ms. Fischer's, not the panel's. 48 C.F.R. § 9.103(b). Of

---

[16] OSG contends that this was done to eliminate any incentive based upon *perceived* financial benefits. App. at 5. However, this is not what OSG's response to Ms. Fischer actually said. See AR 3802 ("In fact, OSG has removed any incentive for shore side managers, vessel operators, or sea staff to improve the financial bottom line at the expense of environmental compliance.").

course, OSG cites the finding of a single panel member, and ignores the fact that other panel members found that OSG, Inc.'s 33 felonies evidenced a management failure. See AR 3925.

Furthermore, OSG's argument amounts to no more than a disagreement with the manner in which Ms. Fischer weighed the facts and exercised her business judgment in determining that she could not find that OSG had a satisfactory record of integrity and business ethics, pursuant to 48 C.F.R. § 9.104-1. The Court cannot substitute its judgment for that of the contracting officer in making responsibility determinations. Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002); see also John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999). Furthermore, the relevant inquiry is not whether a different conclusion could have been reached based upon the facts in the record, but rather, whether the decision had no rational basis. See Mgmt. Solutions & Sys. v. United States, 75 Fed. Cl. 820, 827-28 (2007). OSG cannot meet this burden, in light of the substantial record evidence cited by Ms. Fischer.

## VII. The Contracting Officer's Determination That Insufficient Time Had Passed To Establish The Effectiveness of OSG, Inc.'s ECP Was Rational

Ms. Fischer rationally found that insufficient time had passed to establish that OSG, Inc.'s ECP would be effective. Specifically, Ms. Fischer found that:

> due to the proximity in time to OSG's criminal activities and the creation of OSG's most recent compliance measures (See OSG's ECP, Ref. U) and award of this contract, it is unknown as to whether the new measures will be effective or whether OSG will repeat its prior failures.

AR 1777. She also commented that "not enough time has passed to determine the effectiveness of these measures," and that "[a]lthough[] the remedial actions OSG is undertaking, highlighted by its state-of- the- art ECP, are significant, the fact remains that there are too may uncertainties as to the ultimate effectiveness of OSG's corrective measures." AR 1780, 1883.

Although Ms. Fischer's findings are consistent with the May 18, 2007 MarAd memo, which found that the effectiveness of OSG, Inc.'s remedial measures "remain[ed] to be seen," OSG takes contention with Ms. Fischer's findings, and argues that she "wrongly asserts that the ECP and its various components have only been recently implemented." See AR 1964, Memo at 24. In fact, Ms. Fischer found that not enough time had passed to establish the effectiveness of the ECP, not that it had been recently implemented. See AR 1777, 1780, 1783. Furthermore, Ms. Fischer considered to be "recently" for the purposes of her responsibility determination in relation to the subject procurement would fall within the purview of her business judgment.

OSG contends that Ms. Fischer's decision was irrational because parts of the ECP had been in place since 2005. See Memo at 24 ("many of the ECP components have been in place for a year or more."). First, parts of the ECP being in place is not the same as the entire ECP being in place. See AR 1837 ("The ECP has already been implemented in large part . . . ."). Second, both the responsibility panel and Ms. Fischer recognized that OSG, Inc., had created new compliance measures in 2005. AR 1830, 1777, 1776 n.8 ("The JFS states that after OSG learned of MARPOL violations on four of its vessels between July and September 2005, it

began taking new compliance measures . . . ."). However, Ms. Fischer was concerned because, even after new compliance measures and control technology had been put in place, the new equipment was tricked and violations continued. AR 1777.

Ms. Fischer's determination that not enough time had passed to determine the effectiveness of the ECP is supported by the following substantial evidence in the record:

- The MarAd recommendation, which was specifically cited by Ms. Fischer, and which stated that:

  > The corrective measures set forth in the Plea and ECP and in the supplementary materials submitted to this office by OSG constitute a significant corporate commitment to combat and eliminate the criminal conduct engaged in by so many of its employees. The effectiveness of those measures, however, remains to be seen.

  AR 1964.

- The Joint Factual Statement, which notes that "[n]otwithstanding the fact that Defendant placed control technology on its ships . . . the new anti-tricking equipment was itself tricked by senior ship engineers shortly after installation." AR 1777, 1893.

- The Joint Factual Statement also provides that OSG learned of additional violations in April 2006 that had occurred in November 2005, January 2006, and March 2006. AR 1893.

- The Joint Factual Statement identifies a number of specific instances where new compliance equipment was installed on OSG, Inc.'s, ships, but was circumvented by crew members shortly thereafter. AR 1903, 1904-05.

- The Joint Factual Statement states that as recently as January 2006, violations occurred aboard the M/T Overseas Alcesmar. AR 1906-07.
- The Joint Factual statements references violations from the M/T Cabo Hellas, through March 20, 2006. AR 1911-12.

For these reasons, Ms. Fischer rationally concluded that:

> If the preventative steps taken by OSG in the past did not work, I cannot be confident similar preventative measures will work in the future. Again, due to the proximity in time to the subject procurement, OSG lacks a record of compliance.

AR 1777. Based upon the substantial record evidence cited by Ms. Fischer, her determination was rational.

