**Agreed Redacted Version**

**BID PROTEST**

**No. 07-561C**
**(Judge Hodges)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**OSG PRODUCT TANKERS, LLC,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant,**

**and**

**USS PRODUCT CARRIERS, LLC,**

**Defendant-Intervenor.**

---

# MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFF'S MOTION OF JUDGMENT ON THE ADMINISTRATIVE RECORD AND ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

---

Constantine G. Papavizas
WINSTON & STRAWN LLP
1700 K Street, N.W., Washington, D.C. 20006
(202) 282-5000, Fax: (202) 282-5100
Email: cpapavizas@winston.com

Of Counsel:
Lawrence I. Kiern
Gerald A. Morrissey III
Bryant E. Gardner
WINSTON & STRAWN LLP
1700 K Street, N.W., Washington, DC 20006
(202) 282-5000, Fax: (202) 282-5100
Email: lkiern@winston.com
gmorrissey@winston.com
bgardner@winston.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

STATEMENT OF THE ISSUES ........................................................................................3

STATEMENT OF THE CASE ........................................................................................3

ARGUMENT ........................................................................................14

I. Summary ........................................................................................14

II. Standard of Review ........................................................................................20

III. MARAD's Debarment Decision Has No Bearing on the CO's Non-Responsibility Determination ........................................................................................21

A. MARAD Did Not Decide Anything With Regard to Plaintiff-OSG's Offer ........................................................................................22

B. Contracting Officers' Responsibility Determination Authority is Unfettered by Debarment Proceedings and Plaintiff-OSG Cites Nothing to the Contrary ........................................................................................22

C. The Law of De Facto Debarments Affirms the Result that a Singular Responsibility Determination is Unaffected by Any Debarment Process ........................................................................................25

IV. Plaintiff-OSG is Estopped from Asserting that it Should Have Been Evaluated As a Separate Entity ........................................................................................26

A. Plaintiff-OSG Represented Itself as an Integral Part of the OSG Group ........................................................................................27

B. Plaintiff-OSG Could Not Have Qualified Under the Solicitation But For the Involvement of Other OSG Entities ........................................................................................30

C. Plaintiff-OSG Should be Estopped from Arguing Now That it is a Separate Entity ....................................................31

V. The CO Had No Choice But to Consider the Business Integrity of OSG as a Whole as Plaintiff-OSG is Controlled by OSG-Parent ..........…...................32

A. Plaintiff-OSG Had to be Controlled by OSG-Parent in Order for it to Qualify Under the Solicitation .............................................33

B. Plaintiff-OSG is in Fact Controlled by OSG-Parent ...................35

VI. The CO Was Required by the FAR to Consider Plaintiff-OSG's Affiliates' Past Performance and Integrity.....................................................36

VII. The Administrative Record Contains More Than Ample Support for the CO's Non-Responsibility Determination ..............................................37

A. The CO's Findings Are Amply Supported by the Record ................37

B. The Assertions that U.S.-Flag Vessels Do Not Violate U.S. Environmental Laws Are False ..............................................42

VIII. The CO Was Well Within Her Discretion in Finding USS Responsible ...........43

A. USS Provided Ample Evidence That is Had Adequate Financial Resources ..............................................................43

B. The CO Was Well Within Her Discretion to Accept USS's Offer ........45

CONCLUSION ..............................................................................46

EXHIBITS

Exhibit A: Plaintiff-OSG Ownership Structure

Exhibit B: Plaintiff-OSG Proposed Vessel Ownership/Leasing Structure

# TABLE OF AUTHORITIES

**Treatises**

E. Sullivan, *The Marine Encyclopaedic Dictionary* at 87 (5th ed. 1996)……………………………4

**Statutes**

46 U.S.C. Ch. 121……………………………………………………………………4 & 33
46 U.S.C. § 50501……………………………………………………………………34
46 U.S.C. § 55102……………………………………………………………………4 & 33

**Regulations**

46 C.F.R. § 67.31……………………………………………………………………34 & 35
48 C.F.R. § 9.000……………………………………………………………………23
48 C.F.R. Subpart 9.1…………………………………………………………………23 & 37
48 C.F.R. Subpart 9.4…………………………………………………………………12 & 24
48 C.F.R. § 15.404-1…………………………………………………………………45
49 C.F.R. Pt. 29………………………………………………………………………12

**Cases**

*Delta Data Systems Corp. v. Webster*, 744 F.2d 197 (D.C.Cir.1984)…………………………20

*EPCo Assoc.*, B-238015, 90-1 CPD ¶ 388 (GAO 1990)…………………………………21

*Harvard Interiors Mfg.*, B-247400, 92- 1 CPD ¶ 413 (GAO 1992)…………………………21

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324
(Fed. Cir. 2001)……………………………………………………………………20

*Inter-Coastal Xpress, Inc. v. United States*, 296 F. 3d 1357 (Fed. Cir. 2002)……………………24

*Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166 (D.C. Cir. 1973)……………………………20

*Lampi Corp. v. American Power Prods.*, 228 F.3d 1365 (Fed. Cir. 2000)……………………32

*Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342 (11th Cir. 1994)……………………20

*Quality Trust, Inc.*, B-289445, 2002 CPD ¶ 41 (GAO 2002)…………………………………25

*Redondo-Borges v. U.S. Dep't of Housing and Urban Dev.*, 421 F.3d 1 (1st Cir. 2005)……….....25

*Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278 (Fed. Cir. 2005)……………………………31

*SPM Mfg Corp.*, B-228078, B-228078.2, 88-1 CPD ¶ 370 (GAO 1988)............................21

*SquirtCo v. Tomy Corp.*, 697 F.2d 1038 (Fed Cir. 1983)..........................................32

*Thomas Creek Lumber & Log Co. v. United States*, 22 Cl. Ct. 559 (1991)........................42

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

| | |
|---|---|
| OSG PRODUCT TANKERS LLC,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant,<br>and<br>USS PRODUCT CARRIERS LLC,<br>Defendant-Intervenor | Civil Action No. 07-561C<br>(Judge Robert H. Hodges, Jr.) |

**MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Defendant-Intervenor USS Product Carriers LLC ("USS") hereby joins the United States in opposing Plaintiff's Motion for Judgment on the Administrative Record and in favor of its Motion for Judgment on the Administrative Record and that filed by the United States because:

(1) The non-debarment decision of the U.S. Maritime Administration ("MARAD") is irrelevant to the Military Sealift Command's ("MSC") non-responsibility determination because MARAD did not even consider whether to debar OSG Product Tankers LLC, the entity that is the plaintiff in this case, and because the law plainly required that the MSC Contracting Officer ("CO") make a responsibility determination independently;

(2) Plaintiff-OSG cannot escape the egregious criminal environmental violations of its parent company and its affiliates. It is estopped from arguing now in a post-hoc

rationalization that it is a separate entity that should have been evaluated separately when Plaintiff-OSG consistently portrayed itself in the procurement as an integral part of the OSG group of companies and could not have technically qualified for the procurement except as an integral part of that group. Plaintiff-OSG is also controlled by law by OSG Shipholding Company, Inc. ("OSG-Parent") unless Plaintiff-OSG is suggesting that it intentionally misrepresented its U.S. citizenship status to MSC, and it is controlled in fact as it is majority owned by OSG-Parent. Finally, if Plaintiff-OSG is not an integral part of the OSG group, then it also misrepresented to MSC its ability to provide the vessels that are at the heart of the procurement as it proposed that the actual operator of those vessels would be an OSG entity other than itself.

(3) The OSG group companies committed heinous environmental violations and paid the largest maritime criminal fine in the history of the United States. The CO gave Plaintiff-OSG multiple opportunities to prove, as it would have to under the FAR requirements governing responsibility, that those environmental violations would not affect its operation of tank vessels carrying U.S. Navy and U.S. Air Force gasoline and that it could be trusted. The CO determined, and was unanimously supported by a group of U.S. Government technical experts, that Plaintiff-OSG could not be trusted. Whatever technical defects there are in the CO's extensive responsibility determination – and we believe there are none – even if all of ones referenced by Plaintiff-OSG are accumulated, they cannot overcome the basic findings of the CO based regarding Plaintiff-OSG's record.

(4) Plaintiff-OSG's sour grapes argument that Defendant-Intervenor's finances were leniently evaluated in comparison to the CO's evaluation of Plaintiff-OSG's

environmental record cannot overcome the basic facts that Defendant-Intervenor was well capitalized and Plaintiff-OSG had a uniquely egregious environmental past.

**STATEMENT OF THE ISSUES**

(1) Whether the U.S. Maritime Administration decided anything of relevance to the determination issued by the CO that Plaintiff-OSG was non-responsible.

(2) Whether Plaintiff-OSG, which portrayed itself in its offer as an integral part of the OSG-Parent and could not have qualified for the subject procurement but for that integration, is estopped from now arguing that it is a separate and distinct entity untainted by the criminal violations of that group of companies.

(3) Whether the Government had sufficient evidence before it to support a non-responsibility determination of Plaintiff-OSG.

(4) Whether Plaintiff-OSG was treated unequally in comparison to the Government's treatment of USS.

**STATEMENT OF THE CASE[1]**

1. ***The Solicitation.*** The MSC issued solicitation No. N00033-06-R-5416 (the "Solicitation") on August 31, 2006 in which it requested proposals from offerors to time charter to MSC up to three vessels. AR-2915 & AR-2930. The form time charter that MSC proposed – referred to as "TANKTIME" ("Tanktime" or "Charter Party") – is the essence of the Solicitation. *See* AR-2917. In Amendment No. 11 to the Solicitation, the MSC revised its requirement to one or two vessels. AR-3146.

[1] Plaintiff-OSG's motion is accompanied by a Proposed Joint Stipulation of Facts. USS disagrees with the characterization of substantially all of the "facts" contained in that Proposed Joint Stipulation as well as the relevance of many of the items included. USS asserts that the essential undisputed facts that support a motion for judgment on the administrative record are contained in its Statement of the Case contained herein.

A "time charter" is a form of maritime lease in which the charterer or lessee (in this case, MSC) obtains use of the vessel's full cargo carrying capacity for a period of time.[2] *E.g.* E. Sullivan, *The Marine Encyclopaedic Dictionary* at 87 (5th ed. 1996). In a time charter, the vessel owner or vessel operator otherwise retains complete and exclusive control of the vessel as confirmed by Tanktime at Clause H-18. AR-2964.

