# In the United States Court of Federal Claims

No. 07-561C
Filed June 19, 2008
Reissued June 30, 2008[1]

| | | |
|---|---|---|
| * * * * * * * | | |
| OSG PRODUCT TANKERS LLC, | * | Post-Award Bid Protest; Cross Motions for Judgment on Administrative Record; RCFC 52.1; Contracting Officer's Authority to Determine Contractor's Present Responsibility; Effect of Non-Debarment Decision on Contracting Officer; Integrity and Business Ethics; Standards for Court's Review of Contracting Officer's Decisions; Duty of Contracting Officers to Treat Contractors Fairly. |
| Plaintiff, | * | |
| v. | * | |
| UNITED STATES OF AMERICA, | * | |
| Defendant, and | * | |
| USS PRODUCT CARRIERS LLC, | * | |
| Defendant-Intervenor. | * | |
| * * * * * * * | | |

John J. Pavlick, Jr., Venable, LLP, Washington, DC, for plaintiff. Lars E. Anderson, William D. Coston, Dismas N. Locaria, Peter A. Riesen, William A. Shook, of counsel.

Tara Kilfoyle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Cara Conlin, Joel Weger, Military Sealift Command, of counsel.

Constantine G. Papavizas, Winston & Strawn, LLP, Washington, DC, for defendant-intervenor. Bryant E. Gardner, Lawrence I. Kiern, Gerald A. Morrissey III, of counsel.

## OPINION

**HODGES**, Judge.

The Military Sealift Command solicited bids in August 2006 for the long-term charter of two T-5 petroleum tankers for the Defense Energy Support Center. The contract required that

[1] This Opinion was issued under seal on June 19, 2008, pursuant to the protective order filed in this case. The parties had an opportunity to advise the court of any "protected information" referred to in the Opinion. Neither party proposed any redactions.

bidders comply with the Jones Act[2] and obtain a SECRET facility clearance. The Government received six bids in November 2006, three of which were technically acceptable. Plaintiff OSG Product Tankers submitted the lowest acceptable bid. However, the contracting officer had concerns about the integrity and business ethics of Product Tanker's parent, Overseas Shipholding Group, and plaintiff's ability to obtain the necessary security clearance. The contracting officer investigated both companies and ruled that plaintiff was not "presently responsible." *See* 48 C.F.R. § 9.104-1 (2006) (standards for finding a contractor "presently responsible"). She awarded the contract to USS Product Carriers. Plaintiff filed a post-award protest in July 2007, claiming various defects in the procurement. USS Product Carriers entered the case as intervenor.

The legal issue is whether a contracting officer may disqualify a contractor for reasons of integrity and business ethics despite the decision of a separate government agency declining to debar the contractor's parent company for similar reasons. That is, does an agency decision *not* to debar a contractor for admitted legal violations prevent a contracting officer from disqualifying the contractor's subsidiary for similar reasons? We grant defendant's motion for judgment on the administrative record for the reasons stated below.

## I. BACKGROUND

Plaintiff Product Tankers is an indirect subsidiary of Overseas Shipholding Group. OSG organized Product Tankers in 2005 to specialize in Jones Act shipping and to separate it from OSG's international operations.[3] OSG waived indictment and pled guilty in December 2006 to thirty-three felony counts. The charges related to environmental violations that occurred between June 2001 and September 2005 involved twelve of its foreign-flag vessels. Three OSG ships failed to maintain accurate oil record books and nine ships engaged "in deliberate discharges of machinery space bilge water . . . oily wastes, and oil residues . . . intentionally circumvent[ing] required pollution prevention equipment." AR 1889.

OSG signed a plea agreement with the Government, which imposed significant fines, a new Environmental Compliance Plan, and organizational probation for three years. The

---

[2] The Jones Act states that the tankers must be owned and crewed by United States citizens and built in the United States. *See* 46 U.S.C. §§ 50501, 55102 (2006). Citizens must own at least seventy-five percent of the corporation. *Id.* § 50501.

[3] Plaintiff's citizenship depends on its parent OSG's citizenship. Overseas Shipholding Group, Inc. owns one hundred percent (100%) of OSG Bulk Ships, Inc., which owns one hundred percent (100%) of OSG Product Tankers Corporation, which owns eighty-five percent (85%) of OSG Product Tankers II LLC, which owns eighty percent (80%) of OSG Product Tankers I LLC, which owns seventy-five percent (75%) of OSG Product Tankers, LLC. Aker American Shipping, a foreign company, owns the minority shares of each company. Thus, OSG Product Tankers is five 'generations' removed from OSG. Taken together, Overseas Shipholding Group controls fifty-one percent (51%) of plaintiff Product Tankers, and Aker American Shipping controls the remaining forty-nine percent (49%). *See* 46 U.S.C. § 12103 (requiring a vessel to be owned by a United States citizen to engage in trade).

probationary period applies to plaintiff Product Tankers, which is subject to the new Environmental Compliance Plan as well. OSG was subject to debarment because of its felony convictions.

The Government designated the Maritime Administration (MarAd) as the lead agency for debarment proceedings against OSG. The debarring official at MarAd reviewed OSG's violations and found cause for debarment.[4] Certain mitigating considerations weighed heavily in OSG's favor, according to MarAd. These factors included OSG's acceptance of responsibility for the violations, its cooperation with government investigators, and its implementation of corrective measures. These considerations weighed heavily in OSG's favor, according to MarAd. OSG agreed to a settlement in lieu of debarment, contingent upon OSG's compliance with the Plea Agreement described above. If OSG violates the Plea Agreement in the future, MarAd will resume the debarment action.[5]

Plaintiff argues that the contracting officer lacked authority to issue a non-responsibility determination based on integrity and business ethics. According to Product Tankers, the Government resolved that issue during the debarment proceedings against its parent company, OSG. Plaintiff asserts that MarAd was the appropriate agency to review OSG's integrity and business ethics and to decide that OSG was presently responsible because it followed the applicable standards of review and considered all relevant factors. Plaintiff claims that MarAd's decision bound all government agencies and therefore preempted, or estopped, the contracting officer's finding of non-responsibility based on the same issues of integrity and business ethics.