VIII. The Contracting Officer's Decision That She Could Not Make An Unqualified Determination That OSG Could Comply With the Performance Schedule Was Rational

OSG also argues that Ms. Fischer determined that OSG would be not be able to comply with the performance schedule, and that this determination was irrational. Memo at 27-32; 34-36. OSG insinuates that Ms. Fischer has the burden of proving that OSG could not possibly comply with the performance schedule. Id. This is not the case; Ms. Fischer was required to make an affirmative determination that OSG ***could*** comply with the schedule, and in the absence of information indicating that OSG ***could*** comply, she was obligated to find OSG non-responsible. See 48 C.F.R. § 9.103. Furthermore, OSG overlooks the fact that, to find OSG responsible, Ms. Fischer was required to find that ***all*** of the criteria in 48 C.F.R. § 9.104-1 had been met. Therefore, to demonstrate prejudicial error, such that OSG would have a substantial

chance of receiving the award but for the alleged error, OSG would need to demonstrate that Ms. Fischer's findings regarding OSG's integrity and business ethics were also irrational.

A. The Contracting Officer's Decision That She Could Not Make an Unqualified Determination that OSG Would Be Able to Obtain A Security Clearance Was Rational

Contrary to OSG's representations, Ms. Fischer did not determine that OSG could not obtain a facilities clearance by 2010. See Memo at 27. Rather, she determined that OSG's ability to obtain a facilities clearance was "uncertain." AR 1768. In the absence of information that clearly indicated that OSG was responsible, Ms. Fischer was required to make a determination of non-responsibility. 48 C.F.R. 9.103(b). Therefore, if Ms. Fischer could not affirmatively determine that OSG could obtain a facilities clearance, she could not award the contract to OSG. See 48 C.F.R. § 9.103(a)-(b). Essentially, OSG is asking the Court to find that it was irrational for Ms. Fischer to find that it was not absolutely certain that OSG would be able to obtain a facilities clearance.

First, OSG argues that Ms. Fischer's decision lacked a rational basis because it was based upon two telephone inquiries to DSS.[17] However, a contracting officer has wide discretion in determining the amount of information required to make a responsibility determination. Impresa, 238 F.3d at 1334-35; Southern Foods, Inc. v. United States, 76 Fed.

[17] Defendant is not certain why OSG has characterized Ms. Fischer's inquiries to DSS as being "hasty" or "made at the last minute." See Memo at 27. Ms. Fischer's inquiries to DSS were made on May 16, 2007. See AR 4134-35. Ms. Fischer determined that she could not make an unqualified determination that OSG was a responsible offeror over a month later, on June 19, 2007. See AR 1783.

Cl. 769, 782 (2007). OSG has not articulated any reason that it would be inappropriate for Ms. Fischer to inquire about a facilities clearance with the agency responsible for clearing industrial facilities and facilitating security clearance processes.

Next, OSG contends that Ms. Fischer's inquiry as to whether OSG, Inc., held a facility clearance was "irrelevant." See Memo at 28. However, the National Industrial Security Program Operating Manual ("NISPOM") governing the granting of facilities clearances provides that as a general rule, a parent corporation must have a facilities clearance at the same, or higher, level as a subsidiary. See NISPOM § 2.109. As OSG notes in its memorandum, it is possible for a cognizant security agency [CSA] to determine that an exception should be made. See Memo at 30; see also NISPOM § 2.109. However, there is absolutely no guarantee that this would happen. NISPOM § 2.109. Accordingly, OSG, Inc.'s ability to obtain a facilities security clearance was certainly not "irrelevant," especially where, as here, the tankers would be technically managed by OSG's parent, OSG., Inc. See AR 1833.

OSG also complains that Ms. Fischer did not pose questions to OSG regarding OSG's ability to obtain a secret facility clearance. See Memo at 27. However, Ms. Fischer was not obligated to seek additional or clarifying information from OSG prior to making a non-responsibility determination. John C. Grimberg Co., 185 F.3d at 1303. She was authorized to make a non-responsibility determination based on the existing record, without giving OSG an opportunity to explain or defend against adverse evidence. Id.

OSG also argues that Ms. Fischer's statement that there would potentially be a lengthy adjudication process was incorrect, because OSG contends that there is no process at DSS or

referenced in the NISPOM with regard to hearings and appeals for facility clearances. Memo at 31. Assuming this to be the case, OSG has still not demonstrated that it was arbitrary, capricious, or irrational for Ms. Fischer to rely upon the advice of an agent of DSS, the organization responsible for facilities clearances. The relevant inquiry is not whether the information that Ms. Fischer relied upon was correct, but whether her decision was rational in light of the information that she obtained. See Westech International, Inc. v. United States, __ Fed.Cl.__, 2007 WL 3307320 (Oct. 24, 2007) ("Because the standard requires this court to review the reasonableness of the agency's decision, instead of its correctness, the court 'must exercise restraint in examining information that was not available to the agency.'") (citing ARINC Eng'g Servs., LLC v. United States, 77 Fed. Cl. 196, 200-01 (2007)).