The purpose of the Solicitation was to replace, at least in part, existing, aging, tank vessels "that carry refined oil products, mostly Navy and Air Force jet fuels." AR-2881 & AR-2884.

2. ***Solicitation Requirements.*** The Solicitation contained a series of requirements to ensure that the vessels chartered by MSC qualified for MSC's purpose and to confirm at the outset and over time that the offeror had the requisite tank vessels and the people, experience and resources to operate those vessels to carry Navy and Air Force jet fuels. For example, the Solicitation –

(a) required the vessels offered to be "U.S. Flag, Jones Act compliant, qualified for the US domestic contiguous and non-contiguous coastwise trade" and the offeror was required to warrant that the vessel "shall be Jones Act compliant." AR-2930 & 2994. A U.S.-flag vessel is one documented in the United States and registered with U.S. Coast Guard. *See* 46 U.S.C. Ch. 121. The "Jones Act" refers to section 27 of the Merchant Marine Act, 1920 which restricts the movement of merchandise between points in the United States to U.S.-flag vessels, built in the United States and owned and operated by qualified U.S. citizens. 46 U.S.C. § 55102.

---

[2] According to MARAD's *Glossary of Terms*, a time charter is one where "[v]essels are hired for a specific period of time or a particular voyage in which the ship owner provides the vessel and crew, while the person or persons chartering the ship solicits the cargo."

(b) required that offered vessels "shall be, insofar as due diligence can make them so, seaworthy, properly and efficiently manned and trained, equipped, supplied, and in every way suitable and adequately fitted for and in all respects ready for the service contemplated under this Charter Party." AR-2947 & AR-2941.

(c) required offerors to warrant that the offered vessels "shall have an efficient and legally sufficient complement of Master, Officers, and crew with adequate training and experience in the operation of all of the Vessel(s) equipment." AR-2931.

(d) required offerors to warrant that the vessels would be in compliance with a number of regulatory standards including the International Safety Management Code ("ISM Code") and that the vessels would be entered into the Oil Company International Marine Forum ("OCIMF") database, comply with OCIMF guidelines and have the vessels entered into the Ship Inspection Reporting System ("SIRE"), a database of OCIMF vetting inspections. AR-2930. Acceptance into SIRE, "hinges on the owner/operator's reputation and record within SIRE and similar vetting regimes." AR-3030.

(e) required offerors to maintain marine insurance coverage including Protection and Indemnity ("P&I") Pollution liability coverage with an "underwriter providing first class security, the standard coverage of U.S. $500-million plus an additional U.S. $1-billion oil pollution coverage." AR-2956.

(f) required offerors to submit evidence of a commitment from a U.S. shipyard for the construction of qualified vessels if newly built vessels were offered. AR-3127. The Solicitation also required that the offeror "include documentation to support a financial commitment/agreement with any other entity(ies) who will provide the financial resources necessary to ensure timely delivery of vessel(s) proposed under this solicitation." AR-3127.

(g) required offerors "to have a facility clearance up to Secret level." AR-2934.

3. ***Solicitation Criteria for Evaluation of Offers.*** The Solicitation provides that award would be made "to the responsible offeror(s), with satisfactory past performance, whose technically acceptable proposal, conforming to the solicitation, represents the lowest overall price to the Government, price and price related factors considered." AR-2994.

With regard to past performance, the Solicitation provides that "[o]fferors will be evaluated on their performance under existing and prior contracts (both Government and commercial) for similar services and as otherwise detailed in the solicitation." AR-2995. To facilitate evaluation of past performance, the Solicitation required each offeror to "provide a list of present and past contracts" and whether offeror was the prime or subcontractor on those contracts. AR-2991.

4. ***Offers Submitted.*** MSC received six offers in response to the Solicitation. AR-3264 . Discussions were held with Ocean Shipholdings, Inc., Seabulk Tankers, Inc., Keystone Ocean Services, Inc., USS and Plaintiff-OSG. Only two offers – those submitted by USS and Plaintiff-OSG – were found technically acceptable. AR-3573 .

5. ***Plaintiff-OSG's Offer.*** Plaintiff-OSG's offer does not describe characteristics attributable to Plaintiff-OSG. Rather, it describes characteristics attributable to either OSG-Parent or other subsidiaries of OSG-Parent. For example, Plaintiff-OSG's offer:

(a) contained a description of the business of OSG-Parent, the ultimate parent company of Plaintiff-OSG, including claiming that OSG-Parent "is a market leader in global energy transportation services" and that it "owns and operates an International Flag and U.S.

Flag fleet of 90 vessels." AR-1652. Plaintiff-OSG's offer does not contain a "Corporate Profile" of Plaintiff-OSG. AR-1652-1764.

(b) indicated that the corporate profile of OSG-Parent is contained in its offer because "OSG's experience . . . is the key to ensuring that OSG meets and exceeds their customer's expectations" and "[b]ecause of this experience, we are able to provide MSC an extensive knowledge base in both commercial and military operations that is unmatched in the industry." AR-1653. Plaintiff-OSG's offer did not have a description of the experience or knowledge base of Plaintiff-OSG. AR-1652-1764.

(c) indicated: "For your further guidance we have enclosed a corporate profile of OSG's U.S. Flag Strategic Business Unit (Enclosure Two)." AR-1653. Enclosure Two does not indicate whether Plaintiff-OSG is part of that "Business Unit" or when that "Business Unit" was formed.[3] AR-1661-72. The first biography contained in Enclosure Two is that of [redacted], Senior Vice President and Head of Shipping Operations for OSG-Parent. AR-1665.

(d) contained an exposition of OSG-Parent's compliance programs, policies and plans presented to show Plaintiff-OSG's "familiarity with industry practices and applicable statutes." AR-1653-59.

(e) indicated that "[t]he Head of Shipping Operations holds ultimate responsibility for all health, safety and pollution-prevention matters" for Plaintiff-OSG. AR-1657. The "Head of Shipping Operations" is Captain Robert E. Johnston, an employee of OSG-Parent. AR-1665 & 1863.

---

[3] In its pleadings (Proposed Joint Stipulation of Facts at ¶ 2), Plaintiff-OSG states that it is in fact part of the U.S.-flag business unit, but the Administrative Record does not indicate that Plaintiff-OSG ever made that representation to MSC.

(f) indicated that the offered vessels would be "owned by a U.S. leasing company subsidiary of American Shipping Corporation, an affiliate of APSI [Aker Philadelphia Shipyard, Inc.]" in an attempt to show Plaintiff-OSG's "[b]usiness plan with US Shipyard and construction schedule . . . meets the Government's requirement." AR-1660. Further indicated that each owner would then "bareboat" its vessel to "one of ten wholly-owned subsidiaries of Overseas Shipholding Group ("OSG")" and "[t]he Vessels, in turn will be time chartered to OSG Product Tankers LLC [OSG Sub]." *Id.*

(g) listed its address as "666 Third Avenue, New York, NY," which is also OSG-Parent's address. *E.g.* AR-1691 & 1697.

(h) contained copies of certificates indicating compliance with terms of the Solicitation that are in the name of OSG Ship Management, Inc., a subsidiary of OSG-Parent. AR-1715-16, 1757, 1759, & 1761.

(i) listed a New York address on "DD Form 254, Contract Security Classification Specification." AR-4335.

(j) contained a copy of a Quarterly Report on Form 10-Q submitted to the Securities and Exchange Commission for OSG-Parent as evidence of the "Corporate Viability" of Plaintiff-OSG. AR-4352. The Form 10-Q reports financial results for a "U.S. Segment" of OSG-Parent which is consolidated into the overall results of OSG-Parent. AR-4389-90 & 4352-4407. Nothing was submitted indicating that Plaintiff-OSG has ever had financial results.

(k) submitted copies of, among other things, an "OSG Ship Management, Inc. Licensed Deck Officers' Handbook" and a "Memorandum of Understanding between OSG Ship Management, Inc. and District No. 1-PCD, MEBA," a U.S. citizen maritime officers' union, as

evidence of its "Collective Bargaining Agreements" and its ability to crew the offered vessels. AR-4494 & 4508.

(l) indicated, among other things, that "OSG America, Inc. is committed to maintaining the highest quality standards in managing vessels . . ." in response to MSC's Issues for Discussion on required vetting certificates. AR-1763.

(m) responded with a "Maintenance Plan" which commences with the sentence: "OSG Ship Management, Inc. as an ISO 9002 and ABS SQE certified company has a very extensive maintenance program . . ." when MSC indicated that "[o]fferor needs to provide a narrative of their maintenance policies used to maintain the vessels in a continuous state of readiness." AR-1764.

6. ***USS's Financial Representations.*** USS represented to MSC in its offer and in discussions that:

(a) USS had entered into a contract with the National Steel and Shipbuilding Company ("NASSCO"), a subsidiary of General Dynamics Corporation, for the construction of nine tank vessels, including two offered to MSC. AR-8.

(b) USS is a wholly owned subsidiary of U.S. Shipping Partners, L.P, a publicly traded limited partnership. *Id.*

(c) USS had entered into a joint venture with affiliates of The Blackstone Group and other investors to finance the construction of the first five vessels ordered. *Id.*

(d) the capitalization of the joint venture was [redacted] of which [redacted] was being invested by U.S. Shipping Partners, L.P. and [redacted] was being invested by The Blackstone Group and other investors. *Id.*, 3997 & 4023.

(e) the joint venture had entered into a credit agreement regarding [redacted]. AR-4000.

7. ***OSG's Criminal Violations.*** OSG's criminal violations are a matter of record and entail, for example, the following:

(a) on December 19, 2006, OSG-Parent agreed to plead guilty to 33 felony counts related, as is indicated in the Department of Justice Press Release, to "deliberate vessel pollution from nine ships and false pollution log entries in three additional ships, in six U.S. ports around the nation." AR-1918.

(b) the Department of Justice Press Release further indicated that OSG-Parent would "pay a record $37 million – the largest-ever criminal penalty involving deliberate vessel pollution – and plead guilty to charges related to illegal dumping of waste oil, criminal violations of the Clean Water Act/Oil Pollution Act and the Act to Prevent Pollution from Ships, conspiracy, false statements and obstruction of justice." AR-1918.