Plaintiff also claims that the contracting officer (1) abused her discretion by incorrectly deciding that plaintiff could not obtain a facility clearance; (2) confused plaintiff with its parent

---

[4] 48 C.F.R. § 9.406-1 lists the mitigating and aggravating factors that may influence the debarring official's decision. "The debarring official may consider other factors if appropriate in light of the circumstances of a particular case. The existence or nonexistence of any factor . . . is not necessarily determinative of [a contractor's] present responsibility." 48 C.F.R. § 9.406-1 (2006).

[5] Timeline:

June 2001 – September 2005 – period of OSG violations
March 2002 – OSG became aware of violations
March 2003 – Government began investigation
May 2005 – OSG organized plaintiff OSG Product Tankers
August 2005 – OSG disclosed violations to the Government
Fall 2005 – OSG implemented new compliance measures
August 31, 2006 – Military Sealift Command solicited tanker bids
December 15, 2006 – OSG and Department of Justice signed Joint Factual Statement
December 19, 2006 – OSG pled guilty to felonies
March 21, 2007 – Parties finalized Plea Agreement
May 4, 2007 – Plaintiff made oral presentation to contracting officer
May 18, 2007 – MarAd released debarment memo
June 19, 2007 – Contracting officer found plaintiff non-responsible
July 6, 2007 – Contracting officer chose USS Product Carriers for the contract
July 25, 2007 – Plaintiff filed bid protest in this court

company and made incorrect factual conclusions; and (3) treated plaintiff unfairly and unequally during the bid process. Defendant contends that the contracting officer is free to decide a bidder's responsibility. According to the Government, plaintiff's preemption argument is improper because it relates to policy.

After the Government filed the administrative record, plaintiff filed motions for leave to supplement the record and to file an Amended Complaint. We denied both motions and later motions for reconsideration and for interlocutory appeal as well. *See OSG Prod. Tankers, LLC v. United States*, 81 Fed. Cl. 297, 297 (2008) (Opinion and Order denying certification for interlocutory appeal). This Opinion addresses the parties' cross-motions for judgment on the administrative record pursuant to RCFC 52.1.

## II. LEGAL ISSUES

### A. Jurisdiction and Standing

The Tucker Act grants this court jurisdiction to review bid protests and to "render judgment." 28 U.S.C. § 1491(b)(1) (2006). We review agency decisions pursuant to the standards set forth in the Administrative Procedure Act. *Id.* at § 1491(b)(4). That Act directs the court to "set aside the agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (internal quotes omitted).

A protesting bidder must prove "that it had a substantial chance of securing the award" to establish standing. *Meyers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). The contractor must be an "actual or prospective bidder[] . . . whose direct economic interest would be affected" by winning or losing the contract. *Id.* (quoting *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Product Tankers became an "actual bidder" when it submitted a technically acceptable proposal to the Government. The parties agree that if plaintiff can prove the allegations against the Government, it will win the contract because it presented the lowest acceptable bid. Plaintiff has standing to protest this award.

### B. Standards of Review

Rule 52.1 establishes procedures for considering motions for judgment on the administrative record.[6] A party must meet its burden of proof based on the evidence found in the record. *See, e.g. Cygnus Corp. v. United States*, 72 Fed. Cl. 380, 384 (2006); *Aeolus Sys., LLC v. United States*, 79 Fed. Cl. 1, 5 (2007). This court does not "substitute [our] judgment for that of the agency" in reviewing agency decisions of this nature. *Masai Tech. Corp. v. United States*, 79

---

[6] Rule 52.1 replaced Rule 56.1 in 2006 because Rule 56.1 "applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record. . . . Summary judgment standards are not pertinent to judicial review upon an administrative record." *See* RCFC Rule 52.1. Rules Comm. Note (2006).

Fed. Cl. 433, 442 (2007) (internal quotes omitted). This is particularly true of the issues in this case, where the contracting officer made a determination that a bidder was not "responsible." *See* 48 C.F.R. § 9.104-1. This court reviews such decisions with deference. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 -1335 (noting that "[c]ontracting officers are generally given wide discretion in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination.") (internal quotes omitted); *see also* 48 C.F.R. § 1.602-2 ("contracting officers should be allowed wide latitude to exercise business judgment.").

This court reviews decisions of contracting officers to determine whether they were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(a). A decision that is arbitrary and capricious lacks a rational or reasonable basis. *See Masai*, 79 Fed. Cl. at 441; *Impresa Construzioni*, 238 F.3d at 1332-33. An "award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote*, 365 F.3d at 1351.

A protest challenging the procurement official's rational basis addresses "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id.* (quoting *Impresa Construzioni*, 238 F.3d at 1332-33). An alleged violation of regulation or procedure requires plaintiff to prove that a "clear and prejudicial violation" of a cited statute, regulation, or procedure occurred. *Banknote*, 365 F.3d at 1351; *see also Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 735 (2007) (observing that a "protestor bears the 'heavy burden' of proving the lack of a rational basis or a violation of law by a preponderance of the evidence" in either case).