Furthermore, even if Ms. Fischer were incorrect regarding the hearing and appeals process, it is unclear how this would help OSG's case. It would simply mean that if DSS determined that OSG was ineligible to hold a security clearance, there would be no avenues for appeal, there would be nothing that OSG could do about the determination, and OSG would be ineligible for the contract. Therefore, OSG has not demonstrated that it was prejudiced because, absent this alleged error, there was a substantial chance that OSG would receive the award. See Ironclad/EEI v. United States, 78 Fed. Cl. 351, 357 (2007).

OSG also argues that OSG, Inc. could definitely obtain a facilities security clearance because other companies have committed crimes and maintained their clearances. Memo at 31. OSG alleges that Ms. Fischer "ignored the fact" that these companies maintained their clearances, despite the fact that there is no information regarding these companies in the

administrative record. Id. Nor is it clear whether the standard for being issued a facilities clearance is the same as the standard for maintaining a clearance once criminal activities have been committed. [18]

Essentially, OSG is asking the Court to hold that OSG would definitely have been granted a security clearance, despite the 33 felony convictions of its parent corporation. However, the United States Supreme Court has held that "the question whether to grant a security clearance is a sensitive and inherently discretionary judgment call . . . committed by law to the appropriate agency of the Executive Branch." Dep't of the Navy v. Egan, 484 U.S. 518, 527 (1988); see also Hesse v. Dep't of State, 217 F.3d 1372, 1375-76 (Fed. Cir. 2000). Not only has OSG failed to establish that Ms. Fischer's decision was irrational, but OSG is asking the Court to make a determination that is prohibited by the separation of powers.

B. The Contracting Officer's Decision That The Effect of A Parole Violation Upon The Performance Schedule Was Unknown Was Rational

Ms. Fischer found that the effect of a violation of OSG, Inc.'s parole upon the performance schedule was uncertain. OSG now contends that this decision lacked a rational basis, and evidences "a lack of understanding or misunderstanding of the debarment rules." Memo at 34-36. OSG contends that Ms. Fischer should have been unconcerned, because

[18] For similar reasons, OSG's arguments regarding OSG Car Carrier, Inc., are unavailing. Memo at 30. This information was not before Ms. Fischer, Ms. Fischer was not obligated to search out this information, and it is not clear what OSG Car Carrier does, whether its ships are technically managed by OSG, Inc., and whether OSG Car Carrier, Inc., was issued its clearance before or after the 33 felony convictions of OSG, Inc.

MarAd would have needed to name OSG in OSG, Inc.'s debarment proceedings.[19] Memo at 35. However, this does not establish that Ms. Fischer's concerns were irrational, as defendant has already extensively discussed the relationship between OSG, and OSG, Inc., the plea agreement, and the ECP, and will not restate those arguments here. In addition, Ms. Fischer's concerns were rational because if OSG were debarred during contract performance, the agency head could direct that the contract be terminated. 48 C.F.R. § 9.405-1(a).

Furthermore, what OSG fails to mention is that OSG made no effort whatsoever to explain the debarment rules when specifically asked by Ms. Fischer what would happen if OSG, Inc., violated its probation. During a responsibility meeting with OSG and counsel for OSG, the responsibility panel specifically asked what would happen if there were an intervening environmental incident before the start of contract performance. AR 3917. Although OSG was represented by counsel and had every opportunity to do so, OSG did not take the position, as it subsequently has in its motion for judgment upon the administrative record, that a debarment of OSG, Inc., would have no effect upon the performance of the contract. Instead, OSG responded:

> OSG can't guarantee what actions MarAd and EPA are going to take. Since OSG has implemented significant changes in our management and operations systems, we don't expect that they will debar us. The EPA generally prefers to allow the company to continue doing business with a new system in place rather than debarring them. Mr. Pavlick notes that OSG has cooperated greatly with the government.

---

[19] OSG appears to agree that, for purposes of debarment, OSG and OSG, Inc., are affiliates. See Memo at 35.

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

AR 3917. OSG's failure to present legal arguments regarding its present responsibility in response to a specific question from MSC cannot form the basis for a decision that Ms. Fischer's decision was irrational.

OSG also ignores the fact that potential debarment was not Ms. Fischer's only concern. She was also concerned about what would happen if OSG, Inc., violated the terms of its parole with the Court. AR 1769. As a condition of OSG, Inc.'s plea agreement, OSG, Inc., was placed upon organizational probation for three years. AR 1936. If OSG, Inc., breached any aspect of the Plea Agreement, the Government could pursue "all remedies available under the law." AR 1949. It was rational for Ms. Fischer to have concerns regarding MSC's ability to obtain the tankers if OSG, Inc., breached its Plea Agreement with the Department of Justice, because the consequences were uncertain.

OSG also argues that Ms. Fischer's determination was irrational because the tankers were to be built and owned by an affiliate of APSI. Memo at 45. For this reason, OSG contends that the vessels would be built regardless of whether OSG, Inc., violated its probation, and therefore, there was no reason for Ms. Fischer to be concerned about the performance schedule. Id. In the abstract, however, MSC is not particularly interested in whether the tankers will be built. MSC is interested in whether the tankers will be available to MSC under the contract. Under OSG's offer, MSC would have access to the tankers through OSG and OSG, Inc., not APSI. AR 1722-23. There was to be no privity of contract between APSI and MSC, and as Ms. Fischer noted in her responsibility determination, "it is at the sole discretion of OSG of how to allocate the[] vessels to meet the laydays." AR 1723, 1768. Therefore, Ms.