(c) Acting Associate Attorney General William Mercer is quoted in the Department of Justice Press Release as follows: "What is more disturbing is that OSG's management failed to uncover or stop this illegal activity after allegations were brought to the attention of management on several occasions and again after the initiation of the government's investigation." *Id.*

(d) the "Government's Sentencing Memorandum in Support of the Plea Agreement" dated March 14, 2007 provides in part:

> Defendant's criminal conduct did not involve a solitary violation that might be explained as a single instance of bad judgment or the acts of a rogue employee. The violations at issue in this case were so systemic, repetitive and longstanding that the criminal conduct amounted to a serious failure of corporate and shore-side management. OSG and its shore-based managers are ultimately

> accountable for this failure. It would not be accurate to suggest that OSG's convictions are due to the bad acts of only a few company employees.

AR-1867 & 1875.

(e) the "Sentencing Memorandum" indicated that "OSG provided meaningful and significant cooperation as set forth in the Joint Factual Statement," although "OSG's cooperation was not unblemished." AR-1867 & 1878.

(f) the "Sentencing Memorandum" further indicated that the sentencing of OSG-Parent needed "to provide general deterrence because OSG's crimes are unfortunately not unique" and "[s]ignificant criminal enforcement actions have been brought involving both U.S. and foreign flag vessels." AR-1880 & 1881.

(g) the "Joint Factual Statement," dated December 15, 2006 and signed by the U.S. Department of Justice and OSG-Parent, indicates that all of OSG-Parent's vessels are owned by a separate wholly owned subsidiary and each is operated by one of six vessel management companies including OSG Ship Management, Inc. and Maritrans Operating Company, L.P. AR-1888-89.

(h) the "Joint Factual Statement" indicates that "[o]ne benefit of Defendant's MARPOL [The International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978, referred to as MARPOL 73/78] related crimes was financial. Costs avoided included paying for the cost of offloading sludge and oily waste in port, and, perhaps most significantly, the time (and related costs) needed to make arrangements to offload waste in port." AR-1890.

(i) a "Plea Agreement" provides, among other things, for a three year probation period during which OSG-Parent was required to maintain an Environmental

Compliance Program ("ECP") with a court appointed monitor. AR-1936. The probation period is scheduled to expire May 24, 2010. *See* AR-4160.

8. ***MARAD's Debarment Decision.*** Contemporaneous with the procurement at issue here, MARAD considered whether to debar OSG-Parent as a result of the OSG criminal violations under the U.S. Government's nonprocurement suspension and debarment rules. AR-1961. MARAD found, among other things, that "[t]he frequency and duration of the wrongdoing and its pervasiveness among high ranking officers who directed subordinates to break the law, are of particular concern since these facts demonstrate a culture that disregards the law with impunity." AR-1962. MARAD also found that although corrective measures were taken by OSG-Parent, "[t]he effectiveness of those measures, however, remains to be seen." AR-1964.

After its review, MARAD's Chief Counsel recommended that MARAD enter into a Settlement Agreement with OSG "in lieu of debarring OSG." AR-1961. The concept of a Settlement Agreement in lieu of debarment was suggested to MARAD by counsel for OSG. AR-2103. That Settlement Agreement provides, among other things, that "[t]he Parties agree that the causes for debarment survive the execution of this agreement," and that the Settlement Agreement related "solely to resolution of suspension and debarment issues under 48 C.F.R. Subpart 9.4 and 49 C.F.R. Part 29, in conjunction with the circumstances recited herein, and in no way waives any criminal, civil, contractual, or administrative remedy or right that the Government may have for the circumstances so described . . . ." AR-4160. The Settlement Agreement was executed on behalf of OSG-Parent and "on behalf of all organizational units" by Robert E. Johnston. AR-4163.

MARAD issued two debarment decisions. In the first dated May 17, 2007, MARAD stated that: "DOJ and Coast Guard also indicated that OSG's significant cooperation in the investigation and self-reporting of half the violations to which they pled guilty should mitigate against debarment." AR-1961. In the second dated June 12, 2007 and labeled "CORRECTED," the preceding quotation was excluded. Complaint Exh. C.

9. ***MSC's Non-Responsibility Determination.*** On April 27, 2007, MSC provided Plaintiff-OSG certain questions regarding OSG-Parent's recent guilty plea and invited Plaintiff-OSG to provide an oral briefing to MSC regarding those questions. AR-1785. The CO also convened a board of five subject matter experts representing MSC, the Coast Guard and the Navy to assist in determining whether Plaintiff-OSG was responsible. AR-1770-71.

A briefing was in fact held on May 4, 2007 (*see* AR-1796 for the minutes to that briefing), and OSG Ship Management, Inc. responded to MSC's April 27 letter in letters dated May 1, 2007 and May 8, 2007. AR-2521 & 1807. Plaintiff-OSG was represented at that meeting by, among others, [redacted]. AR-2073.

On May 17, 2007, the board submitted comments to the CO regarding the materials submitted and the briefing. AR-1957. The board concluded unanimously that although OSG's current environmental programs were outstanding, the remedial actions taken by OSG were unproven, OSG's integrity and business ethics were unproven, OSG's root cause analysis appeared incomplete, OSG did not fully answer questions regarding financial incentives for violating the law, OSG's argument that U.S.-flag vessels were unaffected did not make sense and that the three-year probation imposed on OSG by the Department of Justice had not even started. *Id.*

On June 19, 2007, the CO issued an 18-page single spaced non-responsibility determination for Plaintiff-OSG. AR-3431. The determination concludes:

> As my determination must be based upon information available to me today, not on future expectation, I cannot in good conscience, with the uncertainties that exist, find OSG responsible under the subject solicitation at this time. It should be noted that the instant responsibility determination does not control responsibility determinations of OSG for other solicitations with differing requirements in the future.

AR-3448.

10. ***MSC's Finding of Financial Responsibility for USS.*** On June 20, 2007, the CO issued an affirmative finding of responsibility for USS. AR-3956. In that determination, the CO noted that USS is a subsidiary of a public company, U.S. Shipping Partners LP, with total reported assets of about $276 million in 2005 and that the vessels being constructed for the contract would be financed through a joint venture capitalized at [redacted] which was invested by U.S. Shipping Partners LP. *Id.* The CO also noted that the Defense Contract Audit Agency had recommended that a guarantee be provided by U.S. Shipping Partners, LP of USS's financial resources, but that the information provided by USS regarding [redacted] and funds otherwise available to the joint venture made such a guarantee unnecessary. AR-3957.

## ARGUMENT

### I. Summary

In this case, the CO determined that she could not trust a company to operate tank vessels for the Government to transport aviation fuel that had been convicted of serious crimes in connection with the operation of tank vessels, had paid the largest marine criminal environmental fine in the history of the United States, and was only just beginning a three-year probation with a

court ordered and appointed compliance monitor. The Government's Sentencing Memorandum dated March 14, 2007 indicated that "the facts of this case show":

> that OSG engaged in serious criminal conduct because its crimes involved: deliberate pollution; specific intent to violate the law; a high level of consciousness of guilt; acts of concealment, including discharges at night and creation of false documents; bypassing of required pollution prevention equipment; tampering with monitoring devices and doing so in a way designed to avoid detection; actual and perceived threats by senior supervisory engineers to lower level employees; deliberate and repetitive false statements to port state and flag state authorities; obstruction of justice; a large number of participants; a long duration of criminal conduct; cumulative environmental degradation and threats to the environment including the discharge of large volumes of sludge and oil-contaminated waste; discharges within the territorial sea, contiguous zone and exclusive economic zone of the United States; crimes resulting in economic benefit to OSG; crimes committed during the federal investigation; and failure to establish and maintain an environmentally compliant corporate culture.

AR-1874. Had the CO affirmatively found Plaintiff-OSG responsible under these circumstances, it would have been extraordinary.

Plaintiff-OSG takes several tacks in the face of the undeniable enormity of its criminal convictions. First, it argues that a prior decision by MARAD to enter into a "hair trigger" settlement agreement in lieu of debarment barred, as a matter of law (despite the lack of any applicable statute or regulation or affirmative precedents), the CO from finding Plaintiff-OSG not responsible. Second, it argues that the CO confused Plaintiff-OSG, a subsidiary controlled at all times by the ultimate parent OSG-Parent, with its ultimate parent and affiliates controlled by the parent. Third, it attempts to nitpick the CO's detailed non-responsibility determination claiming that the alleged mistakes undermine the non-responsibility determination despite the wide discretion according responsibility determinations and the lack of anything that undermines the central tenet of the non-responsibility determination – Plaintiff-OSG could not be trusted, in

the CO's judgment, to operate tank vessels for the Government given the undeniable magnitude and nature of its criminal convictions.

Plaintiff-OSG's attempt to constrain, by implication, the fundamental discretion of contracting officers to protect the government from non-responsible offerors must fail. Nothing in the cited regulations states that a decision like that rendered by MARAD prevents contracting officers in other agencies from protecting their agency from an offeror that they cannot in good conscience and in the fulfillment of their oaths find responsible.

Moreover, whereas the FAR is emphatic that a responsibility determination must be made and it is presumed that the prospective contractor is not responsible, the debarment regulations are permissive and discretionary. It is irrational to expect that a discretionary process such as debarment could possibly overshadow responsibility determinations in the absence of express direction from Congress which is lacking.

Plaintiff-OSG asserts that the relationship between a non-debarment decision and subsequent responsibility determinations is a "key policy issue." Transcript of Hearing at 5 (Nov. 14, 2007). Indeed, it is a matter of "policy" – but one that is reserved for, and not yet reached by, the U.S. Congress. In the absence of Congressional direction, Plaintiff-OSG is asking this Court to step into the breach and formulate its own "policy" on the relationship between debarment and responsibility where there is no law to guide the court. That is not a proper role for any court.