C. Contracting Officer's Duties

Contracting officers are responsible for ensuring that government contracting programs run effectively. 48 C.F.R. § 1.602-2. Their duties include supervising a contractor's compliance with the contract terms and safeguarding the interests of the United States. *Id.* The Federal Acquisition Regulation (FAR) requires contracting officers to conduct responsibility determinations. *See Id.* § 9.103(b). They must consider many factors before awarding a contract. Price is an obvious factor, but it cannot be the only consideration. A low bid would not benefit the Government if it caused "subsequent default, late deliver[y], or other unsatisfactory performance resulting in additional contractual or administrative costs." *Id.* § 9.103(c).

Contracting officers cannot accept a contract unless they are certain "that all requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met." *Id.* §1.602-1(b). In doing so, they must "request and consider the advice of specialists in audit, law, engineering, information security, transportation, and other fields, as appropriate." *Id.* § 1.602-2(c).

1. Equal and Fair Treatment

The contracting officer must "[e]nsure that contractors receive impartial, fair, and equitable treatment" during the contracting process. *Id.* § 1.602-2(b). Unequal treatment of contractors "goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). An implied contract of fair dealing arises when agencies receive offers in a competitive solicitation. *See Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004).

The contracting officer's obligation to review bids fairly and impartially requires her to treat offerors equally and evaluate proposals without prejudice. *See Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007). If the contracting officer finds the pricing unbalanced, she must evaluate what type of risk, if any, the Government faces, and whether an unreasonably high price for performance would result. *See* 48 C.F.R. §§ 15.404-1(g), 52.215-1(f)(8). A contracting officer may reject a bid if she considers it front-loaded or a high risk for the Government. *See id.* § 15.404-1(g)(3) (noting that a bid may be rejected if "the lack of balance poses an unacceptable risk to the Government."). However, if the contracting officer determines that the proposed prices and the risk are acceptable, she may accept the bid as priced. *See CCL Service Corp. v. United States*, 48 Fed. Cl. 113, 122 (noting that FAR requires "a risk analysis to determine whether award on the basis of an apparently unbalanced offer would result in paying unreasonably high prices" or present unacceptable risks to the Government).

2. Present Responsibility

Procurement officials must satisfy themselves that a bidder is "responsible" before awarding a government contract. *See John C. Grimberg Co., Inc. v. United States*, 185 F.3d 1297, 1301 (Fed. Cir. 1999) (noting that "agencies are charged with the task of awarding contracts only to 'responsible bidder[s]' who are capable of performing the contract"). Responsibility determinations are "practical, not . . . legal determination[s], based primarily on the contractor's suitability for a particular job." *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'r*, 714 F.2d 163, 167 n.18 (D.C. Cir. 1983). A responsibility decision only affects the contractor for a specific contract. *Id.*

The contracting officer evaluates various attributes of the contractor to determine responsibility. The bidder must have adequate financial resources, a satisfactory performance record, a record of integrity and business ethics,[7] and necessary organization, skills, and

---

[7] The Federal Acquisition Regulatory Council issued a rule in December 2000 clarifying what constituted a "satisfactory record of integrity and business ethics." Contractor Responsibility, 65 FR 80,256, 80,256 (December 20, 2000) (stating that the clarification allows "the Government [to] improve the integrity of the contracting process, reduce the risk of fraud or noncompliance, and encourage standards of integrity and compliance with the law."). However, the Council repealed the rule in 2001. Upon reinstating the prior rule, the Council stated:

> [C]ontracting officers will continue to have the authority and duty to make responsibility

production facilities. 48 C.F.R. § 9.104-1. The contractor must qualify for the award and be capable of complying with the agency's schedule.[8] *Id.* A contractor has the burden of proving that it is presently responsible. *Id.* § 9.103(c) ("A prospective contractor must affirmatively demonstrate its responsibility . . . ."); *Id.* § 9.103(b) ("In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility.").

The contracting officer must satisfy herself that plaintiff can meet the requirements of the contract. *See* 48 C.F.R. § 9.105-1(a); *see also John C. Grimberg Co., Inc. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("[T]he contracting officer is the arbiter of what, and how much, information he needs. . . . [A]lthough [he has] the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so."). Thus, a contracting officer may reject a contractor's showing of responsibility as insufficient. She has no duty to return for more support. The amount of information needed to satisfy the contracting officer that a bidder is responsible is also a matter of discretion. *See Bender Shipbuilding & Repair Co., Inc. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002).

## III. DISCUSSION

Plaintiff calls for new limits on the contracting officer's discretion where debarment decisions by other agencies of the Government are involved. However, a contracting officer is the point person for any government contract. FAR requires procurement officers to rule on present responsibility before making a contract award. A decision by a separate government agency for a different purpose should not bind the contracting officer or limit her discretion.

---

> decisions. Agency debarring officials will continue to have the authority and duty to make determinations whether to suspend and debar a contractor. The requirement that contractors must be responsible is statutory. Offerors must have a satisfactory record of integrity and business ethics. . . . Government contracts should be awarded to law-abiding entities. Entities whose behavior reflects negatively on their responsibility have always been subject to scrutiny and the possibility of being disqualified for award of Government contracts. . . . Ferreting out companies who are not responsible has been a responsibility shared by a number of individuals in the Government's contracting process. The FAR Council supports the principle that the Government should do business only with those entities willing and able to comply with the laws enumerated in the December final rule.

Contractor Responsibility, 66 FR 66,986, 66,987-88 (December 27, 2001) (codified at 48 CFR 9.104-1(d)).