Fischer's determination that MSC could potentially encounter difficulty obtaining the tankers if OSG, Inc., violated its probation was entirely rational.

IX OSG Has Failed To Establish That Any Errors of Fact Were Material, Such That The Contracting Officer's Decision Was Irrational, Or Prejudicial, Such That OSG Would Have A Substantial Chance of Receiving The Award But For the Error

OSG contends that because Ms. Fischer made erroneous statements of fact, her determination that she could not affirmatively find that OSG had established a satisfactory record of integrity and business ethics lacks a rational basis. Memo at 22-23. Ms. Fischer's decision cannot be overturned simply because she made minor misstatements of fact. In fact, the Federal Circuit has held that "[o]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations." Andersen Consulting v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992); Metcalf Constr. Co., Inc. v. United States, 53 Fed. Cl. 617, 622 (2002) ("minor errors or irregularities, i.e., harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision.").

In order to sustain OSG's protest, the Court would be required to find that, based upon these errors, Ms. Fischer's decision that she could not affirmatively determine that OSG had a satisfactory record of integrity and business ethics was completely irrational. Furthermore, it is insufficient for OSG to establish that Ms. Fischer made an error - instead, OSG must demonstrate that any errors were prejudicial, such that there was a substantial chance that OSG would have received the award but for the errors. Moore's Cafeteria Servs. v. United States, 77 Fed. Cl. 180, 187 (2007); see Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1561 (Fed. Cir. 1996).

A. OSG Has Not Established That It Is Relevant Whether OSG Is An Indirect Or Wholly Owned Subsidiary of OSG, Inc.

OSG argues that Ms. Fischer's decision lacked a rational basis because she stated that OSG was a wholly-owned subsidiary of OSG, Inc., when OSG is an indirect subsidiary of OSG, Inc. Memo at 26, 42. OSG conveniently fails to mention that Ms. Fischer stated that OSG was a wholly owned subsidiary of OSG, Inc., in the section of her responsibility determination discussing whether OSG had adequate financial resources to perform the contract, not whether OSG had a satisfactory record of integrity and business ethics. AR 1767.

In response to Ms. Fischer's question regarding the relationship between OSG and OSG, Inc., during her responsibility determination, without further explanation of any relevance to OSG's responsibility, OSG responded, "OSG Product Tankers, LLC is an indirect subsidiary of Overseas Shipholding Group, Inc."[20] AR 1833. OSG did not explain the difference between an indirect and wholly-owned subsidiary.[21] What OSG has also failed to explain, either in this bid protest or to Ms. Fischer, however, is the relevance of being an indirect as opposed to a wholly owned subsidiary for purposes of OSG's responsibility determination. OSG had the burden to demonstrate that it was responsible despite the 33

[20] MSC's Business Analysis Committee Report dated March 30, 2007 stated that OSG was a "wholly owned subsidiary of Overseas Shipholding Group, Inc." AR 3695.

[21] Nor is there any reason to believe that, as a non-lawyer, Ms. Fischer would have an independent basis to know the difference between an indirect and wholly owned subsidiary. Counsel for defendant needed to conduct legal research and examine OSG's Rule 7.1 Disclosure Statement in this case (which was not before Ms. Fischer) to understand the difference in corporate structure. It was OSG's failure to not provide this information and explanation to the contracting officer if it believed that this distinction was important. It cannot not claim that the contracting officer failed to find these technical details.

felonies of OSG, Inc., and OSG's failure to carry this burden does not demonstrate that Ms. Fischer's decision was irrational. See Geo-Con, Inc., 853 F. Supp. at 543.

In fact, OSG has still not explained why being an indirect, as opposed to wholly owned, subsidiary is significant and relevant. To prevail in this bid protest action, OSG must provide evidence of "not only a ***significant error*** in the procurement process, but also that the error prejudiced it." See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (emphasis added). OSG does not dispute that OSG is a subsidiary of OSG, Inc.[22] OSG does not contend that OSG is not subject to potential control by OSG, Inc., simply because it is an indirect, as opposed to wholly owned, subsidiary. Furthermore, OSG has not contended that the tankers would not be technically managed by OSG, Inc, because OSG is an indirect subsidiary. AR 1833. Nor has OSG demonstrated that indirect subsidiaries were not bound by OSG, Inc.'s plea agreement. AR 1946.

In addition, OSG has not contended that it provided a technical narrative or financial information for some other intermediate level of corporate parent. See AR 4352-4407; 1619. Nor has OSG explained why additional layers of corporate separation should necessarily give Ms. Fischer any additional assurance, where each of the 12 vessels involved in the felonies at issue in OSG, Inc.'s plea agreement was owned by a separate, wholly-owned subsidiary of OSG, Inc., and operated by a wholly owned subsidiary management company. AR 1868. For

---

[22] By definition, a subsidiary is a company in which another corporation, a parent corporation, owns a majority of the shares of its stock, and the parent corporation has working control of the subsidiary through stock ownership . See 18 Am. Jur. 2d Corporations § 41 (2007).

these reasons, OSG has completely failed to establish that Ms. Fischer's statement that OSG was a "wholly owned subsidiary" demonstrated that her decision lacks a rational basis, or is a basis to overturn the award.