Even more importantly, Plaintiff-OSG's argument rests on a small, but momentous, factual miscalculation. According to Plaintiff-OSG's own pleading, it "was not a named party to MarAd's debarment proceeding." Pl. Mem. in Support of M. on the Admin. Record at 35 (hereinafter "Pl. Mem."). If Plaintiff-OSG was not a named party, then MARAD made no

debarment decision with regard to Plaintiff-OSG. It necessarily follows that the CO cannot be bound by a decision that was not made. The CO was free to make up her own mind as to the responsibility of Plaintiff-OSG even if the law is as Plaintiff-OSG represents since MARAD did not decide not to debar Plaintiff-OSG. This Court therefore need not reach Plaintiff-OSG's "policy" argument, since that argument is factually untenable.

Plaintiff-OSG's second argument also disregards the facts. Plaintiff-OSG argues that it should have been evaluated separately from OSG-Parent or any other subsidiary of OSG-Parent, such as OSG Ship Management, Inc. However, not only did Plaintiff-OSG never request that it be evaluated separately, it affirmatively requested just the opposite. The Administrative Record is replete with representations by Plaintiff-OSG referring the Government to the technical expertise, past experience, biographies, labor management agreements, environmental certifications, business plans and other matters to that of OSG-Parent, OSG Ship Management, Inc. or another affiliate of Plaintiff-OSG. Nothing in the Administrative Record indicates that Plaintiff-OSG could have been found technically responsible or be able to show that it had an acceptable past performance record without the benefit of it being an OSG-Parent-controlled subsidiary. Rather, the record indicates that Plaintiff-OSG was an entity without a history, employees, vessels or any existence other than as an entry in the OSG's corporate secretary's record book and a notation in the files of the Delaware Secretary of State. Plaintiff-OSG should not now be permitted to walk away from that body of representations in an attempt to claim that Plaintiff-OSG somehow should not be tainted by OSG-Parent's criminal record.

In fact, the Administrative Record establishes that it would have been *impossible* for Plaintiff-OSG to qualify for the procurement on its own. According to Plaintiff-OSG's own technical offer, it would never be either the owner or the operator of the vessels it was offering to

the U.S. Government. AR-1660. Rather, the vessels would be owned by "a U.S. leasing company subsidiary of American Shipping Corporation, an affiliate of APSI [Aker Philadelphia Shipyard, Inc. – not an OSG affiliate]" and then leased to "one of ten wholly-owned subsidiaries of Overseas Shipholding Group" such that one of those subsidiaries – not Plaintiff-OSG – would operate the vessel. Plaintiff-OSG would time charter the vessels from one of those subsidiaries and in turn presumably sub-time charter the vessels to the Government. As a time charterer, which by definition does not own or operate the vessel, Plaintiff-OSG could not under any circumstance technically qualify for the procurement, which required the offeror to be a vessel operator. The only mechanism for Plaintiff-OSG to qualify was for it to rely upon the experience, resources, capabilities, employees and contracts of OSG-Parent and its affiliates – the very same persons under probation.

Plaintiff-OSG was found not responsible in part because it did not appear to give straight answers to the CO's questions. *E.g.* AR-3440. Plaintiff-OSG is equally evasive in this litigation. Plaintiff-OSG argues to this Court that there is a meaningful difference between it being an *indirect* subsidiary versus a *wholly owned* subsidiary. *E.g.* Pl. Mem. at 26. There is no meaningful difference here. Plaintiff-OSG is, plain and simple, completely controlled by OSG-Parent. The minority investor in Plaintiff-OSG is a non-U.S. citizen and is limited by federal law governing the operation of vessels in the U.S. coastwise trade to a minority interest that *cannot by law* control Plaintiff-OSG. Were it otherwise, Plaintiff-OSG would not qualify under the solicitation requirement that the vessels offered by "Jones Act qualified." It is ironic and telling that Plaintiff-OSG attempts now to sow the same confusion that convinced the CO in part not to take the very significant chance that OSG's troubles were in its past.

OSG's nitpick argument is no better. Pl. Mem. at 15-46. OSG cannot change the fundamentals. There is a ample support in the record before the CO for the following conclusions, among others:

(a) Plaintiff-OSG is an integral part of the OSG group of companies.

(b) The OSG group committed the most serious criminal environmental marine violations in the history of the United States.

(c) The OSG group did not cooperate fully with the U.S. Government in connection with those criminal violations.

(d) The violations indicated a failure of senior OSG management.

(e) OSG cannot to this day provide a reasoned explanation of why the violations occurred.

(f) State of the art equipment has already been tricked or bypassed by OSG crew.

(g) OSG's current environmental compliance program is not yet proven.

Based on these conclusions, and others, and based on the unanimous recommendation of a board of technical advisors, the CO made a judgment that it was too risky for the U.S. Government to have gasoline be transported by tank vessels operated by Plaintiff-OSG. In her words: "I cannot in good conscience, with the uncertainties that exist, find OSG responsible under the subject solicitation at this time." AR-3448. This is not only a very well founded judgment, it is also the type of contracting officer judgment that courts are loath to disturb. Plaintiff-OSG should not be permitted to skate past the consequences of its actions through post-hoc rationalizations and factual misrepresentations.

## II. Standard of Review

To set aside a bid award, the reviewing court must find either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *See Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973). *See also Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1355-1356 (11th Cir. 1994). For the first ground, reviewing courts look to whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," and the disappointed bidder must show "that the award decision had no rational basis." *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-1333 (Fed. Cir. 2001) (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir.1994)). A challenge on the second ground must show "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333 (citing *Kentron*, 480 F.2d at 1169; *Latecoere*, 19 F.3d at 1356).

Absent a finding of no rational basis for a decision or undue prejudice, a reviewing court will uphold a contracting officer's responsibility determination because "judges are 'ill-equipped to settle the delicate questions involved in procurement decisions'" *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 203 (D.C. Cir. 1984) (quoting *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir. 1978)). "Thus, if a reviewing court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Latecoere,* 19 F.3d at 1356 (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301-03 (D.C. Cir. 1971)).

In line with this deferential standard of review, the GAO has upheld responsibility determinations despite the contracting officer's failure to consider all available information. *See Harvard Interiors Mfg.*, B-247400, 92- 1 CPD ¶ 413 (GAO 1992) (although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so). The GAO has also held that while a contracting officer may allow a contractor to rebut adverse evidence, a decision made without this information is not necessarily flawed. *See EPCo Assoc.*, B-238015, 90-1 CPD ¶ 388 (GAO 1990) ("contracting officer may… make a non-responsibility determination based on the existing record, without giving the contractor an opportunity to explain or defend against adverse evidence"). Finally, "[a] determination of non-responsibility is not necessarily impaired if only one aspect of a firm's capability may have been incorrectly evaluated." *SPM Mfg Corp.*, B-228078, B-228078.2, 88-1 CPD ¶ 370 (GAO 1988) (citing *Southwest Marine, Inc.*, B-225559, et al., 87-1 CPD ¶ 431 (GAO 1987)).

## III. MARAD's Debarment Decision Has No Bearing on the CO's Non-Responsibility Determination

Neither the facts nor the law support Plaintiff-OSG's claims that the CO should have been bound by MARAD's decision to enter into a settlement agreement in lieu of debarment. On the facts, this Court need not even reach the issue of whether a prior non-debarment decision should bind a subsequent responsibility decision because Plaintiff-OSG asserts that it was not a named party in the MARAD proceeding thereby making the MARAD decision irrelevant. On the law, and should this Court choose to address this issue, Plaintiff-OSG has failed utterly to provide any authority in favor of its policy theory that a non-debarment decision forecloses a subsequent responsibility determination. Even in its best light, Plaintiff-OSG has merely provided indicators or implications, all of which cannot possibly overcome the irrefutable and

direct mandate in the FAR to contracting officers not to contract with any person who is not clearly responsible.

**A. <u>MARAD Did Not Decide Anything With Regard to Plaintiff-OSG's Offer</u>**

As the Court has already correctly recognized, much of Plaintiff-OSG's argument boils down to a claim of mistaken identity. Ironically, Plaintiff-OSG's argument to this Court suffers from a case of mistaken identity. Plaintiff-OSG claims that MARAD's non-debarment decision binds MSC. Pl. Mem. at 4-14. Plaintiff-OSG also claims that Plaintiff-OSG is a separate and distinct entity from the OSG entities that polluted the water and covered it up and should have been evaluated by the CO as a separate entity. Pl. Mem. at 42-44. If the latter claim is true, then the former claim fails because Plaintiff-OSG was not an entity considered by MARAD in its debarment proceeding according to Plaintiff-OSG. Proposed Joint Stipulation of Facts ¶ 78.

Plaintiff-OSG makes no attempt to hide the fact, apparently without understanding its significance, that it was not a party to the MARAD debarment proceeding. In its papers before this Court stating that "Product Tankers was not a named party to MARAD's original debarment proceeding." Pl. Mem. at 37.

It follows that if Plaintiff-OSG was not evaluated by MARAD because it was not a party to the debarment proceeding, then that debarment proceeding was irrelevant to the CO's decision and to the decision pending before this Court.

**B. <u>Contracting Officers' Responsibility Determination Authority is Unfettered by Debarment Proceedings and Plaintiff-OSG Cites Nothing to the Contrary</u>**

In the face of the undeniable responsibility that every contracting officer must discharge to ensure that the Government is protected against non-responsible contractors, Plaintiff-OSG argues by implication that that responsibility is constrained by the Government's debarment process. Plaintiff-OSG cites no statute, no regulation, no case and no administrative body

decision to indicate that debarment proceedings constrain responsibility determinations. The few bits of authority Plaintiff-OSG cites are all oblique and confirm, if anything, that debarment proceedings do not mandate any particular result with regard to subsequent responsibility determinations even when the facts and circumstances considered are exactly the same in each forum.

Responsibility determinations are governed by FAR Subpart 9.1. 48 C.F.R. Subpart 9.1. FAR 9.100 provides that "[t]his subpart prescribes policies, standards, and procedures for determining whether prospective contractors and subcontractors are responsible." 48 C.F.R. § 9.100. FAR 9.103 mandates that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only." 48 C.F.R. § 9.103(a). The responsibility determination must be made by the contracting officer: "No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." 48 C.F.R. § 9.103(b). In making that determination, it is assumed that the prospective offeror is not responsible: "In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility." *Id.* Among other things, the prospective contractor must "[h]ave a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104-1(d).