[8] The Federal Acquisition Regulation states that an Executive agency may not consider a debarred contractor for any contract "unless the agency head . . . states in writing the compelling reasons" that justify the award. *Id.* § 9.406-1(c). The Excluded Parties List System contains debarred contractors that "are excluded from receiving contracts, and agencies shall not solicit offers from [or] award contracts to [them]." *Id.* § 9.405(a). Contracting officers must review the list after opening received bids and prior to awarding the contract "to ensure that no award is made to a listed contractor." *Id.* § 9.405(d).

The contracting officer made an unusually thorough and determined effort to insure that her responsibility determination was fair and reasonable. The record supports her factual conclusions. She was conscientious and persistent in performing the duties required of her. The record of this case and the arguments of the parties make clear that the Government, acting through its contracting officer, performed admirably in handling this procurement.

A. Plaintiff's Present Responsibility

The contracting officer was concerned about plaintiff's record of integrity and business ethics, particularly in light of OSG's "recent criminal convictions." AR 1771. FAR requires the contracting officer to consider the past performance and integrity of a contractor's affiliate[9] when it "may adversely affect the prospective contractor's responsibility." 48 C.F.R. § 9.104-3(c). She investigated Product Tankers and OSG before making a responsibility determination. She reviewed the Joint Factual Statement,[10] the Plea Agreement, and the Environmental Compliance Plan. She considered the settlement agreement between OSG and MarAd and MarAd's rationale for not debarring OSG. She consulted representatives from the Department of Justice, the Coast Guard, and the Environmental Protection Agency. She sent plaintiff more than thirty questions in an effort to obtain sufficient information.

Plaintiff made an oral presentation before a board of experts whom the contracting officer convened for that purpose. The board included representatives of the Navy, the Coast Guard, and the Military Sealift Command. Its final memorandum expressed doubt concerning plaintiff's integrity and business ethics.

OSG pled guilty to the felony counts in December 2006. MarAd released its decision in May 2007. MarAd will not debar OSG so long as it complies with the Plea Agreement, but the agency can resume debarment proceedings if violations of the Plea Agreement or the new Environmental Compliance Plan occur. The contracting officer concluded that "[t]he shortness of time between the criminal violations and the award . . . does not allow sufficient time for OSG to reestablish a record of integrity and business ethics." AR 1779. The board agreed with the contracting officer that OSG would need time to restore its record.

Plaintiff argues that the contracting officer was wrong to consider the potential impact of an OSG violation of the Plea Agreement. Product Tankers guaranteed that it could obtain the necessary clearances, but the contracting officer thought OSG's completion of its probation without additional violations was uncertain. Such violations could affect plaintiff's ability to obtain a security clearance. Obtaining the necessary clearances was an important consideration in the contracting officer's decision-making process. She could not make an unqualified

---

[9] FAR regards the term 'affiliate' as including a parent/subsidiary relationship in these circumstances. *See* 48 C.F.R. § 403.

[10] OSG and the Department of Justice prepared and signed the Joint Factual Statement prior to OSG's guilty plea.

determination that plaintiff would have the necessary facilities and equipment for the job. Lack of clearances would affect plaintiff's compliance with the performance schedule as well.

B. Contracting Officer's Decision

The contracting officer issued a report in June 2007 to explain her finding of non-responsibility. The eighteen-page report acknowledged that Product Tankers had adequate financial resources to perform the contract, a satisfactory performance record, sufficient organization and experience, and the necessary accounting and technical skills. *See* 48 C.F.R. § 9.104-1.

The contracting officer used ten pages to detail her analysis of plaintiff's record of integrity and business ethics. She considered the remedial measures that OSG instituted, but did not feel that sufficient time had elapsed for the Government to determine the measure's effectiveness. Six months had passed since OSG pled guilty to the charges against it, and MarAd had issued its debarment report only one month earlier.

1. Effect of Debarring Official's Decision

Plaintiff contends that the contracting officer in this case was estopped or otherwise prevented from basing her non-responsibility determination on plaintiff's integrity and business ethics because the debarment proceedings settled this issue for her. That is, MarAd's decision not to debar OSG necessarily included a review of its integrity and business ethics and a determination that OSG demonstrated its present responsibility. Plaintiff maintains that MarAd's decision applied to all federal agencies, so the contracting officer did not have the authority to find plaintiff non-responsible.

Debarment is distinguished from a finding of non-responsibility in that the latter excludes the contractor from a specific contract with a single Executive agency, and the former excludes the contractor from all Executive agency contracts. *See IMCO, Inc. v. United States*, 33 Fed. Cl. 312, 321 (1995) (noting that the contracting officer's non-responsibility determination "is limited to one particular contract, while the [d]ebarment [o]fficial's determination considers the responsibility of a contractor in regard to all its dealings with the government."). The contracting officer's "determinations of responsibility are based upon different factors [from that of the debarment official's] and have different underlying purposes." *Id.* (internal quotes omitted); *see also Peter Kiewit*, 714 F.2d at 167 n.18 (noting that "differences in focus, criteria, scope, and decisionmaking personnel make the present responsibility and debarment decisions entirely independent of each other.").

Debarment is a discretionary government sanction that excludes a contractor from contracting with the government for a "reasonable, specified period," usually up to three years. 48 C.F.R. §§ 2.101, 9.402(a), 9.406-4(a)(1). "The purpose of debarment . . . is to protect the government from unscrupulous or irresponsible contractors . . . and to safeguard the integrity of government contracting and programs." Steven D. Gordon, *Suspension and Debarment from Federal Programs*, 23 Pub. Cont. L.J. 573, 581 (1994). The debarring agency may decide not to debar the contractor even if a cause for debarment exists. 48 C.F.R. § 9.406-1(a). Debarment

should be "imposed only in the public interest for the Government's protection and not for purposes of punishment." *Id.* § 9.402(b).