B. The Fact That OSG, Inc., Had Been On Probation For Its Thirty-Three Felonies For Three, As Opposed to Zero Months Does Not Establish That Ms. Fischer's Decision Lacked A Rational Basis

OSG contends that Ms. Fischer's responsibility determination lacks a rational basis because she states that OSG, Inc.'s probation had not begun as of June 19, 2007, due to delays in a related Whistleblower action, when in fact, OSG, Inc.'s probation had begun less than three months earlier, on March 21, 2007. Memo at 22. Although this is a one sentence statement in a responsibility determination that is 18 pages long, and one statement among many referenced in support of one sub-heading out of eight describing Ms. Fischer's concerns, OSG contends that Ms. Fischer "[u]sed it as a primary basis for her conclusion" and "relied heavily" upon it. Memo at 22-23. It appears that OSG contends that, if this fact is in error, Ms. Fischer's determination that she could not affirmatively find that OSG had a satisfactory record of integrity and business ethics lacks a rational basis. Memo at 22-23.

Ms. Fischer's relevant conclusion was that insufficient time had passed for OSG to reestablish a record of integrity and business ethics, not that OSG, Inc.'s probation had not yet begun. In reaching this conclusion, Ms. Fischer also found that:

> The shortness of time between the criminal violations and the award of solicitation N00033-06R-5416 does not allow sufficient time for OSG to reestablish a record of integrity and business ethics.

AR 1779. Ms. Fischer also found that:

in considering the "corrective measures set forth in the Plea and ECP," MarAd commented that the "effectiveness of these measures remains to be seen."
Id.

The relevant inquiry for the Court, however, is not whether there are any minor factual errors in Ms. Fischer's decision, but whether the decision lacks a rational basis, or whether any errors prejudiced OSG such that there was a substantial change that OSG would have received the award if the error were corrected. See Axiom Res. Mgmt. v. United States, 78 Fed. Cl. 576, (2007). After OSG, Inc., committed 33 felonies relating to environmental violations over a period of several years, the passage of zero months as opposed to three months of probation served for those felonies does not render Ms. Fischer's decision arbitrary or capricious. See AR 1967-69; AR 1888-1915; AR 1918-20.

C. Ms. Fischer's Statement Regarding OSG, Inc.'s Audits Does Not Demonstrate That Her Decision Lacked A Rational Basis

OSG also contends that Ms. Fischer's decision lacks a rational basis because she incorrectly stated that OSG, Inc., had performed only 15 percent of its required initial audits under the plea agreement for its 33 felonies. Memo at 23-24. At the outset, Ms. Fischer's relevant finding was that insufficient time had passed for OSG to reestablish a record of integrity and business ethics, not that a specified percent of OSG's fleet had been audited. This finding was based upon MarAd's non-debarment decision, which OSG contends that Ms. Fischer was absolutely obligated to follow, among other considerations. AR 1779.

Furthermore, OSG's contention that if Ms. Fischer misstated the status of the audits required by OSG, Inc.'s plea agreement to 33 felonies, it would render her "entire decision

unreasonable," is ridiculous. Memo at 24. Ms. Fischer expended ten single spaced-pages discussing and evaluating numerous aspects of OSG's record of integrity and business ethics, and relied upon 21 references in making her evaluation. See AR 1770-1780. The relevant question for the Court to determine is not whether Ms. Fischer correctly understood the status of every intricacy of OSG, Inc.'s audit program that was mandated by its plea agreement to 33 felonies, but rather, whether Ms. Fischer's decision that she could not affirmatively find that OSG had a satisfactory record of integrity and business ethics was rational.

In fact, Ms. Fischer did not find that OSG, Inc., had not completed what the initial audits required, nor did she make any representations regarding the completeness of the "initial" audits as opposed to the completeness of the audits on OSG, Inc.'s fleet. See AR 1779. She recognized that OSG, Inc., had began its initial audits prior to the mandatory implementation of audits under the ECP required by OSG, Inc.'s plea agreement. AR 1779. The ECP required OSG, Inc., to conduct several different types of audits. AR 1810 ("OSG now boasts a comprehensive multi-layered audit program that consists of a three-phased audit plan, whereby independent third-party auditors are retained, various internal and external audits are conducted, an a court appointed monitoring function provides oversight."). In response to a question from MSC regarding audits at a responsibility meeting dated May 4, 2007, OSG responded that "each ship will be audited once every 36 months by either an external or internal audit group." AR 1802.

It is unclear which audits Ms. Fischer was referring to in her decision. More importantly, OSG has failed to demonstrate that Ms. Fischer's entire responsibility

determination would lack a rational basis if she were incorrect regarding the status of OSG, Inc.'s audit cycle, in light of the substantial amount of evidence and discussion cited in support of her finding that she could not affirmatively find that OSG had a satisfactory record of integrity and business ethics.