Nothing in the FAR Subpart 9.1 indicates that the contracting officer should be guided by potentially related debarment proceedings, much less be bound by them. Plaintiff-OSG cites nothing in FAR Subpart 9.1 to support its position even though FAR Subpart 9.1 is virtually side-by-side with the Subpart 9.4 governing debarments and suspensions and both are treated as a single subject. *See* 48 C.F.R. § 9.000.

The Federal Circuit has held that "[t]he law strongly disfavors repeals by implication." *Inter-Coastal Xpress, Inc. v. United States*, 296 F. 3d 1357, 1370 (Fed. Cir. 2002). The intention to repeal must be clear, and it will be found only where the two provisions are irreconcilable, or the later pronouncement so comprehensively covers the subject matter that it must have been intended as a substitute. *Id.* A decision not to debar is neither irreconcilable with a determination that a bidder is not responsible, nor does the question of debarment wholly occupy the field of responsibility such that there cannot be a finding of non-responsibility where there has been no decision to debar. Debarment is merely one factor to be considered when making a responsibility determination.

FAR Subpart 9.4, which governs debarments and suspensions, similarly does not constrain or supplant responsibility determinations. On the contrary, Subpart 9.4 indicates that debarment/suspension is a tool, a "discretionary action," that can be used to protect the Government when necessary. 48 C.F.R. § 9.402. Whereas a contracting officer cannot, by law, permit a non-responsible offeror to obtain a contract, a contractor need not be debarred even when the causes for debarment/suspension are present. 48 C.F.R. § 9.406-1(a) ("The existence of a cause for debarment, however, does not necessarily require that the contractor be debarred . . .").[4] It follows that a non-debarment decision, which is merely an exercise of discretion, cannot possibly affect or bind a subsequent responsibility determination.

Plaintiff-OSG argues that because a debarment decision by one agency of the Government binds other agencies, so also, a decision not to debar a contractor should prevent other agencies from fulfilling their responsibility determination duties. Pl. Mem. at 4-14. Plaintiff-OSG's argument is misplaced. Although FAR Subpart 9.4 does in fact indicate that a

[4] Moreover, FAR Subpart 9.1 provides that "[t]he debarring official *may* debar" a contractor if a cause for debarment is present. 48 C.F.R. § 9.406-2.

debarment by one agency "shall be effective throughout the executive branch of the Government," it says nothing about decisions not to debar. There simply is no statement indicating that a non-debarment decision has any effect at all. Moreover, given that debarment is a discretionary process, it is illogical to expect that a decision not to debar a prospective contractor – which can be made even if there are ample grounds for debarment – would bind contracting officers in fulfilling their responsibility determinations. Indeed, the MARAD Chief Counsel's recommendation not to debar Plaintiff-OSG admits that there is in fact sufficient basis to debar all members of the OSG group. AR-1962 ("Except for the one count of knowingly discharging a harmful quantity of oil in North Carolina, all of the crimes to which OSG has pled guilty and been sentenced constitute 'cause' for debarment.").

### C. The Law of De Facto Debarments Affirms the Result that a Singular Responsibility Determination is Unaffected by Any Debarment Process

Responsibility determinations intersect with debarment decisions in one sense. Courts and the GAO have recognized that a series of non-responsibility determinations can constitute a "de facto debarment." *E.g. Quality Trust, Inc.*, B-289445, 2002 CPD ¶ 41 (GAO 2002). "A *de facto* debarment occurs when the government uses non-responsibility determinations as a means of excluding a firm from government contracting or subcontracting, rather than following the debarment regulations and procedures set forth at FAR Subpart 9.4." *Id.* Plainly, the single non-responsibility determination, with the invitation by MSC to submit offers for other procurements (*see* AR-3448), does not constitute a *de facto* debarment in this case. *See, e.g., Redondo-Borges v. U.S. Dep't of Housing and Urban Dev.*, 421 F.3d 1, 9 (1st Cir. 2005) ("A single incident is insufficient to establish a pattern or practice of exclusion (and, thus, to establish even a de facto debarment).").

What the intersection of responsibility and debarment shows is that the two spheres are indeed separate except where responsibility determinations are misused to avoid the due process that debarment is supposed to afford. In the absence of such misuse, a responsibility determination stands alone and the contracting officer making that determination need not answer to any other agency. This affirms that the CO did not have to be guided by, much less be persuaded by, MARAD's non-debarment decision.

## IV. <u>Plaintiff-OSG is Estopped from Asserting that it Should Have Been Evaluated As a Separate Entity</u>

Plaintiff-OSG, in its technical offer, its response to CO questions and in connection with its attempt to dissuade the CO from finding it non-responsible, aligned itself closely with OSG-Parent and OSG affiliates, all of whom were expressly subject to the environmental criminal plea agreement. In fact, the Administrative Record is devoid of any instance of Plaintiff-OSG arguing that it should be considered an entity separate and apart from OSG-Parent or OSG affiliates.

Plaintiff-OSG benefited from these representations. Had Plaintiff-OSG insisted that it be evaluated separately from any of its OSG cousins, it would have failed to satisfy virtually all of the Solicitation requirements in that it is merely a paper company without employees, assets, a past history or any other substance. In fact, if Plaintiff-OSG's offer is to be believed, Plaintiff-OSG was not even going to own or operate the vessels offered to the U.S. Government and had it been evaluated separately it would have been found technically deficient on that basis alone.

The concept that Plaintiff-OSG should be considered separately is a post-hoc creation of Plaintiff-OSG's attorneys for the purposes of this case. Having benefited from its representations to MSC, Plaintiff-OSG should be estopped from taking a position before this Court that is diametrically the opposite of those representations.

## A. Plaintiff-OSG Represented Itself as an Integral Part of the OSG Group

The Administrative Record is replete with evidence that Plaintiff-OSG represented itself as an integral part of the group of companies controlled by OSG-Parent. For example:

(a) The technical narrative portion of Plaintiff-OSG's offer contains a "Corporate Profile" of OSG-Parent boasting that OSG-Parent "is a market leader in global energy transportation services" and that it "owns and operates an International Flag and U.S. Flag fleet of 90 vessels." AR-1652. Plaintiff-OSG's offer does not contain a "Corporate Profile" of Plaintiff-OSG since apparently there was none to provide. *See* AR 1652-1764.

(b) Plaintiff-OSG's offer indicates that it provided the "Corporate Profile" of OSG-Parent because "OSG's experience . . . is the key to ensuring that OSG meets and exceeds their customer's expectations" and "[b]ecause of this experience, we are able to provide MSC an extensive knowledge base in both commercial and military operations that is unmatched in the industry." AR-1653.

(c) Plaintiff-OSG's offer also indicates: "For your further guidance we have enclosed a corporate profile of OSG's U.S. Flag Strategic Business Unit (Enclosure Two)." AR-1653. Enclosure Two does not indicate whether Plaintiff-OSG is even a part of that "Business Unit," when that "Business Unit" was formed or which entities comprise the "Business Unit." AR-1661-72. The first biography contained in Enclosure Two is that of [redacted], Senior Vice President and Head of Shipping Operations for OSG-Parent. AR-1665.

(d) To show Plaintiff-OSG's "familiarity with industry practices and applicable statutes," Plaintiff-OSG's offer contains an exposition of OSG-Parent's compliance programs, policies and plans. AR 1653-59. By all appearances, Plaintiff-OSG did not have any compliance programs, policies or plans of its own.

(e) Plaintiff-OSG's offer indicates that "[t]he Head of Shipping Operations holds ultimate responsibility for all health, safety and pollution-prevention matters." AR-1657. The "Head of Shipping Operations" is Captain Robert E. Johnston, an employee of OSG-Parent. AR-1665 & AR-1863.

(f) Plaintiff-OSG claims in this litigation that it is operated separately from an office in Florida. Plaintiff-OSG's offer lists its address, including on its "DD Form 254, Contract Security Classification Specification" (AR-4335), as "666 Third Avenue, New York, NY," which is also OSG-Parent's address. *E.g.* AR-1691 & 1697.

(g) Plaintiff-OSG's offer contains copies of certificates indicating compliance with terms of the Solicitation that are in the name of OSG Ship Management, Inc., a subsidiary of OSG-Parent. AR-1715-16, 1757, 1759, & 1761

(h) As evidence of its "Collective Bargaining Agreements," Plaintiff-OSG submitted copies of, among other things, an "OSG Ship Management, Inc. Licensed Deck Officers' Handbook" and a "Memorandum of Understanding between OSG Ship Management, Inc. and District No. 1-PCD, MEBA," a U.S. citizen maritime officers' union. AR-4494 & 4508.

(i) In Plaintiff-OSG's response to MSC's Issues for Discussion on required vetting certificates, Plaintiff-OSG indicated, among other things, that "OSG America, Inc. is committed to maintaining the highest quality standards in managing vessels . . . ." AR-1763. OSG America, Inc.'s vessels are operated by OSG Ship Management, Inc., a subsidiary of OSG-Parent. AR-1863.

(j) MSC indicated in its Issues for Discussion that "[o]fferor needs to provide a narrative of their maintenance policies used to maintain the vessels in a continuous state of readiness." AR-1735. Plaintiff-OSG responded with a "Maintenance Plan" which commences

with the sentence: "OSG Ship Management, Inc. as an ISO 9002 and ABS SQE certified company has a very extensive maintenance program . . . ." AR-1764.

(k) When Plaintiff-OSG responded to MSC's questions regarding OSG's criminal violations, it did so on "OSG Ship Management, Inc." letterhead in a letter commencing with the sentence: "Overseas Shipholding Group, Inc. (OSG) [OSG-Parent] and its representatives appreciated meeting with you last week to address the Military Sealift Command's ('MSC') questions and concerns relating to the Company's recent plea agreement with the Department of Justice and U.S. Coast Guard." AR-1807.

(l) All of Plaintiff-OSG's responses to MSC's questions regarding OSG's criminal violations refer to compliance and corrective actions taken in response to those violations refer to actions taken by OSG entities other than Plaintiff-OSG. AR-1838.

(j) All three respondents to past performance questionnaires solicited by Plaintiff-OSG provided information about OSG as a whole, not Plaintiff-OSG. AR-3690-93.