The Government "may debar a contractor for a conviction of or civil judgment for . . . falsification or destruction of records, making false statements . . . [or committing] any other offense indicating a lack of business integrity or business honesty that seriously and directly affects the [contractor's] present responsibility." 48 C.F.R. § 9.406-2(a). Additional causes for debarment are breach of a government contract "so serious as to justify debarment"[11] or other causes "so serious or compelling a nature that it affects the present responsibility of the contractor . . . ." *Id.* § 9.406-2 (b-c).

The debarring official may consider mitigating factors and a contractor's remedial measures prior to making the debarment decision; however, he must "afford the contractor . . . an opportunity to submit . . . information and argument[s] in opposition to the proposed debarment."[12] *Id.* § 9.406-3(b)(1). The "existence or nonexistence of any mitigating factors or remedial measures . . . [are] not necessarily determinative of a contractor's present responsibility." *Id.* § 9.406-1(a). "If a cause for debarment exists, the contractor has the burden of demonstrating . . . its present responsibility and that debarment is not necessary." *Id.*

The Federal Acquisition Regulation does not mention what actions a contracting officer should take if a contractor's parent is *not* debarred. The regulations do not suggest that we consider an affiliate's "non-debarment" when reviewing a responsibility determination.

---

[11] Acts such as "[w]illful failure to perform . . . [having] a history of failure to perform, or of unsatisfactory performance of, one or more contracts." 48 C.F.R. § 9.406-2(b)(1)(i)(A-B).

[12] The mitigating factors and remedial measures the debarring official should consider are whether the contractor:

> (1) . . . had effective standards of conduct and internal control systems in place at the time of the activity . . . . (2) . . . brought the activity . . . to the attention of the appropriate Government agency in a timely manner. (3) . . . fully investigated the circumstances surrounding the cause for debarment and, if so, made the result of the investigation available to the debarring official. (4) . . . cooperated fully with Government agencies . . . . (5) . . . agreed to pay all criminal, civil, and administrative liabilit[ies] . . . [and] to make full restitution. (6) . . . [took] appropriate disciplinary action against the individuals responsible for the activity . . . . (7) . . . agreed to implement remedial measures . . . . (8) . . . agreed to institute new or revised review and control procedures and ethics training programs. (9) . . . had adequate time to eliminate the circumstances within the contractor's organization that led to the cause for debarment. (10) . . . management recognizes and understands the seriousness of the misconduct . . . and has implemented programs to prevent recurrence.

48 C.F.R. § 9.406-1(a).

2. Effect of Plea Agreement Violation

Plaintiff points out that MarAd did not name plaintiff as a party in the debarment proceeding against OSG or charge it with violations. An independent basis for debarment would be necessary for the Government to initiate a debarment action against plaintiff. "Consequently, since the debarment proceeding against OSG, Inc. has no bearing on [plaintiff], the CO's claim that [plaintiff] poses a performance risk . . . is speculative and has no basis in law or the Administrative Record," plaintiff asserts.[13]

Plaintiff is correct that debarment affects a contractor's affiliate only if the debarring official names the affiliate in the action. *See* 48 C.F.R. §§ 9.403, 9.406-1(b) (noting definition of "affiliate" and when the debarring official may include affiliates of the contractor in the proceedings). The Government must give the affiliate written notice and an opportunity to respond. *Id.* § 9.406-1(b). Plaintiff is an affiliate of OSG, and a separate entity under the law. *See* 48 C.F.R. § 9.104-3(c) (stating affiliates of the contractor "are normally considered separate entities" when determining the contractor's present responsibility). Affiliates must have been involved in or affected by the contractor's wrongdoing to be named in the debarment. MarAd did not name Product Tankers in the debarment proceeding against OSG, or give plaintiff written notice that it was included in the action.

Plaintiff was not a party to MarAd's debarment proceeding against OSG. MarAd did not evaluate plaintiff's responsibility or make conclusions concerning plaintiff's business integrity.[14] The contracting officer's non-responsibility decision was independent of MarAd's settlement with OSG. Therefore, plaintiff cannot use the debarment settlement to imply support for Product Tanker's integrity and business ethics. *See IMCO*, 33 Fed. Cl. at 321, *Peter Kiewit*, 714 F.2d at 167 n.18. The Federal Acquisition Regulation requires an independent ruling on present responsibility, and FAR provides the standards for making that ruling.

C. The Contracting Officer's Decision Was Rational

Plaintiff claims that the contracting officer's decision was arbitrary and capricious because of material errors of fact and law, omissions of material information, and baseless assumptions. According to plaintiff, the contracting officer failed to distinguish Product Tankers from its parent company, OSG. Plaintiff asserts that the contracting officer held OSG's criminal actions against plaintiff instead of treating it as a separate entity, and that she applied OSG's negative record of integrity and business ethics against it.

The contracting officer recognized that plaintiff was an entity separate from its parent company, according to defendant, but it points out that plaintiff did not distinguish itself from

---

[13] *See supra* Part III.A.

[14] Neither did MarAd intend to make judgments about OSG's business integrity; it merely agreed to a settlement by which OSG would not be debarred in absence of further violations during the probationary period.

OSG in its bid or during the responsibility determination. Plaintiff would not have met the contract requirements without the history and resources of its parent company, the Government asserts. Therefore, OSG's record of integrity and business ethics is a relevant factor in determining plaintiff's integrity and business ethics.