D. The Contracting Officer's Mention of 53 Fed. Reg. 19,208 Does Not Render Her Decision Irrational

OSG also contends that Ms. Fischer's decision was irrational because she mentioned 53 Fed. Reg. 19,204, 19,208 (May 26, 1988), which provides:

> A decision not to impose debarment shall be without prejudice to a subsequent imposition of debarment by any other agency.

53 Fed. Reg. 19,204, 19,208 (May 26, 1988). Memo at 33. OSG alleges that because that this language was removed from a more recent version of the regulation, Ms. Fischer's decision was irrational.

However, Ms. Fischer's reference to the regulation could not possibly have been a prejudicial error, because Ms. Fischer was not debarring OSG. All parties are in agreement that Ms. Fischer lacked authority to do so. Nor did Ms. Fischer believe that she was debarring OSG. AR 3444. Ms. Fischer was simply rendering a responsibility determination for the solicitation. Similarly, MSC was not debarring OSG. See AR 3444, 3463-64. As defendant has established *supra* at Section II, debarment is not the same as a responsibility determination. Therefore, OSG has failed to establish that any error prejudiced OSG, such that there was a substantial chance that OSG would receive the award but for the error. See H.W.A., Inc. v. United States, 78 Fed. Cl. 685, 695 (2007).

## X. OSG Has Failed To Establish That Ms. Fischer Treated OSG and USS Unequally

### A. OSG's Attacks Upon The Responsibility of the Awardee, USS, Are Not Evidence of Unequal Bid Treatment

Despite the Court's Orders of October 24, 2007, November 9, 2007, and November 20, 2007 denying OSG's motion to amend its complaint, and holding that OSG lacks standing to challenge the responsibility of the awardee, USS, OSG has included numerous arguments regarding the responsibility of USS in its motion, repackaging its earlier arguments as evidence of unequal bid treatment. Memo at 49-53. First, OSG apparently contends that the fact that Ms. Fischer found that USS had adequate financial resources to perform the contract is evidence that OSG's bid was treated unequally. Memo at 49-53. Next, OSG alleges that because OSG contends that USS's pricing was unbalanced, OSG's bid was treated unequally. Memo at 53-54.

These arguments make no sense. OSG was not found to be a non-responsible offeror because it lacked adequate financial resources to perform the contract, or because its pricing was unbalanced. AR 1766-1783. OSG was found to be a non-responsible offeror for the solicitation because Ms. Fischer could not affirmatively find that OSG had the ability to comply with the required delivery or performance schedule, a satisfactory record of business ethics and integrity, and the necessary operational controls to perform the contract. AR 1766-1783.

Nor did the contracting officer make any assertions regarding the relative financial resources of OSG and USS. In fact, if anything, the record demonstrates that OSG and USS

were treated equally in this regard. Both USS and OSG were asked whether the parent or subsidiary company would be signing the contract, and if not, whether the parent would guarantee the performance of the subsidiary. AR 3506, 3494. OSG simply responded that "OSG Product Tankers, LLC will be signing the contract and the performance will be guaranteed by the parent company." AR 1619. OSG never asked to fund its performance through an escrow account and was told that it could not, or that it was a non-responsible offeror as a result.

Similarly, the contracting officer did not find that the pricing offered by USS was superior to that offered by OSG. In fact, OSG offered the lowest price, and MSC has never contended that USS's pricing was favorable to OSG's. For these reasons, OSG's arguments amount to nothing more than a challenge to the responsibility and pricing of USS, which the Court has previously been found that OSG lacks standing to challenge. However, despite the fact that the Court has already decided this issue upon more than one occasion, OSG simply refuses to cease challenging the responsibility of USS.

B. OSG and USS Were Treated Equally With Regard To Environmental Protection And Felony Convictions

OSG's arguments that the contracting officer engaged in a "dogged pursuit of information" regarding OSG, Inc.'s environmental violations, while treating USS leniently, is simply unfounded. See Memo at 52. In fact, Ms. Fischer treated OSG and USS equally. Although Ms. Fischer had no reason to believe that USS had any issues regarding environmental compliance, she requested that representatives of the Coast Guard and

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

Department of Justice to check whether USS had a record of environmental offenses. AR 3967; see also AR 3971. On May 10, 2007, Ms. Fischer sent a letter to USS Vessel Management, LP asking USS Vessel Management LLC to certify the following:

> that none of the vessels it owns or operates has been cited for violates of the Clean Water Act, violations of MARPOL regulations, or any other regulations regarding environmental pollution. USS is further requested to certify that it is not currently and has not been in the past involved in any criminal investigations or allegations of criminal behavior involving the Coast Guard, Department of Justice, or any other regulatory body. If you are unable to provide such certifications, please provide relevant information and explanation of any non-compliance with law or regulation.

AR 3976. In response, USS provided a written certification as requested, and provided some additional information regarding the environmental history of USS Vessel Management. AR 3995. USS Vessel Management was able to certify that:

> USS Vessel Management LLC certifies that none of the vessels owned or operated, have been cited for any criminal offenses, including but not limited to those you identified. Moreover, none of our vessels has been cited for any unreported or intentional violations of the Clean Water Act, MARPOL regulations or any other violations related to environmental pollution, including maintaining false record or making false statements. I further certify that to the best of our knowledge USS Vessel Management LLC is not currently and has not in the past been involved in any criminal Investigations or allegations of criminal behavior involving the U.S. Coast Guard, Department of Justice, the EPA, or any other regulatory body.