The foregoing indicates that Plaintiff-OSG made no effort to distinguish itself in its dealings with the CO. The exact opposite was in fact the case. Plaintiff-OSG marketed itself to MSC as an integral component of a larger OSG whole, the very same larger OSG whole that committed criminal violations and was under probation.

At no point in the procurement process or in its dialogue with MSC regarding its criminal violations did Plaintiff-OSG indicate that it was a separately managed stand-alone entity that merited evaluation on its own merits. In fact, had Plaintiff-OSG done so, it would have been a falsification since Plaintiff-OSG is not a stand-alone entity and is in fact managed and controlled by OSG-Parent.

### B. <u>Plaintiff-OSG Could Not Have Qualified Under the Solicitation But For the Involvement of Other OSG Entities</u>

A prime example of how Plaintiff-OSG could not have technically qualified under the Solicitation if it had been considered as a separate and distinct entity is the fact that Plaintiff-OSG had no vessels to offer and no contractual basis to offer the vessels required by the Solicitation without the benefit of other OSG entities.

To show Plaintiff-OSG's "[b]usiness plan with US Shipyard and construction schedule which meets the Government's requirement," Plaintiff-OSG submitted an enclosure which indicates that the offered vessels would be "owned by a U.S. leasing company subsidiary of American Shipping Corporation, an affiliate of APSI [Aker Philadelphia Shipyard, Inc.]." AR-1660. Each owner would then "bareboat" its vessel to "one of ten wholly-owned subsidiaries of Overseas Shipholding Group ('OSG')." AR-1660. "The Vessels, in turn will be time chartered to OSG Product Tankers LLC [Plaintiff-OSG]." *Id.* Exhibit B to this Memorandum illustrates the leasing chain.

A bareboat charter is a maritime lease in which the person holding title to the vessel, *i.e.* the vessel owner, grants full operational control over the vessel to the bareboat charterer, *i.e.* the vessel lessee. A bareboat charter is akin to an automobile financing lease where the owner of the automobile, the bank, holds title but transfers full control over the vehicle to the lessee.

A time charter is a maritime lease under which the vessel owner or the bareboat charterer grants full use of the cargo carrying capacity of the vessel to the time charterer for a specified time. Under a time charter, the time charterer is not in operational control of the vessel. A time charter is akin to a lease in which a limousine owner agrees to make its vehicle available to a law firm for a year but the limousine owner provides the driver, fuels the vehicle and takes care of its

maintenance. The law firm merely has the right to direct where the limousine goes, who it picks up and the like.

The Solicitation solicits offers from vessel owners or vessel operators to time charter their vessels to MSC. "Statement of the Case – Solicitation Requirements" above. A time charterer of a vessel would not qualify under the Solicitation because such a person would be unable to comply with the Solicitation requirements pertaining to the provision of the vessel without violating the Solicitation's sub-contracting clause. *See* "Statement of the Case – Solicitation Requirements," *supra*.

Plaintiff-OSG attempts to mislead in its pleadings by asserting that Plaintiff-OSG would "ultimately control" the tank vessels to be sub-time chartered to the MSC. Proposed Joint Stipulation of Facts ¶ 28. In fact, Plaintiff-OSG would not control the vessels – they would be controlled by the vessel operator, an unnamed OSG entity. Plaintiff-OSG could not comply with the terms of the Solicitation except in reliance upon its affiliate vessel operator referred to in its technical offer only as "one of ten wholly-owned subsidiaries of Overseas Shipholding Group ('OSG')." Plaintiff-OSG viewed itself as so much of an integral part of the OSG group that it did not even bother to name the actual vessel operator.

### C. <u>**Plaintiff-OSG Should Be Estopped from Arguing Now That it is a Separate Entity**</u>

The Federal Circuit has recognized the doctrine of estoppel, which prevents a party from taking a contrary position to one it took earlier just because his interests have changed, especially if it is to the prejudice of a party who has acquiesced to his former position. *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278 (Fed. Cir. 2005). Although the doctrine of estoppel has been applied predominantly to statements made or positions taken in prior legal proceedings in order

to prevent the litigant from " perverting' the judicial process,'" the process has also been applied more broadly. *Id.* at 1290-91.

For example, in *SquirtCo v. Tomy Corp.*, the Federal Circuit considered an intellectual property claim brought by SquirtCo, the holder of the "Squirt" mark, against Tomy, user of the mark "Squirt Squad." In response to Tomy's argument that SquirtCo's mark should not be allowed to interfere with ordinary language usage of "squirt," the Federal Circuit rejected the assertion as patently inconsistent with Tomy's previous acts attempting to register the mark with the patent agency. 697 F.2d 1038 (Fed Cir. 1983) ("Tomy cannot, on the one hand, assert that Squirt Squad is not descriptive of its goods, which it must do in order to entitle it to registration on the Principle Register, and when opposed, assert that the opposer is interfering with ordinary language usage. This position is wholly inconsistent with Tomy's application.") *See also*, *Lampi Corp. v. American Power Prods.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000) (doctrine also applies to statements made in administrative proceedings that a party seeks to repudiate in a subsequent judicial proceeding, or when it is being used as a means of obtaining an unfair advantage).

Plaintiff-OSG's current position, that it is a distinct and separate entity from the OSG group, is wholly inconsistent with its representations to MSC. Plaintiff-OSG should not be permitted to subvert the judicial process by taking such wholly inconsistent positions.

## V. **<u>The CO Had No Choice But to Consider the Business Integrity of OSG as a Whole as Plaintiff-OSG is Controlled by OSG-Parent</u>**

Plaintiff-OSG repeatedly argues that the CO mistakenly apportioned blame for the criminal violations of other OSG entities to Plaintiff-OSG. *E.g.* Pl. Mem. at 42-43. In connection with this arguments, Plaintiff-OSG asserts that it is an "indirect subsidiary" of OSG-Parent and that none of OSG-Parent's U.S.-flag vessels (versus its foreign-flag vessels) was the

subject of any criminal violations. Plaintiff-OSG misinforms the Court in making this argument and these assertions.

First, Plaintiff-OSG must have been *controlled by law* by OSG-Parent if it were to qualify under the Solicitation condition that all offerors be eligible to operate a U.S.-flag vessel in the U.S. coastwise trade. The only mechanism available under applicable law for Plaintiff-OSG to qualify was for it to be ultimately owned by, and controlled by, an entity – OSG-Parent – that is owned by individual U.S. citizens. Therefore, all entities in the OSG group, including OSG-Parent and the other entities that committed crimes, as well as Plaintiff-OSG, were under the common control of OSG-Parent.

Second, although Plaintiff-OSG is not wholly-owned ultimately by OSG-Parent, it was in fact majority-owned by OSG-Parent. Therefore, Plaintiff-OSG was controlled by OSG-Parent as a matter of fact, and the "indirect" subsidiary distinction is irrelevant in this case.

### A. <u>Plaintiff-OSG Had to Be Controlled by OSG-Parent in Order for it to Qualify Under the Solicitation</u>.

The Solicitation required the vessels offered to be: "U.S. Flag, Jones Act compliant, qualified for the US domestic contiguous and non-contiguous coastwise trade . . ." and the offeror was required to warrant that the vessel "shall be Jones Act compliant." AR-2930 & 2994. A U.S.-flag vessel is one documented in the United States and registered with U.S. Coast Guard. *See* Ch. 121 of the Title 46 of the U.S. Code. The "Jones Act" refers to section 27 of the Merchant Marine Act, 1920 which restricts the U.S. coastwise trade (the transportation of merchandise between two points in the United States) to U.S.-flag vessels constructed in the United States and owned and operated by a qualified U.S. citizen (a "Coastwise Citizen"). 46 U.S.C. § 55102. Thus, the Solicitation required that the offered vessels be owned and operated by a Coastwise Citizen or Coastwise Citizens.

Assuming that Plaintiff-OSG is organized like a corporation,[5] it must be owned 75 percent by U.S. citizens for it to qualify as a Coastwise Citizen. Under the Coast Guard's rules, each tier of ownership in the case of a typical multi-tiered corporate structure must be owned 75 percent by U.S. citizens. Ultimately, the parent entity must satisfy the citizenship requirement by having individual U.S. citizens own at least 75 percent of its stock or through a combination of individuals and entities, each of whom qualifies as a Coastwise Citizen in its own right.

Even if the 75 percent U.S. citizen ownership is satisfied, an entity can be disqualified if it is not in fact controlled by U.S. citizens. *See* 46 U.S.C. § 50501(d); 46 C.F.R. § 67.31. The applicable statute and regulations both make it clear that the U.S. citizen control cannot be compromised through any contract or understanding with a non-citizen. *Id.*

The attached wiring diagram (Exhibit A) shows the ownership structure of Plaintiff-OSG. As is apparent, Plaintiff-OSG has taken advantage of the Coast Guard focus on whether the 75 percent requirement is met at each tier of ownership to grant a non-citizen – Aker American Shipping, Inc. ("Aker") – an overall interest in Plaintiff-OSG of 49 percent.[6] Although not illegal in and of itself, the structure emphasizes rather than detracts from the importance of the citizenship of OSG Product Tankers Corporation. Under its ownership structure, Plaintiff-OSG cannot be a Coastwise Citizen unless OSG Product Tankers Corporation is a Coastwise Citizen and OSG Product Tankers Corporation controls Plaintiff-OSG.

---

[5] Limited liability companies are treated as either partnerships or corporations under the Coast Guard's regulations depending on whether the members have rights similar to partners or stockholders. Plaintiff-OSG could not be organized like a partnership because under the Coast Guard's rules, each of its members would then have to qualify as a U.S. citizen, including Aker American Shipping, Inc., which is not a U.S. citizen for purposes of U.S. maritime citizenship laws.

[6] Aker's beneficial ownership in the overall enterprise is effectively 49 percent (25 percent of OSG Product Tankers LLC plus 15 percent (20 % x 75% = 15 %) plus 9 percent (15% x 80% x 75% = 9 %)).

Because the citizenship requirements require a tracing of ownership to the ultimate beneficial owners of any entity, the citizenship of Plaintiff-OSG depends on the citizenship of OSG-Parent. *See* 46 C.F.R. § 67.31. If OSG-Parent is not a citizen, then none of the intermediate entities between OSG-Parent and Plaintiff-OSG is a citizen and Plaintiff-OSG is not a citizen.