The contracting officer did not confuse plaintiff with its parent company as plaintiff alleges, despite plaintiff's efforts to bolster its application by blurring the line between its corporate organization and that of its parent. Plaintiff's bid included multiple references to its parent company in an effort to trade on OSG's financial strength.

Product Tankers described itself as having been established in 1948, the year its parent OSG was organized, instead of 2005. Plaintiff used OSG's international offices and its extensive foreign and domestic fleet in its application. It adopted OSG's safety, health, and environmental standards as its own. Plaintiff submitted its bid using OSG's corporate profile. The bid referenced OSG's familiarity with industry practices and regulations, employee-training programs offered by OSG, and OSG's extensive foreign and domestic fleet. Plaintiff listed tankers from the OSG's Strategic Business Unit in its bid, and featured employees of OSG's U.S. Flag Operations Division.

Defendant's invitation for bids called for compliance with International Organization for Standardization (ISO) standards.[15] Plaintiff submitted ISO certificates for quality and environmental management systems that applied to an affiliate, OSG Ship Management, Inc. OSG's quarterly financial report offered support for plaintiff's corporate financial stability.[16] It listed OSG's government contract history to establish past performance.

Plaintiff's correspondence and presentations to the contracting officer and to the expert panel contained citations to OSG's corporate history, financial statements, past contract performances, regulations, standards, and certifications. Despite these references, the contracting officer discussed plaintiff and OSG separately in her report and made clear plaintiff's status as a subsidiary of OSG. She raised the issue as one for discussion during the solicitation process.[17]

The contracting officer addressed Product Tankers during the bid proposal period, but received communications from plaintiff's affiliates during the responsibility investigation. Her list of questions to "OSG Product Tankers, LLC" in April 2007 prompted a response from an

---

[15] The ISO develops and publishes international standards on a variety of subjects for agencies in 157 countries.

[16] The 10-Q is a quarterly report required by the Securities Exchange Commission for publicly held companies.

[17] "OSG has provided financial data for their parent company. Will the parent company (Overseas Shipholding) or the subsidiary (OSG Product Tanker Group, Inc.) be signing the contract? If it is the subsidiary, will the parent company guarantee the performance of the subsidiary?" AR 3494.

officer of "OSG America, Inc." The letter was on "OSG Ship Management" letterhead. AR 2521. The letter from Eric F. Smith, Vice President, Chief Commercial Officer and Head of Government Affairs, OSG America, Inc., began, "Overseas Shipholding Group, Inc. . . . received your letter of April 27, 2007 . . . . OSG will specifically address each of the questions noted in your letter during our meeting on May 4, 2007." *Id.* Plaintiff sent a follow-up letter from "OSG Ship Management" after the meeting: "Overseas Shipholding Group, Inc. . . . and its representatives appreciated meeting with you . . . attached are written responses to the formal questions you posed."[18] AR 1807.

Plaintiff needed OSG's citizenship and seventy-five percent ownership to meet Jones Act requirements.[19] *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 574-575 (1980) (noting that the United States reserved domestic shipping to "vessels [that were] built in this country and owned by its citizens."); *see* 46 U.S.C. § 55102. Without OSG's corporate history and financial support, plaintiff's bid would have been rejected before a responsibility determination by the contracting officer became necessary.

OSG created Product Tankers as a subsidiary in May 2005, apparently to separate it from OSG's legal problems. The record does not contain plaintiff's performance or financial history. Its employees belong to OSG or one of its subsidiaries. The contracting officer noted that there were excessive amounts of information about OSG and a dearth of information about Product Tankers; she had no choice but to consider Product Tankers' qualifications in light of OSG's history. The contracting officer considered factors relevant to plaintiff's relationship with OSG. Her reasoning was entirely appropriate, and we agree with the result.

1. Factual Conclusions

Plaintiff contends that the contracting officer's decision was arbitrary and capricious because she made incorrect factual conclusions regarding OSG's cooperation with the Government. These conclusions related to OSG's senior management, its probation, its internal audits, implementation of its environmental plan, and plaintiff's ability to obtain the requisite facilities clearance. The contracting officer was incorrect in stating that OSG withheld information from the Government for two years, according to plaintiff, because, "the company had no independent knowledge of conduct that required self-disclosure . . . ."

The contracting officer was aware that OSG cooperated with the Government, increased its management oversight, terminated the responsible employees, upgraded its control equipment, separated the operations and environmental budgets, increased its training programs, and instituted the new Environmental Compliance Plan. She detailed other aspects of OSG's history of integrity and business ethics, noting that its cooperation with the Government did not begin until more than two years after the investigation began. She found that cooperation began

[18] The letter also stated that the contracting officer's questions were similar to those MarAd asked in OSG's debarment proceeding. It did not refer to OSG Product Tankers, the plaintiff in this case.

[19] See supra note 3.

after the Government had uncovered numerous other criminal offenses, however, and after OSG had made "certain representations . . . to the United States regarding [other ships] and the current state of [its] environmental compliance proved incorrect." AR 1773.

The contracting officer knew that the Government had commended OSG on its cooperation after the criminal investigation. She noted, however, that MarAd justified its relatively lenient treatment of OSG by that cooperation. "But for [OSG's] significant cooperation in the government's investigation . . . the United States would have sought a substantially larger criminal fine, additional criminal counts of conviction and a longer term of probation." AR 1948.