AR 3977. Therefore, the record demonstrates that Ms. Fischer also made efforts to ensure the environmental compliance of the awardee, USS.

C. The Contracting Officer Did Not Treat OSG and USS Unequally With Regard to The Ability To Obtain A Security Clearance; Rather OSG and USS Were Not Similarly Situated

OSG also alleges that USS was "deficient" in regard to its security clearance. Memo at 32. In fact, MSC found that USS was deficient in responding to how it would meet this requirement, not deficient in that it did not presently have a security clearance. AR 3393. The solicitation did not require that the offeror have a security clearance upon making its offer, but rather, be able to receive one within 60 days of award. AR 2992. USS's parent corporation had not been convicted of 33 felonies, and there was no apparent reason that Ms. Fischer or MSC should have been concerned about USS's ability to obtain a clearance.

D. Ms. Fischer Properly Pursued Information Regarding the Environmental Violations Of OSG, Inc., And There Is No Evidence That She Acted In Bad Faith

It appears that OSG also contends that the fact that Ms. Fischer pursued information regarding the 33 felonies of OSG, Inc., is somehow evidence of unequal treatment. See Memo at 52 ("The dogged pursuit of information regarding the environmental violations of one of Product Tanker's ultimate parent companies . . . ."); see also Memo at 29 ( . . . the CO's zeal to paint OSG, Inc., as a bad company . . . ."). However, Ms. Fischer was aware of OSG, Inc.'s crimes and plea agreement as early as January 8, 2007, through a Department of Justice press release dated December 19, 2006. See AR 3187. In light of this, and in light of the offer submitted by OSG, and the relationship between OSG, and OSG, Inc., it is unclear how it would have been appropriate for Ms. Fischer **not** to pursue further information regarding OSG, Inc.'s felonies. Furthermore, if by "dogged pursuit of information," OSG is referring to Ms.

Fischer's responsibility investigation, in which she provided OSG opportunities to provide whatever information OSG believed was relevant, met with OSG and its counsel, and permitted OSG to opportunity to submit responses to written questions, it is unclear how OSG can contend that the investigation was improper. Certainly, OSG would not have preferred that Ms. Fischer simply base her determination upon the Department of Justice press release, without further investigation.

OSG alleges that Ms. Fischer acted improperly and with "zeal to paint OSG, Inc. as a bad company," and that Ms. Fischer blatantly ignored all exculpatory or positive information regarding OSG, Inc. Memo at 20, 38-39. OSG has failed to present evidence sufficient to overcome the presumption that Government officials exercise their duties in good faith. See Galen Medical Assocs., Inc. v. United States, 369 F.3d 1324, 1335 (Fed. Cir. 2004). In fact, Ms. Fischer invested substantial time and resources conducting a proper and thorough responsibility investigation for OSG, pursuant to which she provided OSG the opportunity to present whatever information that OSG believed was relevant.

Furthermore, despite OSG's exaggerated assertions to the contrary, more than one and a half pages of Ms. Fischer's non-responsibility determination is spent discussing positive steps that OSG, Inc. took to improve its environmental compliance after the Government began its investigation of OSG, Inc. See AR 1771-72. The positive steps that Ms. Fischer identified included cooperating with the Government's investigation, increasing management oversight, terminating or taking action against crewmembers involved in the criminal activity, upgrading its equipment, separating environmental and operational budgets, focusing on training, and

implementing the Environmental Compliance Plan (ECP) required by OSG, Inc.'s plea agreement. Id. On a number of occasions, Ms. Fischer complimented OSG, Inc.'s ECP, noting that it was "state-of-the art," and "surpasses any other in industry today." AR 1783. OSG has failed to establish that Ms. Fischer acted improperly, or treated OSG unfairly, and in fact, the record demonstrates that the contrary is the case.[23]

E. The Contracting Officer Did Not Find That OSG, Inc., Was The Only Company That Had Ever Committed An Environmental Crime

In her responsibility determination, in discussing the past failures of OSG, Inc.'s environmental compliance equipment, Ms. Fischer noted:

> it is difficult to resolve the fact that OSG's equipment on the ships at issue (prior to current enhancements), met international standards, yet are blamed as being one of the root causes of the criminal actions (Ref L). If in fact the international standards are insufficient, it would be assumed that environmental noncompliance would be widespread throughout the entire industry. This does not appear to be the case.

AR 1778. Clearly, Ms. Fischer's finding was that the equipment could not have been the sole cause of OSG, Inc.'s crimes. Id. This appears to be a finding that OSG itself agreed with. See AR 1808 ("there was an over-reliance on technological advances"); AR 3815.