For Plaintiff-OSG to obtain the benefit of OSG-Parent's citizenship, it must be under the control of OSG-Parent. If Plaintiff-OSG is, in fact, under the control of Aker, it is not a Coastwise Citizen and would be ineligible under the terms of the Solicitation.

Plaintiff-OSG's argument, therefore, that it should be considered and evaluated separately from OSG-Parent or any of OSG-Parent's subsidiaries that are also controlled by OSG-Parent misinforms the Court. Plaintiff-OSG was always under the control of OSG-Parent and it was proper at all times for the CO to evaluate Plaintiff-OSG as an element of the larger OSG whole which is controlled by OSG-Parent.

**B. <u>Plaintiff-OSG is in Fact Controlled by OSG-Parent</u>**

Plaintiff-OSG's attempted distinction between "wholly owned" and "indirect" is wrong for another reason. A simple glance at Exhibit A shows that Plaintiff-OSG is in fact majority owned by OSG-Parent. Even after taking into account the tiered beneficial ownership of Aker, OSG-Parent controls 51% of the overall ownership of Plaintiff-OSG. Under every standard of control, whether it be that employed by the Securities Exchange Commission or under generally accepted principles of accounting or common sense, Plaintiff-OSG is controlled by OSG-Parent.

In its offer, Plaintiff-OSG provided a mountain of evidence that it is in fact controlled by OSG-Parent. For example, as evidence of its "Corporate Viability," Plaintiff-OSG submitted a copy of a Quarterly Report on Form 10-Q for OSG-Parent. AR-4352. That Form 10-Q includes

the consolidated financial results of OSG-Parent's entire U.S.-flag business reported as a "U.S. Segment" of OSG-Parent but no financial results for Plaintiff-OSG. AR-4389-90 & 4352-4407. By all appearances, and there is nothing in the Administrative Record to indicate otherwise, Plaintiff-OSG had no financial results of its own to report and it would, in the future, be included within the "U.S. Segment" of OSG-Parent's financial results. This is additional confirmation that Plaintiff-OSG is in fact controlled by OSG-Parent.

Certainly the Justice Department thought so and OSG agreed. The Joint Factual Statement signed by OSG-Parent, by OSG's attorneys and the DOJ, indicates that all of OSG's vessels are controlled by one or another ship management company, all of which "are ultimately owned and controlled by Defendant [OSG-Parent]." AR-1889.

## VI. <u>The CO Was Required by the FAR to Consider Plaintiff-OSG's Affiliates' Past Performance and Integrity</u>

Plaintiff-OSG repeatedly asserts that the CO made a mistake in not evaluating it as a separate entity despite the overwhelming evidence that it portrayed itself as an integral part of the OSG group, it could not have qualified under the Solicitation except as part of the OSG group and it must have been under common control with OSG-Parent to have made the representations it made to MSC about its U.S. citizenship status. Even aside from these points, the CO was required, contrary to Plaintiff-OSG's arguments, to have evaluated Plaintiff-OSG's affiliates by FAR Subpart 9.1 even if Plaintiff-OSG's arguments regarding separateness are valid.

The FAR provides that:

> Affiliated concerns . . . are normally considered separate entities in determining whether the concern that is to perform the contract meets the applicable standards for responsibility. However, the contracting officer *shall consider* the affiliate's past performance

> and integrity when they may adversely affect the prospective contractor's responsibility.

48 C.F.R. § 9.104-3(c) (emphasis supplied).

Even if Plaintiff-OSG were a separate, independent company with its own vessels, resources, employees etc., it would still have been undeniably part of the OSG group in terms of ownership. As such, the past performance and integrity of various members of the OSG group of companies might adversely affect Plaintiff-OSG's responsibility in that, according to Plaintiff-OSG's offer, all OSG entities have the same training, the same environmental compliance program, the same management and operating systems and so forth. For example, Plaintiff-OSG responded as follows to MSC's question "How will the ECP [Environmental Compliance Program] be applied under an MSC contract"? : ". . . it would be difficult for OSG to manage its vessels under differing operating standards." AR-1833. Under the circumstances, the CO was required to consider the past performance of Plaintiff-OSG's affiliates.

## VII. <u>The Administrative Record Contains More Than Ample Support for the CO's Non-Responsibility Determination</u>

### A. <u>The CO's Findings Are Amply Supported by the Record</u>

Plaintiff-OSG attempts to bring down an elephant's worth of negative information about its criminal history with BB gun shots claiming factual errors. *E.g.* Pl. Mem. at 17-27. Its efforts are doomed to failure. Many, if not all, of those shots are misfires in any event as there is support in the Administrative Record for all of the CO's critical findings. Even if all of the shots hit their mark, there would remain ample, undeniable, evidence in the Administrative Record to support the CO's non-responsibility determination.

The following are certain findings in the non-responsibility determination shown together with incontrovertible support in the Administrative Record that more than adequately support that determination:

| ***Non-Responsibility Findings*** | ***Certain Support in the Administrative Record*** |
|---|---|
| (1) "[I]t does not appear that OSG was forthright in divulging all pertinent and necessary information required by the Government." AR-3438. | "OSG's cooperation was not unblemished. For instance, the most significant acts of cooperation . . . occurred after numerous other criminal offenses had already been uncovered by the United States and after representations made to the United States regarding the *M/T Neptune* and *M/T Overseas Shirley* and the current state of Defendant's environmental compliance proved incorrect." Gov't Sentencing Memorandum ("GSM"); AR-1878. |
| (2) "The record further demonstrates that OSG did not always respond to incidents of pollution with due diligence." AR-3438. | (a) "'What is more disturbing is that OSG's management failed to uncover or stop this illegal activity after allegations were brought to the attention of management on several occasions and again after the initiation of the government's investigation.'" DOJ Press Release, AR-1918.<br><br>(b) "While Defendant's disclosures of information were helpful and deserving of significant credit, they were not always sufficient. . . . In other instances, where Defendant had adequate time to conduct a more complete investigation, Defendant did not pursue all leads, determine how long the violations had been ongoing, or determine all who were responsible." GSM; AR-1879. |
| (3) "OSG waited until more than two years after the investigation had begun to engage in self disclosure. This was only after numerous offenses had been uncovered by the Government." AR-3438. | (a) "Criminal violations occurred during the government's investigation." Joint Factual Statement ("JFS"); AR-1890.<br><br>(b) "In response to the oral question 'if OSG put new compliance measures in place in 1005, why were there continuing violations (per JSF) in March 2006?' OSG's oral response was that 'this is a learning experience' and their written response to this question included 'measures |

| | |
|---|---|
| | like these often do not prove immediately effective.'" AR-1958. |
| (4) "To blame these actions on misunderstandings by the crew and actions of third parties rather than acknowledge the role of management is incongruous in light of the JFS [Joint Factual Statement] (Ref. P) which reads ' . . . Defendant's shore-side management failed to provide and exercise sufficient management controls to prevent or detect criminal violations by its employees.'" AR-3439-40. | (a) "While these crew members engaged in the knowing and deliberate violation of the law, Defendant's shore-side management failed to provide and exercise sufficient supervision and management controls to prevent or detect criminal violations by its employees." JFS; AR-1889.<br><br>(b) "While OSG's ship-based employees engaged in the knowing and deliberate violation of the law, Defendant's shore-side management failed to provide and exercise sufficient supervision and management controls and resources to prevent or detect criminal violations by its employees." GSM; AR-1876. |
| (5) "The GSM [Government Sentencing Memorandum] states that the criminal violations could not be attributed to a 'rogue employee,' but were 'systemic, repetitive and longstanding . . . [and] amounted to a serious failure of corporate and shoreside management.'" AR-3440. | "Defendant's criminal conduct did not involve a solitary violation that might be explained as a single instance of bad judgment or the acts of a rogue employee. The violations at issue in this case were so systemic, repetitive and longstanding that the criminal conduct amount to a serious failure of corporate and shore-side management. OSG and its shore-based managers are ultimately accountable for this failure. It would not be accurate to suggest that OSG's convictions are due to the bad acts of only a few company employees." GSM; AR-1875. |
| (6) "[T]he Government noted direct knowledge and actions taken by 'top ship management personnel' (JFS, Ref. P.) and frequent and pervasive wrongdoing by high-ranking officials. (MARAD Memorandum, Ref. S)." AR-3440. | (a) "The frequency and duration of the wrongdoing and its pervasiveness among high ranking officers who directed subordinates to break the law, are of particular concern since these facts demonstrate a culture that disregards the law with impunity." MARAD Debarment Recommendation; AR-1962.<br><br>(b) Regarding "direct knowledge on the part of top ship management personnel" *see* Item 4 above. |
| (7) "Although the Government attributed the incidents to problems with upper management, OSG failed to adequately address the role of its upper management in relationship to the | OSG's "root cause analysis" determined that the causes of criminality were: lack of comprehension of the importance of compliance, crew member feelings that the |

| | |
|---|---|
| criminal activities, and only cited factors found in its root cause analysis (crew misunderstandings and third party inspections) as well as repeatedly citing ethnic and cultural differences between ship's crews and officers." AR-3440. | equipment did not work and that problems brought to the attention of shore-side personnel did not receive attention and that OSG did not have adequate safeguards. AR-1830. |
| (8) "[T]he Government has described 'systemic and pervasive wrongdoing' among high-ranking officers, (Ref. S) and direct knowledge on the part of top ship management personnel, (JFS, Ref. P) . . ." AR-3441. | See Item 6 above. |
| (9) "OSG admittedly cannot identify the reasons behind crewmembers' alterations of environmental equipment . . ." AR-3441. | (a) MSC: "What is the motivation for the crew members to commit these illegal acts and maintain fraudulent documentation?"<br><br>OSG: "This question plagues the entire marine industry. . . . The best determination as to the motivation of the crew members is outlined in the discussion of the root causes . . ." AR-1833-34.<br><br>(b) MSC: "Why are engineers doing this?"<br><br>OSG: "This is a problem throughout the shipping industry and not just at OSG." AR-1798.<br><br>(c) MSC: "It seems coincidental that the crew on various ships devised similar ways to workaround the system. What is your explanation for this common occurrence?"<br><br>OSG: "We still do not completely understand why engineers committed these acts." AR-1805. |
| (10) "It is troubling that even after OSG implemented new compliance measures and conducted a workshop in 2005 to address environmental compliance issues, violations continued after March of 2006 (Ref. P)." AR-3442. | (a) "An observation is that OSG always seemed to be playing catch-up to get a handle on the state of environmental compliance" Board Report to CO; AR-1957.<br><br>(b) The Joint Factual Statement, executed by OSG-Parent, details the violations following the workshop. AR 1894-1912. |
| (11) "While OSG's environmental compliance equipment may be state of the art, which MSC acknowledges, (Ref. R) it does not appear that | The Joint Factual Statement, executed by OSG-Parent, details the repetitive misuse and abuse. AR 1894-1912. |