2. OSG's Management

Plaintiff argues that the contracting officer was mistaken in her view that OSG's management was involved in the violations. According to plaintiff, OSG's management had no direct knowledge of the violations, but "it was the inadequacy of supervision and management controls . . . that contributed to the violations." AR 1829. The contracting officer found a "serious failure of corporate and shore-side management" in the OSG operation because management was not aware of violations within its own company. *See* AR 1774-76. OSG did not take disciplinary action against its shore-side or corporate management. AR 1775. She reported, "OSG did not satisfactorily address its inability to recognize the criminal actions taking place, despite the frequency of the violations, spread across twelve known vessels, over an extended period of time." AR 1776. She added that the new control equipment OSG installed to prevent falsification of the environmental logs was "tricked by senior ship engineers shortly after installation." AR 1777.

The Joint Factual Statement stated, "[d]efendant's shore-side management failed to provide and exercise sufficient management controls to prevent or detect criminal violations by its employees." AR 1775. The contracting officer concluded that OSG's management "failed to adequately address [OSG's] role . . . in relationship to the criminal activities," but blamed misunderstandings by the crew and actions of third parties. *Id.* She noted that the violations "continued to occur even after new compliance measures were implemented and after OSG conducted a workshop for crew members on this topic . . . ." AR 1777.

3. Facility Security Clearance

The contract required a facility clearance through the level of SECRET. Plaintiff complains that the contracting officer treated it unfairly regarding the facilities security clearance requirement because she "unreasonably determined that . . . the past violations of environmental laws by some of OSG, Inc.'s foreign-flag vessels" would affect plaintiff's ability to obtain a facilities security clearance. According to Product Tankers, the contracting officer's decision regarding plaintiff's ability to obtain a facility security clearance lacked a rational basis, both factually and legally. Plaintiff believes the decision was factually irrational because the contracting officer relied on incorrect information; it was legally irrational because the Federal Acquisition Regulation does not govern facility clearances.

The contracting officer evaluated plaintiff's ability to obtain the necessary facilities security clearance because without it, plaintiff would not have proper facilities and equipment. *See* 48 C.F.R. § 9.104-1(f) ("To be determined responsible, a prospective contractor must . . . [h]ave the necessary production, construction, and technical equipment and facilities, or the ability to obtain them . . . ."). Plaintiff could not complete the job on time without such access. The contracting officer need not be 'absolutely certain' whether plaintiff could have obtained the clearance, but she must "possess or obtain information sufficient to be satisfied that [plaintiff could] currently meet[]" the standard. 48 C.F.R. § 9.105-1(a).

The National Industrial Security Program Operating Manual governs facility clearances. That manual states, a "parent must have [a facility clearance] at the same, or higher, level as the subsidiary. However, the [authorizing agency] will determine the necessity for the parent to be cleared or excluded from access to classified information." NISPOM § 2.109 (2006). A subsidiary may obtain a clearance when its parent does not have one, but this is not the general rule. Contracting officers should not rely upon an exception occurring when making a responsibility determination. *See* 48 C.F.R. § 1.602-1(b) ("No contract should be entered into unless the contracting officer ensures that all requirements of law, . . . regulations, and all other applicable procedures, including clearances and approvals, have been met."); *see also* C.F.R. § 1.602-2 ("Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States . . . .").

The contracting officer contacted the Defense Security Service, which informed her that a company with multiple fraud convictions could have difficulties in obtaining a clearance. From that information, she concluded that "the Government cannot assume that OSG will be able to obtain the Secret Facilities Clearance required for performance under this contract; therefore, I cannot be certain that OSG will be able to provide the required facility (vessels) for this procurement." AR 1780. Plaintiff's parent company had pled guilty to thirty-three felonies and did not have a current facility clearance; her conclusion was a reasonable one.

D. The Contracting Officer Treated Plaintiff Fairly

Product Tankers complains that the contracting officer treated it unequally and unfairly in comparison with other bidders. A contracting officer may not treat contractors differently. Unequal treatment "goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process . . . ." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). Such treatment would be an abuse of a contracting officer's discretion.

According to Product Tankers, the contracting officer applied unequal standards when she analyzed the bidders' financial resources and when she ignored intervenor's unbalanced pricing schedule. Moreover, she used different standards to evaluate the contractors' ability to obtain a facilities security clearance. Plaintiff's argument in this regard depends on an

evaluation of intervenor USS Product Carrier's financial resources, its pricing structure, and its ability to obtain the facilities clearance.[20]

The Government points out that the contracting officer did not make negative comments regarding plaintiff's financial resources. The contracting officer recognized that plaintiff submitted the lowest bid, and that the average price for other bidders fell within Government estimates. The contract did not require the contractor to have the security clearance before making its offer, but did require the contractor to obtain the clearance within sixty days of the award.

Three bidders were subsidiaries of other companies. The contracting officer asked them for the same information. That is, "[w]ill the parent company . . . or the subsidiary . . . be signing the contract? If it is the subsidiary, will the parent company guarantee the performance of the subsidiary?" AR 8, 1619, 3391. Plaintiff responded that it would sign the contract and its parent, OSG, would guarantee performance. Intervenor USS Product Carriers replied that one affiliate would sign the contract and another affiliate had obtained financing for construction of the vessels. Intervenor also had access to a multi-million dollar revolving credit facility if needed. AR 8-10.

Two other offerors were still in consideration when plaintiff submitted a corporate guarantee from its parent company, OSG. One offeror provided a corporate guarantee from its parent company; the other submitted a letter of commitment from two commercial banks for necessary working capital. All four companies had adequate financial resources to perform the contract according to the contracting officer. She did not apply unequal standards in analyzing plaintiff's financial resources.