However, in its effort to depict Ms. Fischer as a zealot with a vendetta against OSG, OSG has characterized this statement as a finding that OSG, Inc. was a complete outlier for having committed an environmental crime. Memo at 18-19. Not only is this completely

[23] For this reason, in the unlikely event that the Court were to hold that Ms. Fischer's decision lacked a rational basis, there would be absolutely no basis for the Court to order that a different MSC contracting officer evaluate the responsibility of OSG on remand.

inaccurate, but defendant continues to find it offensive that OSG would take the position that it has a satisfactory record of integrity and business ethics because other companies also engage in criminal activity. Memo at 19-20. Of course, OSG has endeavored to depict this position, which is entirely reasonable and justified, as some sort of attempt to evade the fact that other companies have committed crimes. There is no reason for defendant to evade this fact, because Ms. Fischer never found that other companies had not. Instead, she simply found that it did not appear to her that environmental compliance was widespread throughout the industry. AR 1778.

However, OSG, Inc's $37 million plea agreement was, and still is, the largest-ever criminal penalty involving deliberate vessel pollution. AR 1918, 1925, 1934-36. There is no evidence in the record indicating that any of the other offerors had committed or been convicted of felonies relating to pollution. In fact the awardee, USS, was able to certify that no vessels owned or operated by USS Vessel Management, LLC had been cited for any criminal offenses, or unreported or intentional violations of the Clean Water Act, MARPOL regulations, or other violations relating to deliberate vessel pollution, and that USS Vessel Management, LLC, had received a number of awards for environmental excellent. AR 3976-77, 3979.

Regardless, there is no point in arguing the issue of OSG, Inc.'s misbehavior relative to other companies, because Ms. Fischer's actual finding appears to be one that all parties agree upon - that equipment could not have been the sole reason for the crimes. AR 1778. OSG has not demonstrated that Ms. Fischer was making an improper attempt to depict OSG, Inc., as a terrible company, or that she was biased or acting in bad faith

.

XI. OSG Has Not Demonstrated That It Would Have A Substantial Chance of Receiving The Award But For the TRANSCOM Briefing, Because The Contracting Officer Made The Responsibility Determination For OSG, And MSC Awarded The Contract, Not TRANSCOM

OSG further complains about a presentation that MSC made to General Schwartz of the United States Transportation Command ("TRANSCOM") regarding the T-5 Tanker Award on June 12, 2007. Memo at 46-48. OSG asserts that this briefing was made to "obtain approval for the award to USS." Memo at 16. Although TRANSCOM was a customer for the transportation to be provided by the tankers, MSC was responsible for the procurement. MSC and Ms. Fischer did not require or seek approval from General Schwartz to make an award to USS. MSC does not obtain its contracting authority through TRANSCOM, but rather, through the Secretary of the Navy. TRANSCOM was not responsible for selecting or approving the awardee. Furthermore, General Schwartz was not authorized to make a responsibility determination for OSG for the solicitation. Only the contracting officer, Ms. Fischer, was authorized to do so. 48 C.F.R. § 9.103(b).

The briefing was simply made to General Schwartz for informational purposes. MSC was aware that General Schwartz was interested in the award as the Commander of TRANSCOM, which was a customer for the tankers. MSC was also aware that General Schwartz was interested in the award because, prior to the solicitation being issued, General Schwartz sent the Secretary of the Navy a letter on May 15, 2006 regarding the Government's

need for new tankers and OSG, Inc.'s tanker production. AR 2900. This letter, which was entitled "Overseas Shipholding Group Tanker Production Profile," stated that:

> The Overseas Shipholding Group's (OSG) tanker construction profile is highlighted, as well as the likelihood of using some of these tankers to replace our organic capacity.

AR 2899-2900. For this reason, and because General Schwartz is the Commander of TRANSCOM, MSC wished to keep him apprised.

OSG complains that the briefing to General Schwartz contained factual inaccuracies.[24] Memo at 46-47. The actual and alleged factual inaccuracies that OSG complains of have been addressed elsewhere in defendant's brief, and defendant will not address them again here. Furthermore, assuming that each and every statement that OSG alleges was inaccurate was in fact incorrect, OSG has not demonstrated how this would demonstrate"substantial prejudice" by showing that there was a "substantial chance" it would have been awarded the contract but for the errors. See Bannum, 404 F.3d at 1353; Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999). If OSG cannot demonstrate that Ms. Fischer's decision and the subsequent award lacked a rational basis based upon actual and alleged factual inaccuracies, the mere fact that the same actual and alleged factual inaccuracies were presented to General Schwartz would not provide a separate basis to overturn the award.

[24] Again, many of these alleged factual inaccuracies are disagreements regarding conclusions and business judgments. See Memo at 47 ("OSG's Remedial Actions are Unproven;" "Ethical Corporate behavior undemonstrated").

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

## CONCLUSION

For these reasons, Ms. Fischer's determination that she could not find OSG to be a responsible offeror for the solicitation was rational. Accordingly, defendant respectfully requests that the Court deny plaintiff's motion for judgment upon the administrative record, and grant defendant's cross-motion for judgment upon the administrative record.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Tara Kilfoyle
TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972
Attorneys for Defendant

OF COUNSEL
CARA CONLIN
JOEL WEGER
Military Sealift Command
914 Charles Morris Ct. SE
Washington Navy Yard
Washington, D.C. 20398

December 13, 2007

Protected Information to Be Disclosed Only In Accordance with U.S. Court
of Federal Claims Protective Order

Certificate of Filing

I hereby certify that on December 13, 2007, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Tara Kilfoyle