| | |
|---|---|
| the prior equipment itself was solely responsible for the problem. The information before me indicates repetitive misuse and abuse by the ships' crews and officers. (JFS, Ref. P)." AR-3442. | |
| (12) "OSG still cannot definitively articulate the rationale behind its employees' efforts to evade environmental compliance measures. (Ref. L.)." AR-3442. | See Item 9 above. |
| (13) "In spite of the Court's observation above, ('one benefit of the MARPOL related crimes was financial') OSG has never clearly indicated or admitted, in any of its responses, to a financial incentive for any for [sic] its crimes." AR-3443. | (a) "One benefit of Defendant's MARPOL-related crimes was financial." JFS; AR-1890.<br><br>(b) "OSG profited from its criminal acts by gaining access to United States ports and waters under false and fraudulent pretenses over a period of years." AR-1869.<br><br>(c) "A motive for the crimes was financial . . ." DOJ Press Release AR-1920. |

Many other matters in the CO's non-responsibility determination are matters of judgment. For example, the CO was greatly troubled about the effectiveness of OSG's compliance efforts given the documented failures of those efforts. *E.g.* AR-3440 ("Although the Government attributed the incidents to problems with upper management, OSG failed to adequately address the role of its upper management in relationship to the criminal activities . . ."). The CO was not alone in worrying about this. MARAD's Chief Counsel, in her recommendation cited favorably by Plaintiff, also concluded, with regard to OSG's compliance measures: "The effectiveness of those measures, however, remains to be seen." AR-1964. And the board of technical experts advising the CO concluded: "OSG needs to actively demonstrate, over a period of time, that their company has not only fully incorporated their improvements, but that their corporate behavior shows integrity and the application of good ethical business practices over the long term." AR-1959.

The judgment exercised by the CO based on all the facts before her is exactly the type of judgment that courts should not disturb. *See, e.g., Thomas Creek Lumber & Log Co. v. United States*, 22 Cl. Ct. 559, 567 (1991) ("[I]n making a responsibility determination, the contracting officer must be afforded a wide discretion.").

### B. The Assertions that U.S.-Flag Vessels Do Not Violate U.S. Environmental Laws Are False

Plaintiff-OSG attempts to prove too much by claiming that the marine environmental violations of the type committed by OSG-Parent and its subsidiaries are limited to non-U.S.-flag vessels. *See* Pl. Mem. at 36. The Administrative Record indicates otherwise. The Government's Sentencing Memorandum states, for example: "Significant criminal enforcement actions have been brought involving both U.S. and foreign flag vessels." AR-1881.

Even more importantly, Plaintiff-OSG consistently represented that its U.S.-flag vessels were operated under the same policies, procedures and compliance program as its foreign-flag vessels. *E.g.* AR-1653-59 (containing an exposition of OSG-Parent's compliance programs, policies and plans as those of Plaintiff-OSG); & 1657 (indicating that the overall corporate head of shipping holds "ultimate responsibility for all health, safety and pollution-prevention matters").[7] This was recognized by the board of experts advising the CO reasonably concluded as follows: "[d]uring their oral presentation, OSG stated their organization is 'One OSG' – not divided into US vs. foreign flag . . . ." AR–1959.

[7] OSG in fact admitted that its U.S.-flag standards were not up to par in comparison to its foreign-flag standards: "OSG is currently working with the U.S. unions to enhance the level of training related to environmental compliance to a standard comparable [sic] OSG's training of its international crews." AR 1816.

## VIII. The CO Was Well Within Her Discretion in Finding USS Responsible

### A. USS Provided Ample Evidence That it Had Adequate Financial Resources

Plaintiff-OSG finds error in the CO's evaluation of USS's financial responsibility in comparison to her determination that Plaintiff-OSG was not responsible. Pl. Mem. at 48. The CO's evaluation of USS's financial position was, in fact, thorough and completely commensurate with the circumstances.

Upon learning, based on USS's initial offer, that USS, the actual offeror, was a subsidiary of U.S. Shipping Partners LLP and that financial information had been submitted for U.S. Shipping Partners LLP, the CO asked: [redacted] AR-3506.

In its response, USS explained its corporate structure (something Plaintiff-OSG never did) including providing an organizational chart. AR-8-10. USS indicated that a joint venture, U.S. Products Investor LLC, between itself and The Blackstone Group and other investors, had been formed and that joint venture would finance the construction of five tank vessels to be built by the National Steel and Shipbuilding Company ("NASSCO"), a subsidiary of General Dynamics Corporation. Two of those vessels were offered to MSC. The financing detailed to MSC involved the capitalization of U.S. Products Investor LLC in the amount of [redacted] [redacted] of which would come from USS and [redacted] of which would come from The Blackstone Group and other investors.

In connection with its review of USS's offer, the Defense Contract Audit Agency ("DCAA") performed a "modified financial condition risk assessment on U.S. Shipping Partners, L.P.," the parent company of USS. AR-3964. U.S. Shipping Partners, L.P. "passed" as DCAA

concluded that "[o]ur modified risk assessment did not show indications of significant unfavorable key financial statement trends or events that would warrant the performance of a detailed financial condition risk assessment." *Id.* DCAA notes in its memorandum that it did not evaluate USS or U.S. Products Investor LLC. *Id.* As it did not have financial information to evaluate those entities, DCAA recommended that MSC obtain a corporate guarantee from U.S. Shipping Partners, L.P. if USS received an award. *Id.* DCAA made the exact same recommendation for the exact same reason with regard to Plaintiff-OSG. AR-4172. DCAA was careful to note that its memorandum did not constitute a financial opinion. AR-3964.

With all of this information in hand, MSC's Business Analysis Committee noted that: [redacted] AR-3696. The Committee recommended that [redacted] *Id.*

In her responsibility determination for USS, the CO did more than that and obtained not only evidence that the [redacted] in funds to be invested by U.S. Shipping Partners, LP had in fact been invested, but also obtained evidence of a [redacted] available for the construction of the tank vessels at NASSCO. AR-3775. She reasonably concludes, on that basis, that parent guarantee recommended by DCAA is not required. *Id.*

As much as it appears to pain Plaintiff-OSG, there is nothing untoward about the foregoing. USS provided more than ample evidence of having segregated the resources necessary to construct the vessels to be leased to MSC, and the CO reasonably concluded that such evidence could be accepted in lieu of a parent guarantee. In contrast, and for its own reasons, Plaintiff-OSG hid the ball about where its funds would be obtained from and offered

MSC a parent guarantee as its alternative way of showing that it had adequate financial resources.

**B. <u>The CO Was Well Within Her Discretion to Accept USS's Offer</u>**

Plaintiff-OSG is equally agitated that the CO judged USS's offer acceptable even though it requires higher payments in the first year of the lease than during other periods arguing that it is "in direct contravention of the Solicitation." Pl. Mem. at 53-54. Plaintiff-OSG correctly cites to the Solicitation provision which provides that "[t]he Government *may* reject an offer as non-responsive if it is materially unbalanced," but does not appear to be willing to acknowledge the import of the word "may." *Id.* at 53 (emphasis supplied). Indeed, the *permissive* Solicitation provision is synonymous with the FAR provision which is equally permissive and leaves it to the discretion of the contracting officer whether to accept unbalanced pricing. *See* 48 C.F.R. § 15.404-1(g)(1). Thus, the record demonstrates that while MSC expressed a preference for balanced pricing, such pricing was not mandatory. During the give and take of the procurement process, MSC asked for USS' business assumptions (AR-3395) and was ultimately willing to accept unbalanced pricing. AR-3271. MSC's Price Evaluation Committee Report contains an extensive treatment of its decision to accept USS's offer including balancing the benefits obtained from accepting the offer with whatever detriment unbalanced pricing might entail. AR-3630-3644.[8]

Plaintiff-OSG also snipes about USS's profit margins. Pl. Mem. at 53. The actual overall difference between Plaintiff-OSG's offer and USS's offer is small, [redacted]. Plaintiff-OSG's overall offer totaled [redacted] while USS's offer totaled [redacted]. AR-3644.

[8] Plaintiff-OSG cites an 1823 statute regarding advance payments – 31 U.S.C. § 3324 – without citation to any recent judicial or GAO interpretive authority, apparently to indicate that the FAR provision on unbalanced pricing is constrained by that statute. Pl. Mem. at 53, n. 16. The uncompleted thought does not merit a response.

Although not disclosed to the Court by Plaintiff-OSG, following a thorough price analysis, MSC found that USS submitted a fair and reasonable competitive proposal and USS's [redacted] AR-3638 & AR-3644.

**CONCLUSION**

For these reasons, Plaintiff-OSG's motion for judgment on the administrative record should be denied and USS's motion for judgment on the administrative record should be granted.

Respectfully submitted,

__________/s/_____________

Constantine G. Papavizas
WINSTON & STRAWN LLP
1700 K Street, N.W., Washington, D.C. 20006
(202) 282-5000, Fax: (202) 282-5100
Email: cpapavizas@winston.com

Of Counsel:
Lawrence I. Kiern
Gerald A. Morrissey III
Bryant E. Gardner
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
(202) 282-5000
Fax: (202) 282-5100
Email:
lkiern@winston.com
gmorrissey@winston.com
bgardner@winston.com

Dated: December 13, 2007

Certificate of Filing

I hereby certify that on December 13, 2007, a copy of the foregoing "MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFF'S MOTION OF JUDGMENT ON THE ADMINISTRATIVE RECORD AND ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Constantine G. Papavizas