The one-year contract included an option to extend for additional years. The contracting officer's Price/Business Evaluation Committee considered the four remaining bids to determine "if the prices proposed [were] materially unbalanced between line items . . . ." *See* 48 C.F.R. § 52.215-1(f)(8). The contracting officer submitted a report[21] to the Evaluation Committee in April 2007 explaining that the prices appeared unbalanced on two proposals because the first-period rates were considerably higher. However, due to lower rates in the later period, the contract's overall average price was in line with the Government's pricing estimates. She noted

---

[20] We ruled earlier in this case that plaintiff does not have standing to challenge USS Product Carrier's responsibility determination. *See OSG Prod. Tankers, LLC v. United States*, 81 Fed. Cl. 297, (2008).

[21] The contracting officer noted that two of the proposals were included only for price comparison purposes because they were technically unacceptable. "[T]wo of the four . . . submitted either incomplete or conditional offers. Specifically, [one] offer did not include a Letter of Intent from a shipyard which rendered their proposal Technically Unacceptable; [the other] made its offer subject to 'approval of [its] Board of Directors, which is expected to be obtained within 60 days'.[sic] Although, these two offers cannot be considered for award, they are included below for price comparison purposes." AR 3633.

that the Government would benefit if it exercised all options under the contract because "the higher first period rates incorporate[d] the risk of a potential 'one year' contract." AR 3634.

The contracting officer concluded that intervenor USS Product Carriers and plaintiff Product Tankers submitted fair and reasonable proposals. In fact, she stated that plaintiff would have received the contract but for its non-responsibility determination. The contracting officer analyzed the bidders' price structures equally and evaluated the proposals without prejudice. *See Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007).

A technical evaluation panel evaluated all bids to determine technical acceptability.[22] "Proposals were evaluated against the established *minimum standards* of acceptability solicited for in [the contract]." AR 3192 (emphasis added). The panel issued two reports to the contracting officer. Bidders could correct technical errors noted in the preliminary report before the panel issued its final evaluation.[23]

The panel concluded that five of the six proposals had the possibility of being technically acceptable. The initial evaluation report gave an opinion on whether the offerors had the ability to obtain the facilities security clearance. If a bidder had not warranted its ability to obtain the personnel and facility security clearances, the panel classified the proposal as 'susceptible to being acceptable' because the offeror could resolve any outstanding issues. Two proposals, including USS Product Carrier's, were susceptible to being acceptable. Plaintiff's was acceptable based solely on its warranted ability to meet the requirement.

The solicitation required that the offeror have a facility clearance. Otherwise, the contract award would be "contingent upon the offeror receiving a facility clearance within 60 days of notice of award." AR 2992. The panel sent the final evaluation memo to the contracting officer in April 2007, supplementing in part its initial evaluation. It found plaintiff technically acceptable in its ability to obtain a facilities clearance. As noted, this judgment relied on plaintiff's assurances that it would apply for and obtain the necessary clearances, not on a thorough investigation into plaintiff's ability to obtain them.

The contracting officer's dissatisfaction with plaintiff's likelihood of obtaining necessary clearances was based on her reasonable and valid business judgment. The contracting officer's analysis regarding plaintiff's ability to obtain necessary clearances was thorough, and her reasoning was sound.

---

[22] Prior to conducting a responsibility determination, the contracting officer must establish that the contractor's bid was technically acceptable. The contract listed evaluation factors: technical requirements, price, and past performance. Only a responsible offeror who had a satisfactory past performance and a technically acceptable proposal that conformed to the solicitation and represented the lowest overall price to the Government could receive the award. AR 2994.

[23] The panel sent the initial memo to the contracting officer on December 22, 2006. OSG pled guilty on December 19, 2006 and did not finalize the Plea Agreement with the Government until March 21, 2007.

IV. Conclusion

The contracting officer found plaintiff not responsible after a careful review of the record. She conducted a thorough investigation, received input from multiple sources, and based her decision on the facts before her. Plaintiff may disagree with the emphasis the contracting officer placed on certain facts, but the record shows that she reviewed the entire record before her and issued a detailed analysis of her conclusions. She used her business judgment to determine that plaintiff was not a responsible contractor. *See, e.g., Bender*, 297 F.3d at 1362 ("[T]he contracting officer made an informed, complicated business judgment based upon ample factual support in the record . . . .").

Plaintiff's case depends on its argument that a contracting officer may not disqualify a bidder on the same grounds that a separate government agency thought insufficient to warrant debarment. Procurement officials are obligated by law to make their own responsibility determinations, however. This contracting officer was not bound by rulings made by other agencies for purposes unrelated to plaintiff's responsibility as a bidder. MarAd's debarment decision did not preempt, control, or prohibit her responsibility decision; she evaluated that information with the same weight as other facts, as she was legally required to.

The contracting officer did not confuse plaintiff with its parent company to plaintiff's detriment, but gave plaintiff every benefit of the doubt during her deliberations. She did not act arbitrarily or capriciously, did not treat plaintiff unequally or unfairly during the bid process, and did not abuse her discretion. She conducted an extensive investigation of the record, with the benefit of expert assistance, and used her business judgment to determine that plaintiff was not a responsible contractor.

We do not substitute this court's judgment for that of a contracting officer making determinations of non-responsibility. We see no problems with her factual conclusions; they were fully substantiated by the record.

Plaintiff's Motion for Judgment on the Administrative Record is DENIED. Defendant's and intervenor's Motions for Judgment on the Administrative Record are GRANTED. The Clerk of Court will dismiss plaintiff's Complaint. No costs. This opinion will be filed under seal. The parties have until June 30 to submit redactions to this court.

s/ Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge